UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND | : | |
| ETHICS IN WASHINGTON | : | |
| 11 Dupont Circle, N.W. | : | |
| Washington, D.C.  20036 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 05-2078 (EGS) |
| | : | |
| U.S. DEPARTMENT OF JUSTICE | : | |
| 950 Pennsylvania Avenue, N.W. | : | |
| Washington, D.C.  20530 | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S MOTION FOR DISCOVERY AND**
**SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Against the backdrop of an unfolding scandal about how and why the government had so drastically reduced the penalty it was proposing for the many years of misconduct by the tobacco industry, plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") filed two Freedom of Information Act ("FOIA") requests with the U.S. Department of Justice ("DOJ") seeking the truth behind the scandal.  DOJ's response to those requests has, itself, been nothing short of scandalous.  DOJ has asked this Court to accept its eight months of delay and obfuscation and argues for the unilateral and virtually unreviewable right to shield all of its documents from the bright light of public scrutiny.  This Court, however, has and should use its inherent discretion to grant plaintiff discovery, as outlined below, to ensure public accountability for DOJ's actions.

## **BACKGROUND**

### **The Underlying Tobacco Litigation**

In 1999, the Department of Justice, on behalf of the United States, commenced a racketeering case against the tobacco industry, including Philip Morris, R.J. Reynolds, Brown & Williamson Tobacco Co., and British American Tobacco.  *See* United States v. Philip Morris, Inc., et al., Civil Action No. 99-2496 (D.D.C.) (GK) (hereinafter "tobacco litigation").  The government's case was based on a 50-year conspiracy by the tobacco industry to defraud the public through deceptive and dangerous advertising and marketing practices.  Id.

Given the severity of the tobacco industry's conduct, DOJ asserted virtually throughout the litigation that the appropriate penalty would be for the industry to fund a comprehensive smoking cessation program at a cost of $130 billion, at a rate of $5.2 billion per year for 25 years.  *See, e.g.*, Myron Levin and Richard Simon, Lawmakers Demand Investigation in Tobacco Case, *Los Angeles Times*, June 9, 2005 (Exhibit 1 to Complaint).  At the end of the litigation, however, on June 7, 2005, DOJ suddenly and inexplicably reduced its proposed penalty by 92%, proposing that the tobacco industry fund only a $10 billion smoking cessation program, at a rate of $2 billion for only five years.  Id.

Following this dramatic and eleventh-hour change in position, evidence came to light suggesting that the government's proposal was the result of improper political influence.  For example, in an internal DOJ memorandum dated May 30, 2006, the leaders of DOJ's trial team, all career government lawyers, argued that the decision to seek only $10 billion in penalties was not based on the facts of the case, would appear to be politically motivated, and would

undermine the government's position in any possible settlement of the case. Eric Lichtblau, Lawyers Fought U.S. Move to Curb Tobacco Penalty, *The New York Times*, June 16, 2005 (Exhibit 2 to Complaint). The trial team's concerns were based, in part, on the fact that the Associate Attorney General had reached his preliminary decision to reduce the proposed penalty "'without reviewing the evidence that supports our factual and legal arguments.'" Id. Moreover, at least two government witnesses have come forward to say they were pressured by senior DOJ officials, including Associate Attorney General ("AAG") Robert D. McCallum, to water down or limit their testimony to be more consistent with the government's latest proposed penalty. *See* Carol D. Leonnig, Expert Witness Says Justice Told Him to Water Down Penalty Recommendation, *The Washington Post*, June 20, 2005 (Exhibit 3 to Complaint); Eric Lichtblau, *The New York Times*, June 16, 2005.

In the face of an ever-increasing public outcry against the government's proposed penalty, AAG Robert D. McCallum took the unusual step of explaining and defending publicly his decision to reduce the government's proposal in an editorial to *USA Today*. Robert McCallum, Remedy is 'Forward-Looking,' *USA Today*, June 9, 2005 (attached as Exhibit A). His editorial attempted to draw support for the proposal from the evidence of record, and respond to those who questioned the motives behind the proposal. Id.

Concerns about whether improper political interference led to the government's sudden reversal in the penalty it was seeking from the Court have continued, however, and Congressmen Henry A. Waxman, Ranking Minority Member of the Committee on Government Reform, and Martin T. Meehan, Democratic Co-Chair of the Congressional Task Force on Tobacco and Health, requested that DOJ's Inspector General initiate an investigation into those concerns. *See*

Letter from Congressmen Waxman and Meehan to Glenn A. Fine, June 8, 2005 (Exhibit 4 to

Complaint), Letter from Congressmen Waxman and Meehan to Glenn A. Fine, June 9, 2005

(Exhibit 5 to Complaint), and Letter from Glenn A. Fine to Congressmen Waxman and Meehan,

June 13, 2005 (Exhibit 6 to Complaint).  The Inspector General declined to do so, concluding

that his office did not have jurisdiction over these matters, and referred the matter to DOJ's

Office of Professional Responsibility for a more limited investigation of "actions of Department

attorneys concerning their authority to litigate, investigate, or provide legal advice."  Exhibit 6 to

Complaint.

