1   decisions with respect to this litigation then?

2        MS. OLSON:  Well, I am and my supervisor at the

3   Department of Justice, my career supervisor.

4        So the person you would want to depose would be Ms.

5   Pustay and she has nothing to say other than what I've just

6   told you.  That we've proceeded with the normal processing of

7   this FOIA request.  And we've now come to the point where the

8   request has been narrowed to manageable proportions.  And what

9   should be decided now --

10       THE COURT:  That's pretty unique litigation strategy,

11  when a representative of a party has nothing to say, when

12  there's no one to be deposed.  I don't think I've heard that

13  argument before.

14       MS. OLSON:  Well, it's not that there's no one to be

15  deposed.  Of course, there's someone up there.  But I think the

16  deposition would be fruitless, because there is no bad faith,

17  there's nothing to find.  It's based on speculation.  There's

18  no evidence of bad faith.  And I think the facts are that the

19  agency proceeded quite expeditiously with this request.

20       And what we ought to decide now is whether the fee

21  waiver was properly --

22       THE COURT:  With respect to bad faith, though, by

23  what standard do I measure their complaint against?

24       MS. OLSON:  Well, I think you look at the amount of

25  time it's taken the agency to complete its processing.

1        THE COURT:  Since June, is that right?

2        MS. OLSON:  Well, it responded within two weeks and

3   said we would like CREW to narrow its request.  And when CREW

4   didn't respond to that --

5        THE COURT:  And you didn't get a response until the

6   complaint was filed, is that correct?

7        MS. OLSON:  Yes.  And then defendant's counsel

8   contacted plaintiff's counsel and said can we try to work

9   out --

10        THE COURT:  I find that startling that you didn't get

11   a response.  The plaintiffs wanted you to treat it on a

12   expedited basis and then you sent a response saying essentially

13   narrow the response, and you didn't hear anything back from

14   them, even though they wanted expedition you didn't hear

15   anything back from them until they filed their complaint?

16        MS. OLSON:  That's right.  That's why I said in our

17   joint report that the ball has really been in their court.

18   There's nothing more we're statutorily allowed to do if we know

19   that it's going to cost the amount of money that this would

20   cost to process.  And then ultimately --

21        THE COURT:  And it's sheer speculation, I guess, on

22   your part to say that things would have been handled

23   differently had you heard back from plaintiff before the

24   complaint was filed?

25        MS. OLSON:  Before the complaint was filed?  Oh, on

1    narrowing the request?

2              THE COURT:  Yes.

3              MS. OLSON:  Yes.  But I think we would have still

4    come to the same point.

5              THE COURT:  Which is?

6              MS. OLSON:  That the fee waiver would have been

7    denied.  Because in looking at the portions of the documents

8    that we did examine, they're all -- these are memos from one

9    attorney to the other in the litigation discussing the legal

10   basis for reducing the damages.  I mean, they are by definition

11   work product or deliberative process, and perhaps even

12   attorney-client, if you consider --

13             THE COURT:  Essentially, what you're saying is even

14   though there's no one to be deposed, if there were someone to

15   be deposed or if there were a request for production of

16   documents or interrogatories, everything would be exempt

17   anyway, right?

18             MS. OLSON:  Ultimately that is -- yes.

19             THE COURT:  Nothing would be producible?

20             MS. OLSON:  Right.

21             THE COURT:  Nothing?

22             MS. OLSON:  I personally reviewed a hundred or so

23   documents and have concluded that there are very sound

24   privileges.

25             THE COURT:  For everything, for every document?

1          MS. OLSON:  Yes.  But if we were to find --

2          And they don't want documents that are already

3     public, obviously.

4          THE COURT:  They have those.  They don't want to

5     waste your time or their time.

6          MS. OLSON:  Right.  If we would find documents that

7     were not privileged, we would produce them, obviously.

8          THE COURT:  Have they been produced, those documents?

9          MS. OLSON:  They would be produced if we would find

10    them.

11         THE COURT:  Do we know that they exist, the documents

12    that aren't privileged?

13         MS. OLSON:  I haven't seen any yet.  I don't think

14    there are any.

15         THE COURT:  Everything you've seen is privileged

16    then?

17         MS. OLSON:  Yes.

18         THE COURT:  Notwithstanding your search and the

19    search of your associates no one has seen any nonprivileged

20    documents?

21         MS. OLSON:  Correct.

22         THE COURT:  Is that the government's position, that

23    even if there was discovery and if I allowed depositions to go

24    forward, there would be no one to depose, and if there was a

25    paper request, there would be no papers produced because

1    everything is exempt, everything is privileged?

2         MS. OLSON:  That's correct.  I think that's what the

3    Court would conclude as well.

4         THE COURT:  That's the government's position?

5         MS. OLSON:  Yes.  And if we were to write a brief on

6    the issue of the fee waiver, we'll provide declarations which

7    describe the portions of documents which we've looked at in

8    considerable detail, or if the Court would like to look at them

9    itself it obviously can.  And I think it will be very clear

10   that these documents are privileged.  I mean, the point is

11   there's this -- the issue of bad faith is that there is no

12   evidence of bad faith because there isn't any bad faith.

13        THE COURT:  Well, there's no documents, so no bad

14   faith?

15        MS. OLSON:  Well, there's no bad faith in the length

16   of time that it has taken to come to this point.  And the

17   decision on the fee waiver was based on a review of the

18   documents, which both components conducted, and which both

19   components concluded -- and as to which both components

20   concluded that privilege has protected all these documents.

21        THE COURT:  Have all the documents within the scope

22   of plaintiff's request been reviewed?

23        MS. OLSON:  Yes.

24        THE COURT:  All right.  And having conducted that

25   review, you're telling me then as an officer of the court that

1    not one of those documents is producible because of the various

2    privileges that apply?

3            MS. OLSON:  I can't tell you that with certainty.

4            THE COURT:  I thought you just did.

5            MS. OLSON:  No.  We reviewed a portion of the

6    documents.

7            THE COURT:  I thought my question was whether or not

8    all the documents have been reviewed, and I thought you said

9    yes.

10           MS. OLSON:  I'm sorry, Your Honor, we haven't looked

11   at all the documents yet.  That's why we're -- we're up to the

12   point where we can't proceed further without an installment of

13   fees from the plaintiff.  That's why the fee waiver issue is

14   now before the Court.

15           Based on our review of a portion of the documents it

16   appears that, and we've focused on the ones that we think would

17   be of the greatest interest to the plaintiffs so as not to

18   waste any time, that these documents that we've looked at so

19   far are all privileged.

20           Our expectation is, based on the nature of them

21   pertaining to damages and the remedy phase --

22           THE COURT:  And litigation.

23           MS. OLSON:  -- and litigation, right, that they would

24   be covered by work product, deliberative process, perhaps

25   attorney-client.

1      So if we were to brief the fee waiver issue now,

2  which we think is what's on the table, we would explain this to

3  the Court in more detail with supporting declarations.

4      THE COURT:  If everything is privileged, how would

5  anyone outside the Department of Justice's inner circles ever

6  determine the rationale for the change in strategy?  How would

7  anyone ever be in a position to assess the change in strategy?

