UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILE COPY
FILED
JAN 16 2001
NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

MOHAMED AL-FAYED, et al.,

Plaintiffs,

v.                                        Civil Action No. 00-2092 (CKK)

CENTRAL INTELLIGENCE
AGENCY, et al.,

Defendants.

## MEMORANDUM OPINION

This case comes before the Court on a motion by certain Defendants,[1] the Department of State (DOS), the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), and the National Security Agency (NSA), for a stay pursuant to *Open America v. Watergate Special Prosecution*. Plaintiffs, Mohamed Al-Fayed and Punch Limited, a British magazine of political satire that Mr. Al Fayed owns and publishes, seek agency records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The requested records pertain to the tragic deaths of Diana Francis Spencer, Princess of Wales, Emad "Dodi" Al Fayed, and Henri Paul, all of whom were killed in an automobile crash in Paris on August 31, 1997, and

---

[1] Only four out of a total of nine defendants have moved for a stay. The remaining defendants are the Department of Justice, the Department of Defense, the Immigration and Naturalization Service, the Executive Office of United States Attorneys, and the Defense Intelligence Agency. The United States Secret Service ("USSS") has been dismissed from this action. The parties have further indicated that Defendant Office of Intelligence Policy Review, a component of the Department of Justice, "need no longer be part of this litigation." Status Report 11/29/00 ¶ 2.



subsequent related events. Pursuant to the instant motion, Defendants DOS, CIA, FBI, and NSA (hereinafter "Defendants") seek a stay which would provide the agencies with additional time to complete the necessary review and release of their records. Based on the following, the Court shall grant Defendants' motion.

## I. BACKGROUND

The facts surrounding the deaths of Princess Diana, Dodi Al Fayed, and their driver Henri Paul have received extensive coverage in the international and national media, and require little elaboration here. The three died while driving through a tunnel under the Place d'Alma in Paris, France, leaving bodyguard Trevor Rees-Jones as the sole survivor of the crash. *See* Compl. ¶ 14. Plaintiffs' Complaint describes the ensuing French investigation, which concluded that Mr. Paul's intoxication and excessive speed on a dangerous stretch of road were responsible for the crash, *see id.* ¶ 15, the testimony of a former British foreign intelligence officer and member of MI6 in the course of the investigation, *see id.* ¶ 18, and a subsequent scheme to defraud Mr. Al Fayed out of millions of dollars in exchange for bogus CIA documents. *See id.* 24-51.

In particular, Plaintiffs detail the alleged involvement of Oswald LeWinter, who claims connections to United States intelligence operations, in the scheme to sell Mr. Al Fayed fabricated CIA documents suggesting that the crash represented a successful assassination of the Princess and her companion by British intelligence ("MI6"). *See id.* ¶¶ 21-23. Legal representatives of Mr. Al Fayed alerted the FBI and the CIA to the proposed transaction, whereby putative former CIA agents and others would exchange various documents pointing to purported MI6 involvement in the crash, and American knowledge of this involvement, for a large sum of money. Subsequently, Mr. Al Fayed's representatives proceeded to arrange the

2

transaction with the knowledge of American law enforcement officials, ultimately designating Vienna, Austria as the site for the exchange, which was to take place on April 22, 1998. *See id.* ¶ 39. Austrian authorities apprehended Mr. LeWinter in the course of the transaction, and he has since remained incarcerated there. *See id.* ¶ 45. At the time of his arrest, Mr. LeWinter was in possession of a variety of forged materials purporting to be CIA documents, and he allegedly implicated one or more actual CIA employees in the fraud scheme. *See id.* ¶¶ 46, 48.

Since these events, Mr. Al Fayed has sought the prosecution of other participants in the fraud scheme, and has attempted unsuccessfully to procure additional information by subpoena in actions filed in the United States District Court for the District of Columbia and the United States District Court for the District of Maryland. *See id.* ¶¶ 52-58. Mr. Al Fayed engaged former Senator George W. Mitchell to pursue any information in the possession of the CIA or the Department of Defense concerning the crash and related events. *See id.* 59-67. After failing to secure information through all of these venues, Mr. Al Fayed and Punch Limited submitted FOIA requests to twenty-one (21) separate branches of ten federal agencies seeking information pertaining to the crash. Plaintiffs divided their requests into twenty categories of names and incidents relating to these events. *See* Zaid Aff. ¶ 4. Shortly after submitting these FOIA requests, Plaintiffs filed a Complaint in this Court, asking for judicial review of the various agencies' failure to respond to, or denial of, their application for expedited processing of their FOIA requests.

