**EXHIBIT A**

0001
1            UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLUMBIA
3

  ------------------------------:
4  CITIZENS FOR RESPONSIBILITY   :
   AND ETHICS IN WASHINGTON,     :
5                       :
     Plaintiff,          :
6                       :
       v.               : Case No.:
7                       : 05-2078(EGS)
   UNITED STATES              :
8  DEPARTMENT OF JUSTICE       :
                        :
9    Defendant.         :
                        :
10 ------------------------------:
11                    Washington, D.C.
                      July 18th, 2006
12
13 Videotaped Deposition of:
14        ROBERT D. MCCALLUM, JR.,
15        Called for oral examination by counsel for
16 Plaintiff, pursuant to notice, at the District of
17 Columbia District Court, 333 Constitution Avenue,
18 N.W., Washington, D.C., beginning at 10:40 a.m,
19 before Teague Gibson of Capital Reporting, a Notary
20 Public.
21
22        *  *  *  *  *
0002
1        A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF:
3        ANNE L. WEISMANN, ESQ.
         MELANIE SLOAN, ESQ.
4        Citizens for Responsibility
         and Ethics in Washington
5        1400 Eye Street, N.W., Suite 450
         Washington, D.C. 20005
6        (202) 408-5565
7  ON BEHALF OF THE DEFENDANT:
8        LISA A. OLSON, ESQ.

1

22   and you're relatively close by, as I understand it.
0092
1   Are you in main justice?
2      A   I am, have just gotten back I guess last
3   week into main justice so.
4      MS. OLSON:  You want to go off the record?
5      Q   No.  Mr. McCallum, when are you leaving
6   the Department of Justice?
7      A   I'm to be sworn in as the United States
8   Embassador to Australia this Friday on the 21st of
9   July.
10      Q   And when are you actually leaving the
11   country to Australia?
12      A   I would actually be leaving the country
13   around August the 13th.
14      Q   But the period between this Friday and
15   August 13th you will no longer be at the Justice
16   Department?
17      A   Do you mean will I physically be present
18   at the Department of Justice?
19      Q   You won't have an official capacity at the
20   Justice Department?
21      A   I will not then be Associate Attorney
22   General.  I have submitted a letter of resignation
0093
1   that will be effective immediately upon my being
2   sworn in as Embassador to Australia.
3      Q   But between now and August 13th will you
4   be in the Washington, D.C. area?
5      A   I will be a -- technically I believe I
6   will be an employee of the Department of State and I
7   will be involved in preparation for my departure
8   with activities at the Department of State and will
9   have facilities made available to me at the State
10   Department.
11      Q   And as Judge Kay mentioned when we
12   discussed the issue of document production, if the
13   Justice Department finds that it has responsive
14   documents and they are produced to us or if we are
15   permitted to go beyond the guidelines that Judge Kay
16   spelled out this morning the parameters for this
17   deposition, after this Friday will you be willing to
18   submit yourself to a further deposition if the court

50

8  for which you have said you were a target, at any
9  time I assume also you were interviewed for that
10  process?
11    A    Yes.
12    Q    And in preparation for your interview did
13  you at any time review the contents or any of the
14  contents of your redwell files?
15    A    Yes.
16    Q    And when in time would that have been?
17    A    I was interviewed on January 13, 2006
18  immediately before I had hip replacement surgery and
19  that's why I'm able to remember it, the date
20  specifically, because they were planning on
21  interviewing me at some date that was after the date
22  of my scheduled surgery.  And so I reviewed the
0130
1  contents of the redwell, not every page or
2  everything, but leafed through it prior to January
3  13, 2006.
4    Q    And based on that review, and I'm not
5  asking for the contents of any of the documents,
6  what is your recollection about the nature of the
7  documents, the kinds of documents that were in your
8  redwell?
9    A    Well, as I said before, there was those
10  two opinions.
11    Q    By those two you mean the D.C. Circuit
12  opinion and the February 28th opinion?
13    A    The February 28th order 886.  And I had
14  some notes, note pads that I looked at.  I had some
15  e-mails I'm sure.
16    Q    When you say note pads, what were they
17  recordations of?
18    A    Different meetings.
19    Q    Meetings?
20    A    Well, I mean, I don't know that there was
21  no telephone call in there or that there was no --
22    Q    But these were your personal notes?
0131
1    A    Yeah, these were notes that I wrote in my
2  own hand, if that's what you mean by personal notes.
3    Q    And do you recall if any of those notes
4  related to conversations you had with tobacco

70

5  industry representatives?

