**EXHIBIT C**

0001
1           UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLUMBIA
3
   -----------------------------:
4  CITIZENS FOR RESPONSIBILITY  :
   AND ETHICS IN WASHINGTON,    :
5                               :
      Plaintiff,          :
6                               :
      v.                   : Case No.:
7                          : 05-2078(EGS)
   UNITED STATES              :
8  DEPARTMENT OF JUSTICE        :
                               :
9     Defendant.        :
                               :
10 -----------------------------:
11                   Washington, D.C.
                     July 19th, 2006
12
13  Deposition of:
14           STEPHEN BRODY,
15         Called for oral examination by counsel for
16  Plaintiff, pursuant to notice, at the offices of
17  Citizens for Responsibility and Ethics in
18  Washington, 1400 Eye Street, N.W., Suite 450,
19  Washington, D.C. beginning at 10:45 a.m, before
20  Teague Gibson of Capital Reporting, a Notary Public.
21
22        *   *   *   *   *
0002
1  ON BEHALF OF THE PLAINTIFF:
2        ANNE L. WEISMANN, ESQ.
         MELANIE SLOAN, ESQ.
3        Citizens for Responsibility
         and Ethics in Washington
4        1400 Eye Street, N.W., Suite 450
         Washington, D.C. 20005
5        (202) 408-5565
6  ON BEHALF OF THE DEFENDANT:
7        LISA A. OLSON, ESQ.
         U.S. Department of Justice Civil Divisoin
8        20 Massachusetts Aveneu, N.W.

2

Washington, D.C. 20530
9      (202) 514-5633
10   ON BEHALF OF THE WITNESS:
11       ROBERT M. WEINBERG, ESQ.
         Bredhoff & Kaiser, PLLC
12       805 Fifteenth Street, N.W.
         Washington, D.C. 20005
13       (202)842-2600
14
15
16
17
18
19
20
21
22
0003
1               C O N T E N T S
2    EXAMINATION BY:                    PAGE
3    MS. WEISMANN                       24
4
7
8
9
10
11
12       (Exhibits retained by court reporter)
13
14
15
16
17
18
19
20
21
22
0004
1
22
0024
1        (Off the record)
2             STEPHEN BRODY,

3   Called for examination, having been duly sworn to
4  tell the truth, the whole truth and nothing but the
5           truth, testified as follows:
6
7  BY MS. WEISMANN:
8     Q   Good morning, Mr. Brody.  My name is Anne
9  Weismann.  I'm with CREW and I'm the plaintiff and I
10  see you're here with your counsel as well?
11     A   Yes.
12     Q   Your name again is Steve Brody?
13     A   Yes, Stephen Brody.
14     Q   Which do you prefer to be addressed?
15     A   Usually Steve.
16     Q   What is your current position?
17     A   Acting Director of the tobacco litigation
18  team in the Civil Division of the Department of
19  Justice.
20     Q   We have been using the tobacco litigation
21  as the word to describe the Government's lawsuit
22  against Phillip Morris and the other tobacco
0025
1  companies, it sounds like you do as well?
2     A   Yes.
3     Q   So if we use that during this deposition I
4  want to make sure we're both talking about the same
5  thing?
6     A   Okay.
7     Q   How long have you been acting Director?
8     A   Since December 1st, 2005.
9     Q   What was your position before that?
10     A   Deputy Director.
11     Q   And how long were you Deputy Director?
12     A   Since September or October of 2001.
13     Q   And were you at the Department of Justice
14  before that?
15     A   Yes.
16     Q   In what capacity?
17     A   Trial attorney on the tobacco litigation
18  team.
19     Q   And for how long were you a trial
20  attorney?
21     A   Starting on December 31st, 2000.
22     Q   So the period of time of May or June of
0026

4

1  last year until December you were the Deputy
2  Director, am I correct?
3      A   Yes.
4      Q   And very briefly just describe what your
5  overall responsibilities were, please?
6      A   My overall responsibilities with the
7  team's Director, Sharon Eubanks, we oversaw the
8  prosecution of the United States' claims and served
9  as trial counsel for the United States in the
10  nine-month racketeering trial against cigarette
11  manufacturers.
12      Q   And how large was your team?
13      A   At its high point I believe we had 38
14  lawyers.
15      Q   And you had an opportunity to work closely
16  with Sharon Eubanks?
17      A   Yes.
18      Q   I'm going to turn your attention now to
19  two FOIA requests.  Do you have knowledge that CREW
20  filed two FOIA requests with the Department of
21  Justice seeking documents relating to the change in
22  remedy in the tobacco litigation?
0027
1      A   Yes.
2      Q   And when did you first become aware that
3  CREW had filed those requests?
4      A   First time I was really aware of it was
5  probably October or November of 2005.
6      Q   And so at that time were you aware that
7  the Department was also in litigation with CREW
8  concerning the FOIA requests?
9      A   Yes.
10      Q   Prior to that period of time were you ever
11  asked by anyone to review documents to see whether
12  they would be responsive to CREW's FOIA request?
13      A   No.
14      Q   So I don't want to misstate your
15  testimony, I want to make sure I'm clear though, is
16  it your best recollection that you didn't have any
17  knowledge of the FOIA requests until CREW was
18  already in litigation with the Department?
19      A   Correct.  To be completely accurate, it's
20  possible that I may have seen the FOIA request when
21  it came in but there were a lot of FOIA requests at

