**EXHIBIT A**

**REDACTED**

**EXHIBIT B**

**REDACTED**

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | : | |
| | : | : |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 05-2078 (EGS) |
| | : | |
| U.S. DEPARTMENT OF JUSTICE, | : | |
| | : | : |
| Defendant. | : | |
| | : | |

**<u>DECLARATION OF ANNE L. WEISMANN</u>**

I Anne L. Weismann hereby declare as follows:

1.  I am Chief Counsel for Citizens for Responsibility and Ethics in Washington ("CREW"). I have held this position since March 2005.

2.  I am the lead counsel in the above-captioned case and have been since CREW first filed its complaint.

3.  In preparation for the discovery authorized by the Court's Memorandum Opinion and Order of June 1, 2006, I obtained on behalf of CREW the documents that have been marked as McCallum Exhibits 2 and 3. I did not obtain these documents from Sharon Eubanks, nor have I ever advised Ms. Eubanks that CREW is in possession of these documents. Moreover, the source from which I obtained these documents has no current or former connection to the U.S. Department of Justice.

4.  There was nothing improper in the manner in which I obtained these documents or that suggested that the documents were stolen government property.

5.  The body of the document that has been identified as McCallum Exhibit 3 contains all

of the information that was provided to CREW.

I declare under penalty of perjury that the following is true and correct.

_____

ANNE L. WEISMANN

Dated: July 24, 2006

**EXHIBIT D**

0001
1          UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3

     ------------------------------:
4  CITIZENS FOR RESPONSIBILITY  :
   AND ETHICS IN WASHINGTON,    :
5                               :
     Plaintiff,           :
6                               :
       v.          : Case No.:
7                   : 05-2078(EGS)
   UNITED STATES           :
8  DEPARTMENT OF JUSTICE       :
                            :
9     Defendant.        :
                            :
10 ------------------------------:
11                   Washington, D.C.
                    July 18th, 2006
12
13 Videotaped Deposition of:
14        ROBERT D. MCCALLUM, JR.,
15        Called for oral examination by counsel for
16 Plaintiff, pursuant to notice, at the District of
17 Columbia District Court, 333 Constitution Avenue,
18 N.W., Washington, D.C., beginning at 10:40 a.m,
19 before Teague Gibson of Capital Reporting, a Notary
20 Public.
21
22        *   *   *   *   *
0002
1          A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF:
3        ANNE L. WEISMANN, ESQ.
         MELANIE SLOAN, ESQ.
4        Citizens for Responsibility
         and Ethics in Washington
5        1400 Eye Street, N.W., Suite 450
         Washington, D.C. 20005
6        (202) 408-5565
7  ON BEHALF OF THE DEFENDANT:
8        LISA A. OLSON, ESQ.

1

       ELIZABETH J. SHAPIRO, ESQ.
9        U.S. Department of Justice Civil Divisoin
       20 Massachusetts Aveneu, N.W.
10        Washington, D.C. 20530
       (202) 514-5633
11
12
   ALSO PRESENT:  Harold Bayuk, Video Technician
13
14
15
16
17
18
19
20
21
22
0003
1              C O N T E N T S
2   EXAMINATION BY:                    PAGE
3   MS. WEISMANN                     5
4   MCCALLUM DEPOSITION EXHIBITS:           PAGE:
5   1      Written Responses          14
6   2      E-mails               71
7   3      Document              84
8
9
10
11
12
13
14      (Exhibits retained by court reporter)
15
16
17
18
19
20
21
22
0004
1      VIDEO TECHNICIAN:  This is the video deposition

                                2

**REDACTED**

**EXHIBIT E**

**Questions for the Record Submitted to
Ambassador - Designate Robert McCallum by
Senator Richard Lugar (#1)
Senate Foreign Relations Committee
June 19, 2006**

**Question:**

As Associate Attorney General, you supervise the Civil Division and several other branches of the Department of Justice. In this capacity, you were ultimately responsible for deciding what remedies to seek against the tobacco companies in the ongoing lawsuit brought against them by the U.S. Government (United States v. Philip Morris USA Inc., et al.). That decision, made at the close of the District Court trial last June, came under fire in the press because the size of the smoking cessation program requested by the Government was significantly smaller than some experts believed was appropriate.

