# EXHIBIT 3

Capital Reporting Company

1                    UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3
      ------------------------------:
4     CITIZENS FOR RESPONSIBILITY   :
      AND ETHICS IN WASHINGTON,     :
5                                   :
           Plaintiff,               :
6                                   :
               v.                   :   Case No.:
7                                   :   05-2078(EGS)
      UNITED STATES                 :
8     DEPARTMENT OF JUSTICE         :
                                    :
9          Defendant.               :
                                    :
10    ------------------------------:

11                               Washington, D.C.
                                 July 19th, 2006
12

13    Deposition of:

14                    DANIEL METCALFE,

15         Called for oral examination by counsel for

16    Plaintiff, pursuant to notice, at the offices of

17    Citizens for Responsibility and Ethics in

18    Washington, 1400 Eye Street, N.W., Suite 450,

19    Washington, D.C. beginning at 3:30 p.m, before

20    Teague Gibson of Capital Reporting, a Notary Public.

21

22                    *    *    *    *    *

Capital Reporting Company

Page 2

1    ON BEHALF OF THE PLAINTIFF:
2        ANNE L. WEISMANN, ESQ.
         MELANIE SLOAN, ESQ.
3        Citizens for Responsibility
         and Ethics in Washington
4        1400 Eye Street, N.W., Suite 450
         Washington, D.C. 20005
5        (202) 408-5565
6    ON BEHALF OF THE DEFENDANT:
7        LISA A. OLSON, ESQ.
         ELIZABETH J. SHAPIRO, ESQ.
8        U.S. Department of Justice Civil Diviosin
         20 Massachusetts Aveneu, N.W.
9        Washington, D.C. 20530
         (202) 514-5633
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 3

1                C O N T E N T S
2    EXAMINATION BY:                      PAGE
3    MS. WEISMANN                          4
4    MS. OLSON                            56
5    MS. WEISMANN                         74
6
7
8
9
10
11
12            (Exhibits - none marked)
13
14
15
16
17
18
19
20
21
22

Page 4

1                P R O C E E D I N G S
2                DANIEL METCALFE,
3    called for examination, having been duly sworn to
4    tell the truth, the whole truth and nothing but the
5        truth, testified as follows:
6
7    BY MS. WEISMANN:
8        Q    Would you please state your name ,sir?
9        A    Daniel James Metcalfe.
10       Q    And what is your current position?
11       A    Director Office of Information and
12   Privacy, United States Department of Justice.
13       Q    And for how long have you held that
14   position?
15       A    I've been a Director of the Office of
16   Information and Privacy since its creation on
17   November 2nd, 1981, so it is coming up on 25 years.
18       Q    And for a period of time were you not
19   Director?
20       A    Yes. Well, let me interrupt you just for
21   a moment. I've held the title of Director since the
22   creation of OIP on November 2nd, 1981.

Page 5

1        Q    Do you currently have another Director
2    with which you share responsibilities?
3        A    No. Dick Huff and I, just to explain for
4    clarity, refer to ourselves as co-directors but each
5    of us have the title Director.
6        Q    And have your job responsibilities changed
7    at all in the last six or eight months?
8        A    I would have to say the technical answer
9    to that question is no with respect to the word
10   "responsibilities." I have during last six to eight
11   months acted on administrative appeals, in the wake
12   of Dick Huff's departure in October of 2005, his
13   retirement in October of 2005. Technically I don't
14   think my responsibility has changed in the way that
15   you might mean but just to give you a shorthand
16   response I have been acting on administrative
17   appeals since about April of this year.
18       Q    And prior to that you did not handle
19   administrative appeals?
20       A    Prior to that I did not regularly handle
21   administrative appeals, however, I did act on some
22   administrative appeals.

2 (Pages 2 to 5)

Capital Reporting Company

Page 6

1     Q    And prior to Mr. Huff leaving, how would
2  you -- what was your area of responsibility?
3     A    Well, prior to Mr. Huff's retirement
4  October 3rd, 2005, Dick had primary responsibility
5  for adjudicating administrative appeals I would act
6  on them occasionally such as when Dick was recused
7  or there was a need for expedited action in Dick's
8  absence, probably on an average two or three per
9  year over the years and I would have primary
10 responsibility for just about everything else that
11 was handled by OIP, litigation, policy work,
12 Government wide guidance and a lot of things.
13    Q    Did you say that you did or did not get
14 involved in actual processing of requests that OIP
15 handled for the senior leadership offices at
16 Justice?
17    A    I don't think I had occasion to say
18 anything with respect to that because I don't
19 believe I was asked a question regarding that.
20    Q    I asked you to describe your
21 responsibilities.  So was that part of your
22 responsibilities?

Page 7

1     A    Let's be very clear here.  You mean the
2  adjudication or the action on initial requests?
3     Q    No, the processing.  There are certain
4  FOIA requests such as the one that CREW filed with
5  the Department of Justice that go directly to OIP as
6  the structure as OIP is set up.  And my question is
7  were you at all responsible or involved with the
8  process of those requests?
9     A    Let's take the word "processing" out, just
10 talk about handling of those requests.  We're
11 talking about initial requests.  There are about a
12 thousand per year made to OIP for records of the
13 Attorney General Deputy Associate and five of the
14 leadership offices.  Those requests have throughout
15 OIP structure been acted upon by Deputy Director of
16 OIP including by the current Deputy.
17    Q    So your answer is that you did not have
18 responsibility for those?
19    A    No, my answer is still continuing.  My
20 answer is that they are acted upon by the Deputy
21 Director of OIP and I would be involved in those
22 from time to time.

Page 8

1     Q    And you specifically singled out, you
2  didn't like my word "processing" so the word you
3  used again was?
4     A    Has nothing to do with like, just for
5  purposes of clarity.
6     Q    What was the word that you used?
7     A    With respect to initial requests?
8     Q    I asked the question in terms of
9  processing and what was the word that you
10 substituted?
11    A    Acting upon or handling probably is a
12 better word.
13    Q    Is there some aspect of it because
14 certainly I've seen correspondence that refers to it
15 as processing.  Does the term "processing" as you
16 understand and use it encompass any other functions
17 than what you have just described?
18    A    No, I think it's quite to the contrary.
19 The term "processing" is generally understood with
20 FOIA personnel as the action on a document, as in I
21 processed a document.  So a personnel tend to say in
22 general I handled a request, I acted upon a request,

Page 9

1  I closed a request and I processed records in order
2  to do so.
3     Q    Has it ever been part of your
4  responsibilities to process documents as you have
5  just defined it?
6     A    I will take your question to mean within
7  OIP during the last 25 years?
8     Q    Yes, as Director?
9     A    Yes, I have processed documents as a trial
10 attorney.
11    Q    Focussing exclusively on your role as
12 Director of OIP?
13    A    I do not recall that at any time that I've
14 been involved in what I call initial requests at the
15 initial request level processing records in the way
16 that I've just described.
17    Q    When did you first become aware that CREW
18 had filed a FOIA request with respect -- with the
19 Department both with the civil and OIP, if it's
20 easier for you to break it down into two separate
21 requests we can?
22    A    I think the answer is probably roughly the

3 (Pages 6 to 9)

Capital Reporting Company

Page 10

1  same without a need to break it down for further
2  clarity and my best recollection is that would be
3  sometime last summer, probably mid to late August or
4  so.
5      Q    How did you become aware that CREW had
6  filed a request?
7      A    My best recollection is that I became
8  aware through OIP's Deputy Director Melanie Pustay.
9      Q    And what was your understanding of what
10  CREW was seeking?
11      A    I don't recall having an understanding of
12  what crew was seeking in that regard beyond that it
13  was tobacco litigation related records.
14      Q    And from the time that you first learned
15  about CREW's FOIA request, did you have any direct
16  responsibility or exercise any direct responsibility
17  with respect to the FOIA request that went to OIP?
18      A    That's a question that needs to be broken
19  down for precision and clarity. As Director of OIP
20  even before Dick Huff's departure I had
21  responsibility in an institutional sense for the
22  actions of OIP including the actions of Deputy

Page 11

1  Director Melanie Pustay.
2      Q    My question went to direct responsibility?
3      A    I'd appreciate it, Counsel, if you let me
4  finish the answer.
5      Q    I want to make sure we're talking about
6  the same request?
7      A    So do I. That's why I was trying to
8  provide some clarity for you. I have responsibility
9  in that when OIP's Deputy Director Melanie Pustay
10  acts on a request that is under my responsibility as
11  the head of the office or as co-head of the office
12  before October 3rd, 2005, so I have responsibility
13  in that sense, but not in a direct sense that's
14  probably the best way to describe it to you.
15      Q    My question specifically asked for direct
16  responsibility. Well --
17      A    I don't believe that is the case, Counsel.
18  Had it been so we wouldn't have needed to have the
19  clarification.
20      MS. WEISMANN: Can we read it back. It's my
21  question.
22      MS. OLSON: Either if he hasn't answered your

