UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,

Plaintiff,

v.

U.S. DEPARTMENT OF JUSTICE,

Defendant.

Civil Action No. 1:05-cv-02078

**REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR A PROTECTIVE/SEALING ORDER AND FOR RETURN OF FEDERAL DOCUMENTS**

Plaintiff is in possession of federal property which was removed without authorization, and it should be returned promptly. Plaintiff's arguments that it should be allowed to retain these documents, McCallum Exhibits 2 and 3, are uniformly without merit.

**1. The Undisputed, Operative Facts Compelling The Return Of The Documents Are That They Are Government Property And Were Taken Without Authorization**

Plaintiff's argument that it should not be required to return the documents in question is based on three erroneous assumptions, i.e., that in order for their return to be required, the documents must have been stolen by plaintiff; they must be federal records; and they must be privileged. Plaintiff's Opposition to Defendant's Motion for a Protective/Sealing Order and for Return of Federal Documents ("Pl. Opp.") at 3-8. These are all red herrings. The critical facts compelling the return of the documents is that they (1) are the property of the federal government, and (2) their release has never been authorized by the federal government. See Declaration of Stuart Schiffer (Exhibit 1). The term "government property" includes "any form

of real or personal property in which the government has an ownership . . . or other property interest," including "the Government mails." 5 C.F.R. § 2635.704(b)(1). Similarly, the "nonpublic, Federally-owned documentary materials" whose removal is prohibited without specific approval include "nonrecord materials, and personal papers, regardless of the nature of the medium or the method or circumstances of recording." DOJ Order 2710.8C at ¶¶ 5(d), 11[1] (Exhibit 2); see also 18 U.S.C. § 641 (making it a crime to "embezzle[], steal[], purloin[], or knowingly convert[] . . . any . . . thing of value of the United States"). The e-mails at issue are internal communications among employees regarding official government business. As such, they are federal property, regardless of who stole them, regardless of whether they qualify as federal "records" under 44 U.S.C. § 3301, and regardless of whether they are privileged (which they are).

Without citing any authority, plaintiff claims it is "axiomatic" that defendant can only lay claim to documents that are federal records. Far from being axiomatic, this notion is inconsistent with the law, under which the unauthorized removal of any federal property is prohibited. Whether Mr. McCallum believed the documents were worthy of preservation in his personal files, Pl. Opp. at 5, is also irrelevant to whether they are government property. Similarly unimportant is the fact that McCallum Exhibit 3 may have involved a nonlitigation matter. Pl. Opp. at 6. As plaintiff admits, McCallum Exhibit 3 involved a "procedural aspect of the OPR investigation," Pl. Opp. at 10, and as such, it concerns official government business. Finally, while Ms. Weismann attests that she did not acquire the documents from anyone with a

---

[1] "Nonrecord materials" are defined as "[t]hose Federally-owned documentary materials that do not meet the statutory definition of records (44 U.S.C. § 3301)." DOJ Order 2710.8C at ¶ 5(f)(1).

connection to the Department of Justice, Pl. Opp. at 4, she is notably silent on the question of whether plaintiff, including any of its employees, played a role in facilitating the acquisition of the documents by the *Associated Press*. Such facilitation would constitute a violation of the Court's order preserving the status quo and prohibiting plaintiff from disclosing information contained in the documents. See Deposition of Robert D. McCallum, Jr. ("McCallum Depo.") at 99-100, 118-19; Deposition of Stephen Brody ("Brody Depo.") at 20. And while plaintiff may not have wrongfully acquired the documents (and defendant has never alleged that it has), it is on notice now that they are federal property that was taken without authorization.

Plaintiff erroneously contends that the government must formally invoke the deliberative process privilege. Pl. Opp. at 7. The privileges are intended to guard information from disclosure. Fed. R. Civ. P. 26(b). Here, the government is trying to recover information, not withhold it, so the invocation of privilege is unnecessary. Moreover, while the privileged nature of these documents reinforces the need for their return to the government, the fact that they are privileged is not critical. Rather, the mere fact that they concern official government business confers proprietary status on them and compels their return in the absence of authorization for their release.

On the basis of the Senate Foreign Relations Committee's vague reference to "some internal Justice Department emails about the drafting of the *USA Today* article," plaintiff says defendant was on notice that McCallum Exhibit 2 was public and has therefore waived the privilege. Pl. Opp. at 13. However, aside from the fact that defendant's right to the return of the documents is by no means contingent on a claim of privilege, the Department of Justice did not know that the Committee had a copy of McCallum Exhibit 2, and it had no reason to know. The

Committee did not specifically identify the e-mails as those in McCallum Exhibit 2, and more to the point, it did not indicate in any way that the e-mails were government property taken without authorization. Moreover, there is no evidence that Committee showed the e-mails to Mr. McCallum or anyone else at the Department of Justice, nor is it the role of the Department of Justice to interrogate Congress as to how it obtained documents. See Pl. Opp. at 13. Finally, plaintiff offers no evidence that McCallum Exhibit 3 has ever been publicized.

