# EXHIBIT 3

to

Reply in Support of Defendant's Motion for a Protective/Sealing Order
and for Return of Federal Documents

**Questions for the Record Submitted to
Ambassador - Designate Robert McCallum
Senator Joseph Biden (#1)
Senate Foreign Relations Committee
June 19, 2006**

**Question:**

Why do you want this position?

**Answer:**

When the President asked me to consider leaving the Department of

Justice to become Ambassador to Australia, I agreed to do so because the

position represents an important opportunity to serve this President and the

United States. The Ambassador to Australia represents the United States

with one of our nation's most important allies, and maintaining and

enhancing that relationship is and should be the top priority of every U.S.

Ambassador to Australia. I have found representing the United States as a

lawyer to be the most professionally satisfying experience of my legal

career, and I know that I will find the same professional satisfaction in doing

so as a diplomat. The forum and issues will be different, but the pride that I

feel in our President and our nation will be the same. I also view an

Asia/Pacific region as the area of the world which will, over the next decade,

have an enormous impact on practically every major issue facing our nation.

1

Issues relating to political stability of nation states, terrorism, economic development, international trade, human trafficking and human rights, drug trafficking, environmental pollution, health and pandemic policy, and technology and intellectual property rights, just to name a few, will present both Australia and the United States with challenges on which close communication and cooperation will be essential for both our national interests. If confirmed by the Senate, it would be a privilege to participate with Australia in addressing such issues in that region.  I am also drawn to the position by the warmth, openness, and friendliness of the Australian people and by the natural wonders and variety of the Australian continent.

**Questions for the Record Submitted to
Ambassador - Designate Robert McCallum
Senator Joseph Biden (#2)
Senate Foreign Relations Committee
June 19, 2006**

**Question:**

If confirmed, what do you expect to be able to report that you have achieved
12 months after arriving at post?

**Answer:**

I would expect to report within the next twelve months: that I have

supported and enhanced the relationship between our two countries and

established good working relationships with representative of the Australian

government on both the national, state,  and local level; that I have taken

steps to ensure the safety and security of the facilities and staff of the U. S.

mission in Canberra and the three consulates, and the safety and welfare of

United States citizens living and traveling in Australia; that I have

established a good working relationship with that staff and the various

agencies represented in the mission by being accessible, responsive, and

direct and transparent in my decision-making; that I have developed

relationships with the U. S. and Australian business and cultural

3

communities through outreach efforts; that I have implemented the

provisions of our Free Trade Agreement with Australia and encouraged the

exchange of cultural resources through tourism, education programs, and the

like as well as through goods and services; that I have participated with

Australia in increasing the stability, cooperation, and understanding of

countries in the Asia/Pacific region; that I have been a spokesman for the

President, his administration, and the United States within Australia so that

our positions on issues of mutual interest are known and understood by the

Australian government and the Australian people; that I have effectively

managed the resources budgeted to the mission consistent with the

President's Management Agenda, and, last but not least, that I have

developed a broad knowledge of and appreciation for Australian sports,

including a mastery of the rules and strategy of both cricket and the apparent

mayhem known as Australian Rules Football.

Questions for the Record Submitted to
Ambassador - Designate Robert McCallum
Senator Joseph Biden (#3)
Senate Foreign Relations Committee
June 19, 2006

**Question:**

In your position as Associate Attorney General, and before that as Assistant
Attorney General, what was your role in supervising the federal tobacco
litigation, *United States v. Philip Morris USA Inc., et al*, a case pending the
U.S. District Court for the District of Columbia?

**Answer:**

With respect to the tobacco litigation, I have been involved in

supervising and overseeing limited aspects of the case from time to time as

requested or initiated by members of the trial team or by the court or when it

appeared to be warranted from my perspective or that of the staff of the

Office of the Associate Attorney General and/or the Office of the Assistant

Attorney General for the Civil Division.  Because of the volume and variety

of the issues involved in the case and because of extent of other matters

within my portfolio of responsibility, I had no personal involvement, even as

to supervision and oversight, in the vast majority of proceedings, filings, and

activities relating to the case.