Other members of Congress and a consortium of associations, including the American

Cancer Society, the American Lung Association, and the American Heart Association, wrote

multiple letters to Attorney General Alberto Gonzales expressing their concerns over the

government's change in position (Exhibits 7, 8, 9,  and 10 to Complaint).  And former Secretary

of Health and Human Services Joseph A. Califano, Jr., now the chairman of the Citizens'

Commission to Protect the Truth, wrote to the Honorable Gladys Kessler, the judge presiding

over the tobacco litigation, to express his concerns that "the actions of the Justice Department

political appointees and the defendants are undermining the integrity of the judicial process."

Letter from Joseph A. Califano, Jr. to the Honorable Gladys Kessler, June 13, 2005 (Exhibit 12

to Complaint).  As Mr. Califano elaborated, "[w]hen witnesses are asked to tone down the truth;

when attorneys are ordered by their superiors to counter their own expert witnesses; when those

superiors are political appointees with close ties to defendants who have contributed millions of

dollars to the political party and administration which appointed them,[1] serious questions arise as to whether parties to this case are thwarting the ability of this Court to render justice on the present record." Id. Mr. Califano also noted that Judge Kessler herself had acknowledged that "'additional influences'" may have been 'brought to bear on the government's position.'" Id.

**Plaintiff's FOIA Requests**

### 1.  Plaintiff's FOIA Request to the Civil Division

On June 28, 2005, CREW sent a FOIA request to DOJ's Civil Division (hereinafter "Civil FOIA"), the component handling the tobacco litigation. The Civil FOIA requested all records relating in any way to the government's proposed penalty in the tobacco litigation (*see* Exhibit 19 to Complaint).

CREW sought a waiver of all fees associated with processing the request, based on the fact that the records it is seeking are likely to contribute to the public's understanding of the individuals and organizations that influence, or attempt to influence, the litigating position of the United States in a lawsuit of major and far-reaching consequences. Id. CREW also sought expedited processing of the Civil FOIA given the "particular urgency in informing the public about the circumstances surrounding" DOJ's proposed penalty in the tobacco litigation, news reports suggesting "that the proposed penalty was the product of improper political influence brought to bear on the government's trial team or career lawyers and that these influences included improper attempts to have the government witnesses alter their trial testimony." Id. CREW explained further that it is a non-profit corporation engaged primarily in disseminating

---

[1] Mr. Califano's letter notes the fact that Mr. McCallum "came to his post from Alston & Bird, the law firm that has represented R.J. Reynolds, a defendant in this case," and that the tobacco industry "contributed more than $2.7 million in 2004 alone to the Republican party." Id.

information it gathers from a variety of sources, including the FOIA, and was seeking the

information in its FOIA request "for the express purpose of disseminating it to the public."  Id.

On July 7, 2005, the Civil Division acknowledged receipt of CREW's FOIA request and

granted expedition, but denied CREW's request for a fee waiver.  As grounds for its denial, the

Civil Division claimed that based on its review of "a portion of the documents . . . the documents

responsive to your request are internal Civil Division and department memoranda and electronic

communications discussing, analyzing, commenting upon, and recommending a proposed

remedy in the litigation."  Letter from James M. Kovakas to Anne L. Weismann, July 7, 2005

(Exhibit 20 to Complaint).  Of note, Mr. Kovakas did not explain what portion of the eight to ten

million documents the Civil Division was then claiming it had were reviewed[2] or how those

documents were selected.  The Civil Division also stated that notwithstanding its position on

fees, it was continuing to search for, collect and review responsive documents but that given the

"large volume of records relating to the remedy phase of this litigation," it could not complete

that process within the statutorily mandated time-period.  Id.  And, without estimating the likely

cost for its search beyond the fact that it was "likely to exceed $250.00 and in fact may be

considerably more than that," the Civil Division asked CREW whether and to what extent it was

willing to incur fees associated with processing its request.  Id.

Four days later, on July 11, 2005, CREW appealed the Civil Division's denial of its fee

---

[2] According to Defendant's counsel that estimate has now been modified, although Defendant has yet to identify the specific number of responsive documents within the Civil Division.  See, e.g., Transcript of February 9, 2006 Hearing (attached as Exhibit B), pp. 9 (request is now of "manageable proportions"), 22 ("it's not eight to 10 million documents, but it's still going to be more than $250 worth of documents").  In any event, the Civil Division's original estimate is wildly inflated as it appears to encompass all publicly filed documents, even though Plaintiff made it clear at the outset that it was not interested in that subset of documents.

waiver request.  Exhibit 21 to Complaint.  In its appeal CREW explained that it satisfied fully the requirements for a fee waiver and that the Civil Division's contrary conclusion was wrong as a matter of law and fact.  The approach advocated by DOJ would "'invert the burden of proof and foist upon [the requester] a burden that is not provided under the FOIA.'"  Project on Military Procurement v. Dep't of the Navy, 710 F.Supp. 362, 367 (D.D.C. 1989) (Judge Sporkin), *cited in* Exhibit 21 to Complaint.