8      MS. OLSON:  Well, the Office of Professional

9  Responsibility is looking.

10     THE COURT:  But that's not the Department of Justice,

11 though, right?

12     MS. OLSON:  Yes, it is the Department of Justice.  It

13 is within the department to see if there's any -- I think they

14 look at potential ethical violations.

15     If you're looking for -- if one is looking for a

16 smoking gun, perhaps --

17     THE COURT:  That's what they're looking for.  They

18 want to find out.  They have an obligation.  Their clients want

19 to know what happened here.

20     MS. OLSON:  Well, let's say, for example, and this is

21 just entirely my own imagination, but let's say there were a

22 document that said, which is what I think they're looking for,

23 that's a letter from the president of a tobacco company to the

24 President of the United States, and it somehow gets in our

25 file, and he says -- or to the attorney general -- and he says

1    if you lower damages we'll give a billion dollars to the

2    presidential campaign.  That might not even be -- that probably

3    wouldn't even be privileged.

4            But what we're looking at so far --

5            THE COURT:  It shouldn't be privileged.  It shouldn't

6    be protected by any privilege.

7            MS. OLSON:  I don't think -- I don't know that a

8    document like that would be privileged.

9            THE COURT:  I can't imagine that it would be

10   privileged.

11           MS. OLSON:  And so the public would probably see such

12   a document, but there are no such documents that I've seen.

13           THE COURT:  Well, how do you know, you haven't seen

14   all the documents?

15           MS. OLSON:  I haven't seen all the documents.  If we

16   found them, though, if we did an index of the documents or if

17   we found one that wasn't privileged, it would be produced.  But

18   I think that it's a -- you know, the idea that there's bad

19   faith is completely an unfounded one.  And I think it would

20   honestly be a waste of time.  I don't know whom we would depose

21   and what we would depose them about.  Because the people

22   involved are Ms. Pustay, myself, my supervisor and the Civil

23   Division counterpart to Ms. Pustay.

24           And so I think the issue to be decided which would

25   move this case forward in the most productive way is the fee

1    waiver issue and we shouldn't be speculating about bad faith.

2    THE COURT:  The attorneys associated with the

3    litigation are recused from this case.  You mentioned the word

4    recused.  Recused from what?

5    MS. OLSON:  Political appointees are all recused from

6    this case.  And anyone who had any connection with, for

7    example, who used to work for a law firm.

8    THE COURT:  They're recused as of what date, though?

9    After a decision was made?

10   MS. OLSON:  No.  The filing of the case.

11   THE COURT:  The filing of the lawsuit?

12   MS. OLSON:  I believe so.

13   THE COURT:  All right.

14   MS. OLSON:  I don't even -- pardon me, Your Honor.  I

15   don't know that they would have been involved prior to that.

16   There wouldn't have been any reason for them to --

17   THE COURT:  Do the plaintiffs have a right to

18   determine whether or not they were involved and to what extent

19   political appointees were involved?  And wouldn't those

20   personnel be appropriate people to depose?

21   MS. OLSON:  But there's no evidence that they were

22   involved.

23   THE COURT:  Well, no one knows.

24   MS. OLSON:  But the purpose of the discovery would be

25   to find out if they were trying to influence the processing of

1    the FOIA requests.

2              THE COURT:  Right.

3              MS. OLSON:  And --

4              THE COURT:  Is that inappropriate to --

5              MS. OLSON:  Well, there's no evidence that they were.

6              THE COURT:  Does it have to be evidence that they

7    were involved as a condition precedent for their discovery?

8              MS. OLSON:  It has to be more than speculative.  And

9    I think at this point it is.  They're basing their allegation

10   of bad faith on the fact that it took six months to come to

11   this point in the processing of the FOIA request.

12             And as we've explained in our joint statement, the

13   request was being actively processed over the last six or seven

14   months.  We've looked at all the documents we're statutorily

15   allowed to look at without getting money from the plaintiff to

16   proceed further.  And all the documents we've looked at are

17   privileged.

18             And we can't proceed further because it would -- it's

19   not eight to 10 million documents, but it's still going to be

20   more than $250 worth of documents, which is what the statute --

21   and it's going to be more than two hours of research for each

22   component, which is what the statute allows.  We've done, I

23   think, two hours of research for each of the three senior

24   offices within Justice and two hours of research, actually over

25   two hours of research in the Civil Division -- two hours of

1      review of a portion of the documents.

2                So the allegations of bad faith are just based on the

3      facts in front of the Court, which I do not think suggest that

4      there has been any wrongdoing or any delay here or any attempt

5      to withhold documents that are properly disclosable and the

6      public should have access to.

7                THE COURT:  All right.  Thank you, Ms. Olson.

8                MS. OLSON:  Thank you, Your Honor.

9                THE COURT:  Ms. Weismann.

10               MS. WEISMANN:  Your Honor, we cannot disagree more.

11     And I think what's telling here is that you have yet to hear

12     from the government how many documents they've looked at.

13               First, we were initially told we were looking at

14     millions, tens of thousands of documents.  They've now admitted

15     that, in fact, they've only spent six hours.  I don't know what

16     percentage of those documents were produced in that time.

17               So we still have no idea when they talk about --

18               And they come up here and say, trust me, I'm a

19     lawyer, I've looked at a handful -- maybe a handful, I don't

20     even know.  We have no idea what numbers we're talking about.

21     But it does sound like from their initial estimates of what our

22     request encompassed that there are likely to be thousands and

23     thousands of pages of documents that they haven't even gathered

24     up because they claim that they're statutorily precluded by it

25     because we won't pay fees.

1          I want to also correct the record because it

2     was suggested that the fault really lies with CREW.  That we

3     failed to heed their requests, that we, you know, narrow our --

4     narrow.

5          What, in fact, happened was that on July 11 when OIP

6     sent a letter acknowledging receipt, which is pretty much

7     boilerplate, if you've seen these kind of letters, they told

8     us, and I'm quoting -- and this is just for Your Honor's

9     information, this is Exhibit 14 to the complaint.  They said,

10    because the records you seek are maintained outside of this

11    office we have not been able to complete the searches to

12    determine whether there are records within the scope of your

13    request.  Accordingly, we will be unable to comply with the 20

14    working day limit in this case, as well as the ten additional

15    days provided by the statute.  In an effort to speed up our

16    record searches you may wish to narrow the scope of your

17    request to limit the number of potentially responsive records

18    or agree to an alternative time frame for processing should

19    records be located.  Or you may wish to await the completion of

20    our record searches to discuss either of these options.

21          That is the sum total of what they said.

22          THE COURT:  And that letter is dated?

23          MS. WEISMANN:  That letter is dated July 11, 2005.

24          THE COURT:  And they said you didn't respond to that,

25    you hit them with the complaint.

1          MS. WEISMANN:  Well, I'm not sure that there's

2     anything in there that really warranted this.  Certainly to us

3     it doesn't read as a red flag, whoa, hold on, your request is

4     so overbroad that we don't even know what to do with it.  It

5     simply says we can't meet our time limits that the statute

6     requires and if you want things faster, sure, you may wish to

7     wait until we're done.  And that's the sum total of what they

8     told us.