## II. DISCUSSION

Defendants have moved to partially stay these proceedings with respect to Counts One, Two, Six, and Seven of the Complaint. In support of their motion, Defendants claim that

3

although they are exercising due diligence in responding to Plaintiffs' FOIA requests, exceptional circumstances prevent them from processing the requests within the statutory time limit.

A. Legal Standard[2]

Under Section 552 (a)(6)(C) of FOIA, the government may obtain a stay of proceedings "[i]f the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." 5 U.S.C. § 552 (a)(6)(C). The D.C. Circuit, in *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976), addressed Section § 552 (a)(6)(C) and found that an agency is entitled to additional time under FOIA's "exceptional circumstances" provision when the agency:

> is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

547 F.2d at 616 (quoting 5 U.S.C. § 552 (a)(6)(C)).

Effective October 2, 1997, as part of the Electronic Freedom of Information Amendments of 1996, Congress added the following two subsections to Section 552(a)(6)(C):

---

[2] The Court rejects Plaintiffs' argument that the Defendants' motion for a stay is "akin" to a motion for summary judgment. As in initial matter, Plaintiffs make this assertion without any basis in law, citing only to a case from the Northern District of Illinois which, contrary to Plaintiffs contention, has nothing to do with a stay, but rather, involves a motion to dismiss, or in the alternative, for summary judgment. *See Schweihs v. FBI*, 933 F. Supp. 719 (N.D. Ill. 1996); Pl. Opp. at 2-3. Moreover, there is little doubt that a motion for stay is substantially different from a motion for summary judgment. Most importantly, in stark contrast to a motion for summary judgment, a motion for a stay does not evaluate the merits of a case. Accordingly, the Court will pay little heed to Plaintiffs' insistence that the instant motion be treated as a motion for summary judgment.

4

> (ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.
> (iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

5 U.S.C. § 552 (a)(6)(C)(ii), (iii). The legislative history for the amendments reveals that Congress, having considered the decision in *Open America*, intended the 1996 amendments to be "consistent with the holding in *Open America*," wanted only to "clarify that routine, predictable agency backlogs for FOIA requests do not constitute exceptional circumstances." H.R. Rep. 104-795, reprinted in 1996 U.S.C.C.A.N. 3448, 3467.[3] Rather than overturn *Open America*, the 1996 amendments merely explain that predictable agency workload and a backlog alone, will not justify a stay. However, the amendments clearly contemplate that other circumstances, such as an agency's efforts to reduce the number of pending requests, the amount of classified material, the size and complexity of other requests processed by the agency, the resources being devoted to the declassification of classified material of public interest, and the number of requests for records by courts or administrative tribunals, are relevant to the Courts' determination as to whether exceptional circumstances exist.[4] See id.

---

[3] Thus, the Court rejects Plaintiffs' suggestion that, due to the amendments, *Open America* is no longer valid and binding caselaw in this Circuit. See Pl. Opp. at 2.

[4] The considerations enumerated in the legislative history directly rebut Plaintiffs' assertion that "non-FOIA demands" on agency resources "are not part of the statutory equation." See Pl. Opp. at 13. Specifically, the legislative history provides that courts contemplating a stay, after considering an agency's "efforts to reduce the number of pending requests," may also consider, *inter alia*, "the size and complexity of *other requests* processed by the agency, [] the