6     A   I don't know whether I can respond to that

7  question without advice of counsel because there are

8  certain pending orders that prohibit me from

9  discussing certain things.

10    Q   Again, I'm not asking you any of the

11  substance of any of these conversations.  I'm

12  simply, just to be clear on what the question is,

13  I'm simply asking whether you have any recorded

14  notes of conversations with representatives of the

15  tobacco industry?

16    A   I believe that I am prohibited from

17  answering that question.

18    MS. OLSON:  She's referring to Judge Kessler's

19  order.

20    Q   Which order was that?

21    A   It's an order under seal.

22    MS. OLSON:  It's a very restrictive order.

0132

1     MS. WEISMANN:  I think we need to know that.

2     MS. OLSON:  I don't have the order in front of

3  me and if he feels that it's perhaps encompassed by

4  that order then I can either go find out now or.

5     MS. WEISMANN:  After this deposition why don't

6  you go back and review the terms of the order and

7  then let us know what your position is and if it is

8  that it's covered by the order will you at least

9  give us the language of the order that you think

10  covers the question?

11    A   The order is under seal.

12    MS. OLSON:  The order itself is under seal.

13    MS. WEISMANN:  Well, at a minimum then --

14    MS. OLSON:  I'm not even allowed to see it,

15  that's why I don't know the contents of it.

16    MS. WEISMANN:  Let's go off the record for a

17  minute.

18    VIDEO TECHNICIAN:  The time is 3:05 p.m., we're

19  off the record.

20        (Off the record)

21    VIDEO TECHNICIAN:  The time is 3:14 p.m., we're

22  back on the record.

0133

1     MS. OLSON:  He cannot respond to the question

71

2   pursuant to an order issued by Judge Kessler which
3   is under seal, the contents of which he is familiar
4   with having read it and agreed to it and if -- I
5   think your response was that if you did have any
6   such documents or information it would be in your
7   redwell but I don't want to answer that for you.
8       A   Yeah, if I have such documents it would be
9   in my redwell, but I'm not suggesting to you one way
10  or another whether there are such documents.
11      Q   I have a request which is that when you go
12  back to main Justice either you or someone at your
13  direction who has access to this order if you would
14  review it and just verify that in fact given the
15  fact that you have limited recollection of a vast
16  majority of documents to which you've been directed
17  and given the fact we have no independent way to
18  verify this?
19      A   You can go to Judge Kessler, I presume.
20      MS. OLSON:  Maybe the question would be does he
21  recall the order.
22      A   I do recall the order.
0134
1       MS. WEISMANN:  I'm asking the questions.
2       MS. OLSON:  You're making a request, you're not
3   asking questions.
4       Q   Let's get at it this way.  Hypothetically
5   if you had informal discussions with representatives
6   from the tobacco companies that were not pursuant to
7   any formal settlement process would those kinds of
8   conversations be within the scope of this order?
9       MS. OLSON:  I object.
10      A   I can't answer the question.
11      MS. OLSON:  You're asking him to speculate.
12      Q   I'm trying to probe what the parameters of
13  that -- you can understand that we are basically
14  shut down by this order which you have?
15      A   As am I.
16      Q   But I have no idea what its parameters
17  are.  All I'm trying to do is in a hypothetical
18  fashion find out are there any conversations that
19  you hypothetically had or could have had with
20  tobacco representatives that would not be
21  encompassed by this order?

72

22     MS. OLSON:  Objection, if you can answer that
0135
1   question without violating the order you are free to
2   do so.
3       A   I have no idea what the question means
4   hypothetical if there was something, you know, out
5   there, but.
6       Q   I am assuming that the order applies to
7   all the parties in the case and not just to you?
8       A   The order is under seal.  I'm not going to
9   respond to the question about an order that's under
10  seal that burdens me with an obligation.
11      Q   I don't understand how this question --
12  let me try to ask it again.  Is there any question
13  about any tobacco -- any conversation that you may
14  have had with a tobacco representative without
15  conceding in any way that you had such a
16  conversation that you could identify given the
17  court's order?
18      A   I don't believe that I can answer that
19  question under the court's order.
20      Q   All right.  Let's go back then to the
21  notes that you were describing.  If you had had any
22  conversations with the White House, would they have
0136
1   been contained in those note pads that are in your
2   redwells?
3       A   Probably so, but I don't remember any
4   specifically, but I would think so.
5       Q   When you reviewed these redwells for
6   purposes of your interview with OPR, do you recall
7   seeing any notes that were recordings of
8   conversations with White House personnel?
9       A   I don't recall any.
10      Q   What other documents can you identify or
11  do you recall from your review in January of this
12  year are in your redwell?
13      A   Besides e-mails, court opinions, my note
14  pads there may have been other intermediate orders
15  from Judge Kessler or orders from other unrelated --
16  or orders from other cases that were not the tobacco
17  case but cases that were against the tobacco
18  industry.  There was some private suits but I'm not