5

22  that time and if I saw it it would have just been
0028
1   that they were distributed to members of the team.
2       Q    Along with your deposition notice you were
3   sent a document request, were you not?
4       A    Correct.
5       MS. OLSON:  I have those here.
6       Q    Now I see from your document response that
7   putting aside whatever objections you have to the
8   response you have no documents beyond those that
9   were included in the complaint?
10      A    Correct.
11      Q    And does that mean then that you would
12  have no e-mails, for example, that would discuss any
13  aspect of the processing of CREW's FOIA request?
14      A    That's correct.  I don't have any e-mails
15  relating to the processing of the FOIA request.
16      Q    In responding to the document request can
17  you just describe what you searched?
18      A    Well, in terms of what I have for
19  documents I have documents in my office, I have a
20  stack of what's basically just a couple of the
21  pleadings in the CREW litigation and I have
22  attachments to the complaint that was filed.  And
0029
1   then I looked back through e-mail and of course I
2   knew from my memory that I didn't have any e-mail
3   relating to the process of the FOIA request but I
4   did glance through and just do a quick search to see
5   whether I might have been mistaken.
6       Q    Is it your practice to print out e-mail or
7   do you retain it in electronic form.
8       A    Well, both.
9       Q    Quite apart from the issue of what
10  documents you have, do you recall ever receiving any
11  directions from anyone within the Department about
12  how to process CREW's FOIA request?
13      A    No.
14      Q    And you don't recall receiving any oral
15  instructions -- do you recall having any discussions
16  with Jim Kovakas about how to process CREW's FOIA
17  requests?
18      A    No.
19      Q    Do you recall ever being in a meeting with

6

20  Mr. McCallum where either the fact -- where CREW's
21  FOIA requests were mentioned or discussed?
22      A.   No.
0030
 1      Q   Is it your testimony that you have had no
 2  role within the Department in processing CREW's FOIA
 3  request?
 4      A   That's correct.
 5      Q   Have you had a role in the litigation and
 6  the Department's defense of the litigation?
 7      A   Yes.
 8      Q   And please describe for me what that role
 9  was?
10      A   Without describing the substance of
11  anything, my role has merely been answering
12  questions that Lisa Olson has had along the way to
13  assist her with the defense of the lawsuit.
14      Q   Were you ever tasked with putting together
15  documents, a representative sampling of documents,
16  from the body of documents that were potentially
17  responsive to CREW's FOIA request?
18      A   At one point in time --
19      MR. WEINBERG:  **Why don't you answer this**
20  **question in terms of what you did without getting**
21  **into any conversations that you had.**
22      A   Sure.  See if I can answer it this way.
0031
 1      Q   I may still ask about those conversations,
 2  but we can start with this.
 3      A   I put together a sampling of documents for
 4  Lisa Olson.
 5      Q   And what was your understanding of what
 6  that sampling was to consist of?
 7      MS. OLSON:  Well, objection.
 8      MS. WEISMANN:  I'm only asking for his
 9  understanding.
10      MS. OLSON:  It's still attorney/client
11  communication.
12      MR. WEINBERG:  **You asked what it consists of,**
13  **if you ask him what his understanding of what he was**
14  **doing what he was putting together**.
15      MS. WEISMANN:  What's your understanding --
16      MS. OLSON:  It's one thing to ask him if he did
17  this.  It's another thing to ask him if he did it at

7

18   my direction or what his understanding of my
19   instructions were and that would be attorney/client
20   communications.  So now we've already established
21   that he did it at my instruction, so what he did is
22   off limits.
0032
1       Q    What was your understanding of what you
2    were doing?  What were the parameters that you were
3    working with?
4       MS. OLSON:  Objection, it's attorney/client
5    privilege.
6       MS. WEISMANN:  Are you directing him not to
7    answer?
8       MS. OLSON:  Yeah.
9       MS. WEISMANN:  Okay.  We'll go to the judge on
10   this because this is clearly -- let's go off the
11   record.
12             (Off the record)
13       MR. WEINBERG:  **If you would ask Mr. Brody what**
14   **he did in terms of preparing the documents and not**
15   **preparing the documents he'll answer that question.**
16   BY MS. WEISMANN:
17       Q    Mr. Brody, what did you do in preparing
18   documentation for the litigation?
19       A    I put together the documents that I had
20   dealing with the internal discussions within the
21   Department of Justice concerning the remedies
22   presentation that we made at closing argument and
0033
1    post-trial briefing.
2       Q    And when you say the documents that you
3    had, what is the universe of documents?
4       A    The universe of documents --
5       MR. WEINBERG:  You mean how many pages?
6       Q    Approximately -- you said my documents.  I
7    don't know what you mean by that, but, so let me see
8    if you can estimate its size in some fashion?
9       A    Size, I would say about -- I'd say it was
10   probably about four inches.
11       Q    And so when you said my documents you're
12   talking about the documents that you had in your
13   office?
14       A    Correct.
15       Q    And so you were not talking about the

8

16    documents of the tobacco litigation team as a whole?

17        A    Correct.

18        Q    So you put together -- and the group that

19    you culled, how many pages was it?

20        A    How many pages, I really couldn't

21    estimate.  Four inches probably.

22        Q    But you said you started with a stack of

0034

1    four inches?

2        A    I provided a stack, I collected, I

3    gathered a stack of four inches.

4        Q    And what I'm trying to find out is from

5    what did you gather -- what was the universe of

6    documents you were looking at to gather those four

7    inches of documents?

8        MS. OLSON:  If you can answer the question.

9        Q    I'm not asking you to identify what the

10    documents are.  I'm asking you in some way describe

11    them and -- what was the volume?

12        MR. WEINBERG:  You want us to talk about this

13    problem?

14        MS. WEISMANN:  Can we go off the record?

15            (Off the record)

16        MR. WEINBERG:  **If you can just again ask what**

17    **did the -- without getting into the substance of the**

18    **documents, what was the nature of the documents he**

19    **put together in terms of the kinds**.

20        MS. WEISMANN:  I think you're misunderstanding

21    my question.  I'm not focussed on the documents he

22    put together.  I'm trying to figure out what he

0035

1    culled them from.

2        MR. WEINBERG:  **He didn't cull them.  If you**

3    **just ask him, get into it any way you want.  He'll**

4    **tell you basically what he provided**.

5        Q    What did you provide?

6        A    Every document that I had dealing with the

7    change to -- well, dealing with the development of

8    the presentation on remedies and closing and the

9    request for remedies and post-trial briefing.

10        Q    And when you say every document you had,

11    are you looking at documents that are available to

12    the entire tobacco litigation team or just documents

13    that you consider to be in your office?