Following the end of the trial, the Office of Professional Responsibility of the Department of Justice undertook an investigation of this issue. Specifically, it sought to determine whether politics improperly influenced your decision. That office recently completed its investigation and concluded, in a June 1, 2006, memorandum to you, that "your actions in seeking and directing changes in the remedies sought were not influenced by any political considerations, but rather were based on good faith efforts to obtain remedies from the district court that would be sustainable on appeal," and that "you did not engage in professional misconduct or exercise poor judgment."

We understand that this matter is now closed. However, it would be helpful to the Committee if you could provide a brief overview of this issue now, followed by a fuller explanation of these events in writing.

**Answer:**

I very much appreciate the opportunity to provide the Committee with a more detailed explanation of the specific legal issues affecting my decision on the cessation remedy recommended by the United States to the Court in the Tobacco

Case.  A brief procedural history of the case might be helpful to the Committee in understanding the legal issues involved.

The United States brought suit in 1999 against cigarette manufacturers and related entities seeking, among other remedies, equitable relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68.  The United States alleged that defendants committed fraudulent acts over decades relating to the sale of cigarettes and thereby participated in the affairs of a RICO enterprise through a pattern of racketeering activity.  The United States sought equitable relief pursuant to 18 U.S.C. §1964(a), which allows discretion to the District Court to issue appropriate orders to "prevent and restrain" violations of RICO.  The equitable remedies sought could include injunctive relief, a cessation program, education programs, marketing restrictions, and the disgorgement of ill-gotten gains.

Defendants moved to dismiss the complaint.  In denying the motion, the District Court considered and rejected defendants' contention that the court could not as a matter of law order the disgorgement of the proceeds of past unlawful activities.  The defendants contended that disgorgement is inherently retrospective and is not calculated to "prevent or restrain" future RICO violations but rather to punish or remedy the effects of past violations.  The District Court ruled that it retained broad, inherent equitable power to enforce the prohibitions of a federal

statute unless the statute in so many words or "'by a necessary and inescapable inference, restricts the court's jurisdiction in equity.'" 116 F. Supp. 2d 131 (D.D.C. 2000)(quoting <u>Porter</u> v. <u>Warner Holding Co.</u>, 328 U.S. 395, 398-99 (1946)).

After four years of discovery, defendants filed a summary judgment motion, again asking the District Court to eliminate the equitable disgorgement remedy. The District Court denied defendants' motion, holding that RICO's legislative history left no doubt of Congress' intent to empower the courts to craft "'equitable relief broad enough to do all that is necessary to free the channels of commerce from all illicit activity.'" (quoting S. Rep. No. 91-617, at 79 (1969)). Citing <u>SEC v. First City Financial Corp.</u>, 890 F.2d 1215 at 1230 (D.C. Cir. 1989), the court held that an equitable remedy is properly ordered if done "'to deprive a wrongdoer of his unjust enrichment and to deter others from violating'" federal law. However, the District Court certified its summary judgment order for interlocutory appeal, concluding that the issue constituted a controlling question of law, the resolution of which by the appellate court before the end of trial would materially advance the case.

On appeal, defendants asked the Circuit Court to reverse the District Court on the grounds that section 1964(a) of RICO explicitly limits the court's jurisdiction to remedies that "prevent and restrain" future RICO violations and does not allow remedies that address the consequences of a defendant's past

conduct. Because disgorgement was measured solely by gains unlawfully acquired in the past and was awarded regardless of defendants' conduct in the future, defendants asserted that it was an unrecoverable remedy as a matter of law.

On February 4, 2005 and four months into the ongoing trial of the case, the Circuit Court of Appeals (per Sentelle, J.) reversed the District Court and granted summary judgment on this issue to defendants. The court considered the "prevent and restrain" language of the statute and declared that "[t]his language indicates that the jurisdiction is limited to forward-looking remedies that are aimed at future violations." The Court reasoned that disgorgement "is a quintessentially backward-looking remedy focused on remedying the effects of past conduct to restore the status quo. It is measured by the amount of prior unlawful gains and is awarded without respect to whether the defendant will act unlawfully in the future. Thus, it is both aimed at and measured by *prior* conduct." (Emphasis in original.) The Court stated: "It is true, as the Government points out, that disgorgement may act to "prevent and restrain" future violations by general deterrence insofar as it makes RICO violations unprofitable. However, . . . this argument goes too far. 'If this were adequate justification, the phrase 'prevent and restrain' would read 'prevent, restrain, and discourage,' and would allow any remedy that inflicts pain.'" The Court further noted that other RICO provisions provide remedies for past conduct, and concluded that "[t]his 'comprehensive and reticulated' scheme,

along with the plain meaning of the words themselves, serves to raise a 'necessary and inescapable inference' ... that Congress intended to limit relief under § 1964(a) to forward-looking orders, ruling out disgorgement."