Page 12

1  question, then why don't you ask it.
2      MS. WEISMANN: He hasn't.
3      A    Please ask it again and I'll give you the
4  best answer I can.
5      MS. WEISMANN: Can you read back the question,
6  please?
7          (Record was read)
8      A    I stand corrected on that. And I just
9  want to make clear that direct responsibility could
10  include the broader responsibility I have in the
11  office over initial request to actions. But the
12  action is taken by OIP's Deputy Director.
13      Q    I'm not sure you answered my question.
14  Did you or did you not have any -- exercise any
15  direct responsibility over CREW's request?
16      MS. OLSON: I think he just said that his
17  direct responsibility could be interpreted as
18  including --
19      MS. WEISMANN: I know we agreed that we are
20  going to use the more refined term, that's why you
21  were saying there was a need to define
22  responsibility. I'm not going to get bogged down in

Page 13

1  nomenclature.
2      A    Actually it's the word "exercise" that
3  matters. The difference between "exercise" and
4  "have."
5      Q    Why don't you describe for me the actions
6  you took with respect to CREW's FOIA request to OIP
7  starting with when you first became aware of it?
8      A    I don't recall taking any actions apart
9  from having discussions about that with Melanie
10  Pustay. As a matter of fact, let me amend that, I'm
11  certain that I took no actions apart from
12  discussions with Melanie Pustay.
13      Q    And do you recall whether you gave her any
14  direction as to how OIP should go about handling
15  FOIA request?
16      MS. OLSON: I want to caution the witness not
17  to get into attorney/client privileged information
18  or deliberative process information here. I think
19  this calls for a yes or no answer and object to the
20  extent it calls for deliberative process
21  attorney/client, but I think you can answer it as
22  long as you don't get into those areas.

4 (Pages 10 to 13)

Capital Reporting Company

Page 14

1     A    So the question is did I direct her?
2     MS. WEISMANN:  Read back the question.
3         (Record was read)
4     A    Without getting bogged down, as you said a
5  moment ago, in nomenclature, I think I gave her some
6  suggestions and some guidance that I would not
7  characterize as direction in the sense that you
8  probably meant the word.
9     Q    In light of Counsel's objection I need to
10 get a clarification from you because the purpose of
11 this deposition and the purpose of the discovery is
12 to explore the processing of the Justice Department
13 of our FOIA request.  If you're going to take the
14 position that any information and how OIP processed
15 that and any communications are privileged then we
16 have a problem and we're going to have to take it to
17 the Judge.
18    MS. OLSON:  Let me take a break, I just want to
19 talk about this for a second.
20        (Off the record)
21    MS. OLSON:  We're going to answer the question
22 but we do object on grounds that his answer does

Page 15

1  disclose deliberative process privileged information
2  and the fact that we're -- by allowing him to answer
3  the question we are not waiving our right to assert
4  the deliberative process privilege with respect to
5  this subject matter or any other subject matter in
6  the litigation, but we're going to allow him to
7  answer the question.
8     Q    Do you recall what the question was?
9     A    No.
10    MS. WEISMANN:  Let's have it read back.
11        (Record was read)
12    A    I recall speaking with Melanie and giving
13 her what I would characterize most accurately as
14 guidance.
15    Q    And what was the guidance that gave her?
16    A    Well, my guidance was in relation to what
17 she told me about the status of the processing of
18 the request or the part of the request that had to
19 do with the Associate's Office, sitting here right
20 now I'm not certain whether the Associate's Office
21 was the only one of OIP's eight offices that handled
22 it.

Page 16

1     Q    There were two others?
2     A    So my only recollection is regarding the
3  Associate's Office.
4     Q    The discussion we're talking about, when
5  did it take place to your best recollection?
6     A    My best recollection is that would have
7  been mid late August, possibly as late in the year
8  as early September.
9     Q    And what was it that Ms. Pustay had told
10 you about the status of the document request with
11 respect to the Associate's Office?
12    A    She told me that the request was being
13 processed by the Civil Division for its part and by
14 the Associate's Office for its part and that the
15 person in the Associate's Office with whom she was
16 dealing had an understanding of how the Civil
17 Division was processing its request and based upon
18 that understanding the person in the Associate's
19 Office was inclined, I think that would be the
20 fairest and most accurate way to say it, inclined to
21 handle the request in a comparable fashion.
22    Q    And who was the individual in the

Page 17

1  Associate's Office?
2     MS. OLSON:  We renew our objection, but for
3  purposes of this particular set of questions we'll
4  allow him to answer, although we are not waiving our
5  right to assert the deliberative process privilege
6  with respect to any other areas.
7     A    Jeff Senger, Jeffrey Senger.
8     Q    And what did Melanie tell you his
9  understanding was of how the Civil Division was
10 processing its request?
11    A    Melanie told me when we first talked about
12 this that Jeff Senger had developed an understanding
13 based upon, I suppose conversations with the Civil
14 Division that the Civil Division was taking, what
15 could be called for, I guess the most accurate way
16 of describing it a categorical approach to the
17 request.
18    Q    And what did you understand her to mean by
19 that or what do you mean by that expression in this
20 context?
21    A    I understand Melanie to mean that that was
22 an approach that would involve not necessarily

5 (Pages 14 to 17)

Page 18

1  looking for records individually record by record,
2  at least at the outset of this stage of the handling
3  of the request at which they were at that point.
4  And then I told Melanie or I guided Melanie
5  suggesting that she speak to Jeff Senger in very no
6  uncertain terms about what Melanie thought and I
7  thought was the proper handling of the request
8  notwithstanding Jeff Senger's understanding of how
9  it was being handled in the Civil Division and I
10  should probably hasten to add that I've since
11  learned that Jeff's understanding how it was handled
12  in the Civil Division was incorrect, they were not
13  taking a categorical approach.
14      Q   And what was the advice that you and
15  Melanie were agreed on that was I presume from what
16  you said communicated to Mr. Senger?
17      A   I can't speak firsthand to what Melanie
18  said to Mr. Senger.  I can only speak firsthand to
19  what Melanie told me.
20      Q   And what was it that you and Melanie
21  agreed upon as the proper approach?
22      A   You've used the phrase "agreed upon."

Page 19

1      Q   I thought you had described it -- well,
2  let's go back to your last answer where I believe --
3  those may not have been your exact words, it was
4  certainly my understanding.
5          (Record was read)
6      Q   So what was it that Melanie and you both
7  thought was the proper approach?
8      A   Other than an approach that was more
9  routine and other than the categorical approach that
10  Jeff Senger had communicated to Melanie, Melanie
11  told me, that he was inclined to take.
12      Q   And what do you mean when you use the word
13  "more routine"?
14      A   More routine in that it is an exception
15  rather than the rule to take a categorical approach
16  to a request.  The routine handling of a request
17  would be to search for records, find those records
18  individually and consider them individually as
19  opposed to taking a more categorical approach that
20  is not nearly so records specific if records
21  specific at all.
22      Q   When you had this conversation with

Page 20

1  Melanie, did you understand from anything she told
2  you that the Associate's Office had in fact done any
3  kind of records search at that point?
4      A   The first thing I should say is that the
5  only understanding I gained from Melanie about the
6  Associate's Office had to do with Jeff Senger and
7  Jeff Senger alone as the person in the Associate's
8  Office who was working on this.
9      Q   But based on the knowledge you had?
10      A   I believe when Melanie and I first spoke
11  at that time there had been no individual focus on
12  individual records.  I am not certain as to how much
13  of a search had taken place because I don't have a
14  recollection sitting here as to whether even Melanie
15  told me any detail how much of the search had taken
16  place.  I do have a very clear recollection sitting
17  here today that Melanie had told me that Jeff Senger
18  was inclined to take and presumably up to that time
19  had been taking to the exclusion of doing anything
20  to the contrary a categorical approach.
21      Q   Is there anything else about the manner
22  and way in which the Associate's Office was

Page 21

1  proceeding on CREW's request that you learned from
2  your conversation with Melanie?
3      A   Again, answering with respect to that
4  first conversation, the answer is no.  I think I
5  have told you everything that I learned which is, A,
6  the approach that Melanie said Jeff Senger was
7  taking and, B, what had been the cause for that
8  approach, specifically Jeff's understanding or
9  misunderstanding of what the Civil Division was
10  doing or was not doing.
11      Q   And did you have any other discussions
12  with Melanie about processing of CREW's FOIA request
13  and handling?
14      A   My best recollection is that I had at
15  least one more and it is possible I had two or three
16  more, so I'd have to say in total I had between two
17  and four, but I had at least one more at which point
18  I learned that Melanie in following my guidance and
19  doing what I believe she would have done even
20  without my guidance has succeeded in changing
21  Mr. Senger's initial inclination.
22      Q   When did that conversation with Melanie

6 (Pages 18 to 21)

Capital Reporting Company

Page 22

1  happen?
2      A    My best recollection is that was some
3  number of weeks later.
4      Q    And did you ever get any information from
5  her or any other source that in fact the Associate's
6  Office at some point in time took at what you have
7  called a more routine approach?
8      A    Yes, I believe some number of weeks later
9  in at least one additional conversation Melanie told
10  me that, yes, that matter had been resolved and it
11  was at a point at which Melanie no longer had the
12  concern that she had discussed with me.
13      Q    And in that conversation that you just
14  described, was there anything else you learned about
15  the processing of the FOIA request either in your
16  office or the Associate's Office?
17      A    You added my office as well as the
18  Associate's Office.
19      Q    Just in those discussions with Melanie?
20      A    Up until now we've been discussing the
21  Associate's Office. Why don't I answer that
22  question first. The answer to that question is no.