**2. The Documents Have No Bearing On Mr. McCallum's Veracity**

Contrary to plaintiff's claim, neither of the documents bears on Mr. McCallum's veracity. On the basis of Mr. McCallum's testimony that he did "not recall" the White House reviewing or approving a *USA Today* editorial written after he made "the decision to propose the smoking cessation program remedy" in the tobacco case, plaintiff argues that Mr. McCallum misled the Senate Foreign Relations Committee into believing that he never discussed the decision with the White House before he made it. Pl. Opp. at 8; McCallum Exhibit 2. Plaintiff is distorting his testimony. Mr. McCallum has consistently testified that he communicated with the White House after the decision was made, but not before. Exhibit 3 at13-14.

First, the Committee asked Mr. McCallum whether he discussed the decision with the White House, and he responded that he did not discuss the decision "prior to making it or prior to its presentation in closing argument," but that he did have certain discussions with the White House "[a]fter the decision was made and presented in court."[2] (Emphases added). Exhibit 3 at

---

[2] The Committee posed the following questions:

d. You have stated in a meeting with Committee counsel that you made the decision to propose the smoking cessation program remedy in the amount of $10 billion. Is that correct?

12-13.

Second, the Committee asked whether Mr. McCallum "discuss[ed] any aspect of this case, including any public statements or articles thereon," with the White House, and he responded that he could "not recall" any such discussions. Exhibit 3 at 13. Plaintiff suggests that Mr. McCallum is lying because the string of e-mails in McCallum Exhibit 2 indicates White House involvement in the *USA Today* article. Pl. Opp. at 8-10. However, there is no evidence whatsoever that Mr. McCallum was lying when he said that he simply could "not recall" such communications. Exhibit 3 at 13. Moreover, the June 9, 2005 *USA Today* article was drafted and published after the June 7, 2005 closing argument in which the remedy decision was announced in open court, Brody Depo. at 63:8 - 64:13; McCallum Depo. at 75:5-21; 79:20 -

---

> It is correct that I made the decision.
>
> e. Did you discuss this matter, and your decision thereon, with any person working in the White House? Please be specific.
>
> I did not discuss my decision on the cessation remedy with anyone at the White House prior to making it or prior to its presentation in closing argument. After the decision was made and presented in court, I did inform the White House Counsel's Office on the status of the case, the closing argument, and my decision.
>
> f. Did you discuss any aspect of this case, including any public statements or articles thereon, with any person working in the White House? Please be specific.
>
> On rare occasions, I did provide the White House with a status report on the case, generally through the White House Counsel's Office. On those rare occasions, no one at the White House suggested any action or directed any action in the case but merely received information on the status of the case. No one at the White House ever tried to influence any aspect of my decisions in this case. I can not recall discussing any public statements or articles about the case with anyone at the White House. However, since my nomination to be Ambassador, I have discussed the case and the cessation remedy with persons at the White House in relation to my nomination and the confirmation process.

Exhibit 3 at 12-14.

80:13. Therefore, Mr. McCallum would have no motive to lie about his lack of recollection, since his testimony already admitted that post-decision contacts with the White House occurred. Exhibit 3 at 13-14.

When the Committee subsequently told Mr. McCallum that it had received certain "internal Justice Department emails" suggesting a White House role in editing the *USA Today* article, Mr. McCallum testified that he still could not recall any White House involvement, and clarified that in responding previously, he had interpreted the Committee's question as referring to the time period before the remedy decision had been made.[3] Pl. Opp. at Exhibit F. This was a reasonable assumption, given that the Committee's entire focus regarding this issue was on whether the decision resulted from political pressure – that would necessarily have been imposed before the decision was made. Exhibit 3 at 6-14; Pl. Opp. at Exhibit F. In that regard, as Mr. McCallum stated, "this post-decision contact with the White House about an op-ed explaining my already-made decision does not alter the fact that no one at the White House ever tried to influence any aspect of my decision." Pl. Opp. Exhibit F. Thus, contrary to plaintiff's convoluted logic, Mr. McCallum's lack of recollection about White House input into the *USA Today* editorial does not indicate a lack of veracity.

Plaintiff also erroneously argues that McCallum Exhibit 3 calls into question Mr.