5

**Questions for the Record Submitted to**
**Ambassador - Designate Robert McCallum**
**Senator Joseph Biden (#4)**
**Senate Foreign Relations Committee**
**June 19, 2006**

## Question:

As the trial in the *Philip Morris* case came to a close, the government
proposed a smoking cessation program valued at $10 billion over five years.
You have indicated that the decision to propose such a program, rather than
a $130 billion program, over 25 years, suggested by an expert witness study
introduced at trial by the government, was made in an attempt to conform to
the decision of the D.C. Circuit in the case, 396 F. 3d 1190 (D.C. Cir.), *cert.*
*denied,* 126 S. Ct. 478 (2005).  Please answer the following questions:

> a. On February 16, 2005, the United States filed a memorandum
> related to the decision of the D.C. Circuit.  It stated that "nothing in
> the ruling of the Court of Appeals restricts or limits" the ability of the
> court to order "any of the other non-disgorgement equitable relief
> sought by the United States."  Were you aware of, and did you
> approve of, the filing of this memorandum?

## Answer:

I was not aware of, or specifically approve, the details of the

February brief.  At that time, I was generally aware that the

government would be taking the position that the Circuit Court

opinion did not preclude the equitable remedy of a cessation program,

the exact parameters of which had not yet been determined.

6

**Question:**

b. On May 12, 2005, the United States filed a memorandum relating to the examination of expert witness Michael Fiore, and stated that, with regard to the smoking cessation remedy supported by his testimony [the $130 billion program], the "Court should find that the remedy is not only forward-looking and aimed at future violations, but will act directly to prevent and restrain ongoing wrongful conduct of decades-long duration." Were you aware of, and did you approve of, the filing of these memoranda?

**Answer:**

I was not aware of and did not approve the filing of the May 12

memorandum.

**Question:**

c. In light of the position taken by the United States with regard to the smoking cessation remedy in the memoranda of February 16, 2005 and May 12, 2005, what action or event after May 12 led the Department of Justice to alter its position on the smoking cessation remedy (by reducing the size and scope of the proposed remedy)?

**Answer:**

The events that led the Department of Justice to revise its

cessation remedy occurred before May 12. As a result of the February

4, 2005, Circuit Court opinion, the applicable legal principles on

recoverable remedies changed in the middle of the trial, restricting

dramatically those remedies available to the government, and the

7

government was obligated to comply with the new standards set by the Court.

On February 10, 2005, the District Court ordered the parties to file memoranda on the scope and meaning of the Circuit Court opinion, and various memoranda were filed by the parties and others as amicus, including the February 16, 2005 memorandum quoted above. In that memorandum, the argument was advanced that: "Requiring Defendants to fund expanded access to smoking cessation programs that have proven to be effective will deprive Defendants of the incentive to continue their approach to the design and marketing of "light" cigarettes, and thereby tend to prevent future unlawful conduct. Further, improving the ability of smokers to quit successfully will reduce the economic benefit to Defendants from continuing to engage in the types of fraudulent marketing of light and low tar cigarettes alleged and proven by the United States in this case. And it will help cure the ongoing and future untoward consequences of Defendants' unlawful conduct, which was aimed at keeping smokers using cigarettes by designing and marketing cigarettes that maintained

8

smoking addiction, even as Defendants publicly denied for decades that smoking was addictive or proven to cause any disease at all."

On February 28, 2005, the District Judge issued Order #886, noting that the appellate decision "has struck a body blow to the Government's case." The judge went on to criticize the arguments presented in the government's memorandum, stating: "The Government's Memorandum regarding the scope of the Court of Appeals' ruling and which, if any, non-disgorgement remedies are available reads as if Judge Sentelle had never written his Opinion. . . . The fact of the matter is that those arguments were rejected by Judge Sentelle in his 2-1 Opinion and are simply not the law to be followed at this time." The judge concluded that "Judge Sentelle's Opinion, as this Court reads it, simply does not permit non-disgorgement remedies to prevent and restrain the effects of past violations of RICO. Rather, this Court's 'jurisdiction is limited to forward-looking remedies that are aimed at future violations' of RICO." The cessation program was one of those non-disgorgement remedies.

Career attorneys in the Organized Crime and Racketeering Section of the Criminal Division, including the Senior Litigation

9

Counsel who was a member of the trial team and gave a portion of the

opening argument in the case at the start of the trial, recommended

revising the non-disgorgement remedies to connect them to future

violations of RICO.  All current smokers as of the date of judgment

were already addicted to cigarettes and, by definition, did not become

addicted on the basis of future violations after the date of judgment.