DOJ's Office of Information and Privacy ("OIP"), the component responsible for resolving administratively all FOIA appeals, acknowledged receipt of CREW's appeal by letter dated July 28, 2005, in which it promised to notify CREW "of the decision on your appeal as soon as we can."  Exhibit 22 to Complaint  That promise was not fulfilled however; OIP waited almost a full six months before informing CREW, by letter dated January 23, 2006, that DOJ was denying CREW's appeal.  *See* Letter from Daniel J. Metcalfe, Director, OIP, to Anne L. Weismann, CREW, January 23, 2006 (attached as Exhibit C).

Offering no explanation whatsoever for this delay, OIP denied CREW's appeal claiming, in part, that "[t]he releasable records that have been identified thus far consist of records that are part of the public record in the tobacco litigation" and accordingly the public understanding would not be enhanced by their release.  Id.  At the same time, OIP offered the completely contradictory statement that "given the wording of your request . . . it would appear that CREW is not interested in receiving the publicly available information that has been located to date."  Id.[3]  In this alone OIP was correct – CREW had told the Civil Division at the outset that CREW

---

[3] This finding is also at odds with the administrative record before OIP when it ruled on the appeal, as the Civil Division had not based its denial on the fact that responsive records were publicly available.  *See* Exhibit 20 to Complaint.

was not interested in the publicly available documents.

OIP also disagreed with CREW that the Civil Division had assessed whether the entirety of the responsive records were likely to be exempt from disclosure, stating that OIP instead regarded Civil's determination as "limited to the records found as a result of the Civil Division's preliminary search (of approximately three hours)." Id. Thus, if OIP is correct, DOJ has yet to make an assessment of any kind about whether any of the remaining tens of thousands (if not millions) of documents can be disclosed. Nor will it make such an assessment until CREW commits to pay fees. Id.

### 2. Plaintiff's FOIA Request to the Office of Information and Privacy

On June 28, 2005, CREW sent a second FOIA request to OIP (hereinafter "OIP FOIA"), the office that handles requests for records from DOJ's senior leadership offices. The OIP FOIA requested all records in the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General: (i) relating in any way to the government's proposed penalty in the tobacco litigation; (ii) relating to any offer of settlement in the tobacco litigation; (iii) regarding contacts between any individuals in the three enumerated offices and the White House concerning the tobacco litigation; and (iv) regarding any contacts between AAG Robert McCallum and his former law firm Alston & Bird concerning the tobacco litigation. *See* Exhibit 13 to Complaint. CREW requested expedition and a waiver of the fees associated with processing the request for the same reasons set forth in its Civil FOIA. Id.

As with its handling of the fee waiver issue in the Civil FOIA, OIP showed a similar disdain for FOIA's statutorily prescribed time-limits in responding to the OIP FOIA. By letter

dated July 11, 2005, OIP acknowledged receipt of CREW's FOIA request.[4]  Exhibit 14 to

Complaint.  Contrary to the Civil Division, OIP denied CREW's request for expedition based on

its extraordinary and unsupported conclusion that there was not an identifiable "particular

urgency to inform the public about an actual or alleged federal government activity."  Id.  OIP

also found, again without explanation, that "the primary activity" of CREW "does not appear to

be information dissemination."  Id.

On the issue of a fee waiver, OIP stated only that it had yet to make a decision and would

do so "after we determine whether or not fees will be assessed for this request."  Id.  OIP's letter

also included the following boilerplate language:

> Because the records you seek are maintained outside of this Office,
> we have not been able to complete the searches to determine
> whether there are records within the scope of your request.
> Accordingly, we will be unable to comply with the twenty-
> working-day time limit in this case, as well as the ten additional
> days provided by the statute.  In an effort to speed up our
> record searches, you may wish to narrow the scope of your
> request to limit the number of potentially responsive records
> or agree to an alternative time frame for processing, should
> records be located; **or you may wish to await the completion
> of our record searches to discuss either of these options.**

Id. (emphasis added).[5]  Finally, OIP claimed that "searches will be initiated in the Offices of the

---

[4] It bears noting that by that same date the Civil Division had already decided CREW's
request for expedition and a fee waiver, and CREW had already filed its appeal from the Civil
Division's determination on fees.

[5] Defendant has relied on this language to suggest that the fault for the delay lies with
CREW because it failed to respond to Defendant's plea that CREW narrow the scope of its
request.  Under its plain meaning, however, this language cannot sustain that construction.
Indeed, it appears that this is mere boilerplate included in virtually every letter that OIP sends
when it cannot comply with the statutorily-prescribed time limits.  For example, CREW sent an
earlier FOIA to OIP on an unrelated subject in February 2004.  In its acknowledgment letter, OIP
included the very same language quoted above.  See Letter from Stephanie L. Kuehn, OIP, to
Melanie Sloan, dated March 24, 2004 (attached as Exhibit D).

Attorney General, Deputy Attorney General, and Associate Attorney General.  Id.

On July 18, 2005, CREW sent a request for expedition to DOJ's Office of Public Affairs pursuant to 28 CFR §16.5(d)(2)(iv), given that its FOIA request of OIP involves "[a] widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."  Exhibit 16 to Complaint.  Had OIP, upon receipt of CREW's initial request for expedition, complied with  DOJ regulations that require "[a] component that receives a request that must be handled by the Office of Public Affairs" to "forward it immediately to that office by hand-delivery or fax," 28 CFR §16.5(d)(2), this additional and time-consuming step would have been unnecessary.