9          We did have discussions with the Civil Division.  And

10    when I was initially given an estimate from the Civil Division

11    of eight to 10 million documents, could I narrow, I said I'm

12    happy to talk about narrowing, but I need to know what kind

13    of -- what are the categories of documents.  Because I can't,

14    you know, in a void narrow my request without knowing what

15    kinds of documents are we talking about.

16         I asked them several times could I meet or talk to

17    the, you know, the records -- whoever is in charge of these

18    records, just to get a general sense of what these records are

19    so we can talk meaningfully about how to narrow it.  And that

20    was never forthcoming.  And eventually the department's counsel

21    did come up with limiting language to which we readily agree.

22         So I have to really take issue with the notion that

23    any delay is CREW's fault.  I think that is entirely at odds

24    with the facts here.

25         And I think the notion that they, in fact, acted

1    expeditiously on our request is simply not borne up with this

2    case because they took seven and a half months, OIP, to decide

3    initially on whether we were entitled to a fee waiver.  Why did

4    that take seven and a half months?

5            THE COURT:  I don't know.  Is that not a reasonable

6    period of time, though?

7            MS. WEISMANN:  Not on a fee waiver request, Your

8    Honor.  They had all the facts they needed initially.

9            The Civil Division made --

10            THE COURT:  Well, they said you had to wait your turn

11    behind everyone else that was seeking expedited things.

12            MS. WEISMANN:  On a fee waiver, though.

13            And, Your Honor, look at what the effect has been.

14    The effect has been to shut us out completely.  Because now

15    they're saying in order for us to even look, to see whether

16    there are potentially nonexempt documents, you have to pay.

17    And we think we meet all of the criteria for a fee waiver.

18            And the procedure that counsel is proposing here

19    totally inverts the burden of proof because --

20            And there's a case in the District, from this

21    District.

22            THE COURT:  The Accuracy case?

23            MS. WEISMANN:  No.  The case I would cite to the

24    Court is a decision of Judge Sporkin in 1989.

25            THE COURT:  It's not cited in this report, is it?

1          MS. WEISMANN:  I don't believe it is, because we

2    haven't gotten to this level.  But it's found at 710 F.Supp

3    362.  It's called Project on Military Procurement v. Department

4    of the Navy.

5          And in that case you had a plaintiff very similar to

6    CREW, it was a public interest nonprofit organization, that was

7    looking at fraud and waste and government contracting and filed

8    a FOIA request.  And as the government has done here, the

9    government in that case in part said we're going to deny your

10   fee waiver request because some of the documents -- because the

11   documents you want are privileged.

12         And what Judge Sporkin said, and I think it's very

13   instructive for this Court, is that it would invert the burden

14   of proof.  And I'm quoting from the case.  And foist upon

15   plaintiff a burden that is not provided under the FOIA.  In a

16   fee waiver case the plaintiff bears the initial burden of

17   demonstrating it has satisfied the public interest analysis.

18   In challenging a decision to withhold documents the burden is

19   upon the defendant to justify its nondisclosure.

20         And the judge went on to say that there's really no

21   record in this case at this point from which, you know, we have

22   to assess the validity of the government's withholdings.

23         I mean, what the government is asking this Court to

24   do is to allow it to cherry pick a handful of documents from

25   its selective -- I mean, they finally did admit they haven't

1    looked at all the documents -- from its selective review of

2    documents and come into this Court and unilaterally make the

3    decision that those documents are exempt.

4         And now counsel says, well, let us come in with

5    declarations. It's too late. Well, this Court's standard of

6    review is de novo on a fee waiver issue, it's based on the

7    record before the agency. None of that is before the agency.

8    We weren't told the reason that this stuff is exempt is because

9    we have this document that's memo A that goes from so and so to

10   so and so. We were told nothing. And its too late for them.

11        And that's because the proper place in FOIA

12   litigation for that kind of argument and that kind of

13   litigation is when we're litigating the merits of exemptions.

14   But we can't even get there because they tell us, sorry, we are

15   precluded from doing anything more until you pay up. And our

16   position is we're entitled to a fee waiver, why should we have

17   to make a commitment to pay before you will even look for more

18   documents.

19        Unless the Court has any further questions, Your

20   Honor.

21        THE COURT: No.

22        Ms. Olson, anything further?

23        MS. OLSON: Yes. Thank you, Your Honor. There are

24   just a few points I would like to make in response to what the

25   plaintiff's counsel said.

1          First of all, it wasn't our responsibility after we

2     initially notified them in about July of last year to contact

3     them and plead for a narrowed request.  I did contact

4     plaintiff's counsel immediately after the litigation was filed.

5     And when the client explained to me that they had gotten no

6     response and that they were facing a pool of eight to

7     10 million documents, that was in early December.  And if

8     plaintiff's counsel asked me to talk to the custodian of the

9     documents, I believe I would have felt it was more appropriate

10    for me to talk to that person, and I did, for a more detailed

11    explanation of what these documents were so that we could come

12    to an agreement on how to narrow them without excluding

13    documents that the plaintiff might be interested in.  And we

14    did come to such an agreement after, I think, going back and

15    forth two or three times with some proposed definitions.

16          On the fee waiver issue, the Office of Information

17    and Privacy, unlike the Civil Division, which was gathering

18    documents from one source, that is the litigating component,

19    the Civil Division, the tobacco team, OIP was gathering

20    documents from the three highest offices within the Department

21    of Justice based on the very broad initial request.  And so it

22    may have taken a bit more time, but not an unreasonable amount

23    of time, for OIP to gather -- to proceed with that process and

24    be able to reach a conclusion.

25          Now, as far as Judge Sporkin's case is concerned,

1    there's some more modern cases, one of which is Van Fripp.  And

2    that's at 2000 U.S. Dist. Lexis 20158, which was a 2000 case,

3    which says that --

4            THE COURT:  Is that cited in your report?

5            MS. OLSON:  I think we did cite it in the joint

6    report.  Van Fripp F-R-I-P-P.  I think it's cited -- well, it's

7    cited in the letters we sent to them in January.

8            THE COURT:  I don't think you focused my attention on

9    this.  There was one case, I think, the Accuracy Media Case, I

10   believe, that was cited.

11           MS. OLSON:  Okay.  There's a Department of Justice.

12           THE COURT:  I would have read these cases.

13           MS. OLSON:  Oh, no, no, no.

14           THE COURT:  And I will read them.

15           MS. OLSON:  I haven't looked into -- I'm sure there

16   are more out there, but this isn't really the issue that -- you

17   know, we're not here today to argue a brief.

18           But I just wanted to bring the Court's attention to

19   this case because it says at headnote 10, the second factor

20   reviewing --

21           THE COURT:  Would it be appropriate for the Court to

22   put in place a briefing schedule?

23           MS. OLSON:  I think so.

24           THE COURT:  Certainly I would have read these cases

25   had they been brought to my attention.  I think I'm familiar

1    with Judge Sporkin's case.

2              MS. OLSON:  I think we're both getting a little ahead

3    of the game, perhaps.

4              But the second factor, this just says that what's

5    important to consider is whether the disclosable portion of

6    requested information are meaningfully informative in relation

7    to the subject matter requested.