5

B. Exceptional Circumstances

As an initial matter, the agencies seeking a stay argue that Plaintiffs have refused to reasonably narrow the scope of their requests. *See* Def. Mem. at 17-18. Section 552 (a)(6)(C) provides that refusal to narrow a request shall figure into the Court's consideration of the "exceptional circumstances" question. *See* 5 U.S.C. § 552 (a)(6)(C). Plaintiffs assert that they have reasonably narrowed their requests in that they agreed to limit the dates of many of the requests to 1997 through the present. *See* Pl. Opp. at 9 n.9. Nonetheless, Defendants argue that this temporal limitation is of little value since there is little likelihood that Plaintiffs' requests, as initially posed, would have resulted in the location of material which predated 1997. *See* Def. Mem. at 18. In response, Plaintiffs insist that Defendants have refused to "negotiate a deadline for processing Plaintiffs' requests," and that "[t]his fact alone calls into question the good faith of defendants." Pl. Opp. at 9. However, Plaintiffs' expectation of a negotiated schedule misreads Section 552(a)(6)(c)(iii), which places the onus of modification squarely upon the requester, and does not indicate that an equal burden rests with the agency to "negotiate" an agreeable "deadline." *See* 5 U.S.C. § 552 (a)(6)(C). Accordingly, Plaintiffs' argument that Defendants have acted in bad faith, in this regard, is a non-starter, and it further appears that Plaintiffs' efforts to limit the scope of their requests are more symbolic than substantive.

Turning now to the specific claims of each agency, the DOS argues that the burden of the

---

resources being devoted to the declassification of classified material of public interest, or [] the number of requests for records by courts or administrative tribunals." H.R. Rep. 104-795, reprinted in 1996 U.S.C.C.A.N. 3448, 3468 (emphasis added). Accordingly, this Court will ascribe little, if any, weight Plaintiffs' argument in Section II.B. of his Opposition. *See* Pl. Opp. at 12-14.

6

large number of FOIA requests it receives, compounded by approximately 70 time-sensitive requests from Congress, the White House, and other executive agencies which fall outside of the agency's "predictable workload," have created "exceptional circumstances" which justify a stay of proceedings as to it. *See* Def. Mot. at 19-21; Grafeld Decl. ¶¶ 37-39. In addition, the DOS indicates that its efforts to respond to FOIA requests in a timely manner are hampered by the fact that the office which addresses the DOS's FOIA requests, as well as Privacy Act requests and other requests for information, suffers from a 36% vacancy in staff, despite agency efforts to the contrary. *See* Def. Reply at 15; Grafeld Decl. ¶ 42. The DOS further attests that, pursuant to its commitment to reduce the backlog of pending requests, the agency has initiated attempts to reorganize infrastructure, design and implement new technologies, and inaugurate a task force, all of which are aimed at reducing the backlog. *See* Def. Mot. at 22; Grafeld Decl. ¶¶ 2, 4, 6. As evidence of these efforts, the DOS reports that "Operation Good Faith Effort" taskforce has "completed action on many of the Department's oldest outstanding requests, clos[ed] over 2500 cases, and released nearly 70,000 pages to requesters." Def. Mot. at 24; Grafeld Decl. ¶ 17. Based on these circumstances, the DOS anticipates that it will be unable to respond before June 18, 2001 and argues that it is entitled to a stay until that date. *See* Def. Mot. at 8; Grafeld Decl. ¶ 63.

The CIA anticipates that it will be able to completely process Plaintiffs' requests by November 15, 2002. *See* Def. Opp. at 11; Dyer Decl. at ¶¶ 27, 38. The CIA asks this Court to stay its proceedings based on similar reasons to those offered by the DOS. First, the CIA notes that it has experienced a "steady increase" in the number of FOIA demands each year. *See* Def. Opp. at 25; Dyer Decl. ¶ 10. In addition, the CIA argues that the result of its decentralized

records system, while ensuring limited personnel access and enhanced physical security, requires that separate agency components must work together to complete many FOIA requests. *See* Def. Opp. at 25; Dyer Decl. ¶ 13. This unique need for departmental coordination within the CIA slows down the processing of requests. *See* Def. Opp. at 25-26; Dyer Decl. ¶ 14. Nonetheless, the CIA attests to exercising due diligence in processing Plaintiffs' requests and making reasonable progress in reducing its backlog. *See* Def. Opp. at 27. To support this contention, the CIA notes that it has instituted new technology which has resulted in a reduction of its backlog by 20%-23% over the past three years. *See id.;* Dyer Decl. ¶ 21. Still, the large volume of FOIA and Privacy Act requests received by the CIA, nearly 5,500 in 1999 alone, irreversibly slows the processing of requests. *See* Def. Opp. at 29; Dyer Decl. ¶ 27. The CIA points out that the burden of these requests cannot be anticipated, since even if the volume is high, there is no way to anticipate the breadth or complexity of each new request. *See* Def. Reply at 7-8. Accordingly, the CIA argues that, as a result of the large volume of requests and its due diligence in processing these requests, it is entitled to a stay.