73

# EXHIBIT B

Robert McCallum answer to SFRC question
June 28, 2006

Question:  On June 9, 2005, USA Today published an oped under your name regarding the tobacco cessation remedy proposed in the tobacco litigation.  The Committee has received a copy of some internal Justice Department emails about the drafting of the article; these emails indicate that the individuals at the White House had a role in editing or supervising the final text of the article, and that you were copied on these emails.

Do you recall the involvement of the White House in the approval of this article?  Does the evidence that White House staff may have been involved in the drafting of this article alter your position that no one at the White House ever tried to influence any aspect of your decisions in this case?

Answer:  I was previously asked the question: "Did you discuss any aspect of this case, including any public statements or articles thereon, with any person working in the White House?"  I thought that the portion of the inquiry relating to "public statements or articles" was focused on statements or articles about my decision by others, and I responded: "I can not recall ever discussing any public statements or articles about the case with anyone at the White House."  My answer remains the same relating to my public statements, specifically the op-ed below, in that I don't recall ever discussing it with anyone at the White House.  Nor do I recall the involvement of the White House in the review or approval of this op-ed.  However, once my decision was made and announced in the closing argument, I likely would have informed the White House of any op-ed to be published under my name so that the White House would be aware of it and have the opportunity to comment.  This post-decision contact with the White House about an op-ed explaining my already-made decision does not alter the fact that no one at the White House ever tried to influence any aspect of my decision.

**EXHIBIT D**

```
0001
1            UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF COLUMBIA
3
     ----------------------------:
4   CITIZENS FOR RESPONSIBILITY  :
    AND ETHICS IN WASHINGTON,     :
5                            :
       Plaintiff,            :
6                            :
        v.              : Case No.:
7                       : 05-2078(EGS)
    UNITED STATES           :
8   DEPARTMENT OF JUSTICE       :
                         :
9     Defendant.        :
                         :
10  ----------------------------:
11                    Washington, D.C.
                     July 19th, 2006
12
13  Deposition of:
14          DANIEL METCALFE,
15        Called for oral examination by counsel for
16  Plaintiff, pursuant to notice, at the offices of
17  Citizens for Responsibility and Ethics in
18  Washington, 1400 Eye Street, N.W., Suite 450,
19  Washington, D.C. beginning at 3:30 p.m, before
20  Teague Gibson of Capital Reporting, a Notary Public.
21
22           *   *   *   *   *
0002
1   ON BEHALF OF THE PLAINTIFF:
2       ANNE L. WEISMANN, ESQ.
         MELANIE SLOAN, ESQ.
3       Citizens for Responsibility
         and Ethics in Washington
4        1400 Eye Street, N.W., Suite 450
         Washington, D.C. 20005
5        (202) 408-5565
6   ON BEHALF OF THE DEFENDANT:
7       LISA A. OLSON, ESQ.
         ELIZABETH J. SHAPIRO, ESQ.
```