9

14     A   Some of the documents were available to
15  the entire tobacco litigation team.  However, many
16  of the documents were only available to me and to
17  Sharon Eubanks among the members of the team.
18     Q   We had a hearing before Judge Sullivan in
19  this matter on February 9th, 2006.  Have you read
20  the transcript of that hearing?
21     A   I have read -- I have seen portions of the
22  transcript of that hearing that were appended to
0036
1  CREW's motion for discovery.
2     Q   I'm looking at page 40 of that transcript.
3  Ms. Olson said to the court I asked the head of the
4  tobacco litigation team to give us a representative
5  sample of the documents that he felt would be of the
6  greatest interest to the plaintiff; is that
7  accurate?
8     MS. OLSON:  Well, you can answer that if you
9  can -- if you understand the question.
10     A   I believe -- see if I can answer it this
11  way.
12     MR. WEINBERG:  **Just answer whether it's**
**13  accurate or not.**
14     A   I think it's accurate, yes.
15     Q   And she used the term "representative
16  sample" is that also what she asked you to do?
17     MR. WEINBERG:  **And is that accurate?**
18     A   That is --
19     MS. WEISMANN:  She's now made a statement in
20  open court about what she asked, I think it's a
21  little late for them to be claiming privilege.
22     MS. OLSON:  Well, is your question did I use
0037
1  those exact words or?
2     MS. WEISMANN:  Can we read back the question?
3        (Record was read)
4     A   Yes.
5     Q   And she also said I asked him to provide
6  documents that he thought were most responsive; is
7  that also accurate?
8     A   Yes.
9     Q   And in determining what documents would be
10  most responsive what criteria did you use?
11     MS. OLSON:  Well --

10

12      MR. WEINBERG:  **He testified he gave you**
13  **everything there was that was related to the issue.**
14      MS. WEISMANN:  He's described what he gave us.
15  I just want to make sure though because I don't know
16  what else he has.
17      MR. WEINBERG:  **His description that he gave was**
18  **that he gave everything that was related to the**
19  **issue of --**
20      MS. WEISMANN:  The court did not deem that
21  sufficient to answer the court's concerns because
22  that was what Ms. Olson told the court.  I think
0038
1  we're entitled to probe here.
2      MR. WEINBERG:  I don't think that is what
3  Mr. Olson told the court, but he's given the answer.
4      MS. WEISMANN:  I have the transcript.
5      MR. WEINBERG:  Did Ms. Olson say he gave every
6  document?
7      MS. WEISMANN:  No.
8      MR. WEINBERG:  **That's what he's testified**
9  **already.  He didn't use any criteria, he gave every**
10  **document.**
11      MS. WEISMANN:  Let me explain.  You said he
12  gave every document he had that he thought related
13  to our FOIA, there still is a judgment call.
14      MR. WEINBERG:  **No, he didn't say that related**
15  **to FOIA.  He said he gave every document -- his**
16  **testimony --**
17      Q    Your testimony is that the four inches of
18  documents you provided is the entirety of the
19  documents you have relating in any way to the remedy
20  in this case?
21      A    No, I believe what I testified was
22  relating to the internal discussions within the
0039
1  Department of Justice as to what would be presented
2  as the remedy request by the United States.
3      Q    So that was your understanding of what
4  CREW was seeking?
5      A    No.
6      Q    This is where we're having a disconnect
7  and we're entitled to probe.  So you were asked to
8  give a representative sampling of what?  What was
9  your understanding of what you were to give a

11

10  representative sampling of?
11      MS. OLSON:  Why don't you ask him what he
12  thought?
13      MS. WEISMANN:  I'm asking the questions.
14      MS. OLSON:  You're asking for attorney/client
15  communications.
16      MS. WEISMANN:  You waived attorney/client
17  communication when you reported to the court in open
18  court that you had asked him to give a
19  representative sample.
20      MS. SLOAN:  Basically seems like you all are
21  not being cooperative and not answering the
22  questions.  If we have to go back to the Judge we
0040
1  will.
2      MR. WEINBERG:  **He's already -- I'll tell you,**
3  **just taking his testimony today he's already**
4  **answered that the question you asked as to whether**
5  **what Ms. Olson said on the transcript was or was not**
6  **accurate and he's told you and he's willing to tell**
7  **you again.  What he -- but the point is she might**
8  **have used the words "representative sample," he has**
9  **not told you that he provided a representative**
10  **sample.  He told you that he provided something more**
11  **than a representative sample.**
12      MS. WEISMANN:  I'd like to be -- with all due
13  respect, Mr. Weinberg, I'd like to be able to ask
14  the witness and not get his testimony through you.
15      MR. WEINBERG:  **He's testified to that.  The**
16  **record will show that.**
17      MS. WEISMANN:  That's not how I understand his
18  testimony because every time I've attempted to ask a
19  question you've asked me to restate it in a way that
20  you think he can answer and I'm entitled to probe,
21  sir, and if you're telling me that I can't go beyond
22  this, we will take it to the Judge.
0041
1      MR. WEINBERG:  I'm telling you what you're
2  doing is you are not listening to the answers he's
3  giving you.
4      MS. SLOAN:  You're testifying for the witness.
5      MR. WEINBERG:  **If you want to ask him whether**
6  **he provided a representative sample or did he**
7  **provide a comprehensive set of documents, ask him**

12

**8  that.  You're asking him as if he was culling**

**9  documents which he wasn't doing.**

10    MS. OLSON:  For the record, I would like to say

11  that I didn't waive any attorney/client privilege.

12  I was responding to a question by the Judge and I

13  didn't reveal any --

14    MS. WEISMANN:  You can raise that with Judge

15  Sullivan as well.

16    Q   Mr. Brody, let me explain by way of

17  background.  There was certain representations made

18  in court and the court itself, Judge Sullivan, did

19  not have a clear understanding of what had

20  transpired within the Civil Division.  However clear

21  you think you're being, I feel an obligation to

22  address Judge Sullivan's questions and concerns.