The government unsuccessfully sought to overturn the Circuit Court's ruling, exhausting all available avenues. On March 4, 2005, the government filed a Petition for Panel Rehearing and Petition for Rehearing En Banc, which was denied. On July 18, 2005, the government filed a petition for certiorari seeking review by the United States Supreme Court which was denied.

On February 10, 2005, the District Court ordered the parties to file memoranda on the scope and meaning of the Circuit Court opinion, and various memoranda were filed by the parties and others as amicus. On February 28, 2005, the District Judge issued Order #886, noting that the appellate decision "has struck a body blow to the Government's case." The judge went on to criticize the arguments presented in the government's memorandum: "The Government's Memorandum regarding the scope of the Court of Appeals' ruling and which, if any, non-disgorgement remedies are available reads as if Judge Sentelle had never written his Opinion. . . . The fact of the matter is that those arguments were rejected by Judge Sentelle in his 2-1 Opinion and are simply not the law to be followed at this time." The judge concluded that "Judge Sentelle's Opinion, as this Court reads it, simply does not permit non-disgorgement remedies to prevent and

restrain the effects of past violations of RICO. Rather, this Court's 'jurisdiction is limited to forward-looking remedies that are aimed at future violations' of RICO." The cessation program was one of those non-disgorgement remedies.

As a result of this Circuit Court opinion and the District Court's order #886, the applicable legal principles on recoverable remedies changed in the middle of the trial, restricting dramatically those available to the government, and the government was obligated to comply with the new standards set by the two courts. Career attorneys in the Organized Crime and Racketeering Section of the Criminal Division, including the Senior Litigation Counsel who was a member of the trial team and gave a portion of the opening argument in the case at the start of the trial, recommended revising the non-disgorgement remedies to connect them to future violations of RICO. All current smokers as of the date of judgment were already addicted to cigarettes and, by definition, did not become addicted on the basis of some future violation after the date of judgment. Based upon the two court orders, these career attorneys took the view that the funding of a cessation program for existing smokers would only be a recoverable remedy under the new legal standard if the program were connected to the future consequences of future violations of RICO.

After conferring with a number of attorneys including the principal career attorneys leading the trial team, I accepted and agreed with the recommendation to

revise the cessation remedy in a manner to meet the new legal standard. For this reason, the government asked the Court to find as a matter of fact that defendants will continue to violate RICO for at least one year after entry of final judgment and to require defendants to fund a five year, ten billion dollar smoking cessation program. The remedy was based upon two groups of smokers who are practically certain to be the future victims of defendants' continuing wrongful conduct: new youth smokers and those smokers switching to low-tar and light cigarettes, thinking them to be healthier. The evidence established that only one of five quit attempts in a cessation program is successful, and so the proposed cessation remedy was to cover five times the number of victims of the future RICO violations in order to remove from the smoking population an equivalent number of existing smokers to the number of the two groups affected by the continuing fraudulent acts within the first year. Thus the cessation remedy addressed the defendants' future violations with forward-looking relief even though it involved existing smokers. For each smoker in those two groups gained or retained by defendants, an existing smoker was eliminated, and therefore the cessation remedy was calculated to "prevent and restrain" future wrongful acts in direct relation to their consequences.

The proposed factual finding of at least one year of continuing violations was presented as a minimum period, and if the District Court made a factual

finding of a longer period based upon the evidence, the size and/or duration of the program could increase in the same proportion. For instance, a factual finding that the violations were likely to continue for five years would result in a fifty billion dollar program over whatever period the judge determined in her equitable discretion.    The revised cessation remedy was also presented as part of a comprehensive remedial package which included a monitor, and an extension of any cessation program could be sought and imposed in the event the monitor determined that future violations of RICO continued.

The case is still pending before the United States District Court.