Page 23

1      Q    And did you have any conversations with
2  anyone else within the Justice Department about the
3  Associate's Office's handling of CREW's FOIA
4  request?
5      A    Prior to today?
6      Q    Yes.
7      A    Apart from counsel in connection with the
8  present matter?
9      Q    Yes.
10      A    I have no recollection of any such
11  conversation.
12      Q    Did you ever have occasion to mention to
13  Mr. McCallum in any way or refer in any way to
14  CREW's FOIA request?
15      A    No.
16      Q    Did you ever receive any e-mails from
17  anyone within the Department that gave you
18  information about how the Associate's Office was
19  processing CREW's FOIA request?
20      A    I have no recollection of having received
21  any such e-mails. Let me hasten to add one thing,
22  just again for clarity, you asked me about

Page 24

1  conversations with Mr. McCallum and you referenced
2  the FOIA request, I think you said the handling of
3  the FOIA request. The answer to that question is
4  no. If your question were broader to include this
5  deposition and the fact that he and I were both
6  being deposed, of course would be a different
7  answer. As to the request the answer is no.
8      Q    And other than the handling of the request
9  have you had, other than what you just described,
10  have you had any other discussions with Mr. McCallum
11  about the litigation that CREW has now against the
12  Department of Justice?
13      A    The only discussion I have with
14  Mr. McCallum about either the request or the
15  litigation and I've already said none with respect
16  to the request had to do with the deposition.
17      Q    And in that discussion did you -- when did
18  that discussion take place?
19      A    My best recollection is that there was a
20  staff meeting held either two Fridays ago or three
21  Fridays ago at which I just made reference to the
22  fact that our depositions were coming up, nothing

Page 25

1  more than that.
2      Q    So you don't recall having -- you have
3  described the sum total of the conversations you had
4  with anyone in the Department relating to the
5  Associate's Office's handling the FOIA request; is
6  that correct?
7      A    As I sit here today I can recall no
8  conversation with anyone in the Department regarding
9  handling of the Associate's Office CREW request
10  other than Melanie. If I had any such conversation,
11  I cannot recall it and I'm pretty darn certain I did
12  not.
13      Q    Would that also include any aspect of the
14  handling that you had with -- that was happening
15  within OIP itself?
16      A    Now we've shifted to the second request,
17  correct?
18      Q    When you say second request, are you --
19  let's be clear on terms?
20      A    You're right.
21      Q    Were you aware that CREW had also filed a
22  FOIA request with the Civil Division?

7 (Pages 22 to 25)

Capital Reporting Company

Page 26

1    A    Oh, let me amend what I said earlier. I
2  knew CREW had a basic FOIA request. I thought that
3  request had been made at the same time to the Civil
4  Division and to OIP perhaps with respect to multiple
5  components, leadership components within OIP's
6  jurisdiction, the Associate's Office and more. I
7  certainly was aware there was a Civil Division
8  request. I was regarding it as one request.
9    Q    And so when you described your discussions
10 they would have encompassed both requests, in other
11 words, your answer would apply to both requests?
12   A    Well, when I was answering the question I
13 was thinking about the FOIA request with respect to
14 the Associate's Office.
15   Q    Did you have any discussions with anyone
16 in the Civil Division about their handling of the
17 FOIA request?
18   A    No.
19   Q    And did you have any conversations with
20 anyone in your office about Civil's FOIA request?
21   A    Yes, I had conversations with at least one
22 person in my office regarding the administrative

Page 27

1  appeal aspect of the Civil Division FOIA request.
2    Q    Who was that discussion with?
3    A    Janice McCloud.
4    Q    Was she the senior attorney that was
5  assigned to handle the appeal?
6    A    Yes.
7    Q    Were you aware that the requests had been
8  expedited?
9    A    You're asking was I aware. You said were
10 you aware.
11   Q    Are you aware?
12   A    At what point in time?
13   Q    When did you -- were you aware that they
14 had been expedited?
15   A    Yes, I'm aware of that today, yes.
16   Q    And when did you become aware that the
17 Civil Division request had been expedited?
18   A    Sitting here today I have no recollection
19 of becoming aware of that prior to January of this
20 year when I acted upon or approximately the time I
21 acted upon the appeal from the denial of the fee
22 waiver request made to the Civil Division.

Page 28

1    Q    When did you become aware that the
2  Associate's Office request which had also
3  encompassed, just for clarity, the Attorney General
4  and Deputy Attorney General's offices but we're
5  going to be focussing on the Associate's Office,
6  when did you become aware that that request had been
7  expedited?
8    A    I can't be certain. It is possible that I
9  became aware of that when I discussed the
10 Associate's Office request with Melanie back last
11 summer. It is possible I did not.
12   Q    And I know there was a division of
13 responsibility at that time between you and Dick
14 Huff and the correspondence reflects that he was the
15 decision maker within OIP for that issue?
16   A    Please clarify because it's now not clear
17 what issue you're speaking of.
18   Q    The expedition issue to OIP?
19   A    I believe as a factual matter that's
20 incorrect.
21   Q    What is your understanding who the
22 decision maker was?

Page 29

1    A    Well, you're talking about decision maker,
2  someone acting on an request for expedited
3  processing.
4    Q    Under whose name was the decision issued?
5    A    Let me finish my answer, please. If we're
6  talking about an initial request and a request for
7  expedited processing made atop that initial request,
8  the decision maker in the first instance is the same
9  official that would act on the initial request. In
10 the case of an initial request filed for Attorney
11 General or Deputy Attorney General or Associate
12 Attorney General records that would be OIP Director
13 Melanie Pustay.
14   Q    At that time she was not a Director, she
15 was a Deputy Director?
16   A    What you just said to me has nothing to do
17 with what I just said.
18   Q    Just for clarity, I don't know if by that
19 you mean that that's a responsibility that would
20 normally reside with the Director.
21   A    No, what I'm trying to explain to you.
22   Q    I thought you said Director?

8 (Pages 26 to 29)

Capital Reporting Company

Page 30

1    A    No, OIP Deputy Director Melanie Pustay.
2    Q    And if there were an appeal from that that
3  would go to Mr. Huff, would it not?
4    A    That's a different matter entirely, yes.
5    Q    You agree that that would go to Mr. Huff?
6    A    I agree that Mr. Huff acted upon appeals
7  prior to his retirement on October 3rd, yes.
8    Q    And did you have any occasion to discuss
9  with him CREW's appeal from a denial of expedition
10  and by appeal I mean its administrative appeal
11  within OIP?
12    A    Sitting here today I do not recall any
13  such discussion.
14    Q    And does it -- and sitting here today do
15  you have a recollection of discussing it with anyone
16  else within OIP?
17    A    No.
18    Q    Is there any other discussions with anyone
19  within the Department that you can recall you had
20  related to the request and the handling of the
21  request, the Department's handling of the request,
22  and by Department I mean any component of the

Page 31

1  Department?
2    A    Make sure that I understand the breadth of
3  your question or breadth of what you're seeking to
4  encompass by the question.  You're talking now about
5  both the leadership office or office's request and
6  the Civil Division request?
7    Q    Yes.
8    A    Singular or plural?
9    Q    Yes.
10    A    Encompassing both?
11    Q    Right.
12    A    You're talking about both levels at the
13  initial level and the appeal level with respect to
14  the fee waiver denial from Civil?
15    Q    Yes.  I want to know the universe of
16  discussions that you had?
17    A    Well, I've identified Melanie and I've
18  identified Janice McCloud and I've also talked about
19  consultation with counsel for purposes of this
20  deposition.  I can recall having no other
21  conversation with anyone else.
22    Q    You were the deciding official, were you