---

[3] In his clarification, Mr. McCallum he went on to say that "once my decision was made and announced in the closing argument, I likely would have informed the White House of any op-ed to be published under my name so that the White House would be aware of it and have the opportunity to comment." This is consistent with his deposition testimony that he did not specifically recall White House involvement in this editorial, see also McCallum Depo. at 71:10-17 ("I don't remember specifically any particular input but I am sure that there were opportunities for people . . . at the White House . . . ."), and that he "did not discuss [his] decision on the cessation remedy with anyone at the White House prior to making it . . . ." Exhibit 3 at 13.

McCallum's assertion that he did not speak with the head of the Office of Professional Responsibility ("OPR"), Marshall Jarrett, about the OPR investigation. Pl. Opp. at 10; see McCallum Depo. at 84:13-18; 149:12 - 150:19. However, Mr. Jarrett has already corroborated Mr. McCallum's testimony that the two did not speak. Mr. Jarrett declared that Mr. McCallum "has taken no part in supervising or directing OPR's investigation in this matter," "did not attend any of the meetings," and "gave no instructions or guidance on OPR's conduct of the investigation." March 10, 2006 Declaration of H. Marshall Jarrett at ¶ 9 (Exhibit 3 to Defendant's Opposition to Plaintiff's Motion for Discovery). Furthermore, McCallum Exhibit 3 shows no first-hand knowledge about any alleged contact between Mr. McCallum and Mr. Jarrett, so plaintiff's allegations about untruthfulness are based purely on speculation. It is more likely that Ms. Eubanks, who was allegedly typing her e-mail at the same time that she attempted to listen and converse, Pl. Opp. at 10, simply misunderstood Mr. McCallum. See McCallum Depo. at 149:12 - 150:19. Mr. McCallum's recollection is also consistent with Mr. Brody's testimony that he had no knowledge of any contacts between Mr. McCallum and Mr. Jarrett. Brody Depo. at 55:10-13.

Plaintiff argues that if Mr. McCallum testified untruthfully about the involvement of the White House in the *USA Today* editorial, which he clearly did not, then the Court is entitled to infer that he may not have testified truthfully about his knowledge of and role in the processing of plaintiff's FOIA requests. Pl. Opp. at 10. Plaintiff neglects to point out, however, that the Court would also have to make another quantum leap and infer that Mr. McCallum also improperly influenced the individuals who processed the FOIA requests. Such an inference contradicts all of the evidence to date. The individuals who processed the requests, Melanie

Pustay and James Kovakas, have submitted detailed declarations indicating that they were not pressured by Mr. McCallum or anyone else to delay the processing of plaintiff's FOIA requests. See March 10, 2006 Declaration of Melanie Ann Pustay; March 10, 2006 Declaration of James M. Kovakas. Moreover, the deponents that plaintiff questioned have testified that they played no role in processing the FOIA requests and that there were no discussions with Mr. McCallum about them. McCallum Depo. at 51:3-7; 52:7-12; 56:11-16; 81:17 - 82:4; 83:13 - 84:3; 88:9-12; 88:16-20; 89:2-4; Brody Depo. at 27:2 - 28:1; 29:9-22; 30:1-4; 51:9-20; 61:9-12; Deposition of Daniel Metcalfe ("Metcalfe Depo.") at 10:14-11:14; 13:5-12; 23:1-15; 24:13-16; 25:7-12; 31:17-21; 31:22 - 32:8. The documents in question therefore provide no support for plaintiff's far-fetched and completely unsubstantiated proposed inferences of bad faith.

**3. The Return Of The Documents Is Warranted**

This is an extraordinary matter that requires an extraordinary remedy. Federal property has been take from the government's possession without authorization. The property in question appears to have been stolen, and the All Writs Act, in conjunction with the Fed. R. Civ. P. 26(c) (authorizing a court, inter alia, to order that "disclosure . . . not be had," and that "certain matters not be inquired into"), provides the Court with the authority to order them returned.

## CONCLUSION

For the foregoing reasons, defendant's motion for a protective/sealing order and for return of federal documents should be granted.[4]

[4] Contrary to plaintiff's claim, Pl. Opp. at Conclusion, defendant has never accused plaintiff of stealing documents. With respect to plaintiff's potential violation of a Court Order, plaintiff's counsel has never denied a role in facilitating the acquisition by the *Associated Press* of McCallum Exhibits 2 and 3.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney

**/s/ Lisa A. Olson**
ELIZABETH J. SHAPIRO
LISA A. OLSON (D.C. Bar #38266)
U.S. Department of Justice
20 Mass. Ave., N.W., Room 7300
Washington, D.C. 20530
Telephone: (202) 514-5633
Telefacsimile: (202) 616-8470
E-mail: lisa.olson@usdoj.gov
Counsel for Defendant

Dated: July 27, 2006