In the view of these career attorneys, the funding of a cessation

program for existing smokers would only be a recoverable remedy

under the new legal standard if the program were connected to the

future consequences of future violations of RICO.

After conferring with a number of attorneys including the principal

career attorneys leading the trial team, I accepted and agreed with the

recommendation to revise the cessation remedy in a manner to meet

the new legal standard.  For this reason, the government asked the

Court to find as a matter of fact that defendants will continue to

violate RICO for at least one year after entry of final judgment and to

require defendants to fund a five year, ten billion dollar smoking

cessation program.  The revised remedy was based upon two groups

10

of smokers who are practically certain to be the future victims of defendants' continuing wrongful conduct: new youth smokers and those smokers switching to low-tar and light cigarettes, thinking them to be healthier. The evidence established that only one of five quit attempts in a cessation program is successful, and so the proposed cessation remedy was to cover five times the number of victims of the future RICO violations in order to remove from the smoking population an equivalent number of existing smokers to those affected by defendants' continuing fraudulent acts within the first year. Thus, the cessation remedy addressed defendants' future violations with forward-looking relief even though it involved existing smokers.  For each smoker in those two groups gained or retained by defendants, an existing smoker was eliminated, and therefore the cessation remedy was calculated to "prevent and restrain" future wrongful acts in direct relation to their future consequences.

The proposed factual finding of at least one year of continuing violations was presented as a minimum period, and if the district court made a factual finding of a longer period based upon the evidence, the size and/or duration of the program could increase in the same

11

proportion. For instance, a factual finding that the violations were

likely to continue for five years would result in a fifty billion dollar

program over whatever period the judge determined in her equitable

discretion.  The revised cessation remedy was also presented as part of

a comprehensive remedial package which included a monitor, and an

extension of any cessation program could be sought and imposed in

the event the monitor determined the future violations of RICO

continued.

**Question:**

d. You have stated in a meeting with Committee counsel that you
made the decision to propose the smoking cessation program remedy
in the amount of $10 billion.  Is that correct?

**Answer:**

It is correct that I made the decision.

**Question:**

e. Did you discuss this matter, and your decision thereon, with any
person working in the White House?  Please be specific.

**Answer:**

I did not discuss my decision on the cessation remedy with anyone at the White House prior to making it or prior to its presentation in closing argument. After the decision was made and presented in court, I did inform the White House Counsel's Office on the status of the case, the closing argument, and my decision.

**Question:**

f. Did you discuss any aspect of this case, including any public statements or articles thereon, with any person working in the White House? Please be specific.

**Answer:**

On rare occasions, I did provide the White House with a status report on the case, generally through the White House Counsel's Office. On those rare occasions, no one at the White House suggested any action or directed any action in the case but merely received information on the status of the case. No one at the White House ever tried to influence any aspect of my decisions in this case. I can not recall ever discussing any public statements or articles about the case with anyone at the White House. However, since

13

my nomination to be Ambassador, I have discussed the cessation remedy

with persons at the White House in relation to my nomination and the

confirmation process.

**Questions for the Record Submitted to
Ambassador - Designate Robert McCallum
Senator Joseph Biden (#5)
Senate Foreign Relations Committee
June 19, 2006**

**Question:**

The Office of Professional Responsibility (OPR) at the Department of
Justice reviewed your actions in the *Philip Morris* case.  Please respond to
the following questions:

a.  Did you have any role in supervising the OPR investigation?

**Answer:**

No.

**Question:**

b. Did you have any contact with OPR Counsel Marshall Jarrett, or

any of his staff, regarding the investigation, other than the interview or

interviews of you by OPR?

**Answer:**

I had no contact with Marshall Jarrett regarding the OPR

investigation.  I do remember one contact with one interviewer outside the

interview context.  I had been informed in an interview that the OPR report

was likely to be completed at the end of May.  I was leaving town on June 1,

15

and I notified an interviewer in order to receive notice of the OPR

conclusions if the report was issued while I was out of the office for a week.

I can recall no other contact with any of Marshall Jarrett's staff outside the

interview context.