At the same time, CREW filed an appeal with the Co-Director of OIP from OIP's initial determination not to expedite CREW's FOIA request (Exhibit 15 to Complaint).  CREW's appeal included copies of numerous news reports that suggested that the proposed penalty was the product of improper political influence brought to bear on the government's team of career lawyers.  Id.  As CREW noted, "the urgency for this information to be made public could not be clearer, as the government's proposal implicates the rights and responsibilities of millions of Americans and tobacco companies that make up some of the most powerful and lucrative businesses in the United States and abroad."  Id.

Fully three weeks later, by letter dated August 9, 2005, OIP advised CREW that DOJ's Office of Public Affairs had granted CREW's request for expedition.  Exhibit 17 to Complaint. OIP reiterated that it had ongoing searches in the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General.  Id.  Then, by letter dated August 12, 2005, OIP advised CREW that its appeal on expedition was moot in light of the decision of DOJ's

Office of Public Affairs to grant expedition.  Exhibit 18 to Complaint.

 Finally, on January 19, 2006, seven months after CREW filed the OIP FOIA and only days before the parties were to submit a joint report to the Court on the status of this action, OIP advised CREW that its fee waiver request to OIP was denied.  Letter from Melanie Ann Pustay, Deputy Director, OIP to Anne Weismann, CREW, January 19, 2006 (attached as Exhibit E). OIP offered no explanation for the seven-month delay in deciding CREW's request for a fee waiver of OIP.  Ignoring the evidence CREW had proffered concerning the two government witnesses who had stated publicly that they were pressured to change their testimony, OIP based its denial in part on its finding that CREW had failed to "provide . . . evidence that, in fact, any individual or organization attempted to influence or did influence the government's litigating position."  Id.  OIP also found that CREW's statement in this regard "is too ephemeral a basis on which to grant a fee waiver," id., a statement contradicted by the fact that DOJ's own Office of Professional Responsibility is conducting an investigation into exactly this issue.  Finally on the fee waiver, OIP concluded, based on its "review of the documents we have located, our knowledge of the subject matter, and our general familiarity with the records that are responsive to this request," that the records CREW is seeking "are virtually inherently protected by the attorney work-product, attorney-client, and deliberative process privileges."  Id.

 OIP also claimed to have given CREW two hours of free search time per component based on its finding that CREW is a "non-media, non-commercial requester."  Id.  According to OIP, the combined six hours of search time (two hours each for the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General) yielded a mere five documents, totaling 20 pages.  Id.  Of those five documents, OIP withheld one in full as

protected by the attorney-client, attorney work-product and deliberative process privileges.  Id.

OIP failed to offer any description of this document.  Of the remaining four documents, two have

been referred to the Civil Division and two to the Criminal Division, with no explanation for

these referrals, or the nature of these documents.  Id.  Finally, OIP announced that the one office

in which it was unable to complete its search was the Office of the Associate Attorney General

(id.), despite the fact that AAG McCallum is a central figure in this matter.

    In the interim, after waiting four months with no concrete results,[6]  CREW filed the

instant complaint on October 24, 2005.  To date, CREW has yet to receive a single document in

response to either of its requests.

## ARGUMENT

### I.  This Court Should Exercise Its Sound Discretion And Grant Plaintiff's Request For Discovery In Light Of The Evidence That The Government Is Acting In Bad Faith.

    As with any civil litigation, this Court has broad discretion on whether and what

discovery CREW should be accorded.  *See, e.g.*,  SafeCard Servs., Inc. v. Sec. and Exchange

Comm'n, 926 F.2d 1197, 1200, 288 U.S.App.D.C. 324, 327 (D.C. Cir. 1991).  Where, as here,

"one party has an effective monopoly on the relevant information" the need for discovery is

especially acute.[7]  This is because discovery is "an important tool for truth-testing" in FOIA

---

    [6] On September 26, 2005, an individual in OIP responsible for processing CREW's
request advised CREW that OIP's search of the Office of the Attorney General was finished.
But CREW has received no documents as a result of that search and the only description OIP has
provided with respect to the five documents it claims to have located so far does not delineate
from which office the documents were provided.  *See* Letter Melanie Ann Pustay to Anne L.
Weismann, January 19, 2006 (Exhibit E).

    [7] Founding Church of Scientology v. Nat'l Security Agency, 610 F.2d 824, 833, 197
U.S.App.D.C. 305, 314 (D.C. Cir. 1979), *citing* Ray v. Turner, 587 F.2d 1187, 1218 n.81, 190

cases, "as in other litigation." <u>Washington Post Co. v. U.S. Dep't of State</u>, 840 F.2d 26, 38, 268

U.S.App.D.C. 146, 158 (D.C. Cir. 1988), *reh'ing granted, judgment vacated on other grounds*,

898 F.2d 793, 283 U.S.App.D.C. 196 (D.C. Cir. 1990).[8]  And while discovery in a FOIA case is

typically limited, even the Department of Justice has recognized that "[t]he major exception to

this limited scope of discovery is when the plaintiff raises a sufficient question as to the agency's

good faith in processing documents or any other respect." <u>Freedom of Information Act Guide &</u>

<u>Privacy Act Overview</u>, U.S. Department of Justice, Office of Information and Privacy, May 2004

Edition, pp. 812-13.[9]

 For example, discovery was granted in a FOIA case where the government had justified

its search and claimed exemptions through the use of "boilerplate language" and "there are direct

contradictions, questions of fact, and questions of good faith that arise when reviewing the

adequacy of the search for documents." <u>Long v. U.S. Dep't of Justice</u>, 10 F.Supp.2d 205, 210

(N.D. N.Y. 1998).  And where a FOIA plaintiff alleged that the agency in question had a pattern

or practice of late responses to FOIA requests, the Court concluded that discovery was

appropriate before the parties briefed the merits of this claim "to adequately address the issue."