8              In other words, the public can't be informed about

9    the operation, can't reach a better understanding about the

10   operations of government based on documents that will never be

11   disclosed to the public.  And I think Judge Sporkin's case kind

12   of leapfrogs and says that we should decide the merits of these

13   privileges before we even decide who pays for the search.  And

14   that would put the government in the position -- for example,

15   in this case, let's say there are a million documents or

16   250,000 documents involved -- of processing and doing a Vaughn

17   Index on each of those documents before we even decide who is

18   going to pay for it.

19             And if it turns out CREW pays for it, I don't think

20   they would be happy.  And if the government pays for it,

21   perhaps CREW wouldn't even have wanted these documents

22   processed if it knew they would never be disclosed.

23             So it kind of turns the whole point of the fee waiver

24   on its head, because it puts the government in the position of

25   paying.  And I think the rationale is that --

1           THE COURT:  So what's your recommendation at this

2    point?  Counsel doesn't want the Court -- if I understand

3    plaintiff's position correctly, the plaintiffs would prefer the

4    Court not focus on the fee waiver issue at this point, not

5    focus on the merits at this point and focus rather on bad faith

6    at this point.  That's going to delay ultimate resolution of a

7    merits determination.

8           MS. OLSON:  Yes, it will.  And I think it would be a

9    fishing expedition ultimately.

10          THE COURT:  Maybe it's appropriate for the Court to

11    focus on bad faith, which means that the Court will put in

12    place some sort of briefing schedule and deal with that issue

13    first and then resolve what remains.

14          MS. OLSON:  But there's no evidence of bad faith.  So

15    it would be doing that based purely on speculation.  It's

16    unclear who would be deposed, what they would be asked, and I

17    guarantee that they would have nothing to say because there's

18    nothing to say.  There's no evidence of bad faith.

19         I think that the case has proceeded expeditiously.  I

20    mean, six months in a FOIA case is nothing, six or seven

21    months.  And what we should decide now is who should pay the

22    fees for further processing.  What CREW wants are the

23    documents.  And if we decide the fee waiver issue now, then we

24    can decide whether we're going to proceed, whether these

25    documents will even be disclosed.

1          I think the expedition issue is water under the

2     bridge.  The agency has proceeded expeditiously.  There's no

3     evidence of bad faith, other than perhaps minor bureaucratic

4     delays caused by the statute itself, by the constraints of the

5     statute itself.

6          And so I think a discovery here would be a complete

7     waste of time.  I think what's on the table now is the fee

8     waiver issue.  And I think a briefing schedule should be set

9     for that.  You know, if the public, regarding Judge Sporkin's

10    case, if the public isn't going to gain by this, the public

11    shouldn't pay.  So we should decide now who is going to pay for

12    the continued processing of these documents and get to the

13    issue of the merits.  And I think fishing expeditions --

14         THE COURT:  The public has a right to know whether or

15    not there's been any bad faith, though.  Doesn't the public

16    have a right to know that?

17         MS. OLSON:  I think it would truly be a fishing

18    expedition, Your Honor.

19         THE COURT:  It may be at the end of the day, though.

20    But shouldn't there be a legitimate inquiry about that, what

21    was done, what wasn't done, so that at least a court can

22    determine whether or not a prima facie showing of bad faith has

23    been shown, which may pave the way for discovery?

24         I accept your representations as an officer of the

25    court, but you do have -- and I'm not assigning any bad faith

1    to your representations, but isn't more required, though?

2          MS. OLSON:  Not unless there's some evidence of bad

3    faith, and there's none here.  We have agency people doing

4    their job to process documents in accordance with the statute.

5    And I think they've done it expeditiously.

6          THE COURT:  They've done the best job they could

7    under the circumstances?

8          MS. OLSON:  Yes.

9          THE COURT:  And the case was expedited, to the extent

10   it should have been expedited, under the circumstances, taking

11   its place behind other cases that are expedited?

12         MS. OLSON:  Yes.

13         THE COURT:  Is that right?  Was that a real yes?

14         MS. OLSON:  Yes, it is.  But I don't know if it even

15   took its place behind other cases.

16         THE COURT:  It didn't leapfrog, though, did it?

17         MS. OLSON:  I don't know if it did or not, but I

18   think six months is a darn short amount of time.

19         THE COURT:  But this is a high profile case, though.

20   This is a case that I think the trial was over when, September

21   or so?

22         MS. OLSON:  Well, I know they gave it very immediate

23   consideration.  Both components responded to CREW within two

24   weeks of their original June 28 request.  They gave them a

25   response.

1    THE COURT:  That would have been standard anyway.

2    You have to respond within that time frame.

3    MS. OLSON:  They did.  And they said --

4    THE COURT:  That wasn't just a favor to the

5    plaintiffs, though.

6    MS. OLSON:  Well, they asked them to narrow their

7    request.  They put them on immediate notice that this was going

8    to involve a huge pool of documents.  And that the burden was

9    on the plaintiff or the ball was in their court.  At that

10   point -- at any point in time in the last six or seven months

11   they could have done one of two things; narrowed the request or

12   paid an installment of fees and the processing would have

13   proceeded.

14   THE COURT:  But they couldn't have sought a waiver of

15   fees, though, at that point, could they?

16   MS. OLSON:  Well, they could have from the Civil --

17   Well, the Civil Division, I believe, immediately

18   denied a fee waiver.

19   THE COURT:  And the other issue wasn't denied until

20   January 19?

21   MS. OLSON:  Right.  And both of them granted

22   expedition.  By August expedition was granted.  So I think CREW

23   then appealed the denial of the fee waiver and that process

24   took some time.  And this has been actively processed for the

25   last --

1    THE COURT:  It seems to me, and I'm not making folly

2    of your argument at all, but it seems to me, trying to sum it

3    up, it seems to me you're saying you did the best you could

4    under the circumstances and at the end of the day, Judge, they

5    aren't going to get anything anyway, so why are we focusing on

6    bad faith?

7    MS. OLSON:  Well, no, I don't want to characterize my

8    argument quite that way.  Because if there were bad faith, I

9    think that would be a very important issue to look into.  You

10   can't just brush that under the rug.

11   THE COURT:  Right, exactly.

12   MS. OLSON:  But there is no evidence of bad faith

13   here.  You know, you can't say that anything wrong has happened

14   and the past should be forgotten because the ultimate issue is

15   they're not going to get anything.

16   THE COURT:  And the plaintiffs have to say more than

17   just, Judge, this appears to be bad faith?

18   MS. OLSON:  Right.  Based on how slow the agency was,

19   because the agency wasn't slow.

20   THE COURT:  Right.  Well, then what is the judge

21   supposed to do, look at what the agency did, I guess, every

22   step of the way and determine whether, as a matter of fact,

23   there has been bad faith, right?

24   MS. OLSON:  Yes.  Look if there's some evidence of

25   bad faith on the part of the people processing these documents.

1    If you look at the letters, the correspondence that was sent,

2    and the fact that the agency acted immediately when the

3    plaintiff -- we finally reached an agreement as to a narrowed

4    request to bring this into manageable proportions, the agency

5    has taken every step it can.