The FBI's requests for a stay also indicates that it has "extreme" burdens on its information processing resources. *See* Def. Opp. at 30-32; Hodes Decl. ¶ 28. A continual influx of requests caused the FBI's backlog to reach a high of 16,244 requests by the end of 1996. *See* Def. Opp. at 30; Hodes Decl. ¶ 28. Over the past three years the FBI has hired over 350 new personnel to help process FOIA and Privacy Act requests and had succeeded in reducing the backlog to 3,733 requests by October 1, 2000. *See* Def. Opp. at 30; Hodes Decl. ¶ 34, 34. Nonetheless, the FBI argues that constant incoming requests combined with the agency's substantial FOIA and Privacy Act related litigation demands, both of which are unpredictable,

make rapid response to many requests an insurmountable challenge. *See* Def. Opp. at 30; Hodes Decl. ¶¶ 29, 30.

In Plaintiffs' case, the FBI, pursuant to its first-in, first-out processing system,[5] has placed Plaintiffs' requests into two queues according to the anticipated volume of potentially responsive records. *See* Def. Mem. at 11; Hodes Decl. ¶¶ 17, 37. The FBI indicates that the portions of Plaintiffs' requests for records which were assigned to the "small queue," for which 500 or less responsive pages are anticipated, can be processed by mid-February, 2001. *See* Def. Mem. at 11; Hodes Decl. ¶ 17. With regard to Plaintiffs' remaining requests to the FBI, which have been placed in the "medium queue," for which 501-2500 responsive pages are anticipated, the FBI has identified approximately 1,500 pages of potentially responsive material, much of which, the FBI believes will consist of classified information. *See* Def. Mem. at 33; Hodes Decl. ¶ 17. Consequently, the FBI indicates that it will be unable to completely process the requests waiting in the "medium queue" until February 28, 2002. *See* Def. Mem. at 11; Hodes Decl. ¶¶ 27, 38. Based on these facts, the FBI argues that the Court should stay its proceedings as to the FBI until

---

[5] In their Opposition, Plaintiffs contend that the FBI does not "truly process requests on a first-in, first-out basis." Pl. Opp. at 26. In support of this contention, Plaintiffs offer the declaration of James Lesar, an attorney who purports to "specialize in [FOIA] litigation." Lesar Decl. ¶ 2. Mr. Lesar offers anecdotal evidence which comports with Plaintiffs' assertion regarding first-in, first-out processing. However, Mr. Lesar's declaration relies, in many instances, on information which is over a decade old. Moreover, much of the declaration itself consists of unsupported assertions. Thus, the Court finds that there is little merit in Plaintiffs' assertion that the FBI does not adhere to a first-in, first-out processing formula. Furthermore, even if the FBI did not adhere strictly to first-in, first-out processing, there is little support for the contention that *Open America* requires such a system. To the contrary, *Open America* merely requires "good faith and due diligence" and a "procedure which is fair overall in the particular agency." *Open America*, 547 F.2d at 615. In this instance, Plaintiffs have not offered any concrete evidence that the FBI's processing system is unfair, or that it has been implemented in bad faith.

9

those dates because the FBI is functioning under the extraordinary circumstances provision in Section 552 (a)(6)(c).

Finally, the NSA, like the other defendants, contends that it is operating under extraordinary circumstances. See Def. Mem. at 35; Grube Decl. ¶¶ 15-18. Currently, the NSA estimates that there are 132 cases in the "simple" queue which are ahead of plaintiffs' requests, and that it will be able to reach Plaintiffs' requests by September 15, 2001. See Def. Mem. at 13, 36; Grube Decl. ¶ 30. The NSA points to ongoing personnel difficulties which have thwarted efforts to increase the size of its FOIA processing office. See id; Grube Decl. ¶ 15. More significantly, the NSA points out that many of its records contain classified information, which prior to release, must be examined on a word-for-word basis to insure against the inadvertent release of classified information. See Def. Mem. at 36; Grube Decl. ¶¶ 13, 14. These factors, attests the NSA, have lead to a substantial backlog of FOIA requests which, although answered on a first-in, first-out basis, are often slow to process. See Def. Mem. at 36, 37; Grube Decl. ¶ 18.