1

 5    MS. OLSON:  Should I call the Magistrate and
 6  ask him not to leave because you raised the issue of
 7  this opinion and if anything in it caused his office
 8  to change its practices and that's what these
 9  questions pertain to.  And I'm going to ask him if
10  there's any problem here, I just want to make sure
11  he doesn't leave his office.
12    MS. WEISMANN:  These questions related to my --
13    MS. OLSON:  You raised the issue of the
14  Magistrate's opinion and you said -- the Judge's
15  opinion, the June 1st opinion, and asked if anything
16  in this opinion caused his office to change its
17  practices, I think you asked that question twice.
18    MS. WEISMANN:  And I think his answer was no.
19    MS. OLSON:  My questions pertain to that.
20    MS. WEISMANN:  I don't see the link, but that's
21  fine, we want to take a break.
22    MS. OLSON:  We're still ticking time away.
0061
 1    MS. WEISMANN:  We're not on the record.
 2    MS. OLSON:  The time is running.
 3    MS. WEISMANN:  This is not our time.  We're off
 4  the record.
 5         (Off the record)
 6    MS. WEISMANN:  Our objection is under 30(b).
 7  We think this is beyond the scope of the court
 8  ordered discovery and we're happy to take it up with
 9  the Magistrate.
10    MS. SHAPIRO:  There is no court order directing
11  the scope of our questioning.
12    MS. WEISMANN:  There is a court order directing
13  the scope of discovery.
14    MS. OLSON:  But also these questions directly
15  pertain to delays in the processing of the FOIA
16  request.  You raised the statistics in your brief,
17  you raised the order today in deposition.  Let's
18  just call him.
19         (Off the record)
20    JUDGE KAY:  Hello.
21    MS. OLSON:  Hi, Judge Kay, Lisa Olson and Anne
22  Weismann.  The issue is that CREW, the plaintiff,
0062
 1  has completed the deposition of Mr. Metcalfe, its

33

2  questioning.  And in her questions she raised the
3  issue of whether anything in the Judge's June 1st,
4  2006 opinion which was critical of the handling of
5  the timing, the delays in this FOIA processing,
6  caused Mr. Metcalfe to change the way his office
7  handled FOIA requests.
8      JUDGE KAY:  Whether or not anything in Judge
9  Sullivan's June 1 memo brought about a structural
10  change in the way they handled FOIA requests?
11      MS. OLSON:  Not necessarily a structural
12  change, but just any change in the way they handled
13  FOIA requests.  And the Judge's opinion included
14  some statistics that the plaintiff used in their
15  brief supporting their motion for discovery and then
16  the Judge discusses these statistics at some length
17  in his opinion and he says that the median
18  processing time for this handling of this FOIA
19  request was far longer than the median processing
20  time in the statistics and I would like to -- they
21  have objected to about 20 questions I have for
22  Mr. Metcalfe regarding these statistics and whether
0063
1  in fact there was a delay whether the Judge's
2  opinion which stated that there was a -- that we
3  exceeded the median time for processing was in fact
4  correct or if his conclusion was erroneous and this
5  relates directly to Ms. Weismann's question whether
6  anything in the opinion prompted Mr. Metcalfe to
7  change the way his office handled things.  CREW has
8  objected to my asking these few questions and so we
9  are coming to you for a resolution of that.
10      JUDGE KAY:  Okay.  All right.  Ms. Weismann,
11  I'll hear from you.
12      MS. WEISMANN:  As Ms. Olson has indicated this
13  was an issue that was fully briefed with the court.
14  We had two arguments before the Judge on this issue.
15  The statistics were raised in our briefs.  They had
16  an opportunity and, as I'm sure you know from
17  reading the opinion, the Judge was very troubled by
18  the Government's failure to respond to our
19  statistics.  Simply stated we just -- this is their
20  witness, they have complete access to him.  This is
21  our discovery and we don't think that this is the

34

22  appropriate forum for them to pursue this.
0064
1      JUDGE KAY:  All right.  Ms. Olson.
2      MS. OLSON:  Our response in the brief, Your
3  Honor, was that these statistics were entirely
4  irrelevant and we continue to believe that.  The
5  court obviously has relied on them in its opinion.
6  It was unforeseen that it should do so, that it
7  should adopt CREW's viewpoint.  We are now taking
8  this one step further and ensuring that erroneous
9  information -- that the court does not continue to
10  rely on erroneous information.  What Mr. Metcalfe's
11  testimony will show is that the court's calculation
12  of the time it took to process these requests
13  between June and January included weekends and
14  holidays and that the statistics never include
15  weekends and holidays.  If weekends and holidays are
16  subtracted from the court's calculation, we are
17  exactly within the median range.
18      JUDGE KAY:  Let me tell you what my feeling is
19  here.  I agree with Ms. Weismann, I think
20  Mr. Metcalfe he's your witness and obviously you
21  could submit a written submission to Judge Sullivan
22  and attach a declaration by Mr. Metcalfe saying
0065
1  everything that you would elicit during the course
2  of this deposition?
3      MS. OLSON:  Your Honor, we're willing to do
4  that --
5      JUDGE KAY:  No, no, I understand.  Let me tell
6  you what my thinking is on this.  There is obviously
7  going to be a request, I agree with Ms. Weismann's
8  statement she's saying it's her deposition and she's
9  paying for it, but I am also of the opinion that
10  somewhere along the line the plaintiff's counsel are
11  going to request on the trial court that there be
12  some broader dissemination of the testimony that is
13  going to be submitted to Judge Sullivan and since
14  there is the pleading or the memorandum of opinion
15  by Judge Sullivan and that if indeed any of the
16  either the videotaped or the transcript is going to
17  be disseminated beyond the confines of this
18  litigation I guess from a fear of be balanced I