0042

1    MS. OLSON:  I have another objection on

2  relevance grounds.

3    MS. WEISMANN:  Excuse me.

4    MS. OLSON:  Can I just --

5    MS. WEISMANN:  This is not relevant.

6    MS. OLSON:  No, of course it's not.

7    MS. SLOAN:  Let's just call Judge Kay now,

8  let's go.

9    MS. WEISMANN:  Let's go off the record.  This

10  has been the --

11    MR. WEINBERG:  This is so easy.

12    MS. SLOAN:  If you're going to say it's not

13  relevant for us to ask about exactly this point we

14  would much rather get a ruling from the Judge on

15  this.

16    MR. WEINBERG:  Calm down.  He's answering the

17  questions.

18    MS. SLOAN:  You're speaking for him.  He's not

19  answering any questions.  He's barely spoken.

20    MR. WEINBERG:  The record will show that he

21  already -- anything I've said has been only after he

22  answered the question, but all I'm asking to you --

0043

1    MS. WEISMANN:  We're not trying to be

2  difficult.

3    MR. WEINBERG:  **All I'm saying is we're making a**

**4  very simple point that shouldn't at all cause you**

**5  any problem and that is you identified the**

13

**6  instructions that were given to him "representative**
**7  sample."  If you would listen to his answers you**
**8  would have heard that he didn't provide a**
**9  representative sample, he provided something more**
**10  than representative sample.**
11    MS. WEISMANN:  I also heard he didn't provide
12  everything that we want.
13    MR. WEINBERG**:  I understand.  You can't be**
**14  asking him what the criteria were for his providing**
**15  a representative sample, that's all I'm saying.**
16    MS. WEISMANN:  I can ask --
17    MR. WEINBERG:  You can ask him, I don't care --
18    MS. SLOAN:  Call the Judge.  If they're going
19  to argue it's not relevant, it would be good to get
20  it from the Judge.
21    MR. WEINBERG:  He's answering the question.
22    MS. OLSON:  I didn't tell him not to answer,
0044
1  but I do want it to be on the record this has
2  nothing to do with FOIA processing.  This has to do
3  with my conduct as the attorney defending the
4  Department of Justice of this litigation.  Doesn't
5  have anything to do with delays in the FOIA
6  processing.  Mr. Brody's already testified that he
7  didn't have anything to do with the processing of
8  the FOIA request.  So I just want that relevance
9  objection to be on the record.  I'm not instructing
10  him not to answer if we can get a question that's
11  not attorney/client privilege.
12    Q   I'm going to ask the question again.  I
13  know you're going to say I've asked it.  I don't
14  think it was answered.  I want to get an assertion
15  privilege on the record.  Were you asked to give
16  Ms. Olson a representative sampling or words to that
17  affect?
18    A   Yes.
19    Q   And is it your testimony that you gave her
20  something other than a representative sampling?
21    A   Let me see if I can explain.  CREW's FOIA
22  request as it was served and as I saw the wording of
0045
1  it as an exhibit to the complaint asked for all
2  documents dealing with remedies in the case from
3  2001 onward.  What I gave, what I collected, was all

14

4   of the documents that I had relating to the internal
5   deliberations within the Department of Justice as to
6   what would be presented as a remedies request at
7   closing argument and in post-trial briefing.
8       Q   Thank you for that explanation.  And was
9   it your understanding that all of the documents
10  presented to Ms. Olson were privileged?
11      A   I never made that type of assessment.  I
12  haven't analyzed it that way.
13      Q   And have you had any occasion since then
14  to analyze it that way?
15      A   No.
16      Q   Has anyone discussed the privilege nature
17  of these documents with you as it relates to CREW's
18  FOIA request?
19      MR. WEINBERG:  **You mean other than with his**
20  **counsel?**
21      Q   That's not my question.
22      MR. WEINBERG:  **You said anyone.  Why don't you**
**0046**
1   **limit your question.**
2       MS. WEISMANN:  I get to ask the questions.
3       MS. OLSON:  Object on attorney/client
4   privilege.  To the extent you are asking for
5   communications between him and me or any other
6   attorney on this case, we object.
7       Q   When you assembled these documents you had
8   no understanding whatsoever about whether or not
9   they were privileged?
10      A   When I assembled the documents I did not
11  make an assessment about whether the set of
12  documents which constituted the internal
13  deliberations of the Department of Justice has to
14  what the remedies request would be were privileged.
15  I did not go through document by document and make
16  an assessment.
17      Q   And when you presented them, did you
18  present them as internal deliberations, did you use
19  that description or words to that affect?
20      A   I don't recall using words to that affect.
21      Q   Did you make any characterization
22  generally of the kinds of documents they were,
0047
1   beyond that they were memos?

15

2      MR. WEINBERG:  **He hasn't said that they were**
3  **memos.  Object to the form of the question**.
4      A   Without revealing the substance of any
5  communications that I had with Ms. Olson, counsel
6  for United States in this action, yes, I discussed
7  with her the nature of the documents.
8      Q   Now was that your only involvement with
9  respect to documents responsive to CREW's FOIA
10  request?
11      A   Yes.
12      Q   And were you at any point --
13      MS. OLSON:  Before you ask that, can I confer
14  with him for a couple seconds, just right here.
15      MS. WEISMANN:  Off the record.
16          (Off the record)
17  BY MS. WEISMANN:
18      Q   Let's go back to the documents.  What did
19  you go through to cull those documents or pull those
20  documents?
21      A   E-mail, memos, drafts of testimony, drafts
22  of trial presentations.
0048
1      Q   Did you go through the entire tobacco
2  litigation files?
3      A   No.
4      Q   What types of documents, give me the
5  categories of documents that you provided Ms. Olson?
6      A   There was primarily e-mail, some drafts of
7  witness testimony.  There were memos, internal
8  memos.  There was probably one publicly filed
9  meeting.
10      MR. WEINBERG:  Hang on one second.
11          (Off the record)
12  BY MS. WEISMANN:
13      Q   Did any of the documents include your
14  personal notes that you took of conversations?
15      A   No.
16      Q   Did any of the documents include e-mail
17  between you and the tobacco representatives?
18      A   No.
19      MS. OLSON:  **Objection.  If you're suggesting**
20  **that such documents exist that he has any -- you**
21  **haven't established that he would have had any notes**
22  **or had any such communications.  So just objection**