**Questions for the Record Submitted to**
**Ambassador - Designate Robert McCallum**
**Senator Joseph Biden (#1)**
**Senate Foreign Relations Committee**
**June 19, 2006**

**Question:**

Why do you want this position?

**Answer:**

When the President asked me to consider leaving the Department of

Justice to become Ambassador to Australia, I agreed to do so because the

position represents an important opportunity to serve this President and the

United States.  The Ambassador to Australia represents the United States

with one of our nation's most important allies, and maintaining and

enhancing that relationship is and should be the top priority of every U.S.

Ambassador to Australia.  I have found representing the United States as a

lawyer to be the most professionally satisfying experience of my legal

career, and I know that I will find the same professional satisfaction in doing

so as a diplomat.  The forum and issues will be different, but the pride that I

feel in our President and our nation will be the same.  I also view an

Asia/Pacific region as the area of the world which will, over the next decade,

have an enormous impact on practically every major issue facing our nation.

Issues relating to political stability of nation states, terrorism, economic

development, international trade, human trafficking and human rights, drug trafficking, environmental pollution, health and pandemic policy, and technology and intellectual property rights, just to name a few, will present both Australia and the United States with challenges on which close communication and cooperation will be essential for both our national interests. If confirmed by the Senate, it would be a privilege to participate with Australia in addressing such issues in that region.  I am also drawn to the position by the warmth, openness, and friendliness of the Australian people and by the natural wonders and variety of the Australian continent.

**Questions for the Record Submitted to**
**Ambassador - Designate Robert McCallum**
**Senator Joseph Biden (#2)**
**Senate Foreign Relations Committee**
**June 19, 2006**

**Question:**

If confirmed, what do you expect to be able to report that you have achieved 12 months after arriving at post?

**Answer:**

I would expect to report within the next twelve months: that I have supported and enhanced the relationship between our two countries and established good working relationships with representative of the Australian government on both the national, state,  and local level; that I have taken steps to ensure the safety and security of the facilities and staff of the U. S. mission in Canberra and the three consulates, and the safety and welfare of United States citizens living and traveling in Australia; that I have established a good working relationship with that staff and the various agencies represented in the mission by being accessible, responsive, and direct and transparent in my decision-making; that I have developed relationships with the U. S. and Australian business and cultural communities through outreach efforts; that I have implemented the

provisions of our Free Trade Agreement with Australia and encouraged the exchange of cultural resources through tourism, education programs, and the like as well as through goods and services; that I have participated with Australia in increasing the stability, cooperation, and understanding of countries in the Asia/Pacific region; that I have been a spokesman for the President, his administration, and the United States within Australia so that our positions on issues of mutual interest are known and understood by the Australian government and the Australian people; that I have effectively managed the resources budgeted to the mission consistent with the President's Management Agenda, and, last but not least, that I have developed a broad knowledge of and appreciation for Australian sports, including a mastery of the rules and strategy of both cricket and the apparent mayhem known as Australian Rules Football.

**Questions for the Record Submitted to**
**Ambassador - Designate Robert McCallum**
**Senator Joseph Biden (#3)**
**Senate Foreign Relations Committee**
**June 19, 2006**

## Question:

In your position as Associate Attorney General, and before that as Assistant Attorney General, what was your role in supervising the federal tobacco litigation, *United States v. Philip Morris USA Inc., et al*, a case pending the U.S. District Court for the District of Columbia?

## Answer:

With respect to the tobacco litigation, I have been involved in supervising and overseeing limited aspects of the case from time to time as requested or initiated by members of the trial team or by the court or when it appeared to be warranted from my perspective or that of the staff of the Office of the Associate Attorney General and/or the Office of the Assistant Attorney General for the Civil Division. Because of the volume and variety of the issues involved in the case and because of extent of other matters within my portfolio of responsibility, I had no personal involvement, even as to supervision and oversight, in the vast majority of proceedings, filings, and activities relating to the case.