Page 32

1  not, on the appeal that CREW took from the Civil
2  Division's determination on a fee waiver?
3    A    Yes.
4    Q    And is that the only matter on which you
5  worked with Janice relating to CREW's request?
6    A    I'm aware of no other matter that Janice
7  worked on relating to the CREW's request.  So the
8  answer to that certainly is yes.
9    Q    Explain to me who makes assignment
10  decisions in your office, does that come from you,
11  does it come from Melanie?
12    A    By assignment.
13    Q    Who would have assigned this matter to
14  Janice?
15    A    You're speaking of administrative appeals,
16  I imagine?
17    Q    Yes, this specific one?
18    A    But administrative appeals in general and
19  this administrative appeal in particular, not other
20  matters within OIP's?
21    Q    Right.
22    A    Well, administrative appeals in general

Page 33

1  are handled by a variety of different attorneys in
2  OIP, but in some instances they specialize in the
3  subject matter area and that was the case here,
4  Janice has specialized in fees and fee waiver
5  matters for many, many years.
6    Q    And who made the decision to have her --
7  did it involve a decision or do all such appeals
8  routinely go to her because of their subspecialty?
9    A    The latter.
10    Q    She got this as a matter of course because
11  it was a fee waiver appeal?
12    A    That is correct.
13    Q    Do you know when she got assigned the
14  matter?
15    A    Sitting here today I do not.
16    Q    And while she was -- is the process for
17  her to workup a draft or a recommended decision for
18  you or does it go to other levels of review?
19    A    Other fee -- other administrative appeal
20  matters go through multiple levels, but fee waiver
21  matters that were handled by Janice are worked up by
22  Janice and go directly to the Director of the

9 (Pages 30 to 33)

Capital Reporting Company

Page 34

1  office, prior to October '05 Dick Huff, subsequent
2  to that we handled it in a different way.
3    Q    The Civil Division in this case issued its
4  initial decision on fees on July 7th, CREW filed an
5  appeal for that on July 11th and OIP received
6  receipt of that on July 28th. So am I to understand
7  that between July 28th when OIP officially
8  acknowledged receipt of our appeal and October of
9  2005 this would have been within Dick's
10  jurisdiction; is that correct?
11    A    Well, when you say "this" you mean final
12  action on the administrative appeal.
13    Q    And anything that was going on, yes, the
14  handling -- OIP's handling of this particular
15  administrative appeal?
16    A    Your understanding is exactly correct up
17  until October 3rd, 2005, yes.
18    Q    And do you recall whether you had any
19  discussions with Janice about the administrative
20  appeal, CREW's administrative appeal, during that
21  period?
22    A    Yes, I recall whether I had any

Page 35

1  discussions with her and the answer is no, I did
2  not.
3    Q    And did you have any discussions with Dick
4  Huff during that period?
5    A    No.
6    Q    And so as of October you had -- did you
7  have any knowledge that there was in the office an
8  appeal from Civil's denial of the fee waiver?
9    A    I have no recollection of having had any
10  knowledge that there was such a pending appeal.
11    Q    When did you first become aware that there
12  was an appeal pending in your office?
13    A    January of this year.
14    Q    Do you recall when in January that was?
15    A    I don't recall exactly when, but I can
16  fairly say that my best guess is probably about the
17  second week of January, I would say about the 10th
18  or so.
19    Q    And when was it that Janice McCloud got to
20  you a draft for your review?
21    A    It would be exactly the same time I just
22  described in my previous answer. In other words, I

Page 36

1  was not aware of the matter till Janice came to me
2  with the draft that you've spoken of in this
3  question.
4    Q    And do you know whether or not she had
5  completed that draft earlier?
6    A    I think the best most accurate answer to
7  that question is yes and that I do know that Janice
8  had completed a draft earlier in time, but with
9  respect to that draft that she presented to me my
10  recollection of what I understood at the time was
11  that that draft had been completed right at that
12  time.
13    Q    Do you know when that earlier draft had
14  been completed?
15    A    No, I cannot say with precision, but I do
16  have a recollection of learning that Janice had had
17  an earlier draft at an earlier point in time and
18  that due to some change of circumstances or some
19  development of some sort there came a later draft
20  and that was the later draft that Janice presented
21  to me at the time at which I learned about that to
22  begin with.

Page 37

1    Q    And do you know whether the change in
2  circumstance that you've alluded to in fact was
3  changing the outcome of that fee waiver appeal?
4    A    I do. I don't know whether this is a
5  point at which counsel wants to just renew a
6  continuing objection.
7    MS. OLSON: Well, let's take a quick -- because
8  it gets into deliberative process I think, but I
9  need to know what he'll say.
10    (Off the record)
11    MS. OLSON: We object to the question because
12  it calls for some deliberative information and to
13  that extent we object and reserve our right to
14  object in the future and don't waive our right to
15  object on deliberative process grounds with respect
16  to the subject matter or any other matter in this
17  litigation, but he can answer the question.
18    A    The answer to the question is I am certain
19  there was no change in that outcome and that what
20  I'm recalling about any change from one point in
21  time to a later point of time had to do with either
22  some understanding or some development connected to

10 (Pages 34 to 37)

Page 38

1  the scope of the request.
2      Q    When Mr. Huff left did that create a
3  backlog in the office?
4      A    That question has no simple answer.  When
5  Dick Huff retired on October 3rd certainly there was
6  a major hole, I guess to put it in simple parlance,
7  with respect to the OIP's function.  Dick Huff had
8  been adjudicating administrative appeals for a
9  couple dozen years at that point.  And it was up to
10  me at that point to decide how we would handle that
11  responsibility and certainly there was a period of
12  time thereafter in which administrative appeal
13  adjudications were not taking place as quickly as
14  they took place, as productively as they took place
15  prior to Dick's retirement.
16      Q    Were you aware that OIP was also in its
17  handling of our request acting on our fee waiver
18  request to OIP?
19      A    We've now moved away from the Civil
20  Division request and its appeal back to the request
21  that had to do with the Associate's Office and
22  perhaps other leadership offices?

Page 39

1      Q    Right.
2      A    The question to me is whether I was aware
3  that OIP with respect to that aspect of things was
4  acting on fee waiver.  And I'm going to answer it
5  with respect to the point of time in mid January
6  when Janice came to me and told me that there was an
7  administrative appeal to be acted upon from the
8  Civil Division.  So I'm going to say that as of that
9  point in January I probably became aware of OIP's
10  action on fee waiver requests for its part of
11  things.  I'm not certain sitting here today that I
12  was but I think it is likely that I became aware.
13      Q    And was there any effort to coordinate the
14  responses?
15      A    If by coordinate the responses you mean to
16  look at one decision in connection with the other
17  decision I don't recall that.  I recall only that I
18  might have learned the circumstances were such that
19  I might have learned that OIP was likewise acting
20  and if I did learn that I certainly would have asked
21  what that action was to in my own mind be aware of
22  whether they were the same or different and if

Page 40

1  different inquire as to why.
2      Q    And who would have handled that request
3  that went initially to OIP and was decided, would
4  Janice have been involved in that one?
5      A    No, she would not.  Let me back up.  You
6  used the word "involved."  That's a broad word.  My
7  answer no is not accurate because Janice might have
8  been consulted.
9      Q    But she was not directly assigned it?
10      A    No, she would not be acting on an initial
11  request.
12      Q    Because she would be the one that would go
13  to look at the appeal?
14      A    That's one thing, yes.  But in addition to
15  that we have a staff working under Melanie under the
16  Deputy Director that handles initial requests.  That
17  staff does not include Janice.
18      Q    Do you know who in the office did in fact
19  act on the CREW's initial request that went to OIP?
20      A    To give you the best answer I can right
21  now I have to think back to see if I can recall who
22  within the initial request staff of OIP worked on

Page 41

1  the CREW request.  It would have been one of the
2  paralegals, it's possible that I learned who that
3  was at some point.
4      Q    But you don't know?
5      A    I can't recall today, no.
6      Q    CREW's FOIA requests, both of them, were
7  filed on June 28th.  OIP made an initial fee waiver
8  determination with respect to the OIP request on
9  January 19th.  OIP made a decision with respect to
10  our appeal from the Civil Division fee waiver
11  determination on January 23rd.  Is it a mere
12  coincidence that it was four days apart?
13      A    I'm not sure what you mean by a question
14  such as that.
15      Q    I'm trying to understand whether the
16  timing was orchestrated or happentance?
17      MS. OLSON:  Object to the form of the question.
18  He hasn't established -- you haven't established
19  that he -- objection to the form.
20      Q    You may answer.
21      A    Would you like to rephrase the question
22  not using the word "orchestrated" or would you like

Page 42

1  me to answer as asked?
2      Q    I want you to answer my question and then
3  if I feel like I want follow up I can ask that.
4      A    All right.  The answer to your question is
5  that there was no such orchestration in the way that
6  I perceive you to intend that to mean by the tenor
7  of your question.
8      Q    Was there a coordination in terms of the
9  timing between the release of the two decisions?
10     A    I am aware of no such coordination.
11     Q    Were you aware on January 23rd that OIP
12  had made its initial fee waiver request decision on
13  January 19th?
14     A    Sitting here today I'm not certain that I
15  was.  However, I hasten to add that I think it's
16  entirely possible that I was because I think it's
17  entirely possible that that's one of the things
18  Janice would have told me when I worked with her on
19  the adjudication of the appeal and I think it's
20  entirely possible that had she told me that had I
21  become aware of the other aspect of it I would have
22  inquired as to what the outcome was there in the way