<u>Gilmore v. U.S. Dep't of Energy</u>, 35 F.Supp.2d 1184, 1189 (N.D. Ca. 1998).  Similarly, Judge

Lamberth agreed that discovery was appropriate in a FOIA case brought by a public interest

organization for documents related to trade missions conducted by the Department of

---

U.S.App.D.C. 290, 321 n.81 (D.C. Cir. 1978).

 [8] *Cf.* <u>Londrigan v. FBI</u>, 670 F.2d 1164, 1175, 216 U.S. App.D.C. 345, 356 (D.C. Cir. 1981) (recognizing that discovery "is especially important" in FOIA cases as the requester is "entitled to as complete and accurate an explanation of the reasons for nondisclosure of sought-after information as the agency is able to provide").

 [9] This book is available on-line at www.usdoj.gov/index.html.

Commerce, where the agency's search had suspiciously failed to uncover documents from the Secretary of Commerce, the White House, or the Democratic National Committee.  Judicial Watch v. U.S. Dep't of Commerce, 34 F.Supp.2d 28 (D.D.C. 1998).  Judge Lamberth subsequently expanded the scope of discovery when the initial round of discovery revealed evidence that the agency had illegally destroyed documents in an effort to circumvent FOIA's disclosure requirements.  Id. at 32.

The instant case also presents facts that raise a sufficient question of  bad faith on the part of the Department of Justice in responding to CREW's two FOIA requests to warrant further exploration through discovery.  Most striking is the complete and utter failure of DOJ to produce a single responsive document to CREW, notwithstanding the passage of eight months since CREW first filed its requests with the agency, coupled with a seven-month delay in resolving CREW's fee waiver requests despite the fact that the agency claimed to be processing the requests on an expedited basis.

At a recent hearing on this matter counsel for the Defendant argued that there was nothing noteworthy about a seven-month delay, and suggested instead that it represented "business as usual" for DOJ.[10]  This is, however, an outright falsehood.  DOJ's own reports, filed annually with Congress regarding DOJ's administration of the FOIA, demonstrate that the time DOJ has consumed to date processing CREW's FOIA requests substantially exceeds the median processing time for other expedited requests.

For example, in 2004, the most recent report available, the Office of the Attorney General

---

[10] *See, e.g*., Transcript of February 9, 2006 Hearing at pp. 11 (characterizing six months for an expedited request as "very reasonable"); 32 ("six months in a FOIA case is nothing"); 34 ("six months is a darn short amount of time"); 38 ("here it's just the ordinary workings of government").

processed two FOIA requests on an expedited basis, and the median number of days it took the office to process those two requests was 136.[11]  That year the Office of the Deputy Attorney General processed no requests on an expedited basis, while the Office of the Associate Attorney General processed one request on an expedited basis, which took 47 days.  Id.

Nor was 2004 an anomaly.  In 2003, the Offices of the Attorney General and the Deputy Attorney General processed three requests on an expedited basis, consuming a median number of 80 days, while the Office of the Associate Attorney General processed one request on an expedited basis, which took 42 days.[12]   In 2002, the Office of the Attorney General processed five expedited requests in a median number of 134 days, the Office of the Deputy Attorney General processed six requests in a median number of 128 days, and the Office of the Associate Attorney General processed one request which took 148 days.[13]  Likewise, in 2001, the Office of the Attorney General processed nine expedited requests in a median number of 107 days, the Office of the Deputy Attorney General processed 17 expedited requests in a median number of 47 days, and the Office of the Associate Attorney General processed six expedited requests, in a median of 47 days.[14]   In 2000, the Offices of the Attorney General and the Associate Attorney General processed one expedited request each which took 12 days for each office, and the Office

---

[11] See DOJ FOIA 2004 Annual Report, Part VII. Compliance With Time Limits/Status of Pending Requests, available at www.usdoj.gov/oip/annual_report/2004/04foiapg7.htm.

[12] FOIA FOIA 2003 Annual Report, Part VII. Compliance With Time Limits/Status of Pending Requests, available at www.usdoj.gov/oip/annual_report/2003/03foiapg7.htm.

[13] FOIA FOIA 2002 Annual Report, Part VII. Compliance With Time Limits/Status of Pending Requests, available at www.usdoj.gov/oip/annual_report/2002/02foiapg7.htm.