6         Now, within six or seven months every step it is

7    allowed to take under the statute has been taken. I mean, how

8    fast -- it's sort of impossible to imagine that they could have

9    done it a great deal faster, to have turned around a request

10   for eight to 10 million documents within fewer than six months

11   would be, I think, remarkable.

12        So I just don't think there's any -- there has to be

13   some evidence. The case law says that bad faith can't be based

14   on speculation. And if you had pressures being put on people

15   or something unusual out of the ordinary, then perhaps that

16   would be evidence of bad faith. But here I think you had the

17   reasonable ordinary, perhaps somewhat cumbersome, process under

18   the FOIA statute of looking at documents.

19        THE COURT: So they would have to have a declaration,

20   say, for instance, that pressures were being placed on people,

21   for instance?

22        MS. OLSON: No, they wouldn't have to have a

23   declaration.

24        THE COURT: How did they ever make that showing then?

25        MS. OLSON: I think if the agency hadn't come up with

1    answers to any of their -- you know, they asked for expedition,

2    they asked for a fee waiver.  If the agency had just been

3    unresponsive, if it hadn't conducted the review, the two-hour

4    review that it's statutorily required to conduct.

5         THE COURT:  Nothing had been done, right.

6         MS. OLSON:  Yeah.  Or if any of those things -- if

7    there's some inexplicable reason for the delay.  But I think

8    here it's just the ordinary workings of government.  And I

9    think they did proceed fast.

10        THE COURT:  At the very least, though, the Court

11   should have some limited briefing schedule in place on this

12   issue, on bad faith, or have I heard enough, I've heard enough,

13   I don't need to hear any more?

14        MS. OLSON:  Oh, I'm sorry.

15        THE COURT:  No, no, I'm just asking you.  You had

16   some cases, some other cites you were going to give me.

17        MS. OLSON:  There was another case, just regarding

18   the fact that on the fee waiver, and this is really the merits

19   of the fee waiver, that if documents are not -- it's a U.S.

20   District Court, I think, of D.C. case as well -- that if the

21   documents are not disclosable, then the public can't benefit

22   and the public shouldn't pay the bill for the processing of the

23   documents.  And I think that's the issue that we should now

24   confront and not speculate and go on fishing expeditions

25   into --

1          THE COURT:  That gets back to my original point.  The

2     bottom line is they don't get anything, Judge, they don't get

3     any documents.

4          MS. OLSON:  They might if the Court decides that they

5     do ultimately.  If the Court -- if we address the fee waiver

6     issue now, what happens is the Court will either say the

7     government pays or CREW pays based on --

8          THE COURT:  All right.  Let's assume I say the

9     government pays.  Then maybe what the Court should do is hold

10    in abeyance the bad faith argument and just get to the merits

11    of this case, have you produce your privilege log and maybe

12    appoint someone to review the documents in camera.  Would that

13    be appropriate?

14         MS. OLSON:  Certainly the Court in reviewing the

15    documents, if there were any suspicion of bad faith, the issue

16    can always be addressed.  But there's no evidence of it now and

17    there's no point.  The Court will, and perhaps CREW, will

18    become more educated as to the nature of these documents.  And

19    I think light will be shed on this case in general if we

20    proceed with the fee issue now, the fee waiver issue.

21         And in the process of doing that we will submit

22    declarations to the Court explaining why we have denied the fee

23    waiver.  And the basis for that denial is that in looking at

24    the portion of documents, and we've focused on the ones we

25    think would be of the greatest interest to CREW, we've looked

1    at them and determined that they are privileged.  And,

2    therefore, the public would not benefit from their disclosure

3    and a fee waiver should be upheld.

4            THE COURT:  The public wouldn't benefit because they

5    wouldn't be disclosed?

6            MS. OLSON:  The denial of a fee waiver should be

7    upheld.

8            Pardon me?

9            THE COURT:  The public would not benefit because

10    they're not going to be disclosed?

11            MS. OLSON:  Yeah.  The understanding of the

12    government would not be enhanced because these documents will

13    never come to public light and, therefore, the public shouldn't

14    pay for their processing.

15            THE COURT:  Then someone must have looked at all the

16    documents in an effort to determine that these are the

17    documents that plaintiffs probably would want.

18            MS. OLSON:  Well --

19            THE COURT:  I thought you told me earlier that no one

20    has looked at all the documents.

21            MS. OLSON:  I asked the head of the tobacco

22    litigation team to give us a representative sample of the

23    documents that he felt would be of the greatest interest to the

24    plaintiff.  And we narrowed the request to begin with documents

25    dated January 2005 onward because that's when the remedy phase,

1    the debate over the remedies began to take place actively.  We

2    didn't want to get into --

3             THE COURT:  Does that satisfy the review process,

4    though?  I mean, if someone on the litigation team is asked to

5    determine what he or she believes plaintiffs would want, does

6    that satisfy the requirement?

7             MS. OLSON:  I just thought a random sampling would

8    come up with a lot of documents, for example, documents that

9    were already publicly disclosed or documents, you know, routine

10   litigation procedure documents.

11            THE COURT:  I understand what you're saying, but I'm

12   thinking out loud, I'm just asking, does that satisfy FOIA?

13            MS. OLSON:  Yes.

14            THE COURT:  I mean, the whole purpose of FOIA is the

15   public has a right to know to the extent that it's allowable.

16   The public has a right to know what its government is doing.

17   And we have to keep in mind it's the people's government we're

18   talking about.

19            A FOIA request is made and then pursuant to that

20   request then a request is made by the person receiving the FOIA

21   request to ask counsel in related litigation or unrelated

22   litigation to take a look and provide documents that he or she

23   thinks are relevant to this FOIA.  Does that satisfy FOIA?

24            MS. OLSON:  Yes.  We have to look at a portion of the

25   documents.

1          THE COURT:  But you're looking at what someone else

2     has given you, though, and say they probably want fees, let's

3     see, they probably want this one, maybe not that one, they

4     probably want this, and then they give them to you, you're the

5     reviewing officer, you have a statutory responsibility.  That

6     lawyer who has an interest in the outcome of that case doesn't

7     have the same sensitivity necessarily or objectivity

8     necessarily that the reviewing officers should have, I think.

9          MS. OLSON:  But I asked him to provide documents that

10    he thought were most responsive.

11         THE COURT:  Well, shouldn't the response be, hey, we

12    have this response and we have an obligation to the public,

13    give us your documents?

14         MS. OLSON:  Well, that's what I asked for, documents

15    that if they were disclosable would be of the greatest -- I

16    mean, I was trying not just to take a random sample.

17         THE COURT:  I'm not beating up on you.  I'm just

18    saying it seems to me the response should have been give us

19    your documents, we'll review them.

20         MS. OLSON:  Well, we have access to them.

21         THE COURT:  That's not what you're telling me,

22    though.  Have you reviewed all the documents that the

23    litigation counsel --

24         MS. OLSON:  Well, I wanted to make the best use of

25    the two hours that we're required to conduct.

1          THE COURT:  I'm not sure you can do that.  I'm just

2     carrying this discussion with you.  I'm not so sure you can do

3     that by just saying to the attorney give us the documents that

4     you think the plaintiffs are most interested in.