The NSA argues that the steady increase in the number of requests, combined with the largely classified nature of its materials and its staffing difficulties, makes reduction of its backlog a significant challenge which justifies the agency's need for extra time. Plaintiffs discount the NSA's claimed difficulties, questioning the veracity of the statistics offered in the Grube Declaration, arguing that staffing difficulties are predictable, and belittling the impact of the classified nature of the NSA's information. See Pl. Opp. at 16-17. In response, the NSA explains the statistical discrepancies by the simple fact that different methodologies were used to calculate the numbers. See Def. Reply at 12. In addition, the NSA explains that staffing

difficulties are not predictable, since vacancies are never predictable, nor is the volume of FOIA requests. *See id.* Lastly, the NSA notes that it is constantly looking for methods to speed up the process and to reduce its backlog of requests and has taken steps toward the purchase of new technology to assist in its efforts. *See* Def. Reply at 11-12; Grube Decl. ¶ 16-17, 29. Specifically rebutting each of Plaintiffs' attacks, the NSA argues that it has offered sufficient grounds to justify a stay pursuant to Section 552 (a)(6)(c).

All of the agencies' assertions are supported by lengthy and detailed affidavits, each of which explain the reasons for the agency's backlog and inability to process FIOA requests rapidly, and describe the measures being taken to remedy these problems. *See* Def. Exs. 1-4. Nonetheless, throughout their Opposition, Plaintiffs attempt to discredit the veracity of the various declarations offered by Defendants in support of their motion. Primarily, Plaintiffs' contrast the agencies' statistics regarding the number of pending requests and the size of the agency's backlog, offered in Defendants' affidavits, against similar statistics available through other sources. *See, e.g.,* Pl. Opp. at 16, 22, 26. Drawing comparisons, Plaintiffs imply that Defendants have manipulated their figures to support their motion and attempt to show that Defendants' attestations are not reliable. *See id.* However, despite these seemingly careful comparisons, Plaintiffs either fail to recognize, or fail to point out to the Court, that the differences in statistics are largely the result of differences in methodology. Namely, the bodies calculating the statistics were considering different information. For example, Plaintiffs' statistics on the NSA's FOIA workload include only FOIA requests, while the numbers offered in the Grube Declaration reflect both FOIA and Privacy Act requests. *See* Def. Reply at 12. Therein lies the innocent discrepancy. "Agency affidavits are accorded a presumption of good

11

faith," and contrary to Plaintiffs insistence, there is no evidence in this case which rebuts that presumption. *Safecard Services, Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Thus, the Court finds no grounds upon which to reject the factual assertions in Defendants' affidavits.

### III. CONCLUSION

After considering Defendants' motion, memoranda, and affidavits, Plaintiffs' opposition, and the relevant law, the Court is convinced that Defendants DOS, FBI, CIA, and NSA are entitled to invoke the "exceptional circumstances" provision of FOIA, due to unanticipated workload, inadequate resources of the agencies, complex and voluminous requests, the agencies' efforts to reduce the number of pending requests, and the exercise of due diligence in responding to Plaintiffs' FOIA requests. Further, as the Court found in its previous two rulings declining to issue a temporary restraining order or a preliminary injunction, Plaintiffs have not demonstrated a compelling need to expedite the processing of their requests. Accordingly, Defendants' motion for a stay shall be granted.[9] An appropriate Order accompanies this Memorandum Opinion.

_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

Jan. 16, 2001

---

[9] Not more than one month after this Court denied Plaintiffs' request for discovery into the processing of their FOIA requests, Plaintiffs' again implore this Court to permit discovery. As described above, each of the four Defendants that has moved for a stay has provided a detailed affidavit explaining its processing procedure and Plaintiffs' progress in that procedure. Given this reliable evidence, the Court sees no reason to permit discovery at this stage in the litigation. *See Safecard*, 926 F.2d at 1200 ("Agency affidavits . . . cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.") (internal quotations omitted).