35

19   would permit the deponent to perhaps respond to what
20   Judge Sullivan had criticized the Government of
21   doing.  So to that extent I'm inclined to let him
22   put it on there, otherwise I would certainly suggest
0066
1   that you go ahead and do it separately, but
2   obviously if there is a dissemination and I'm sure
3   that Ms. Weismann is not prepared at this point to
4   certainly make a statement on the record as to
5   whether there will or will not be any dissemination
6   of the transcript, then I would like at least the
7   transcript to be presented as a fair composite of
8   the testimony of Mr. Metcalfe so that would be my
9   ruling.
10       MS. WEISMANN:  Your Honor, may I just make one
11   point?
12       JUDGE KAY:  Yes.
13       MS. WEISMANN:  I'm not sure -- I think if we
14   had the full transcript and I think we should
15   probably reserve on this because if we don't have it
16   yet you would see how limited my questions were and
17   how far these questions go beyond that.  If you're
18   talking about fair and balanced, I'm not sure that I
19   agree that allowing this line of questioning --
20       JUDGE KAY:  Are you saying there was no
21   discussion in the deposition as to these statistics?
22       MS. WEISMANN:  None whatsoever.  I simply asked
0067
1   the question as to whether or not he was familiar
2   with the opinion and whether based on the -- and in
3   fact I didn't even point out the statistics at all.
4   I focussed on the language in Judge Sullivan's
5   opinion that was critical of the delay within OIP on
6   how -- and which was a separate discussion from the
7   statistics in processing fee appeals.  I realize
8   this is a lot of technical stuff to you.  And my
9   question didn't go to those at all and I didn't even
10   press him on what steps, if any, he had taken after
11   reading it.  I simply asked him if he read it and it
12   caused him to re-evaluate anything.  So I think the
13   line of questioning that Ms. Olson was pursuing in
14   addition to the fact that this is our deposition I
15   think goes so far beyond and if the court's

36

16  concerned is a balanced deposition I don't believe
17  that that in fact would represent a balanced
18  deposition.
19      JUDGE KAY:  I was under the impression that
20  there was a discussion of --
21      MS. WEISMANN:  No, there was in the Judge's
22  opinion but not in the deposition.
0068
1      JUDGE KAY:  I see.
2      MS. OLSON:  The entire purpose of this, well,
3  there was a discussion of the court's conclusion
4  that there was unwarranted delays in this case.
5      JUDGE KAY:  I understand that.
6      MS. OLSON:  My question is very limited and it
7  is for the purpose of clarification.  My questions
8  are very limited.  It's unclear to me why they're
9  concerned about --
10      JUDGE KAY:  How many questions are you talking
11  about, Ms. Olson?
12      MS. OLSON:  I'll count them.
13      MS. WEISMANN:  She said at least 20.
14      MS. OLSON:  19 questions.
15      MS. WEISMANN:  And, Your Honor, if I think if
16  we were to ask the court reporter to review my
17  questions I'm quite competent there were less than
18  five, they were very limited in scope.  This has
19  been, I think it's fair to say, a pretty limited
20  deposition and what I'm concerned about is that this
21  is going to -- it's sort of opening up the
22  proverbial Pandora's Box.  It takes us in a new
0069
1  direction and I think if the court's concern is a
2  fair and balanced presentation I think this takes us
3  far afield from that.  They're free to present this
4  evidence before Judge Sullivan.
5      MS. OLSON:  Well, Your Honor.
6      MS. WEISMANN:  They didn't move to reconsider
7  when he issued his order, that certainly was an
8  appropriate vehicle in which to submit this, and --
9  well, I think we've made our position clear.
10      MS. OLSON:  I'm willing to limit my questions
11  to seven questions and we have not asked a single
12  question on cross throughout these depositions and I