16

**0049**
1  **to the form of the question to the extent that's**
2  **what you're insinuating.**
3      MS. WEISMANN:  I think you have to make
4  clear -- let's not have speaking objections.
5      MS. OLSON:  I object to the form of the
6  question**. I just want it understood that he is not**
7  **by his answer admitting that he had any such**
8  **documents or that any such documents exist; is that**
9  **correct?**
10     MS. WEISMANN:  No, you can't ask him questions.
11     MS. OLSON:  I can ask him a question.  I just
12  want it understood that he is not -- that is not
13  what he is answering.
14     Q   At any time have you discussed with anyone
15  in the Office of Information and Privacy any aspect
16  of the CREW's FOIA request?
17     A   No.
18     Q   At any point have you received any
19  communication from either orally, writing, including
20  e-mail, anyone, when I say "them" I mean any
21  personnel in the Office of Information and Privacy
22  concerning CREW's FOIA request?
**0050**
1      A   No.
2      Q   I know I may have asked this, but just to
3  make sure, at any time have you received any
4  communication either orally or in writing from Jim
5  Kovakas or anyone else who handles FOIA requests on
6  behalf of the Civil Division?
7      A   Concerning CREW's FOIA request?
8      Q   Concerning CREW's FOIA request?
9      A   No.
10     Q   Have you had at any time since CREW's
11  litigation was filed provided any access to anyone
12  related to this litigation to other documents beyond
13  what you provided to counsel?
14     MR. WEINBERG:  Object to the form of the
15  question.
16     A   Can you explain what you mean by "provided
17  access"?
18     Q   Were you either directly provided or made
19  available?
20     A   I haven't taken affirmative steps to do

21  that.  The reason that I'm struggling with your
22  question is that I don't know that I would have to
0051
 1  take affirmative steps for that to happen.  That's
 2  why I'm struggling with your question.
 3      Q    To your knowledge has counsel for the
 4  Government reviewed any other documents that you
 5  have in your possession beyond the documents you've
 6  described you've provided her?
 7      MS. OLSON:  Objection, that would be
 8  attorney/client.  I'm instructing him not to answer.
 9      Q    Have you at any point since CREW's
10  document request was filed reviewed any documents in
11  the Associate Attorney General's Office?
12      A    No.
13      Q    Have you been asked to provided any input
14  on any documents within the Associate Attorney
15  General's Office with respect to a FOIA request?
16      A    No.
17      Q    Have you had an opportunity in any other
18  capacity to review Mr. McCallum's documents as they
19  relate to the tobacco FOIA litigation?
20      A    No.
21      Q    Let's marked this as Brody.
22         (Brody Exhibit No. 1 was marked)
0052
 1      Q    Before we get to that.  Going back to
 2  Mr. McCallum's documents and the documents within
 3  the Associate Attorney General's Office.  Have you
 4  ever been advised that those documents were made off
 5  limits to anyone but a limited number of people,
 6  when I say advised, it doesn't necessarily have to
 7  be in those precise words or words to that affect?
 8      MR. WEINBERG:  Object to the form of the
 9  question.  Are you saying in connection to the FOIA
10  request?
11      Q    We can limit it in connection with the
12  FOIA request, yes.
13      A    Can I confirm with counsel for a second,
14  there's a potential privilege issue?
15      MS. WEISMANN:  Okay.
16         (Off the record)
17  BY MS. WEISMANN:
18      Q    Do you know what the last question was?

18

19    A   Yes.  Other than attorney/client
20  communications relating to this litigation I've had
21  no conversations with anyone on that subject.
22    Q   Did you have an understanding that
0053
1  Mr. McCallum -- that documents in Mr. McCallum's
2  office that was responsive to CREW's FOIA requests
3  that access was limited to documents in
4  Mr. McCallum's office that was responsive to CREW's
5  FOIA request?
6    MR. WEINBERG:  Object to the form.
7    MS. OLSON:  I think that's the same question.
8    MR. WEINBERG:  **Object to the form of the**
9  **question.  He just told you he had no communications**
10  **other than --**
11    MS. WEISMANN:  I know he told me -- I think
12  your speaking objections are really a form of
13  coaching.
14    MS. OLSON:  Object to the form of the question,
15  you just asked that.
16    Q   You may answer.
17    A   The answer is the same.
18    MS. WEISMANN:  Read back his answer.
19      (Record was read)
20    Q   My question goes to whether or not you had
21  an understanding that Mr. McCallum's documents were
22  of limited accessibility?
0054
1    MR. WEINBERG:  Well, are you asking whether he
2  had an understanding based on anything other than
3  his conversations with counsel which would be
4  privileged?
5    MS. WEISMANN:  I'm happy to ask it that way as
6  a start, but it's my deposition.
7    Q   Do you have an understanding based on
8  anything other than attorney/client communications
9  that access to documents in Mr. McCallum's -- that
10  access to Mr. McCallum's documents was limited?
11    A   No.
12    Q   And I take it then for you to affirm or
13  deny whether or not access was limited, your
14  understanding could require to you reveal -- would
15  require you to reveal attorney/client privilege
16  information?