13

**Questions for the Record Submitted to**
**Ambassador - Designate Robert McCallum**
**Senator Joseph Biden (#4)**
**Senate Foreign Relations Committee**
**June 19, 2006**

**Question:**

As the trial in the *Philip Morris* case came to a close, the government proposed a smoking cessation program valued at $10 billion over five years. You have indicated that the decision to propose such a program, rather than a $130 billion program, over 25 years, suggested by an expert witness study introduced at trial by the government, was made in an attempt to conform to the decision of the D.C. Circuit in the case, 396 F. 3d 1190 (D.C. Cir.), *cert. denied,* 126 S. Ct. 478 (2005). Please answer the following questions:

> a. On February 16, 2005, the United States filed a memorandum related to the decision of the D.C. Circuit. It stated that "nothing in the ruling of the Court of Appeals restricts or limits" the ability of the court to order "any of the other non-disgorgement equitable relief sought by the United States." Were you aware of, and did you approve of, the filing of this memorandum?

**Answer:**

I was not aware of, or specifically approve, the details of the February brief. At that time, I was generally aware that the government would be taking the position that the Circuit Court opinion did not preclude the equitable remedy of a cessation program, the exact parameters of which had not yet been determined.

**Question:**

> b. On May 12, 2005, the United States filed a memorandum relating to the examination of expert witness Michael Fiore, and stated that, with regard to the smoking cessation remedy supported by his testimony [the $130 billion program], the "Court should find that the remedy is not only forward-looking and aimed at future violations, but will act directly to prevent and restrain ongoing wrongful conduct of decades-long duration." Were you aware of, and did you approve of, the filing of these memoranda?

**Answer:**

I was not aware of and did not approve the filing of the May 12

memorandum.

**Question:**

> c. In light of the position taken by the United States with regard to the smoking cessation remedy in the memoranda of February 16, 2005 and May 12, 2005, what action or event after May 12 led the Department of Justice to alter its position on the smoking cessation remedy (by reducing the size and scope of the proposed remedy)?

**Answer:**

The events that led the Department of Justice to revise its

cessation remedy occurred before May 12. As a result of the February

4, 2005, Circuit Court opinion, the applicable legal principles on

recoverable remedies changed in the middle of the trial, restricting

dramatically those remedies available to the government, and the

government was obligated to comply with the new standards set by the Court.

On February 10, 2005, the District Court ordered the parties to file memoranda on the scope and meaning of the Circuit Court opinion, and various memoranda were filed by the parties and others as amicus, including the February 16, 2005 memorandum quoted above. In that memorandum, the argument was advanced that: "Requiring Defendants to fund expanded access to smoking cessation programs that have proven to be effective will deprive Defendants of the incentive to continue their approach to the design and marketing of "light" cigarettes, and thereby tend to prevent future unlawful conduct. Further, improving the ability of smokers to quit successfully will reduce the economic benefit to Defendants from continuing to engage in the types of fraudulent marketing of light and low tar cigarettes alleged and proven by the United States in this case. And it will help cure the ongoing and future untoward consequences of Defendants' unlawful conduct, which was aimed at keeping smokers using cigarettes by designing and marketing cigarettes that maintained smoking addiction, even as Defendants publicly denied for decades that smoking was addictive or proven to cause any disease at all."

On February 28, 2005, the District Judge issued Order #886, noting that the appellate decision "has struck a body blow to the Government's case." The judge went on to criticize the arguments presented in the government's memorandum, stating: "The Government's Memorandum regarding the scope of the Court of Appeals' ruling and which, if any, non-disgorgement remedies are available reads as if Judge Sentelle had never written his Opinion. . . . The fact of the matter is that those arguments were rejected by Judge Sentelle in his 2-1 Opinion and are simply not the law to be followed at this time." The judge concluded that "Judge Sentelle's Opinion, as this Court reads it, simply does not permit non-disgorgement remedies to prevent and restrain the effects of past violations of RICO. Rather, this Court's 'jurisdiction is limited to forward-looking remedies that are aimed at future violations' of RICO." The cessation program was one of those non-disgorgement remedies.

Career attorneys in the Organized Crime and Racketeering Section of the Criminal Division, including the Senior Litigation Counsel who was a member of the trial team and gave a portion of the opening argument in the case at the start of the trial, recommended revising the non-disgorgement remedies to connect them to future

violations of RICO. All current smokers as of the date of judgment were already addicted to cigarettes and, by definition, did not become addicted on the basis of future violations after the date of judgment. In the view of these career attorneys, the funding of a cessation program for existing smokers would only be a recoverable remedy under the new legal standard if the program were connected to the future consequences of future violations of RICO.