Page 43

1  I prescribed in the previous answer.
2      Q    The processes that OIP uses to decide
3  initial fee waiver requests, are they affected at
4  all when the requests are expedited?
5      A    Yes.
6      Q    And how is that?
7      A    Any action on any request that's expedited
8  or any aspect of that request that's expedited is
9  affected by the expedited treatment that is granted.
10  The first thing is that the request is put at the
11  front of the line, that's the nature of expedited
12  treatment.
13     Q    And I'm focussing now on the fee waiver
14  issue and how that is affected by expedition, is it
15  put in the front of the line as well for decision on
16  fee waiver?
17     MS. OLSON:  Object as to form.  You understand
18  that I think it was slightly compound.  Do you
19  understand the question?
20     A    I think I might understand it but I'm not
21  certain that I understand it.  I'm perfectly
22  comfortable saying that when a request is expedited

Page 44

1  that means that request is put at the head of the
2  line and handled as soon as practicable.
3      Q    When you say the head of the line because
4  I'm used to seeing that term with respect to
5  document production, so when an agency goes in and
6  files an open America stay and you talk about
7  putting it at the head of the line, are you saying
8  it goes to the head of the line in terms of when
9  your office will get to a fee waiver request?
10     A    I'm not distinguishing between a fee
11  waiver request aspect of the FOIA request and the
12  remainder of the request.
13     Q    So it's fair to say that in your mind your
14  office tries to expedite the handling of all aspects
15  of a request when it's in your office, if it's been
16  granted expedition?
17     A    I think it's fair to say that Government
18  wide all agencies if they grant expedited treatment
19  will put the request at the head of the line and
20  then make sure that that request is not waiting
21  behind other requests ahead of it.  That is the
22  nature of expedition.

Page 45

1      Q    Do you know whether anyone in your office
2  actually reviewed Associate Attorney General
3  documents that would have been identified as
4  potentially responsive to our request?
5      A    No, sitting here today I do not.  As I've
6  described previously, all that I know in that area
7  or down the road toward that is that when I heard
8  from Melanie subsequently that the Associate's
9  Office concern that she had had been resolved.
10     Q    And in the routine handling of documents
11  of the Associate Attorney General's Office, would
12  individuals in your office review their documents?
13     A    Yes.
14     Q    And in this case it's your testimony that
15  you don't know whether that document review took
16  place?
17     A    Sitting here today I don't know how that
18  document review progressed in that case or in any of
19  the other thousand requests that were handled -- I'm
20  putting it in context by telling you that I do not
21  routinely become aware of how matters are processed
22  by the initial request staff.  They have about a

12 (Pages 42 to 45)

Page 46

1  thousand requests per year and although I gave
2  guidance to the initial request staff from the time
3  that Melanie became Deputy Director many years ago
4  up until the time I started adjudicating
5  administrative appeals I do not routinely become
6  aware of what routinely or otherwise is done in the
7  handling of the initial request staff's work.
8      Q    When were you aware that CREW had filed
9  suit against the Department based on these FOIA
10 requests?
11     A    Well, I don't recall here at this moment
12 exactly when the suit was filed.  But if I'm correct
13 in my general rule, my recollection is that it was
14 filed sometime last summer.  Then I think I would
15 have become aware of that when Melanie and I talked
16 about the Associate Attorney General part of the
17 request in the way that I described in previous
18 answers.
19     Q    And I assume subsequent to that time
20 you've had an opportunity to have additional
21 discussions with people about the litigation?
22     A    The word "people" is too broad.

Page 47

1      Q    Within the Department of Justice?
2      A    If we put aside the realm of that is
3  connected with this deposition here today.
4      Q    I'm not asking you about that.
5      A    So we understand that we're putting that
6  aside, we're just talking about litigation in its
7  other respects, all other respects.  I can recall
8  having discussion about the litigation only with
9  Melanie.
10     Q    And did the filing of CREW's lawsuit in
11 any way change how your office handled our request?
12     A    I'm not aware of any respect in which that
13 is so, but I should probably hasten to add just as a
14 general matter that I am not directly involved in
15 all aspects of such things, as you probably
16 understand by now.
17     Q    Only asking you what you have knowledge
18 of?
19     A    I understand.
20     Q    Have you had occasion to read the opinion
21 that Judge Sullivan filed in this matter on June
22 1st, 2006?

Page 48

1      A    Yes.
2      Q    And in that opinion he specifically notes,
3  I'm quoting from page 8, "the court is troubled by
4  the length of time the Government took to exhaust
5  the three hours of search by the Government's
6  responses to the statistical data presented by the
7  plaintiff and by the government's obvious delay in
8  adjudicating CREW's fee waiver request and appeal."
9          Since reading this opinion, have you had
10 any opportunity to reassess the processes within OIP
11 for handling expedited appeals?
12     A    Did you say opportunity?
13     Q    Uh-huh.
14     MS. OLSON:  Well, I'm going to object to the
15 form of the question because you're suggesting that
16 something in that opinion might have prompted him to
17 do that and if you establish a foundation that there
18 is something in that opinion that he would think
19 would serve as a basis for doing so then he could
20 answer the question.
21     Q    Is there anything in Judge Sullivan's
22 opinion that would cause you to undertake a review

Page 49

1  of any of the processes in your office?
2      A    Would cause or has in fact caused?
3      Q    Has in fact caused, that's what I tried to
4  ask the first time?
5      A    I can answer the question this way for
6  complete clarity.  After reading that decision I did
7  go back and examine the administrative appeal
8  adjudication file in this case and looked at it in
9  relation to the opinion.
10     Q    And as a result of that review have you
11 learned anything additional about how OIP did handle
12 the request?
13     A    As a result of going back to the
14 administrative appeal I focussed on the
15 administrative appeal denial and looked at the time
16 interval in relation to the Judge's opinion and I
17 also looked at another aspect of it in relation to,
18 here I might be confusing two things so I'll
19 indicate that in advance, either the opinion or a
20 brief that was filed in this case, and I concluded,
21 again, I'm not certain now today whether this aspect
22 was in the opinion or merely in the brief, that a

13 (Pages 46 to 49)

Page 50

1  matter of an inconsistency was not at all accurate
2  on the part of the party or parties who said there
3  was an inconsistency or claimed there was such. I
4  can't sitting here today recall whether that found
5  its way into the Judge's opinion, it might have.
6      MS. WEISMANN: Let's take a five minute break.
7         (Off the record)
8  BY MS. WEISMANN:
9      Q    Since Judge Sullivan's opinion came out on
10 June 1st of this year has OIP changed in any respect
11 to how it continues to handle CREW's request?
12     A    You're asking me now about CREW's request
13 vis-a-vis the Associate's Office with the leadership
14 offices?
15     Q    Yes. I understood you didn't have a role
16 other than the fee appeal in Civil's request?
17     A    That's correct. And I don't have a role
18 with respect to what you're speaking about now.
19 That's being handled by the initial request staff
20 under the direction of OIP Deputy Director Melanie
21 Pustay.
22     Q    Do you have any knowledge?

Page 51

1      A    Not only do I not have any knowledge, I
2  would not in the ordinary scheme of things have any
3  such knowledge.
4      Q    It's not every day that you get a judge
5  being this critical as he has been of the Deputy's
6  handling, so I'm trying to see if that has caused
7  anyone at OIP to re-evaluate how they are handling
8  CREW's FOIA request?
9      A    If it aids you in your understanding I can
10 tell you that given that initial requests are
11 handled by the initial request staff under Melanie's
12 direction and given that now as of today as of last
13 month, two months, several months, I have been
14 acting on administrative appeals I would have no
15 involvement, no knowledge, of what is happening at
16 the initial request level. In other words, to be
17 specific, the same wall that existed between
18 Melanie's staff and Dick prior to his retirement in
19 October now exists and has existed for several
20 months vis-a-vis me.
21     Q    Do you know if there was any document
22 review conducted in the Associate Attorney General's

Page 52

1  Office, when I say document review I mean pursuant
2  to our FOIA request?
3      A    I have no such knowledge nor would I in
4  the ordinary course of things have such knowledge.
5      Q    And so you have not learned anything about
6  that subject?
7      A    Well, your second question is a little bit
8  broader than the first and in the interest of
9  clarity and completeness I think I should say that
10 the knowledge that I do have from Melanie is that
11 the matter was resolved and that therefore I have
12 firsthand knowledge from Melanie as of sometime late
13 last summer, early last fall, that the handling of
14 that aspect of the request was proceeding in an
15 ordinary way as distinct from where it was
16 previously when Melanie first consulted me.
17     Q    And do you know what the basis for
18 Melanie's reasoning was?
19     A    Yes.
20     Q    What was that?
21     A    I know that Melanie told me that that was
22 based upon further discussions that she had had with