[14] FOIA FOIA 2001 Annual Report, Part VII. Compliance With Time Limits/Status of Pending Requests, available at www.usdoj.gov/oip/annual_report/2001/01foiapg7htm.

of the Deputy Attorney General processed five expedited requests in a median number of nine days[15]

In the face of this five-year history, there is simply no way that the seven or so months it took these three offices to locate five documents, none of which has been released to CREW, can properly be characterized as "expedited." This blatantly inadequate response alone justifies discovery on the issue of whether DOJ is complying in good faith with its FOIA obligations. Nor can DOJ blame the delay on the number of responsive documents. While OIP has located only 20 pages of documents so far, after claiming to look for six hours, DOJ estimates that it would take $336 of search time to complete its search of the Office of the Associate Attorney General. *See* Exhibit D. This suggests that the remaining number of documents is significantly less than the tens of thousands of documents – or even millions – the Civil Division claims to have.

Additional evidence of DOJ's bad faith includes the inordinate time it took OIP to decide the fee waiver issue. Statistics are not available on the average time it takes OIP to decide a fee waiver issue either in the first instance or on appeal, but an eight-month delay is, on its face, unjustified, particularly where the agency purportedly is expediting its treatment of the requests. Nor can DOJ justify this delay as warranted by complex factual or legal issues. Both decisions by OIP (on the OIP FOIA and on the appeal of the Civil FOIA) are based on review of a small number of documents that OIP readily concluded were "virtually inherently protected" by privilege. Letter from Melanie Ann Pustay to Anne L. Weismann, January 19, 2006 (Exhibit E).

---

[15] FOIA FOIA 2000 Annual Report, Part VII. Compliance With Time Limits/Status of Pending Requests, available at www.usdoj.gov/oip/annual_report/2000/00foiapg7.htm. For the Court's convenience, copies of DOJ's Annual Reports for the years 2000 through 2004 are attached as Exhibit F.

OIP's actions in this regard are especially suspicious given that OIP waited until days before DOJ was to report to the Court on the progress of the case to deny the fee waiver requests and that DOJ is now using this denial as a basis to shield from public view all of the documents in DOJ's possession that are responsive to CREW's FOIA requests.

DOJ's claims of justified delay also ring hollow given the pending investigation by the Office of Professional Responsibility ("OPR").[16]  Back in June 2005, before CREW had filed its FOIA requests, DOJ announced that OPR was investigating whether DOJ was influenced to reduce the damages it was seeking in the tobacco litigation by improper political interference. *See* Letter of June 13, 2005, from Glenn Fine to The Honorable Henry Waxman and Martin Meehan (Exhibit 6 to Complaint).  If OPR truly is investigating the allegations of improper political influence it would, of necessity, include a review of documents in the Civil Division as well as the Offices of the Attorney General, Deputy Attorney General and Associate Attorney General.  It necessarily follows that those offices must have already identified and collected relevant documents that, while they may not overlap completely with what CREW is seeking, would certainly be a substantial subset of CREW's requests.

In short, there is a pattern of delay and obfuscation and direct contradictions that, as in Long v. U.S. Dep't of Justice, justifies discovery on the issue of DOJ's compliance with its FOIA obligations.  For example, apart from the delay and the timing of OIP's decisions on the fee waiver issue, OIP has, on the one hand, justified its fee waiver decision by the fact that

---

[16] While DOJ's Office of Professional Responsibility reports directly to the Attorney General, it is our understanding that the Associate Attorney General, who has been publicly identified as the individual primarily responsible for DOJ's decision to reduce its proposed penalty in the tobacco litigation, has had at least some involvement in overseeing OPR's investigation.

CREW, according to OIP, is seeking publicly available documents. On the other hand, OIP has, in the same letter, acknowledged that CREW's request does not appear to encompass publicly available documents. *See* Exhibit E.

In a similar vein, OIP now suggests the fault lies with CREW for failing to narrow its request in the face of pressure by OIP to do so. But the only letter in which OIP even raised this issue states simply that CREW may wish to narrow its request so that OIP can respond more quickly, that CREW may wish to agree to a different time table for processing its request than that mandated by FOIA, or that CREW "may wish to await the completion of our [OIP's] record searches to discuss either of these options. Letter from Melanie Ann Pustay to Anne Weismann, July 11, 2005 (Exhibit 14 to Complaint). The language actually used by OIP belies its claim that CREW is at fault for the delay because it failed to narrow its request

Moreover, with respect to the OIP FOIA, there is no basis to conclude that it could be narrowed in a way that would significantly decrease the number of responsive documents yet still give CREW what it needs to ensure public accountability for DOJ's actions.[17] And while defendant's counsel did not provide the Court with an estimate of how many documents remain for OIP's review, she did make it clear it was significantly less than the thousands of documents the Civil Division has yet to review. Transcript of February 9, 2006 Hearing at p. 59. When coupled with the five documents that OIP has processed to date, it appears that any fault actually lies with OIP and its inordinately slow pace in reviewing documents – *e.g*., six hours for 20

---

[17] With the Civil FOIA, by contrast, CREW has agreed to a narrowing of its request in a manner that DOJ now suggests will result in a significantly smaller number of responsive documents. The process to reach that narrowed universe of documents was, however, somewhat frustrating as DOJ refused to give CREW access to information that would explain the categories of documents DOJ had so that CREW could meaningfully narrow its request.

pages.