5          MS. OLSON:  Well, I can go over any time and look at

6     all the documents, but we were only required or allowed under

7     the statute to conduct a two-hour review.  So I said give us an

8     over inclusive set of documents that will take us two hours to

9     review.  Because he knows more about what's in these documents

10    than I do if I go over there and see two rooms full of files.

11    So I could do that, but I think a random sampling would be much

12    less informative to the Court and to the public.  But I could

13    do that, if that's what the Court wanted to do.

14         THE COURT:  I'm just thinking out loud.  What's the

15    statutory responsibility, though, of the FOIA lawyer who

16    receives this?  Is it to rely upon someone else who posted

17    these documents and says, here, we're not going to give

18    you these?  They kept some documents.

19         MS. OLSON:  No, they haven't kept anything.  We have

20    access to all of them.  It's our Civil Division, the

21    counter-part to Ms. Pustay, Jim Kovakas, who actually conducts

22    the review.  But I wanted to see them myself so that I could

23    come to the Court and say --

24         THE COURT:  All right.  I understand what you're

25    saying, but all you're telling me, though, is that all you've

1    seen is what they've given you, the lawyer's given you?

2         MS. OLSON:  Yes.

3         THE COURT:  And he's picked through them.  You showed

4    him this FOIA request and he's picked through them, or she.  Is

5    it a man or a woman?

6         MS. OLSON:  It's a guy.

7         THE COURT:  All right.  It's a guy.  This guy picks

8    through them and gives you some documents.  I mean, does that

9    process instill confidence in the public?  Does the public have

10   confidence in that process?

11        MS. OLSON:  But Jim Kovakas or I can go to this room

12   full of documents any time and pick out any documents we want.

13   I just wanted him to have a targeted approach so that the

14   portion of documents we looked at would be the most

15   enlightening to the Court and to the public.

16        THE COURT:  Is this normally what happens, though?  I

17   just don't know.

18        MS. OLSON:  Well, when you have eight to 10 million

19   documents, I mean, for me to go over and do a random, you know,

20   blindly sort of pick documents out and start reviewing for two

21   hours, I might come up with nothing but public pleadings.  And

22   I didn't want to waste the Court's time or my time when

23   ultimately we'd come to explain to the Court why we denied the

24   fee waiver.  I wanted to be able to say, you know, these are

25   documents that would be of great interest and if the Court

1    wants more of them, we can do ultimately all of them.  But

2    under the statute we're only required to review the documents

3    for two hours, and so I wanted it to be a fruitful two hours.

4            THE COURT:  It's just troubling listening to you.  If

5    that's the way the government does its business, then so be it.

6    It's just troubling to hear that that's the process.

7            MS. OLSON:  Why, Your Honor?  I'm not understanding.

8    Because --

9            THE COURT:  All right.  The FOIA request comes in and

10   goes to who, it goes to you?

11           MS. OLSON:  No.  It goes to Jim Kovakas.

12           THE COURT:  It goes to the litigation lawyer?

13           MS. OLSON:  And to Ms. Pustay at the Office of

14   Information and Privacy.  Then Jim Kovakas is required on the

15   fee -- when they ask for a waiver of fees Jim Kovakas is

16   required to conduct a two-hour search of documents, a two-hour

17   review.  For two hours he's supposed to review the pool of --

18           THE COURT:  This is the guy we're talking about,

19   right?

20           MS. OLSON:  No.  The guy is Steve Brody.  He's the

21   head of the tobacco litigation team.  So he knows all these

22   documents intimately.

23           THE COURT:  But he doesn't have any statutory

24   responsibility insofar as the FOIA request is concerned?

25           MS. OLSON:  No, but we were just trying to extract a

1    meaningful portion of documents from this general pool of eight

2    to 10 million documents, or maybe it's less.  It's fewer than

3    that now because we've narrowed the request.

4            But of all the documents that are responsive from

5    January 2005 onward I wanted to get to the meat of it.  I

6    didn't want to be reviewing certificates of service.  So I said

7    to Steve send us over a portion of documents for our two-hour

8    review that are not public, extract the documents that are

9    responsive that will be the most informative.  Or I don't know

10   what words I used, but I said send us documents that, you know,

11   it's not going to be a waste of time, these are not going to be

12   public documents, and that's what he did.

13           And I think that was -- it was to help the process,

14   not intended to exclude documents.  This was to make sure that

15   the important documents were included because he knows them

16   intimately because he's worked on the case for five years.  And

17   I can go over any time and pick any number of documents that I

18   want or Jim Kovakas can.

19           THE COURT:  All right.  And the person who you got

20   the documents from is a career --

21           MS. OLSON:  Yes, he is a career person who headed the

22   tobacco litigation team, Steve Brody.  He knows -- he's

23   familiar with all the documents.

24           And then Jim Kovakas is the Civil Division FOIA

25   person who conducts the review.  And then when the litigation

1    was filed, I told Jim and Melanie Pustay with OIP that I

2    personally wanted to review the documents so that I could come

3    to the Court and say to the Court I have looked at these, I've

4    looked at about I think it's over a little bit over a hundred

5    documents.

6            THE COURT:  But those are the documents that have

7    been selectively given to you?

8            MS. OLSON:  The two-hour review.  Those are from

9    among the documents that Steve sent over.

10           THE COURT:  But you're raising a lot of questions,

11   though.  And, again, I'm not criticizing you, but you're

12   telling me that you get these documents that have been

13   selectively selected by someone, albeit you say give us the

14   documents that you feel as though would be most responsive to

15   plaintiff's request, whether they get it or not they're not

16   going to be public now, give me the documents --

17           MS. OLSON:  Well, I didn't say whether they get it or

18   not.

19           THE COURT:  Well, that's my editorial.

20           MS. OLSON:  Right.

21           THE COURT:  They weren't going to be public.

22           MS. OLSON:  Well, we didn't know that at that point.

23           THE COURT:  That's what you just said, though.

24           MS. OLSON:  Well, after we reviewed them we

25   determined that, after Jim Kovakas reviewed them.

1          THE COURT:  But you get a random sampling of those

2     documents, though?

3          MS. OLSON:  Yeah.  Well, we could get a random

4     sampling.  It is more or less random.

5          THE COURT:  Does that discharge the government's

6     responsibility, though, legal responsibility?

7          MS. OLSON:  Yes.  We're just required to do a

8     two-hour review of a portion of the documents.

9          THE WITNESS:  Right.  A portion of the documents that

10    have been selected by someone else, though.

11         MS. OLSON:  Well, but --

12         THE COURT:  And, again, if that's the process, then

13    that's fine.  This has all been very educational, but it just

14    raises questions, that's all.

15         MS. OLSON:  I can't speak for Jim Kovakas, because I

16    know that -- actually, I'm going to correct myself.  Before I

17    got on this case, before the case was filed, Jim Kovakas'

18    office did review documents based on their broader request for

19    two hours.  And many of those were completely -- you know, they

20    were possibly public.  Or whatever was responsive to their

21    request he did a two-hour review.

22         When the litigation was filed and we narrowed the

23    request, I said to Steve Brody send me over documents

24    post-January 2005 or afterward based on this narrowed request.