37

13   might add we've sat through hours of questions that
14   had nothing to do with FOIA processing.  In the
15   interest of fairness and balance --
16       JUDGE KAY:  I'm going to let them ask the seven
17   questions.  I'm going to limit it to the seven
18   questions, Ms. Olson.  I think you have a right to
19   some cross-examination.  I'm not sure based upon --
20   the fact is the question asked of Ms. Weismann was
21   based upon Judge Sullivan's opinion whether or not
22   any changes were affected with respect to the
0070
1   processing of the FOIA cases so I think it does
2   encompass some degree of an acknowledgment by Judge
3   Sullivan that he viewed the statistics and was
4   somewhat critical of the Department.  So I'm going
5   to permit you to ask those seven questions and
6   hopefully it'll be brief.  Counsel, get it over and
7   done with and go on.
8       MS. WEISMANN:  We may have redirect?
9       JUDGE KAY:  The answer is yes, on those
10   questions.
11       MS. WEISMANN:  Yes, of course.
12       JUDGE KAY:  Okay.  Thank you, Counsel.
13       MS. WEISMANN:  Thank you.
14       MS. OLSON:  Thank you.  Take a couple minutes
15   break, if that's okay.
16            (Off the record)
17       MS. WEISMANN:  I'd like the record to reflect
18   that counsel and the witness just had at least a
19   five minute conversation in which they had questions
20   with them and it appeared that they were consulting
21   over the content of those questions.
22       MS. OLSON:  That's your perception of the
0071
1   situation, Ms. Weismann, and I'm not going to
2   comment on it.
3   BY MS. OLSON:
4       Q    Mr. Metcalfe, I want to you look at what
5   we were looking at on page 12 at the bottom where it
6   says the plaintiff's fee waiver request to the Civil
7   Division was denied 201 days after its FOIA request
8   was granted expedited processing and 210 days after
9   its initial FOIA request was submitted.  Are the

38

7   counting as of the date of the request for expedited
8   processing, by that I mean to say the date it was
9   received by the Agency which I believe was July 1st,
10  2005. And if one were to count working days as the
11  statistics are in fact counted under the statute
12  scheme from July 1st, 2005 to January 19th, 2006 I
13  believe one would reach the number of 136 and it is
14  the number of 136 that would create an apples and
15  apples comparison with the numbers that appear in
16  footnote 8 as opposed to an apples and oranges
17  comparison which one is left with on the face of the
18  court's opinion.
19      Q   Is that 136 within the range of numbers in
20  the statistics in footnote 8?
21      A   I'm looking now at the range of numbers
22  appearing in footnote 8 and I see numbers as low as
0074
1   42, I see numbers as high as 148, 136 and 134, 128,
2   so it does appear to me that, yes, that number 136
3   again reflecting the working days so that we're
4   talking about apples and apples not oranges and
5   apples is indeed within that range.
6       Q   Going back to the Civil request that the
7   opinion discusses at the bottom of page 12, assuming
8   that CREW's FOIA request to Civil was opened on June
9   28th, 2005 and action was taken on the fee waiver
10  part of CREW's request on July 7th, 2005, what would
11  be the number of days used in the annual report to
12  record that request in its statistics as opposed to
13  the 201 or 210 days in the opinion?
14      A   Given the dates you just read to me I
15  think the answer would be nine calendar days, but
16  six working days with the 4th of July holiday being
17  there and that the number six is what would appear
18  properly in the annual report. Specifically the
19  number of working or business days between the date
20  that the request was received by the component and
21  the date that the action was taken.
22      MS. OLSON:  No more questions.
0075
1   BY MS. WEISMANN:
2       Q   During the break that you took your
3   counsel before we resumed the redirect did you