19

17     A   That's correct.  I cannot answer that
18  question without revealing attorney/client
19  communications.
20     Q   REDACTED
22     A   REDACted
0055
1     Q   REDACTED
2     A   REDACTED
3     Q   REDACTED
5     A   REDACTED
6   MS. OLSON:  REDACTED
10     Q   REDACTED
13     A   REDACTED
14     Q   REDACTED
19   MS. OLSON:  REDACTED
22   MS. WEISMANN:  REDACTED
3   MS. OLSON:  REDACTED
6   MS. WEISMANN:  REDACTED
9   MS. OLSON:  REDACTED
10     Q   REDACTED
12     A   REDACTED
16     Q   REDACTED
19   MS. OLSON:  REDACTED
21   MS. WEISMANN:  REDACTED
2   MS. OLSON:  REDACTED
6     MS. WEISMANN:  Are you directing him not to
7  answer?
8     MS. OLSON:  Yes, on Rule 30(b) or whatever it
9  is that deals with scope of the order.
10     Q   REDACTED
12     MS. OLSON:  REDACTED
15     MS. WEISMANN:  Are you directing him not to
16  answer?
17     MS. OLSON:  Yes, just had a hearing with the
18  Judge this morning on that.
19     Q   When did you first become aware of CREW's
20  lawsuit?
21     A   I probably became aware of it in November
22  of 2005.
0058
1     Q   Who within the Department of Justice have
2  you spoken to about this litigation since it was
3  filed?
4     A   Sharon Eubanks, Lisa Olson, Daniel

20

 5  Crane-Hirsch.
 6      Q    Who is Daniel Crane-Hirsch?
 7      A    He was a trial attorney on the tobacco
 8  team.  Carolyn Hahn who is a trial attorney on the
 9  tobacco team, Noel Kurtin.
10      Q    Who is Noel?
11      A    Is a trial attorney on the tobacco team.
12  Linda McMahon is a trial attorney on the tobacco
13  team.  Mary Jo Moltzen is a trial attorney on the
14  tobacco team.  Jeffrey Senger.
15      Q    And Mr. Senger is?
16      A    He works at Robert McCallum's office.  I'm
17  not sure of his exact title.  At one point he was
18  Chief of Staff but I don't know if that's his title.
19      Q    How many discussions did you have with
20  Mr. Senger?
21      A    Two.
22      Q    And each of them related to the FOIA
0059
 1  litigation?
 2      A    Yes.
 3      MS. OLSON:  Objection.  That's fine.
 4      Q    And when did these discussions take place?
 5      A    About three weeks ago.
 6      Q    And how long was each discussion in
 7  length?
 8      A    Two, three minutes.
 9      Q    And was any of the discussion centered on
10  your deposition or Mr. McCallum's deposition?
11      MS. OLSON:  Objection, that may divulge
12  privileged information so.
13      MS. WEISMANN:  And what is the privilege that
14  you're asserting?
15      MS. OLSON:  It depends on what his answer would
16  be.  Let me talk with him for a second and see if he
17  can answer it.
18      MS. WEISMANN:  It's somewhat improper generally
19  to consult with counsel while a question is pending.
20  I'm willing to allow it for the preservation of
21  privilege but if I feel that it's abuse we will take
22  that issue --
0060
 1      MS. OLSON:  Our purpose in confirming with him
 2  is to find out whether he can answer the question

21

3    and it's our greatest endeavor to cooperate as fully
4    as possible and answer the questions as fully as
5    possible and to that end I'll confer with him for a
6    moment and see if he can answer it without divulging
7    privileged information.
8              (Off the record)
9      MS. OLSON:  He can answer your question.
10     A   Yes.
11             (Record was read)
12     A   The answer is yes.
13  BY MS. WEISMANN:
14     Q   Who generated the phone call, were these
15  phone calls or in-person meetings?
16     A   Phone calls.
17     Q   And who called who?
18     A   I initiated the discussion.
19     Q   In both instances?  I think you said there
20  were two phone calls?
21     A   There were two.  I initiated the first
22  call, the easiest way to put it.  As to who picked
0061
1    up the phone on the second one I'm not sure.
2      Q   Was the second a follow-up to the first?
3      A   Yes.
4      Q   And what was your purpose in making the
5    phone calls?
6      A   To ensure that everyone involved in the
7    FOIA litigation was aware of obligations imposed by
8    the District Court in the tobacco litigation.
9      Q   Have you had any conversations with
10  Mr. McCallum about CREW's FOIA request or the CREW's
11  FOIA litigation?
12     A   No.
13     Q   What documents did you review prior to
14  coming to your deposition today?
15     A   None, although I saw this document
16  outside.
17     Q   Are you talking about today?
18     A   Today.
19     Q   And have there been any other occasion
20  when you were shown that document?  By that document
21  we're talking about Brody Exhibit 1?
22     A   No.
0062

22

1     Q    Were you told anything about yesterday's
2   deposition?
3     A    No.
4     Q    You said you did see a copy of the
5   transcript of the February 9th, 2006 hearing?
6     A    Correct, it was appended to CREW's motion.
7     Q    And who provided you with that copy?
8     A    I don't remember if it was forwarded to me
9   by Lisa Olson or if I pulled it off of the Pacer
10   website myself.
11     Q    And what directions have you been given
12   about your deposition?
13     MS. OLSON:  Objection, attorney/client.
14     MS. WEISMANN:  Are you instructing him not to
15   answer?
16     MS. OLSON:  Yes, of course.
17     Q    Have you had any discussions with Peter
18   Keisler about CREW's FOIA request or this
19   litigation?
20     A    No.
21     Q    Have you had any discussions with Dan
22   Marine about CREW's FOIA request or this litigation?
0063
1     A    No.
2     Q    So you have identified the universe of
3   people within the Justice Department you have had
4   discussions about CREW's lawsuit?
5     A    I may have offhand mentioned to one person
6   or another current or former tobacco team members
7   that I was going to be deposed but beyond that no.
8     Q    REDACTED
10     A    REDACTED
11     Q    REDACTED
13     A    REDACTED
16     Q    REDACTED
18     A    REDACTED
19     Q    REDACTED
20     A    REDACTED
22     Q    REDACTED
4     A    REDACTED
5     Q    REDACTED
8     A    No.
9     Q    You gave part of the closing argument, did
10   you not?