After conferring with a number of attorneys including the principal career attorneys leading the trial team, I accepted and agreed with the recommendation to revise the cessation remedy in a manner to meet the new legal standard. For this reason, the government asked the Court to find as a matter of fact that defendants will continue to violate RICO for at least one year after entry of final judgment and to require defendants to fund a five year, ten billion dollar smoking cessation program. The revised remedy was based upon two groups of smokers who are practically certain to be the future victims of defendants' continuing wrongful conduct: new youth smokers and those smokers switching to low-tar and light cigarettes, thinking them to be healthier. The evidence established that only one of five quit

attempts in a cessation program is successful, and so the proposed

cessation remedy was to cover five times the number of victims of the

future RICO violations in order to remove from the smoking

population an equivalent number of existing smokers to those affected

by defendants' continuing fraudulent acts within the first year. Thus,

the cessation remedy addressed defendants' future violations with

forward-looking relief even though it involved existing smokers. For

each smoker in those two groups gained or retained by defendants, an

existing smoker was eliminated, and therefore the cessation remedy

was calculated to "prevent and restrain" future wrongful acts in direct

relation to their future consequences.

The proposed factual finding of at least one year of continuing

violations was presented as a minimum period, and if the district court

made a factual finding of a longer period based upon the evidence, the

size and/or duration of the program could increase in the same

proportion. For instance, a factual finding that the violations were

likely to continue for five years would result in a fifty billion dollar

program over whatever period the judge determined in her equitable

discretion. The revised cessation remedy was also presented as part of

a comprehensive remedial package which included a monitor, and an

extension of any cessation program could be sought and imposed in

the event the monitor determined the future violations of RICO

continued.

**Question:**

d. You have stated in a meeting with Committee counsel that you
made the decision to propose the smoking cessation program remedy
in the amount of $10 billion. Is that correct?

**Answer:**

It is correct that I made the decision.

**Question:**

e. Did you discuss this matter, and your decision thereon, with any
person working in the White House? Please be specific.

**Answer:**

I did not discuss my decision on the cessation remedy with

anyone at the White House prior to making it or prior to its

presentation in closing argument. After the decision was made and

presented in court, I did inform the White House Counsel's Office on

the status of the case, the closing argument, and my decision.

**Question:**

f.  Did you discuss any aspect of this case, including any public

statements or articles thereon, with any person working in the White

House?  Please be specific.

**Answer:**

On rare occasions, I did provide the White House with a status report

on the case, generally through the White House Counsel's Office.  On those

rare occasions, no one at the White House suggested any action or directed

any action in the case but merely received information on the status of the

case.  No one at the White House ever tried to influence any aspect of my

decisions in this case.  I can not recall ever discussing any public statements

or articles about the case with anyone at the White House.  However, since

my nomination to be Ambassador, I have discussed the cessation remedy

with persons at the White House in relation to my nomination and the

confirmation process.

**Questions for the Record Submitted to**
**Ambassador - Designate Robert McCallum**
**Senator Joseph Biden (#5)**
**Senate Foreign Relations Committee**
**June 19, 2006**

## Question:

The Office of Professional Responsibility (OPR) at the Department of Justice reviewed your actions in the *Philip Morris* case. Please respond to the following questions:

    a. Did you have any role in supervising the OPR investigation?

## Answer:

    No.

## Question:

    b. Did you have any contact with OPR Counsel Marshall Jarrett, or any of his staff, regarding the investigation, other than the interview or interviews of you by OPR?

## Answer:

    I had no contact with Marshall Jarrett regarding the OPR investigation. I do remember one contact with one interviewer outside the interview context. I had been informed in an interview that the OPR report was likely to be completed at the end of May. I was leaving town on June 1, and I notified an interviewer in order to receive notice of the OPR

conclusions if the report was issued while I was out of the office for a week.

I can recall no other contact with any of Marshall Jarrett's staff outside the

interview context.

**EXHIBIT F**

Robert McCallum answer to SFRC question
June 28, 2006

Question:  On June 9, 2005, USA Today published an oped under your name regarding the tobacco cessation remedy proposed in the tobacco litigation.  The Committee has received a copy of some internal Justice Department emails about the drafting of the article; these emails indicate that the individuals at the White House had a role in editing or supervising the final text of the article, and that you were copied on these emails.