Page 53

1  Jeff Senger.
2      Q    Have you had any contact or discussions
3  with Steve Brody who is the acting Director of the
4  tobacco litigation team with respect to CREW's FOIA
5  requests?
6      A    You need not qualify the question. I have
7  never met Mr. Brody and to my recollection I'm quite
8  certain I've never spoken to him or communicated
9  with him.
10     Q    Whatever you described or said you had no
11 knowledge of, are there any other discussions
12 outside of speaking with your lawyers that you've
13 had with anyone in the Civil Division about their
14 handling of our FOIA request?
15     A    This is now going back to the FOIA request
16 at Civil?
17     Q    Yes.
18     A    Let's be precise and comprehensive. I
19 certainly learned what Civil had done from Janice
20 when I acted upon the administrative appeal
21 pertaining to Civil, that did not include any
22 discussions with anyone in Civil and I'm quite

Page 54

1  certain I have had no discussion with anyone at
2  Civil about Civil's handling of this request.
3      Q    And have you had any discussions with
4  anyone in the Associate's Office other than the
5  discussion you identified with Mr. McCallum, I don't
6  mean to call it a discussion, where you raised the
7  deposition issue, relating to any way CREW's FOIA
8  requests?
9      A    Absolutely not.
10     Q    In response to the second question you
11 identified a number of documents in what you call
12 the administrative file consisting of draft letters
13 and handwritten notations and I'm trying to
14 understand why it was that you did not deem these
15 documents responsive to the first request?
16     A    The first thing I can say is I don't think
17 it's my role.
18     Q    So you did not prepare this response?
19     A    Please allow me on continue the answer. I
20 don't think it's my role to unilaterally deem
21 anything here. I can tell you that in connection
22 with that document request I put on a table the

Page 55

1  administrative appeal file and consulted with
2  counsel and as a result of that consultation the
3  document you are holding in your hand was prepared.
4      Q    So if we have concerns we should take it
5  up with your counsel?
6      A    Or if I can provide any further assistance
7  I would be glad to do so so long as counsel is in
8  agreement with that.
9      Q    I don't know if you're the right person to
10 take this up -- I don't understand why the
11 administrative file as he described it is not
12 responsive to our first request?
13     MS. OLSON:  We can take this up --
14     MS. WEISMANN:  That's fine.
15     A    I'm perfectly comfortable, however, of
16 providing any additional assistance in the matter.
17     MS. WEISMANN:  I think this concludes our
18 deposition.
19     MS. OLSON:  I have actually a few questions for
20 Mr. Metcalfe, cross-examination questions, relating
21 to the Judge's order that you raised.
22     MS. WEISMANN:  Before we get there we have to

Page 56

1  have an understanding on time.
2      MS. OLSON:  Absolutely.
3      MS. WEISMANN:  It's not our time.  We are going
4  to reserve the balance of our time.
5      MS. SHAPIRO:  We would object to that, both in
6  time and re-deposing him.
7      MS. WEISMANN:  When you say you object to what,
8  that your questions don't consume our time?
9      MS. SHAPIRO:  No, I don't have any problem with
10 that.
11     MS. WEISMANN:  I'm trying to understand the
12 nature of your objection.
13     MS. SHAPIRO:  I think time has probably passed,
14 so to the extent you think there's reservation, it's
15 an issue we can take up --
16 BY MS. OLSON:
17     Q    Mr. Metcalfe, have you read the court's
18 June 1st, 2006 opinion, an order that Ms. Weismann
19 referred to earlier?
20     A    Yes.
21     Q    I want to show you a copy and draw your
22 attention to Section B on page 12 which is entitled

Page 57

1  DOJ's annual reports.  Have you read this section?
2      A    Yes.
3      Q    Now in footnote 8 the court sites
4  statistics showing the median time for processing
5  expedited FOIA requests for the years 2000 to 2004.
6  Do you see that?
7      A    Yes.
8      Q    Can you explain what those statistics are?
9      A    Well, those are statistics that appear to
10 be gleaned from or derived from annual reports to
11 Congress, pardon me, the annual reports to the
12 Department of Justice that are filed by federal
13 agencies each year pertaining to activity of initial
14 request levels.  By that I mean to say activity by
15 the components of the Department that act on
16 requests in the first instance.
17     Q    Are you responsible?
18     MS. WEISMANN:  Object, at this point I think
19 your question goes beyond the scope of our direct.
20     MS. SHAPIRO:  That's fine.
21     Q    Are you responsible for the final
22 preparation of the annual report which includes

15 (Pages 54 to 57)

Page 58

1  these statistics?
2      A   As Director of OIP in a larger sense the
3  answer is yes.
4      MS. SLOAN:  I think we should continue to
5  object.  You had the opportunity to put all this on
6  the record before, you had opportunities for
7  declarations when we had motions about all of this
8  issue and so for you to be asking these questions
9  now of your own witness who's available to you at
10  all times during our deposition we object.  I don't
11  see --
12      MS. SHAPIRO:  That's fine.  You objected and
13  it's not a basis on which to direct --
14      MS. WEISMANN:  I will speak for us and I'd
15  like -- I would like one representative from the
16  Government to speak.  It's getting confusing.
17      Q   Your objection's noted.  Are you
18  responsible for the final preparation of the annual
19  report which includes these statistics?
20      A   I believe I answered yes.
21      MS. WEISMANN:  I object to the question.  It
22  goes beyond the scope of our direct and we don't

Page 59

1  believe this is within the scope of the Judge's
2  order.
3      Q   Your answer to the question is?
4      A   The answer is yes.
5      Q   Then the opinion says at the bottom of
6  page 12 that the plaintiff's fee waiver request to
7  Civil Division was denied 201 days after its FOIA
8  request was granted expedited processing and 210
9  days after its initial FOIA request was submitted.
10  Do you see that?
11      A   Yes.
12      Q   Do the statistics for the median period of
13  time for processing expedited FOIA requests to which
14  the court refers include action at the initial level
15  and the administrative appeal level?
16      A   No.
17      MS. WEISMANN:  I object.  You need to give me
18  time to make my record.  I object to the question as
19  beyond the scope.
20      A   May I ask a clarifying question, are you
21  going to object every time?
22      MS. WEISMANN:  Depends on the question.

Page 60

1      A   In other words, just so I can understand,
2  do you not have a continuing objection?
3      MS. WEISMANN:  That depends on the question.
4  Well, we need to take a break here.
5      MS. OLSON:  Should I call the Magistrate and
6  ask him not to leave because you raised the issue of
7  this opinion and if anything in it caused his office
8  to change its practices and that's what these
9  questions pertain to.  And I'm going to ask him if
10  there's any problem here, I just want to make sure
11  he doesn't leave his office.
12      MS. WEISMANN:  These questions related to my --
13      MS. OLSON:  You raised the issue of the
14  Magistrate's opinion and you said -- the Judge's
15  opinion, the June 1st opinion, and asked if anything
16  in this opinion caused his office to change its
17  practices, I think you asked that question twice.
18      MS. WEISMANN:  And I think his answer was no.
19      MS. OLSON:  My questions pertain to that.
20      MS. WEISMANN:  I don't see the link, but that's
21  fine, we want to take a break.
22      MS. OLSON:  We're still ticking time away.

Page 61

1      MS. WEISMANN:  We're not on the record.
2      MS. OLSON:  The time is running.
3      MS. WEISMANN:  This is not our time.  We're off
4  the record.
5      (Off the record)
6      MS. WEISMANN:  Our objection is under 30(b).
7  We think this is beyond the scope of the court
8  ordered discovery and we're happy to take it up with
9  the Magistrate.
10      MS. SHAPIRO:  There is no court order directing
11  the scope of our questioning.
12      MS. WEISMANN:  There is a court order directing
13  the scope of discovery.
14      MS. OLSON:  But also these questions directly
15  pertain to delays in the processing of the FOIA
16  request.  You raised the statistics in your brief,
17  you raised the order today in deposition.  Let's
18  just call him.
19      (Off the record)
20      JUDGE KAY:  Hello.
21      MS. OLSON:  Hi, Judge Kay, Lisa Olson and Anne
22  Weismann.  The issue is that CREW, the plaintiff,