Finally, this case has been brought against a backdrop of allegations of serious impropriety at the highest levels of DOJ including the Associate Attorney General. As Judge Lamberth recognized in Judicial Watch v. Dep't of Commerce, the evidence of bad faith did "not occur[] in a vacuum." 34 F.Supp.2d at 29. Rather, "[e]ven before this litigation was commenced" DOJ demonstrated a "disregard for the law." Id. Specifically, two government witnesses have alleged that the Associate Attorney General and others at DOJ pressured them to change their testimony to be more consistent with the government's reduced penalty proposal.[18] The team of career government attorneys responsible for the tobacco litigation has alleged that the Associate Attorney General made his initial decision to reduce the penalty without consideration of the evidence in the case.[19] And the Associate Attorney General never recused himself from involvement in the tobacco litigation, despite his former employment with Alston & Bird, the law firm that represents one of the primary tobacco defendants. Is it any wonder that DOJ has yet to produce for public view a single document explaining why DOJ made the startling decision to reduce its proposed penalty by 92%? If DOJ prevails in this lawsuit the public will be forever barred from access to documents that would shed light on matters of great public interest.

In sum, while there is no single "smoking gun" that alone evidences DOJ's bad faith, there are numerous indicia that, taken as a whole, raise a serious question about whether DOJ is

---

[18] *See Eric Lichtblau, Lawyers Fought U.S. Move to Curb Tobacco Penalty, The New York Times*, June 16, 2005; Carol D. Leonnig, Expert Witness Says Justice Told Him to Water Down Penalty Recommendation, *The Washington Post*, June 20, 2005.

[19] *See* Eric Lichtblau, *The New York Times*, June 16, 2005.

complying in good faith with its FOIA obligations. This is enough to justify discovery at this juncture. *See, e.g.*, <u>Judicial Watch v. U.S. Dep't of Commerce</u>, 34 F.Supp.2d at 31. And while discovery may delay in the short run CREW's, and the public's, access to the documents it seeks through its FOIA requests, that delay is warranted by the more serious questions raised by the government's conduct. Accordingly, the Court should exercise its discretion and allow the discovery Plaintiff requests.

## II. Depositions Of Top-Level DOJ Officials Are The Most Efficient Way To Resolve The Questions Concerning The Government's Bad Faith.

Plaintiff is mindful that discovery in this FOIA litigation should not derail resolution of the underlying merits of its claims, as set forth in the Complaint. Accordingly, Plaintiff proposes that discovery be limited to the depositions of four individuals who are best-situated to answer the serious questions raised about what DOJ has done in responding to Plaintiff's FOIA requests, and why. Depositions are the most stream-lined method to get to the bottom of DOJ's conduct, as they allow plaintiff to question directly those individuals with greatest personal knowledge of the issues.

Accordingly, Plaintiff requests that it be permitted to depose the following four officials: (1) Associate Attorney General Robert McCallum; (2) OIP Director Daniel Metcalfe; (3) Steve Brody who has been identified by DOJ as the individual on the tobacco team responsible for assembling documents responsive to CREW's FOIA request; and (4) James Kovakas, Attorney in Charge of the Civil Division's FOIA processing. Each of these individuals is likely in possession of relevant facts that will shed light on the government's conduct in responding to CREW's FOIA requests.

First and foremost, the Associate Attorney General is at the heart of the allegations of government misconduct surrounding the government's decision to reduce its proposed penalty in the tobacco litigation. Thus, documents in his office are likely to be the most revealing about what the government did and why. Yet it is precisely those documents that DOJ has put out of CREW's (and the public's) reach, first, by denying CREW's request for a fee waiver and second, by exhausting the free time to which CREW is statutorily entitled before completing its search of the Associate Attorney General's Office. If, as the evidence suggests, there has been a conscious effort to shield his records from public view, the Associate Attorney General is the best individual to be deposed.[20]

Second, OIP has played a pivotal role in delaying the processing of Plaintiff's FOIA requests and has provided the most convenient excuse for not producing documents, namely that CREW is not entitled to a fee waiver. Moreover, OIP reports directly to AAG McCallum.[21] Daniel Metcalfe heads OIP and, given the inconsistencies in his letter of January 23, 2006, as discussed above, and the relationship between his office and that of AAG McCallum, his role in any delay and obfuscation warrants exploration through discovery.

---

[20] Notably absent from the description by Defendant's counsel during the February 9th hearing of what she had reviewed was any mention of the Associate Attorney General's records. *See* Transcript of February 9, 2006 Hearing at pp. 43-49. Instead, she admitted to having reviewed only "a little bit over a hundred documents" from the Civil Division. *Id.* at 47. Given the likelihood that documents explaining why DOJ changed its settlement position are likely to be in AAG McCallum's office, it is curious to say the least that Defendant focused almost exclusively on Civil Division records during the hearing. CREW has been advised that career DOJ lawyers, including Defendant's counsel in this case, have not been permitted access to the records of the Associate Attorney General. Absent discovery CREW does not have any means to explore this issue.

[21] According to DOJ's web site, the Office of the Associate Attorney General oversees OIP. *See* www.usdoj.gov/aag/index.html.