25    I don't want public documents, I don't want documents that CREW

1    isn't interested in, send me the documents that we can look at

2    for two hours.

3        So Jim Kovakas did do a two-hour random sampling

4    based on their broader request.  I was trying to target it so

5    that we really get to the heart of this matter.

6        THE COURT:  But his search was random?

7        MS. OLSON:  Whose, Jim's?

8        THE COURT:  Yes.

9        MS. OLSON:  Yes, his would have been completely

10   random.  But I felt like -- this litigation has been going on

11   for five years.  There are too many documents in this pool that

12   are irrelevant, unimportant, public, and I just don't think we

13   need to waste time with those.

14       THE COURT:  I keep going back to the first question I

15   asked.  Why doesn't my beloved colleague have this case, Judge

16   Kessler?  It's been going on for five years, hasn't it?

17       MS. OLSON:  Well, I don't think it's that complicated

18   a case.  I think it will be self-evident, when the Court gets a

19   taste for what these documents are, that they're all going to

20   be work product or deliberative process, possibly

21   attorney-client.

22       THE COURT:  That gets back to something else.  In the

23   final analysis the public doesn't get anything, they don't get

24   any documents?

25       MS. OLSON:  Well, we don't know that yet.  I mean,

1    the review at this point is just for fees, it's not on the

2    merits and so you're only obligated to look at a portion of the

3    documents.  And OPR has taking care of its investigation.

4              THE COURT:  Our circuit -- I'm just thinking back now

5    to other cases -- our circuit has focused on procedures for a

6    random sampling process in some cases.  Is that the same random

7    sampling procedure followed by your colleagues in determining

8    what documents to review?

9              MS. OLSON:  Yes, Your Honor.  I don't mean to mislead

10   you in thinking this was not a random sample.  It was

11   perhaps -- what I didn't want was a lot of fat.  I didn't want

12   the public documents.  I didn't want -- I just wanted to get to

13   the, really get to the meat of the matter.  And it was random,

14   but I'm trying to be helpful to the Court and to the plaintiff.

15   And --

16             THE COURT:  I understand.  And certainly excluding

17   documents that they already know or certainly excluding

18   documents that are already within the public's province.

19             MS. OLSON:  And the Court can look at as many

20   documents as it wants.  We can go in, close our eyes and pull

21   documents out.  But I've looked at over a hundred documents.

22   It's more than two hours.  So I probably spent four or five

23   hours looking at those documents, just because it takes time to

24   read everything.  And so you can take a random sample from them

25   or from the remaining documents of that room full of documents

1    that the litigation team has.

2            THE COURT:  All right.  Thank you, Ms. Olson.

3            MS. OLSON:  Thank you, Your Honor.

4            THE COURT:  Ms. Weismann.

5            MS. WEISMANN:  We disagree that there's no evidence

6    that there's bad faith.  I mean, we are, obviously, very

7    limited in what we have access to because the government has

8    failed to disclose much of anything.  We now know that out of

9    the eight to 10 million documents that they originally

10   estimated were responsive somebody has culled out a hundred and

11   those one hundred have been looked at.  And now counsel is

12   saying trust us, that the other eight to 10 million are similar

13   enough to this hundred that you should be comfortable with our

14   self-selected cherry picking process.

15           And especially where we think there are going to be

16   for any number of documents serious waiver issues, to what

17   extent were these documents shared with tobacco industry

18   representatives?  And what about our request to OIP that on its

19   face saw documents that weren't privilege?  And they haven't

20   even begun to address that.

21           We asked for any contacts between the associated

22   attorney general and its former law firm, Alston & Byrd, which

23   represents tobacco companies.  And even though --

24   notwithstanding his involvement with that firm and that

25   industry he never recused himself from the underlying

1    litigation.  Those aren't documents that are privileged.

2             And Your Honor had a discussion with counsel earlier

3    about other documents that, you know, it's hard to imagine any

4    privilege.  They will never be accounted for under the process

5    that the government is using.

6             We don't have the smoking gun evidence yet because as

7    an outside FOIA requester the doors are closed to us.  They

8    want to close the doors at a very premature stage.  They want

9    to close the doors, not just to us, because we are a public

10    interest nonprofit group.  What we are dedicated to is

11    informing the public about areas of possible misconduct and

12    unethical treatment.

13             And that really is the backdrop here that you can't

14    ignore.  And that is that there were very serious and multiple

15    allegations.  Whether they're true or not we don't know.  But

16    that the government changed its position as a result of

17    improper political motivation.  That was repeated in articles

18    from the New York Times to the Washington Post.

19             The associated attorney general wrote an editorial to

20    USA Today explaining why the change took place.  And now when

21    we say, okay, give us the documents that explain this, they

22    close the door.  That's a potential waiver issue.  But if the

23    government has its way, nobody will ever get to explore that.

24             And we do think that there are serious questions.  Do

25    they amount to, you know, concrete proof of bad faith?  I don't

1    know.  But to come into court and say after seven and a half

2    months it's acceptable that all we've really done is given you

3    two hours of search time and looked at a hundred documents out

4    of eight to 10 million, that doesn't sound like good faith to

5    us.

6           And I want to just look at what they've said when

7    they denied our fee waiver.  They said there's no evidence that

8    any individual or organization attempted to influence the

9    government's litigating position.  What about the two trial

10   witnesses who came forward publicly and said we were pressured,

11   we were pressured by the associated attorney general's office

12   to change our testimony, to make it more consistent with the

13   government's watered down weakened proposal for penalties?

14          They said our claims about misconduct were too

15   ephemeral.  If it's too ephemeral, why is the Office of

16   Professional Responsibility looking into the matter?

17          Your Honor, all of this is a smokescreen.  And if the

18   government has its way, that's all it will ever get to.  And

19   that is why we dispute -- we don't think that it's a clear

20   enough record that we should just proceed to litigate in the

21   normal course.  We think there are serious questions that need

22   to be answered first.  And the government somewhere has to be

23   accountable for its behavior.

24          THE COURT:  Which means if I accept your proposal

25   then I'm going to put it on hold for any merits determination

1    or any briefing process.

2            MS. WEISMANN:  And we realize that.  And we are not

3    happy about that either, but we think these underlying

4    questions are just too important.

5            THE COURT:  What should the Court do?

6            MS. WEISMANN:  We think the Court should order a

7    limited period of discovery.  We have proposed 60 days.  You

8    know, I mean, if the Court believes another period is

9    appropriate.  But we know how people's schedules works.  We

10   don't want sort of excuses.  We're prepared to dedicate

11   whatever resources we can bring to bear to complete discovery

12   and then we can come back.

13           THE COURT:  But you're not entitled to discovery,

14   though, as a matter of course, are you?

15           MS. WEISMANN:  No, we're not as a matter of course.

16           THE COURT:  You have to overcome that hurdle, don't

17   you?

18           MS. WEISMANN:  We have to overcome that hurdle, yes.

19           THE COURT:  Shouldn't I get some more authorities on

20   that or shouldn't there be more of a record developed by

21   plaintiffs?  I recognize the awkward position you're in.