40

4    discuss any of the contents of your testimony with
5    your counsel?
6        MS. OLSON:  I object to that, of course he
7    discussed the contents of his testimony, I'm his
8    lawyer.
9        Q    I'm talking about the contents of the
10   testimony you just gave?
11       MS. OLSON:  I object.  Any discussions that we
12   had are attorney/client privilege.
13       Q    I'm entitled to ask the questions.  And
14   prior to coming here today did you discuss with your
15   counsel these precise questions that you would be --
16   that she would ask you?
17       MS. OLSON:  I object, attorney/client work
18   product.
19       Q    And are you aware that these statistics --
20   that the statistics on which Judge Sullivan relied
21   for his opinion were presented to the court based on
22   OIP's own annual statistics?  Are you aware of that?
0076
1        A    Ms. Weismann, let me make sure I
2    understand your question.  I'm going to give you my
3    understanding of it, please tell me if I have it
4    correct or incorrect.  Are you asking me whether I'm
5    aware that the statistics that are in footnote 8 are
6    derived from the annual FOIA report?
7        Q    No.
8        A    I believe I answered that question or said
9    so.
10       Q    I'm asking whether you're aware that CREW
11   in its briefing on this issue submitted statistics
12   that CREW got directly from the annual statistics
13   that OIP presents to Congress?
14       MS. OLSON:  If he can answer that question.
15       A    I think I can.
16       Q    Have you read the pleading in the case,
17   that's the representation that was made.  I'm
18   talking about the briefing.  Have you read the brief
19   that we filed?
20       A    Yes, I definitely did.
21       Q    You're aware that we put in certain
22   statistics in our brief?
0077

41

1     A   I am aware having read the brief that
2   there are statistics in your brief, yes.
3     Q   Are you aware that Justice Department had
4   numerous opportunities to respond to this?
5     MS. OLSON:  I object, this is so outside the
6   issue.
7     MS. SLOAN:  You want to call Judge Kay, let's
8   call him.
9     MS. WEISMANN:  I don't think we need to call
10  him.
11     MS. OLSON:  It's outside the scope of the
12  order.  The order concerns delay in processing.
13     MS. SLOAN:  Not outside the scope of your
14  re-direct.
15     MS. OLSON:  You'll have to speak.
16     MS. WEISMANN:  Are you going to direct him not
17  to answer?
18     MS. OLSON:  It's outside the scope of the
19  order.  You're asking him what we did in litigation
20  and I know if you want to try to con Judge Sullivan
21  into some sort of a side track, that's fine.  It's
22  like -- this is so beside the point that I'd be
0078
1   happy if you want to take it up.  Our questions
2   concerned the delays in the processing which are
3   discussed in this order and if you want -- the
4   question you are now asking are what we did in this
5   litigation in the briefs.  Mr. Metcalfe is a fact
6   witness.  If you want to ask him about the
7   statistics he's very happy to answer those questions
8   but you're asking him about a privileged
9   attorney/client and work product communication.
10     MS. WEISMANN:  Are you finished with your
11  objection?
12     MS. OLSON:  Yes, but I'm directing him not to
13  answer because you're asking him for privileged
14  information as well as information that's outside
15  the scope of the order.
16     MS. WEISMANN:  Just to be clear, it's your view
17  that it's privileged whether or not he was aware
18  that the Government had an opportunity to respond to
19  CREW's submission?
20     MS. OLSON:  That's outside the scope.  That

42

21   particular question is outside the scope of the
22   order allowing discovery in this case concerning
0079
 1   delays in FOIA processing.  So yes, under Rule 30
 2   I'm instructing him not to answer.
 3       Q    Was it your understanding when you came
 4   here today, Mr. Metcalfe, that you would be
 5   discussing statistics?
 6       MS. OLSON:  Objection.  Again that calls for
 7   privileged attorney/client communications.
 8       MS. WEISMANN:  I'm asking for his
 9   understanding, not the basis of his understanding.
10       MS. OLSON:  He would have no basis for any
11   understanding except what he and I discussed.
12       MS. WEISMANN:  So you're objecting?
13       MS. OLSON:  Yes, as attorney/client.
14       MS. WEISMANN:  And directing him not to answer?
15       MS. OLSON:  Yes.
16       MS. WEISMANN:  I want the record to reflect
17   since I think this is consist with the discussion we
18   had with Judge Kay who was not physically present
19   that counsel had a list of what she has identified
20   as 19 typed questions.
21       MS. OLSON:  And I'd like to state on the record
22   that opposing counsel, Ms. Weismann, has had
0080
 1   probably 30 or 40 pages of typed questions
 2   throughout these depositions as is the normal
 3   practice of an attorney.
 4       MS. WEISMANN:  We are done.
 5         (Reading and signing was waived)
 6        (5:20 p.m. the deposition was concluded)
 7
 8
 9
10
11
12
13
14
15
16
17

43