23

11    A    Yes.
12    Q    And when did that happen?
13    A    June 7th, 2005.
14    Q    As the Deputy Director of the tobacco
15  litigation team, did you attend meetings with
16  Mr. McCallum?
17    A    Yes.
18    Q    And directing your attention to the period
19  of February through the time that the -- February of
20  2005 through the time that the Department announced
21  what its proposed remedy was going to be, how
22  frequent would you say those meetings were?
0065
1      MR. WEINBERG:  **I'm going to object to that**
2  **question.  It's beyond the scope of the inquiry.**
3  **Mr. Brody has testified at length before the**
4  **appropriate investigating authorities about the**
5  **substance of what happened during that period.  Was**
6  **your FOIA request filed in February of 2005?  Was**
7  **the processing of your FOIA request occurring?  He's**
8  **not here to talk about the tobacco litigation, the**
9  **OPR investigation or anything other than the**
10  **processing of the FOIA.**
11      MS. WEISMANN:  Well, we got a ruling today from
12  the Magistrate Judge that we're entitled to probe on
13  one issue.  I'm not going to get into the substance
14  of either the OPR investigation or the tobacco
15  litigation.  You can certainly make your objection,
16  but unless you are going to direct him not to answer
17  in which case we're happy to go to the Magistrate
18  Judge and make a proffer.
19      MR. WEINBERG:  I'm pretty close to that.  You
20  can't use this litigation to --
21      MS. WEISMANN:  You don't need to lecture me on
22  what we can and can't do.
0066
1      MR. WEINBERG:  Let's see where you get, go
2  ahead.
3      MS. WEISMANN:  Are you allowing him to answer
4  the question?
5      MR. WEINBERG:  Yeah.
6    Q    How frequent were those meetings?
7    A    You mean meetings related to anything?
8    Q    No, I'm sorry, meetings related to the

24

 9  tobacco litigation?
10      A    Well, anything in the tobacco litigation?
11      Q    Uh-huh.
12      A    Pretty frequent.
13      Q    Would you define what you mean by pretty
14  frequent?
15      A    It's hard to answer the question because
16  it's not like --
17      Q    I realize it may not be the same from week
18  to week?
19      A    Right.
20      Q    But were there periods of time where they
21  would have been daily?
22      A    I doubt they ever would have been daily.
0067
 1      Q    Were there periods of time they would have
 2  happened more than one a week?
 3      A    Yes.
 4      Q    And at their most intense, by most intense
 5  I mean most frequent, what would you say the amount?
 6      A    I imagine there were probably weeks with
 7  three or four meetings.
 8      Q    And did Mr. McCallum take notes during
 9  those meetings?
10      A    Yes.
11      Q    Did Mr. McCallum review filings that were
12  made of the case before they were made?
13      A    Occasionally.
14      Q    Do you know whether or not he reviewed a
15  filing that the Government made on May 12th, 2005
16  which I think revolve around Dr. Fiore's testimony?
17      A    Yes, I do know.
18      Q    And what is the answer?
19      A    No.
20      Q    And you are, I assume, familiar with Judge
21  Kessler's ruling of February 28th, 2005?
22      A    You're referring to Order 886, yes, I'm
0068
 1  familiar with Order 886.
 2      Q    And do you know when Mr. McCallum became
 3  aware of that ruling?
 4      MS. OLSON:  Anne, object, because you were
 5  asking Mr. McCallum about this yesterday and it
 6  resulted in the court's order.  How does this relate

7  to Mr. McCallum's voracity?  If you can explain
8  that, we'd be willing to answer the question but if
9  it's just going to get into the substance.
10     MS. WEISMANN:  It's not going to get into the
11  substance.
12     MR. WEINBERG:  It is getting --
13     MS. OLSON:  Could you just explain how it's
14  going to get into the voracity?
15     MR. WEINBERG:  You can have the witness out of
16  the room and explain it to us.
17     MS. WEISMANN:  The ruling that we got this
18  morning and I wrote down the language.
19     MS. OLSON:  Information that may challenge the
20  voracity of Mr. McCallum.
21     MS. WEISMANN:  Right.
22     MR. WEINBERG:  He wasn't giving you an
0069
1  opened-ended -- you were talking about what is now
2  Brody Exhibit 1 REDACTED
6     MS. WEISMANN:  With respect to that and it's
7  really --
8     MR. WEINBERG:  You could literally, on your
9  interpretation, you can inquire into every
10  conversation that was ever had with Mr. McCallum to
11  see whether some place or another he said something
12  that wasn't correct and that can't be what the
13  Magistrate was ordering.
14     MS. WEISMANN:  I'm not inquire about any
15  conversations with Mr. McCallum.  All I inquired
16  about was the frequency of those conversations.  I
17  have not touched the subject matter beyond the fact
18  that they related to the tobacco litigation.
19     MR. WEINBERG:  Unless you have a specific --
20  his knowledge of --
21     MS. WEISMANN:  I'm asking about specific
22  documents that -- whether he reviewed them.  Are you
0070
1  directing him not to answer or not?
2     MR. WEINBERG:  I guess what we're saying is
3  that we would be happy if the witness leave the room
4  and you can explain how this could possibly relate
5  to the FOIA litigation and then we can make a
6  decision as to whether to direct him or not.
7     MS. WEISMANN:  Off the record.

26

8         (Off the record)
9  BY MS. WEISMANN:
10    Q   I'm not going to require to you answer
11  that last question.  I want to go back and focus,
12  again, on the documents that you assembled for Ms.
13  Olson.  Did you yourself get those documents or did
14  you delegate that to someone else?
15    A   I assembled that set of documents myself.
16    Q   And were these documents that had already
17  been segregated in some way?
18    A   Yes.
19    Q   It would be helpful if you would start by
20  describing where these documents were housed?
21    A   I was able to collect the documents from
22  the files in my office.
0071
1    Q   And how many filing cabinets do you have
2  in your office?
3    A   Filing cabinets that are assigned
4  personally for my use, probably five.
5    Q   And was it within those five filing
6  cabinets that these documents resided?
7    A   I think they were actually in a bookcase.
8    Q   And so these are documents that had
9  already been assembled by you before the request
10  came from counsel?
11    A   Yes.
12    Q   And what was your purpose initially in
13  assembling these documents?
14    MS. OLSON:  Objection, that would violate --
15  that's privileged under law enforcement
16  investigatory privilege.
17    Q   Is that an ongoing investigation?
18    MS. OLSON:  I'm going to -- my understanding is
19  that his response to that would divulge privileged
20  information or could divulge it, so I'm going to ask
21  him not to answer.
22    MS. WEISMANN:  But are you talking about an
0072
1  ongoing law enforcement investigation, because OPR
2  has provided publicly two letters that state its
3  conclusions.
4    MR. WEINBERG:  **Mr. Brody has his own**
**5  obligations with respect to whatever may have**