Do you recall the involvement of the White House in the approval of this article?  Does the evidence that White House staff may have been involved in the drafting of this article alter your position that no one at the White House ever tried to influence any aspect of your decisions in this case?

Answer:  I was previously asked the question: "Did you discuss any aspect of this case, including any public statements or articles thereon, with any person working in the White House?"  I thought that the portion of the inquiry relating to "public statements or articles" was focused on statements or articles about my decision by others, and I responded: "I can not recall ever discussing any public statements or articles about the case with anyone at the White House."  My answer remains the same relating to my public statements, specifically the op-ed below, in that I don't recall ever discussing it with anyone at the White House.  Nor do I recall the involvement of the White House in the review or approval of this op-ed.  However, once my decision was made and announced in the closing argument, I likely would have informed the White House of any op-ed to be published under my name so that the White House would be aware of it and have the opportunity to comment.  This post-decision contact with the White House about an op-ed explaining my already-made decision does not alter the fact that no one at the White House ever tried to influence any aspect of my decision.

**EXHIBIT G**

Metcalfe Transcript (07.21.06)

```
0001
1            UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLUMBIA
3
   ------------------------------:
4  CITIZENS FOR RESPONSIBILITY  :
   AND ETHICS IN WASHINGTON,    :
5                       :
     Plaintiff,         :
6                       :
         v.             : Case No.:
7                       : 05-2078(EGS)
   UNITED STATES        :
8  DEPARTMENT OF JUSTICE      :
                        :
9    Defendant.         :
                        :
10 ------------------------------:
11                 Washington, D.C.
                   July 19th, 2006
12
13 Deposition of:
14          DANIEL METCALFE,
15        Called for oral examination by counsel for
16 Plaintiff, pursuant to notice, at the offices of
17 Citizens for Responsibility and Ethics in
18 Washington, 1400 Eye Street, N.W., Suite 450,
19 Washington, D.C. beginning at 3:30 p.m, before
20 Teague Gibson of Capital Reporting, a Notary Public.
21
22         *   *   *   *   *
0002
1  ON BEHALF OF THE PLAINTIFF:
2        ANNE L. WEISMANN, ESQ.
         MELANIE SLOAN, ESQ.
3        Citizens for Responsibility
         and Ethics in Washington
4         1400 Eye Street, N.W., Suite 450
         Washington, D.C. 20005
5         (202) 408-5565
6  ON BEHALF OF THE DEFENDANT:
7        LISA A. OLSON, ESQ.
         ELIZABETH J. SHAPIRO, ESQ.
8        U.S. Department of Justice Civil Divisoin
         20 Massachusetts Aveneu, N.W.
```

Page 1

Metcalfe Transcript (07.21.06)

9      Washington, D.C. 20530
       (202) 514-5633
10
11
12
13
14
15
16
17
18
19
20
21
22
0003
1              C O N T E N T S
2      EXAMINATION BY:                    PAGE
3      MS. WEISMANN                    4
4      MS. OLSON                   56
5      MS. WEISMANN                   74
6
7
8
9
10
11
12      (Exhibits - none marked)
13
14
15
16
17
18
19
20
21
22
0004
1              P R O C E E D I N G S
2              DANIEL METCALFE,
3      called for examination, having been duly sworn to
4      tell the truth, the whole truth and nothing but the
5              truth, testified as follows:
6

Metcalfe Transcript (07.21.06)

17  there and that the number six is what would appear
18  properly in the annual report.  Specifically the
19  number of working or business days between the date
20  that the request was received by the component and
21  the date that the action was taken.
22      MS. OLSON:  No more questions.
0075
1  BY MS. WEISMANN:
2      Q   During the break that you took your
3  counsel before we resumed the redirect did you
4  discuss any of the contents of your testimony with
5  your counsel?
6      MS. OLSON:  I object to that, of course he
7  discussed the contents of his testimony, I'm his
8  lawyer.
9      Q   I'm talking about the contents of the
10  testimony you just gave?
11      MS. OLSON:  I object.  Any discussions that we
12  had are attorney/client privilege.
13      Q   I'm entitled to ask the questions.  And
14  prior to coming here today did you discuss with your
15  counsel these precise questions that you would be --
16  that she would ask you?
17      MS. OLSON:  I object, attorney/client work
18  product.
19      Q   And are you aware that these statistics --
20  that the statistics on which Judge Sullivan relied
21  for his opinion were presented to the court based on
22  OIP's own annual statistics?  Are you aware of that?
0076
1      A   Ms. Weismann, let me make sure I
2  understand your question.  I'm going to give you my
3  understanding of it, please tell me if I have it
4  correct or incorrect.  Are you asking me whether I'm
5  aware that the statistics that are in footnote 8 are
6  derived from the annual FOIA report?
7      Q   No.
8      A   I believe I answered that question or said
9  so.
10      Q   I'm asking whether you're aware that CREW
11  in its briefing on this issue submitted statistics
12  that CREW got directly from the annual statistics
13  that OIP presents to Congress?
14      MS. OLSON:  If he can answer that question.
15      A   I think I can.