Page 62

1  has completed the deposition of Mr. Metcalfe, its
2  questioning. And in her questions she raised the
3  issue of whether anything in the Judge's June 1st,
4  2006 opinion which was critical of the handling of
5  the timing, the delays in this FOIA processing,
6  caused Mr. Metcalfe to change the way his office
7  handled FOIA requests.
8      JUDGE KAY: Whether or not anything in Judge
9  Sullivan's June 1 memo brought about a structural
10  change in the way they handled FOIA requests?
11      MS. OLSON: Not necessarily a structural
12  change, but just any change in the way they handled
13  FOIA requests. And the Judge's opinion included
14  some statistics that the plaintiff used in their
15  brief supporting their motion for discovery and then
16  the Judge discusses these statistics at some length
17  in his opinion and he says that the median
18  processing time for this handling of this FOIA
19  request was far longer than the median processing
20  time in the statistics and I would like to -- they
21  have objected to about 20 questions I have for
22  Mr. Metcalfe regarding these statistics and whether

Page 63

1  in fact there was a delay whether the Judge's
2  opinion which stated that there was a -- that we
3  exceeded the median time for processing was in fact
4  correct or if his conclusion was erroneous and this
5  relates directly to Ms. Weismann's question whether
6  anything in the opinion prompted Mr. Metcalfe to
7  change the way his office handled things. CREW has
8  objected to my asking these few questions and so we
9  are coming to you for a resolution of that.
10      JUDGE KAY: Okay. All right. Ms. Weismann,
11  I'll hear from you.
12      MS. WEISMANN: As Ms. Olson has indicated this
13  was an issue that was fully briefed with the court.
14  We had two arguments before the Judge on this issue.
15  The statistics were raised in our briefs. They had
16  an opportunity and, as I'm sure you know from
17  reading the opinion, the Judge was very troubled by
18  the Government's failure to respond to our
19  statistics. Simply stated we just -- this is their
20  witness, they have complete access to him. This is
21  our discovery and we don't think that this is the
22  appropriate forum for them to pursue this.

Page 64

1      JUDGE KAY: All right. Ms. Olson.
2      MS. OLSON: Our response in the brief, Your
3  Honor, was that these statistics were entirely
4  irrelevant and we continue to believe that. The
5  court obviously has relied on them in its opinion.
6  It was unforeseen that it should do so, that it
7  should adopt CREW's viewpoint. We are now taking
8  this one step further and ensuring that erroneous
9  information -- that the court does not continue to
10  rely on erroneous information. What Mr. Metcalfe's
11  testimony will show is that the court's calculation
12  of the time it took to process these requests
13  between June and January included weekends and
14  holidays and that the statistics never include
15  weekends and holidays. If weekends and holidays are
16  subtracted from the court's calculation, we are
17  exactly within the median range.
18      JUDGE KAY: Let me tell you what my feeling is
19  here. I agree with Ms. Weismann, I think
20  Mr. Metcalfe he's your witness and obviously you
21  could submit a written submission to Judge Sullivan
22  and attach a declaration by Mr. Metcalfe saying

Page 65

1  everything that you would elicit during the course
2  of this deposition?
3      MS. OLSON: Your Honor, we're willing to do
4  that --
5      JUDGE KAY: No, no, I understand. Let me tell
6  you what my thinking is on this. There is obviously
7  going to be a request, I agree with Ms. Weismann's
8  statement she's saying it's her deposition and she's
9  paying for it, but I am also of the opinion that
10  somewhere along the line the plaintiff's counsel are
11  going to request on the trial court that there be
12  some broader dissemination of the testimony that is
13  going to be submitted to Judge Sullivan and since
14  there is the pleading or the memorandum of opinion
15  by Judge Sullivan and that if indeed any of the
16  either the videotaped or the transcript is going to
17  be disseminated beyond the confines of this
18  litigation I guess from a fear of be balanced I
19  would permit the deponent to perhaps respond to what
20  Judge Sullivan had criticized the Government of
21  doing. So to that extent I'm inclined to let him
22  put it on there, otherwise I would certainly suggest

17 (Pages 62 to 65)

Page 66

1 that you go ahead and do it separately, but
2 obviously if there is a dissemination and I'm sure
3 that Ms. Weismann is not prepared at this point to
4 certainly make a statement on the record as to
5 whether there will or will not be any dissemination
6 of the transcript, then I would like at least the
7 transcript to be presented as a fair composite of
8 the testimony of Mr. Metcalfe so that would be my
9 ruling.
10     MS. WEISMANN: Your Honor, may I just make one
11 point?
12     JUDGE KAY: Yes.
13     MS. WEISMANN: I'm not sure -- I think if we
14 had the full transcript and I think we should
15 probably reserve on this because if we don't have it
16 yet you would see how limited my questions were and
17 how far these questions go beyond that. If you're
18 talking about fair and balanced, I'm not sure that I
19 agree that allowing this line of questioning --
20     JUDGE KAY: Are you saying there was no
21 discussion in the deposition as to these statistics?
22     MS. WEISMANN: None whatsoever. I simply asked

Page 67

1 the question as to whether or not he was familiar
2 with the opinion and whether based on the -- and in
3 fact I didn't even point out the statistics at all.
4 I focussed on the language in Judge Sullivan's
5 opinion that was critical of the delay within OIP on
6 how -- and which was a separate discussion from the
7 statistics in processing fee appeals. I realize
8 this is a lot of technical stuff to you. And my
9 question didn't go to those at all and I didn't even
10 press him on what steps, if any, he had taken after
11 reading it. I simply asked him if he read it and it
12 caused him to re-evaluate anything. So I think the
13 line of questioning that Ms. Olson was pursuing in
14 addition to the fact that this is our deposition I
15 think goes so far beyond and if the court's
16 concerned is a balanced deposition I don't believe
17 that that in fact would represent a balanced
18 deposition.
19     JUDGE KAY: I was under the impression that
20 there was a discussion of --
21     MS. WEISMANN: No, there was in the Judge's
22 opinion but not in the deposition.

Page 68

1     JUDGE KAY: I see.
2     MS. OLSON: The entire purpose of this, well,
3 there was a discussion of the court's conclusion
4 that there was unwarranted delays in this case.
5     JUDGE KAY: I understand that.
6     MS. OLSON: My question is very limited and it
7 is for the purpose of clarification. My questions
8 are very limited. It's unclear to me why they're
9 concerned about --
10     JUDGE KAY: How many questions are you talking
11 about, Ms. Olson?
12     MS. OLSON: I'll count them.
13     MS. WEISMANN: She said at least 20.
14     MS. OLSON: 19 questions.
15     MS. WEISMANN: And, Your Honor, if I think if
16 we were to ask the court reporter to review my
17 questions I'm quite competent there were less than
18 five, they were very limited in scope. This has
19 been, I think it's fair to say, a pretty limited
20 deposition and what I'm concerned about is that this
21 is going to -- it's sort of opening up the
22 proverbial Pandora's Box. It takes us in a new

Page 69

1 direction and I think if the court's concern is a
2 fair and balanced presentation I think this takes us
3 far afield from that. They're free to present this
4 evidence before Judge Sullivan.
5     MS. OLSON: Well, Your Honor.
6     MS. WEISMANN: They didn't move to reconsider
7 when he issued his order, that certainly was an
8 appropriate vehicle in which to submit this, and --
9 well, I think we've made our position clear.
10     MS. OLSON: I'm willing to limit my questions
11 to seven questions and we have not asked a single
12 question on cross throughout these depositions and I
13 might add we've sat through hours of questions that
14 had nothing to do with FOIA processing. In the
15 interest of fairness and balance --
16     JUDGE KAY: I'm going to let them ask the seven
17 questions. I'm going to limit it to the seven
18 questions, Ms. Olson. I think you have a right to
19 some cross-examination. I'm not sure based upon --
20 the fact is the question asked of Ms. Weismann was
21 based upon Judge Sullivan's opinion whether or not
22 any changes were affected with respect to the

18 (Pages 66 to 69)

Page 70

1  processing of the FOIA cases so I think it does
2  encompass some degree of an acknowledgment by Judge
3  Sullivan that he viewed the statistics and was
4  somewhat critical of the Department. So I'm going
5  to permit you to ask those seven questions and
6  hopefully it'll be brief. Counsel, get it over and
7  done with and go on.
8      MS. WEISMANN: We may have redirect?
9      JUDGE KAY: The answer is yes, on those
10 questions.
11     MS. WEISMANN: Yes, of course.
12     JUDGE KAY: Okay. Thank you, Counsel.
13     MS. WEISMANN: Thank you.
14     MS. OLSON: Thank you. Take a couple minutes
15 break, if that's okay.
16         (Off the record)
17     MS. WEISMANN: I'd like the record to reflect
18 that counsel and the witness just had at least a
19 five minute conversation in which they had questions
20 with them and it appeared that they were consulting
21 over the content of those questions.
22     MS. OLSON: That's your perception of the

Page 71

1  situation, Ms. Weismann, and I'm not going to
2  comment on it.
3  BY MS. OLSON:
4      Q    Mr. Metcalfe, I want to you look at what
5  we were looking at on page 12 at the bottom where it
6  says the plaintiff's fee waiver request to the Civil
7  Division was denied 201 days after its FOIA request
8  was granted expedited processing and 210 days after
9  its initial FOIA request was submitted. Are the
10 courts numbers correct?
11     A    No, no, I believe the court's numbers are
12 incorrect in that putting aside the difference
13 between 201 and 210 these numbers appear to conflate
14 together. Actually the initial request level with
15 action at the administrative appeal level which are
16 indeed two separate stages of action and when it
17 comes to two statistics are treated entirely
18 different. By that I mean to say only the initial
19 request level activity is reflected in the annual
20 FOIA report that is cited in footnote 8, whereas
21 administrative appeal activity is not so treated or
22 reflected in the annual report.