Third, CREW seeks to depose Steve Brody, the individual Defendant's counsel has identified as responsible for gathering the documents offered up as a representative sampling. Given the evidence to date of bad faith, CREW would like to explore how Mr. Brody made his selection and the extent to which he was acting at the direction of higher-level officials. Mr. Brody could also speak to the relationship between the Civil Division and the Office of the Associate Attorney General both during the tobacco litigation and in responding to CREW's FOIA requests.

Fourth, CREW requests that it be permitted to depose James Kovakas, the Civil Division official responsible for processing CREW's Civil FOIA. Mr. Kovakas can also speak to the relationship between his office and OIP and the extent to which he was influenced in reaching his decision on fees.

Finally, CREW requests that it be given a period of 60 days to complete this discovery. This will minimize any delay in resolving the underlying merits, while ensuring adequate time to explore the questions raised by DOJ's conduct to date.

### III. Discovery Should Precede Any Briefing On The Merits Of Whether CREW Is Entitled To A Fee Waiver.

DOJ will undoubtedly respond that the Court should first examine the legal issue of whether CREW is entitled to a fee waiver, and thereby ignore all the indicia suggesting DOJ has acted in bad faith. That course runs the risk that DOJ will never be held accountable for its actions.

The Court should not infer that CREW seeks to avoid the merits of the fee waiver issue. To the contrary, CREW submits that this is the paradigmatic case for granting such a waiver, given the public's obvious right to know what DOJ did and why. Defendant's reliance on the

claimed, but untested, privileged status of a handful of self-selected documents does not provide

a legitimate basis to shield all other documents from public view or prevent CREW from

contesting the merits of those withholdings.  As Judge Sporkin explained in a remarkably similar

case,

> Allowing the case to proceed as defendant urges would invert the
> burden of proof and foist upon plaintiff a burden that is not
> provided under the FOIA.  In a fee waiver case, the plaintiff bears
> the initial burden of demonstrating it has satisfied the public
> interest analysis; in challenging a decision to withhold documents,
> the burden is upon the defendant to justify its nondisclosure . . .
> In effect, defendant's position is that all an agency needs to do to
> defeat a fee waiver is proffer that the requested documents fall
> within various FOIA exemptions.  This cannot be so.  Such a
> position clearly places the cart before the horse requiring the
> Court to pass upon the validity of withholding documents
> before the agency decides the documents are to be withheld.  By
> proceeding in this manner the defendant is denying plaintiff the
> opportunity to challenge, before the agency and in court, an
> actual decision to withhold specific information.

Project on Military Procurement v. Dep't of the Navy, 710 F.Supp. 362, 367 (D.D.C. 1989).  The

Court was particularly mindful that denying a public interest and "financially limited" requester

a fee waiver "based on an agency determination that is speculative and unreviewable" would be

"unfair and contrary to the spirit of the FOIA."  Id. at 368.

The Second Circuit reached a similar conclusion in Carney v. U.S. Dep't of Justice, 19

F.3d 807 (2d Cir. 1994).  The plaintiff there, a doctoral student, was seeking documents from

DOJ about DOJ's role in the federal judicial selection process, and unsuccessfully sought a fee

waiver before the agency.  The Court termed DOJ's denial of the fee waiver, based in part on the

agency's untested assertion that the documents were exempt from disclosure, "an unduly

restrictive construction to the public interest fee waiver provision."  Id. at 814.  As the Second

Circuit explained, "[a] fee waiver request should be evaluated based on the face of the request and the reasons given by the requester in support of the waiver." Id. at 815. And especially where, as here, "the request is for records that should be disclosed in the public interest, the agency should not be allowed to charge for searching the records, because [CREW] is acting in the public interest by attempting to obtain the records." Id.[22]

Given the serious questions raised by DOJ's conduct to date in responding to CREW's two FOIA requests, however, briefing on the merits of CREW's entitlement to a fee waiver should be postponed until the Court has an adequate answer to the question of whether DOJ is proceeding in good faith. That question can only be answered by a full airing of all the underlying facts that to this point have been accessible only to the Defendant. Allowing CREW access to these facts through discovery will redress this inequity and provide a basis for the government to be accountable to the public and this Court.

## CONCLUSION

Congress enacted the Freedom of Information Act "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978). It is cases like the instant one that test these principles, and ensure that the system of checks and balances Congress put in place actually works. This Court should accordingly permit CREW to proceed with discovery, as outlined herein, to answer a threshold and very serious

_____

[22] The folly of allowing DOJ to proceed with a unilateral and essentially unreviewable determination of privilege is especially acute here, where there are legitimate issues of waiver given the allegation that the Associate Attorney General was acting in consort with the tobacco industry. For example, as this Court recognized during last month's hearing, there is no legitimate privilege for correspondence between tobacco companies and DOJ. See Transcript of February 9, 2006 Hearing at pp. 19-20.

question: Is DOJ complying in good faith with its obligations under the FOIA?

Respectfully submitted,


___/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and
  Ethics in Washington
11 Dupont Circle, N.W.
Washington, D.C.  20036
Phone: (202) 588-5565
Fax: (202) 588-5020

Attorneys for Plaintiff


Dated: February 23, 2006