22   You're telling me you don't have the smoking gun.

23           MS. WEISMANN:  The problem is how do we develop that

24   record.  The government says there's absolutely no evidence of

25   bad faith.  We say there are all these indicia of bad faith.

1    will they -- but we have no way to test beyond that. And it's

2    only through discovery.

3            But we think there's enough, there's enough to raise

4    a serious question. There's enough when you have the kind of

5    delays. There's enough when you have, you know, things here

6    and there. When you have the government claiming that our

7    claims are too ephemeral. When the government wants to ignore

8    what the public record already is in this case.

9            The fact that here we are seven and a half months

10    later and all we know is that a hundred documents have been

11    reviewed and counsel says trust me, of those hundred

12    hand-picked documents, there's nothing that you're entitled to,

13    and they want to shut the doors, that's troubling.

14            THE COURT:  It is troubling.

15            What the Court should --

16            I assume there must be other authorities out there,

17    aside from Judge Sporkin's opinion and the authorities that Ms.

18    Olson mentioned to the Court. The Court would be happy to read

19    whatever additional authorities there are.

20            Maybe what the Court should do at this point is to

21    afford you an opportunity to supplement the record. We've

22    learned some things this morning as a result. And this is part

23    of the record in this case, this proceeding today.

24            What's reasonable under the circumstances? How much

25    time would you like to supplement the record with respect to

1     your request for discovery, the theory being that there's been

2     bad faith on the part of the government?

3          MS. WEISMANN:  Would two weeks be appropriate?

4          THE COURT:  That's fine with me.

5          MS. WEISMANN:  And, of course, Your Honor, I mean,

6     with the understanding that we so far don't have an avenue to

7     get the kind of smoking gun evidence.

8          THE COURT:  Well, I'm asking you, what do you want me

9     to do?  If you want to focus on this, I'm not going to turn

10     away from your allegations.  I'm prepared to put in place a

11     briefing schedule and get to the merits, which at some point

12     you want me to do.

13          But if you want an opportunity to attempt to persuade

14     the Court that you're entitled to discovery, then I'll be more

15     than happy to accommodate you, and the government as well, and

16     do it on an expedited, on a real expedited basis.

17          MS. WEISMANN:  Two weeks would be appropriate.

18          THE COURT:  Two weeks?  Today is the 9th.  That's

19     fine.  The 23rd.

20          Essentially, it will be your motion for discovery,

21     correct?

22          MS. WEISMANN:  Correct, Your Honor.

23          THE COURT:  I think it's appropriate for you to

24     attach to your motion your proposed discovery plan, what do you

25     plan to do if the Court agrees with you.

1          MS. WEISMANN:  We will attach a proposal as well.

2          THE COURT:  Is that enough time, two weeks?

3          MS. WEISMANN:  Yes.

4          THE COURT:  All right.  That's fine.

5          How much time would the government like, counsel?

6          MS. OLSON:  May I have two weeks to respond?

7          THE COURT:  Absolutely.

8          MS. OLSON:  Your Honor, may I make one point?

9          THE COURT:  Sure.  Let me first lock down these

10   dates.

11          The 23rd for plaintiff's submission.  And two weeks

12   thereafter is the -- is it March already?  March 9.

13          MS. WEISMANN:  February is a short month.

14          THE COURT:  Do you want to reply?

15          MS. WEISMANN:  Yes.

16          THE COURT:  How much time for your reply?

17          MS. WEISMANN:  A week.

18          THE COURT:  That's fine.  Let me give you ten days.

19   Why don't I just give you until -- let's see.

20          The 23rd, the 9th, and let's just say the 20th then

21   for your response, March 20.

22          Ms. Olson, you were about to say something?

23          MS. OLSON:  Yes, Your Honor.  Just that I think the

24   line is being blurred between bad faith, the alleged bad faith

25   in the government's position regarding damages and bad faith in

1    processing the FOIA request.

2            THE COURT:  Counsel is going to have to draw the line

3    there.  I agree with you, I don't want the line blurred at all.

4    That's why I'm affording everyone an opportunity to reduce

5    their arguments to writing.  I totally agree with you.

6            MS. OLSON:  You can't use FOIA litigation to punish

7    officials for alleged decisions that really have nothing to do

8    with a FOIA request.

9            THE COURT:  That's the underlying basis for the FOIA

10    lawsuit, though.  They believe something inappropriate

11    occurred.  And their argument now is that the government has

12    not been sympathetic or sensitive to their FOIA request in that

13    regard.  And that's the bad faith that I understand counsel to

14    be complaining about.

15            MS. OLSON:  I think I've said this before, but there

16    aren't eight or ten million documents responsive to their

17    narrowed request.  There are fewer than that, but there are

18    more than would take two hours to process.  And I think she

19    said that there might be evidence that documents have been

20    shared with tobacco companies and that's just outrageous.

21    There's no evidence of that.  And that has nothing to do with

22    whether there was bad faith, again, in the processing of this

23    FOIA request.  And if they really --

24            THE COURT:  I think the point counsel was making was,

25    well, suppose there were documents that showed that during the

1    course of litigation before another judge.  I think that's what

2    counsel was saying.

3        MS. OLSON:  Oh, okay.

4        Another thing is that if they really wanted these

5    documents, they could have paid conditionally --

6        THE COURT:  How much money?

7        MS. OLSON:  -- and we would have continued with the

8    processing.

9        THE COURT:  How much money?  It's a public interest

10   group.

11       MS. OLSON:  If I can just --

12       $330 to finish for the Office of Information and

13   Privacy.  It would be more than that for the Civil Division,

14   though.

15       THE COURT:  How much would it be?

16       MS. OLSON:  I don't know.

17       THE COURT:  Thousands of dollars?

18       MS. OLSON:  I know they have more documents than the

19   Office of Information and Privacy, so it would probably be in

20   the thousands.

21       THE COURT:  Given the high profile nature of this

22   case, would the government consider just waiving the fees,

23   though?

24       MS. OLSON:  Well, they're complying with the

25   standards --

1          THE COURT:  That's for traditional litigation,

2    though.

3          MS. OLSON:  -- in the statute.

4          Well, I think their objective is to comply with the

5    law no matter what.

6          THE COURT:  You can't make an exception?

7          MS. OLSON:  Well, the Court can make an exception to

8    the law, I suppose, but we certainly can't.

9          THE COURT:  The Court is going to follow the law.

10          MS. OLSON:  Thank you, Your Honor.

11          THE COURT:  All right.  Anything else?

12          MS. WEISMANN:  No, Your Honor.

13          THE COURT:  All right.  I'm sure I'm going to have

14    some more questions.  Let's just pick a date now that's

15    convenient for everyone.

16          I'm going to suggest April 6 at 10:30.  Is that a bad

17    date or bad time for anyone?

18          MS. WEISMANN:  That works for the plaintiffs, Your

19    Honor.

20          MS. OLSON:  That's fine with me.  Thank you.

21          THE COURT:  All right.  Thank you.  The parties are

22    excused.  Thank you.

23          (The hearing concluded at 1:30 p.m.)

24

25

1          CERTIFICATE OF REPORTER

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5                    *Elaine A. Merchant*

6                ELAINE A. MERCHANT, RPR, CRR

7                Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25