**6  occurred here and he can't be in a position of**
**7  divulging information that he's not permitted to**
**8  divulge.  So it's not necessary to -- anything to do**
**9  with the FOIA request.  He's told you what the**
**10  documents consisted of.  He's told you where they**
**11  were located in his office and he's told you they**
**12  were segregated for another purpose.  It's of no**
**13  moment to you what the purpose was.**

14      MS. WEISMANN:  It is -- I'm entitled to know
15  whether the parameters he used in these other are
16  consistent with the parameters of our request.

17      MR. WEINBERG:  **He's already told you the**
**18  parameters that he used for these documents and**
**19  he'll tell you again.  You don't need to know what**
**20  the other purpose was.**

21      Q   I'm not trying to breach any privilege.
22  Let's go back to these documents.  You already had a

0073
1  segregated group of documents in your office?
2      A   That's correct.
3      Q   And so when the request from counsel came
4  in this case that is what you provided counsel?
5      A   That's correct.
6      Q   As part of satisfying counsel's request
7  did you review any larger volume of documents or did
8  you rely on the documents you had already assembled?
9      A   I relied on the documents I already
10  assembled.
11      Q   And at any point since that request has
12  come in have you gone back to a larger body of
13  documents for purposes of this litigation?
14      A   No.
15      Q   And at any point did you direct anyone
16  else to assemble documents for purposes of this
17  litigation?
18      A   No.
19      Q   Did you direct anyone else to assemble
20  documents for purposes of responding to our FOIA
21  requests?
22      A   No.

0074
1      Q   And have you seen an actual copy of CREW's
2  FOIA requests to the Civil Division?
3      A   I believe so, yes.

28

4    Q    And do you know when you saw it?

5    A    As I said, I probably saw it at -- I

6  probably saw it about the time that it came in,

7  although I can't tell you specifically that that's

8  when I saw it.  It would have just been something

9  that was distributed to the entire team as

10  correspondence related to the case and I can't tell

11  you for certain if I actually saw it at about the

12  time it came in.

13    Q    I thought your testimony initially was you

14  were not aware of the FOIA request until the

15  litigation was filed?

16    A    Right, but what I'm saying is I could have

17  seen a copy of the request.  There were a lot of

18  FOIA requests coming in to the Department of Justice

19  following closing arguments at trial, a number of

20  those, and I don't know if CREW's was included

21  amongst these were circulated to everyone on the

22  tobacco team as was most general correspondence

0075

1  dealing with the case.

2    MR. WEINBERG:  **So the record is clear, he has**

3  **given that same answer earlier in this deposition.**

4    Q    The record is what it is.  It's not your

5  testimony that at that time you took any actions to

6  identify documents that might be responsive to our

7  FOIA request?

8    A    Correct.

9    Q    Are you aware whether anyone else on the

10  tobacco team or within the Civil Division was asked

11  to assemble documents that were responsive to CREW's

12  FOIA request?

13    A    At what point in time?

14    Q    At any time since the request was filed?

15    A    I am aware that.  I think Jim Kovakas was

16  doing something.

17    Q    But no one else on the tobacco litigation

18  team that you're aware of?

19    A    Correct.

20    Q    Would this include the period of time that

21  Sharon Eubanks was there?

22    A    Correct.

0076

1    Q    And do you know when Mr. Kovakas was

29

2   assembling documents?
3     A   No.
4     Q   Do you know whether it happened after the
5   litigation was filed?
6     A   Well, I don't know whether or what he
7   actually did, it's just my understanding he had some
8   involvement in it.
9     Q   You just have a general understanding that
10  he had some involvement in CREW's FOIA request?
11    A   Correct.
12    Q   You worked pretty closely with Ms. Eubanks
13  over a period of years, did you not?
14    A   Yes.
15    Q   And based on that do you feel that she is
16  an honest person?
17    MS. OLSON:  Objection, just completely outside
18  the scope of this deposition.  I'm going to instruct
19  him not answer.  It has nothing to do with the
20  voracity of Mr. McCallum.  It has nothing to do with
21  what the court said yesterday, the processing of
22  this FOIA request, and so under Rule 30 I'm going to
0077
1   instruct him not to answer.
2     MS. WEISMANN:  I, for the record, would note
3   that you have made the most outrageous of
4   accusations about her conduct and I think it is
5   relevant, but if you want to continue to direct him
6   not to answer?
7     MS. OLSON:  Well, yes, I am.
8     MS. WEISMANN:  I think we're done.  Thank you
9   so much for your time.
10        (Reading and signing was waived)
11      (12:10 p.m. the deposition was concluded)
12
13
14
15
16
17
18
19
20
21
22

0078

1       I, TEAGUE GIBSON, the officer before whom

2  the foregoing deposition was taken, do hereby

3  certify that the witness whose testimony appears in

4  the foregoing deposition was duly sworn by me; that

5  the testimony of said witness was taken by me in

6  stenotypy and thereafter reduced to typewriting

7  under my direction; that said deposition is a true

8  record of the testimony given by said witness; that

9  I am neither counsel for, related to, nor employed

10  by and of the parties to the action in which this

11  deposition was taken; and, further, that I am not a

12  relative or employee of any counsel or attorney

13  employed by the parties hereto, nor financially or

14  otherwise interested in the outcome of this action.

15

16            Teague Gibson

17          Notary Public in and for

18           the District of Columbia

19

20  My commission expires:

21  June 14, 2010

22

31