Page 39

Metcalfe Transcript (07.21.06)

16    Q    Have you read the pleading in the case,
17  that's the representation that was made.  I'm
18  talking about the briefing.  Have you read the brief
19  that we filed?
20    A    Yes, I definitely did.
21    Q    You're aware that we put in certain
22  statistics in our brief?
0077
1    A    I am aware having read the brief that
2  there are statistics in your brief, yes.
3    Q    Are you aware that Justice Department had
4  numerous opportunities to respond to this?
5    MS. OLSON:  I object, this is so outside the
6  issue.
7    MS. SLOAN:  You want to call Judge Kay, let's
8  call him.
9    MS. WEISMANN:  I don't think we need to call
10  him.
11    MS. OLSON:  It's outside the scope of the
12  order.  The order concerns delay in processing.
13    MS. SLOAN:  Not outside the scope of your
14  re-direct.
15    MS. OLSON:  You'll have to speak.
16    MS. WEISMANN:  Are you going to direct him not
17  to answer?
18    MS. OLSON:  It's outside the scope of the
19  order.  You're asking him what we did in litigation
20  and I know if you want to try to con Judge Sullivan
21  into some sort of a side track, that's fine.  It's
22  like -- this is so beside the point that I'd be
0078
1  happy if you want to take it up.  Our questions
2  concerned the delays in the processing which are
3  discussed in this order and if you want -- the
4  question you are now asking are what we did in this
5  litigation in the briefs.  Mr. Metcalfe is a fact
6  witness.  If you want to ask him about the
7  statistics he's very happy to answer those questions
8  but you're asking him about a privileged
9  attorney/client and work product communication.
10    MS. WEISMANN:  Are you finished with your
11  objection?
12    MS. OLSON:  Yes, but I'm directing him not to
13  answer because you're asking him for privileged
14  information as well as information that's outside

Page 40

Metcalfe Transcript (07.21.06)

15  the scope of the order.

16      MS. WEISMANN:  Just to be clear, it's your view

17  that it's privileged whether or not he was aware

18  that the Government had an opportunity to respond to

19  CREW's submission?

20      MS. OLSON:  That's outside the scope.  That

21  particular question is outside the scope of the

22  order allowing discovery in this case concerning

0079

1  delays in FOIA processing.  So yes, under Rule 30

2  I'm instructing him not to answer.

3      Q   Was it your understanding when you came

4  here today, Mr. Metcalfe, that you would be

5  discussing statistics?

6      MS. OLSON:  Objection.  Again that calls for

7  privileged attorney/client communications.

8      MS. WEISMANN:  I'm asking for his

9  understanding, not the basis of his understanding.

10      MS. OLSON:  He would have no basis for any

11  understanding except what he and I discussed.

12      MS. WEISMANN:  So you're objecting?

13      MS. OLSON:  Yes, as attorney/client.

14      MS. WEISMANN:  And directing him not to answer?

15      MS. OLSON:  Yes.

16      MS. WEISMANN:  I want the record to reflect

17  since I think this is consist with the discussion we

18  had with Judge Kay who was not physically present

19  that counsel had a list of what she has identified

20  as 19 typed questions.

21      MS. OLSON:  And I'd like to state on the record

22  that opposing counsel, Ms. Weismann, has had

0080

1  probably 30 or 40 pages of typed questions

2  throughout these depositions as is the normal

3  practice of an attorney.

4      MS. WEISMANN:  We are done.

5          (Reading and signing was waived)

6          (5:20 p.m. the deposition was concluded)

7

8

9

10

11

12

13

Page 41