Page 72

1      Q    If you please look at the sentence that
2  contains footnote 13. The court says plaintiff's
3  fee waiver request to OIP was denied 206 days after
4  its initial request was submitted. Is the time
5  period in footnote 13 on which he basis his
6  calculation correct?
7      A    No, it is incorrect because the phrase 206
8  days is presented as if those are working days or
9  business days is the phrasing of that as opposed to
10 calendar days. And under the reporting requirements
11 and the reporting regime established by Congress
12 Subsection E of the Act through the 1996 amendments
13 all reporting and accounting statistics are based
14 upon working days, so that therefore if one were to
15 look at calendar days and present a number that
16 would be accurate with respect to calendar days that
17 would not be accurate with respect to working days
18 and one would be left with, to put it in common
19 parlance, an apples and oranges situation.
20     Q    Given the time period for OIP's request is
21 July 1st, 2005 to January 19th, 2006, what is the
22 number that correctly would be reported by the

Page 73

1  agency in its statistics in the way those statistics
2  are required to be reported?
3      A    I can answer that question by first noting
4  that I believe there was a slight error in that the
5  court was counting as of the date of the action on
6  the expedited processing whereas it should have been
7  counting as of the date of the request for expedited
8  processing, by that I mean to say the date it was
9  received by the Agency which I believe was July 1st,
10 2005. And if one were to count working days as the
11 statistics are in fact counted under the statute
12 scheme from July 1st, 2005 to January 19th, 2006 I
13 believe one would reach the number of 136 and it is
14 the number of 136 that would create an apples and
15 apples comparison with the numbers that appear in
16 footnote 8 as opposed to an apples and oranges
17 comparison which one is left with on the face of the
18 court's opinion.
19     Q    Is that 136 within the range of numbers in
20 the statistics in footnote 8?
21     A    I'm looking now at the range of numbers
22 appearing in footnote 8 and I see numbers as low as

Page 74

1  42, I see numbers as high as 148, 136 and 134, 128,
2  so it does appear to me that, yes, that number 136
3  again reflecting the working days so that we're
4  talking about apples and apples not oranges and
5  apples is indeed within that range.
6      Q   Going back to the Civil request that the
7  opinion discusses at the bottom of page 12, assuming
8  that CREW's FOIA request to Civil was opened on June
9  28th, 2005 and action was taken on the fee waiver
10  part of CREW's request on July 7th, 2005, what would
11  be the number of days used in the annual report to
12  record that request in its statistics as opposed to
13  the 201 or 210 days in the opinion?
14      A   Given the dates you just read to me I
15  think the answer would be nine calendar days, but
16  six working days with the 4th of July holiday being
17  there and that the number six is what would appear
18  properly in the annual report.  Specifically the
19  number of working or business days between the date
20  that the request was received by the component and
21  the date that the action was taken.
22      MS. OLSON:  No more questions.

Page 75

1  BY MS. WEISMANN:
2      Q   During the break that you took your
3  counsel before we resumed the redirect did you
4  discuss any of the contents of your testimony with
5  your counsel?
6      MS. OLSON:  I object to that, of course he
7  discussed the contents of his testimony, I'm his
8  lawyer.
9      Q   I'm talking about the contents of the
10  testimony you just gave?
11      MS. OLSON:  I object.  Any discussions that we
12  had are attorney/client privilege.
13      Q   I'm entitled to ask the questions.  And
14  prior to coming here today did you discuss with your
15  counsel these precise questions that you would be --
16  that she would ask you?
17      MS. OLSON:  I object, attorney/client work
18  product.
19      Q   And are you aware that these statistics --
20  that the statistics on which Judge Sullivan relied
21  for his opinion were presented to the court based on
22  OIP's own annual statistics?  Are you aware of that?

Page 76

1      A   Ms. Weismann, let me make sure I
2  understand your question.  I'm going to give you my
3  understanding of it, please tell me if I have it
4  correct or incorrect.  Are you asking me whether I'm
5  aware that the statistics that are in footnote 8 are
6  derived from the annual FOIA report?
7      Q   No.
8      A   I believe I answered that question or said
9  so.
10      Q   I'm asking whether you're aware that CREW
11  in its briefing on this issue submitted statistics
12  that CREW got directly from the annual statistics
13  that OIP presents to Congress?
14      MS. OLSON:  If he can answer that question.
15      A   I think I can.
16      Q   Have you read the pleading in the case,
17  that's the representation that was made.  I'm
18  talking about the briefing.  Have you read the brief
19  that we filed?
20      A   Yes, I definitely did.
21      Q   You're aware that we put in certain
22  statistics in our brief?

Page 77

1      A   I am aware having read the brief that
2  there are statistics in your brief, yes.
3      Q   Are you aware that Justice Department had
4  numerous opportunities to respond to this?
5      MS. OLSON:  I object, this is so outside the
6  issue.
7      MS. SLOAN:  You want to call Judge Kay, let's
8  call him.
9      MS. WEISMANN:  I don't think we need to call
10  him.
11      MS. OLSON:  It's outside the scope of the
12  order.  The order concerns delay in processing.
13      MS. SLOAN:  Not outside the scope of your
14  re-direct.
15      MS. OLSON:  You'll have to speak.
16      MS. WEISMANN:  Are you going to direct him not
17  to answer?
18      MS. OLSON:  It's outside the scope of the
19  order.  You're asking him what we did in litigation
20  and I know if you want to try to con Judge Sullivan
21  into some sort of a side track, that's fine.  It's
22  like -- this is so beside the point that I'd be

Page 78

1  happy if you want to take it up. Our questions
2  concerned the delays in the processing which are
3  discussed in this order and if you want -- the
4  question you are now asking are what we did in this
5  litigation in the briefs. Mr. Metcalfe is a fact
6  witness. If you want to ask him about the
7  statistics he's very happy to answer those questions
8  but you're asking him about a privileged
9  attorney/client and work product communication.
10     MS. WEISMANN: Are you finished with your
11  objection?
12     MS. OLSON: Yes, but I'm directing him not to
13  answer because you're asking him for privileged
14  information as well as information that's outside
15  the scope of the order.
16     MS. WEISMANN: Just to be clear, it's your view
17  that it's privileged whether or not he was aware
18  that the Government had an opportunity to respond to
19  CREW's submission?
20     MS. OLSON: That's outside the scope. That
21  particular question is outside the scope of the
22  order allowing discovery in this case concerning

Page 79

1  delays in FOIA processing. So yes, under Rule 30
2  I'm instructing him not to answer.
3     Q   Was it your understanding when you came
4  here today, Mr. Metcalfe, that you would be
5  discussing statistics?
6     MS. OLSON: Objection. Again that calls for
7  privileged attorney/client communications.
8     MS. WEISMANN: I'm asking for his
9  understanding, not the basis of his understanding.
10     MS. OLSON: He would have no basis for any
11  understanding except what he and I discussed.
12     MS. WEISMANN: So you're objecting?
13     MS. OLSON: Yes, as attorney/client.
14     MS. WEISMANN: And directing him not to answer?
15     MS. OLSON: Yes.
16     MS. WEISMANN: I want the record to reflect
17  since I think this is consist with the discussion we
18  had with Judge Kay who was not physically present
19  that counsel had a list of what she has identified
20  as 19 typed questions.
21     MS. OLSON: And I'd like to state on the record
22  that opposing counsel, Ms. Weismann, has had

Page 80

1  probably 30 or 40 pages of typed questions
2  throughout these depositions as is the normal
3  practice of an attorney.
4     MS. WEISMANN: We are done.
5        (Reading and signing was waived)
6        (5:20 p.m. the deposition was concluded)

Page 81

1
2        I, TEAGUE GIBSON, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing deposition was duly sworn by me; that
6  the testimony of said witness was taken by me in
7  stenotypy and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness; that
10  I am neither counsel for, related to, nor employed
11  by and of the parties to the action in which this
12  deposition was taken; and, further, that I am not a
13  relative or employee of any counsel or attorney
14  employed by the parties hereto, nor financially or
15  otherwise interested in the outcome of this action.
16
17        Teague Gibson
          Notary Public in and for
18          the District of Columbia
19
20  My commission expires:
21  June 14, 2010
22

21 (Pages 78 to 81)