# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLUMBIA

 3
        -------------------------------:
 4   CITIZENS FOR RESPONSIBILITY      :
     AND ETHICS IN WASHINGTON,         :
 5                                     :
          Plaintiff,                   :
 6                                     :
             v.                        :   Case No.:
 7                                     :   05-2078(EGS)
     UNITED STATES                     :
 8   DEPARTMENT OF JUSTICE             :
                                       :
 9       Defendant.                    :
                                       :
10   -------------------------------:

11                         Washington, D.C.
                           July 19th, 2006
12

13   Deposition of:

14              STEPHEN BRODY,

15        Called for oral examination by counsel for

16   Plaintiff, pursuant to notice, at the offices of

17   Citizens for Responsibility and Ethics in

18   Washington, 1400 Eye Street, N.W., Suite 450,

19   Washington, D.C. beginning at 10:45 a.m, before

20   Teague Gibson of Capital Reporting, a Notary Public.

21

22              *    *    *    *    *
```

Capital Reporting Company

Page 2

1   ON BEHALF OF THE PLAINTIFF:
2       ANNE L. WEISMANN, ESQ.
        MELANIE SLOAN, ESQ.
3       Citizens for Responsibility
        and Ethics in Washington
4       1400 Eye Street, N.W., Suite 450
        Washington, D.C. 20005
5       (202) 408-5565
6   ON BEHALF OF THE DEFENDANT:
7       LISA A. OLSON, ESQ.
        U.S. Department of Justice Civil Divisoin
8       20 Massachusetts Aveneu, N.W.
        Washington, D.C. 20530
9       (202) 514-5633
10  ON BEHALF OF THE WITNESS:
11      ROBERT M. WEINBERG, ESQ.
        Bredhoff & Kaiser, PLLC
12      805 Fifteenth Street, N.W.
        Washington, D.C. 20005
13      (202)842-2600
14
15
16
17
18
19
20
21
22

Page 3

C O N T E N T S

1
2   EXAMINATION BY:                    PAGE
3   MS. WEISMANN                       24
4   BRODY DEPOSITION EXHIBITS:         PAGE:
5   1       Eubanks E-mail             51
6
7
8
9
10
11
12      (Exhibits retained by court reporter)
13
14
15
16
17
18
19
20
21
22

Page 4

P R O C E E D I N G S

1
2       JUDGE KAY:  Good morning, Counsel.
3       MS. WEISMANN:  Good morning, Your Honor.
4       MS. OLSON:  Good morning.
5       JUDGE KAY:  What's the problem, something to do
6   with the scope of the next two depositions?
7       MS. WEISMANN:  Well, Your Honor, this is Anne
8   Weismann and there are two issues we would like to
9   raise with you this morning because they relate to
10  the deposition of Steve Brody which was scheduled
11  for this morning.
12      The first issue relates to what yesterday
13  was marked as McCallum Exhibit 3 and I apologize
14  because I realized that you probably don't have a
15  copy of it.  But this is the document that was a
16  single page e-mail sent from Sharon Eubanks to Steve
17  Brody in which she recounted a telephone
18  conversation she had had with Mr. McCallum and they
19  were discussing certain aspects of the OPR
20  investigation.
21      Now our understanding, Your Honor, of the
22  reason for the sealing order was to give the

Page 5

1   Government an opportunity to perfect any claim of
2   privilege before Judge Sullivan and prevent the
3   further dissemination of information that the
4   Government claimed was privileged.  We have had an
5   opportunity to review the document even further and
6   we asked counsel for the Government to do so as
7   well.  We submit that the document isn't privileged
8   under any conceivable privilege and we think if you
9   decide that issue that of necessity the issue of
10  sealing has to fall out.
11      JUDGE KAY:  Any chance, Ms. Weismann, of
12  dropping that in a fax machine?
13      MS. WEISMANN:  Absolutely.
14      JUDGE KAY:  If you could do that immediately I
15  should get it in a matter of moments.
16      MS. WEISMANN:  So then we can make our
17  arguments on that document.
18      JUDGE KAY:  You're scheduled to take one or two
19  this morning.
20      MS. WEISMANN:  Only one this morning.  The
21  second's not scheduled to begin until 3:15.  And let
22  me just tell you what the second issue is.  We did

2 (Pages 2 to 5)

Capital Reporting Company

Page 6

1  want to revisit the scope.  When I reviewed the
2  transcript last night it was clear to me that you
3  had afforded us the opportunity to come back to you
4  if we felt that we wanted to and it was also.
5      JUDGE KAY:  Come back to Mr. McCallum's?
6      MS. WEISMANN:  I'm bringing it up today because
7  there are two areas of inquiry in particular that we
8  were prohibited by your order and what you said from
9  inquiring into and they both related to the two
10 documents that have been placed under seal.
11     JUDGE KAY:  Right.
12     MS. WEISMANN:  And we would like to raise those
13 issues as well with Mr. Brody.  I'm happy to explain
14 further and to make my presentation to you as to why
15 we think we should be entitled to, but if you want
16 we can address this first issue of the document.
17     JUDGE KAY:  I think it probably just came
18 through.  This is not document Number 1 that I
19 looked at.
20     MS. WEISMANN:  Right, there were two different
21 documents.  One was a group of e-mails.
22     JUDGE KAY:  I understand that the other one I

Page 7

1  thought started off you're saying this was a
2  different one than was marked as Number 1.  It has a
3  Number 1 marked on it.  It has a Number 1 on it.
4      MS. WEISMANN:  That's just a marking of the
5  margin.
6      JUDGE KAY:  This is a difficult one, I thought
7  it looks the same with Schiffer and OPR.
8      MS. WEISMANN:  You saw this document yesterday,
9  Your Honor.
10     JUDGE KAY:  Let me refresh my recollection.
11         (Off the record)
12     JUDGE KAY:  All right.  I've looked at it.
13     MS. WEISMANN:  Your Honor, as you can see the
14 entire subject of this is an OPR investigation.
15     JUDGE KAY:  Yes, indeed.
16     MS. WEISMANN:  It can't possibly be work
17 product because it's not part of litigation.  The
18 OPR process --
19     JUDGE KAY:  Let me hear from Ms. Olson or
20 Mr. Shapiro.
21     MS. OLSON:  Thank you, Your Honor.  Ms. Shapiro
22 is not here this morning.  The Government's concerns

Page 8

1  about this document are twofold.  First of all, we
2  confirmed last night from the highest level of the
3  Justice Department that Ms. Eubanks would not have
4  been authorized to release this document to the
5  public.  So our concern is that it's Government
6  property, it's been purloined and it should be
7  returned to the Government and placed under seal for
8  that reason.
9      Our second concern is that it would be
10 subject to the law enforcement investigatory
11 privilege because it concerns an ongoing
12 investigation and these are privileged attorney
13 communications as well.
14     The third concern is if you look at the
15 date of this document it's June 21st, 2005, which is
16 a week before CREW even filed their FOIA request.
17 It can't possibly have any bearing on the processing
18 of CREW's FOIA request which is the proper subject
19 of this deposition.  The fact that they're here
20 today with no questions to ask Mr. Brody outside of
21 imploring you to alter your ruling yesterday which I
22 think you repeated a couple of times as to the scope

Page 9

1  of this deposition being to explore what role, if
2  any, the witness had in processing the FOIA request
3  or what role the witnesses played in the FOIA
4  request or whether DOJ acted in bad faith in this
5  alleged delay.  This could not possibly have any
6  bearing on this issue and the fact that they have no
7  questions to ask him shows that the reason for this
8  deposition is essentially a sham to get into the
9  underlying merits of the tobacco litigation.
10     JUDGE KAY:  Ms. Weismann, I'd like you to focus
11 on the last point.
12     MS. WEISMANN:  That this is a sham?  Well,
13 first of all, I have no idea from where she has --
14 what evidence she has of her assertion that we have
15 no other questions to ask.  I'm sorry, I don't
16 understand which point.
17     JUDGE KAY:  Not so much the no questions, I
18 guess till the deposition starts.
19     MS. WEISMANN:  We haven't begun the deposition.
20     JUDGE KAY:  I'm more interested.
21     MS. WEISMANN:  The relevance?
22     JUDGE KAY:  The fact that the particular e-mail

3 (Pages 6 to 9)

Capital Reporting Company

Page 10

1  was sent prior to --
2      MS. WEISMANN:  Of the timing of the e-mail?
3  That gets into the relevance, Your Honor, and I
4  would be happy to address that.  But can I at least
5  first address the privilege issue?
6      JUDGE KAY:  Well, I must tell you, Counsel, I
7  would have serious question as to whether or not it
8  would constitute privileged material and as to
9  whether or not it might be sealed.  In terms of the
10  investigative, the chilling affect on the
11  internal -- I don't even know if this would
12  constitute investigative --
13      MS. WEISMANN:  Your Honor, may I make one point
14  I meant to add is that we do intend to file a brief
15  I hope by the end of the week on this issue because
16  as you know from yesterday this is going to be heard
17  by the court next Wednesday.
18      JUDGE KAY:  That's correct.  And I would hope
19  that each side would have an opportunity to put
20  something on paper ahead of time and I think Judge
21  Sullivan would really like to have it this week so
22  both of you can get something in to him he would

Page 11

1  appreciate that for next Wednesday.  Go ahead,
2  Ms.Olson.
3      MS. WEISMANN:  I've made my point.  Thank you,
4  Your Honor.
5      JUDGE KAY:  Okay.  On the issue as to whether
6  or not it should be sealed, obviously that's
7  something that's going to be addressed by Judge
8  Sullivan, but on looking at it, my initial reaction
9  is, as I said, I have serious question as to, one,
10  it would be privileged.  And having said that as to
11  whether or not it would warrant being sealed, but
12  because I don't know if the investigative chilling
13  affect on the internal investigation certainly
14  stands out here that -- but that's just my personal
15  view and is of no moment in that the next question I
16  guess we have to address is the relevancy of it and
17  I'm not sure, again, wherein it bears a relationship
18  to the somewhat narrow scope that I outlined so if,
19  Ms. Weismann, you could sort of address that.
20      MS. WEISMANN:  I will, Your Honor, and I don't
21  mean to be disrespectful to the questions you want
22  to ask me, but I feel we are continually deprived of

Page 12

1  an opportunity to at least present our arguments and
2  what was clear to me yesterday when we met with
3  Judge Sullivan at 9:30 is that he anticipated that
4  any discovery issue as a preliminary matter would be
5  raised with you.  The reason I brought up the
6  privilege issue is that the transcript reflects the
7  fact that Ms. Shapiro saw a sealing of these
8  documents to prevent dissemination of the
9  information that would be potentially privileged.
10  It seems to us if that was the only basis for
11  sealing this document, which is an entirely separate
12  issue from what the Government's ability to get back
13  anything that it claims is stolen, which I would add
14  is a very serious charge which we dispute entirely.
15  There is nothing improper about the manner in which
16  we came into possession of this document, but we'll
17  address that with Judge Sullivan.
18      But if the rationale for sealing the
19  document, that specific aspect of your ruling
20  yesterday, was because it was privileged it seems to
21  us the issue of privilege is ripe and with respect
22  to the law enforcement investigative privilege is

Page 13

1  our understanding that this investigation is over.
2  OPR submitted two letters to members of Congress
3  saying that they had completed their investigation
4  and that is a temporal privilege that falls out here
5  with the investigation being closed.  And of course
6  we don't even think it applies in the first
7  instance.  So I just wanted to make sure that the
8  record was clear and why we think the document is
9  not privileged.
10      Let me now turn to the relevance issue and
11  this is why I started out by saying we had two
12  issues because one is our ability to use a sealed
13  document.  The second is our ability to use it
14  whether or not it's relevant.  Your Honor, this is,
15  as you know, a discovery into whether or not the
16  Government acted in bad faith.  We have evidence
17  including this e-mail including the other sealed
18  document that was submitted into the record
19  yesterday that we believe demonstrates or can be
20  linked to other information to demonstrate that
21  Mr. McCallum had not testified truthfully.  We think
22  the voracity of a witness is very relevant.  We may

4 (Pages 10 to 13)

Capital Reporting Company

Page 14

1 not prevail on whether or not we can convince Judge
2 Sullivan if he hasn't told the truth in the past
3 he's not telling the truth now. We realize that the
4 Government will, I'm sure most vigorously, dispute
5 our characterization and our interpretation of this
6 evidence but we think we should be able to probe
7 into that.
8        Now how this specific document plays into
9 this is in this way. Mr. McCallum has said in
10 written testimony before the Senate Foreign
11 Relations Committee that he had no contact
12 whatsoever with Mr. Jarrett. In his oral testimony
13 before the Senate Foreign Relations Committee and
14 this is in conjunction with his nomination and
15 consideration of his nomination to be Embassador to
16 Australia he described the OPR process as completely
17 independent. He said in this litigation that he had
18 nothing to do with the OPR investigation. We think
19 this document calls into question that.
20        Your Honor was very clear yesterday that
21 with respect to this document and the other document
22 we were not permitted to ask him any questions on

Page 15

1 the substance. Mr. Brody was the recipient of this
2 e-mail, we would explore with him his understanding
3 of this e-mail whether he had any discussions with
4 Ms. Eubanks about the subject of this e-mail. We'd
5 also like to explore other areas that we think
6 Mr. McCallum may not have testified truthfully
7 either yesterday or in his testimony and public
8 statements that he's made and we think that the
9 voracity of a witness in a hearing that's about the
10 Government's bad faith should be fair game.
11        Now, I understand your concern that what
12 we're really going to is to prove the merits and
13 that's not true. But the subject matter of the
14 areas that we think he has not been truthful in
15 concerns several areas. One is his relationship and
16 contacts with OPR and Marshal Jarrett. The second
17 area is his contacts with the White House and when
18 those contacts occurred.
19        I mentioned yesterday that one of the
20 things we were trying to accomplish by our
21 preliminary questions was to get a timeframe in
22 place because, again, in his written questions to

Page 16

1 the Senate Foreign Relations Committee and the
2 senators Mr. McCallum said that he did not advise
3 the White House about his decision until after it
4 was made and we think that those e-mails that were
5 the other sealed exhibit go to that and we wanted
6 the ability to probe with him beyond those e-mails
7 and we've been denied that opportunity.
8        We are willing to take of course that
9 issue up with Judge Sullivan. We're not asking you
10 today to do anything with respect to Mr. McCallum's
11 deposition but we are asking you for the ability to
12 probe with Mr. Brody both this one-page document and
13 the subject matter of the other sealed document for
14 which we believe Mr. Brody has some relevant
15 information. And that, Your Honor, in a nutshell is
16 what we see as the relevance and that is why we are
17 asking you to reconsider that part of your ruling at
18 least as to Mr. Brody and his deposition.
19        MS. OLSON:  Your Honor, may I respond to a
20 couple of points?
21        JUDGE KAY:  Yes, go ahead.
22        MS. OLSON:  It's our position that this

Page 17

1 document not only concerns a law enforcement
2 investigation but also may be deliberative and these
3 are issues that we want to brief. The chilling
4 affect of exposing something like this would be of
5 significant consideration as you just pointed out
6 with respect to either of those privileges.
7 Ms. Weismann has said that they want to ask
8 Mr. Brody about this e-mail in order to determine
9 whether Mr. McCallum was truthful when he said he
10 didn't speak to Mr. Jarrett. Well, I would
11 recommend that CREW ask Mr. Jarrett whether
12 Mr. McCallum spoke to him and in fact that's
13 something Mr. McCallum himself suggested yesterday.
14 What they'd be asking Mr. Brody about with respect
15 to this e-mail is whether he heard that Sharon
16 Eubanks heard that Mr. Schiffer heard that
17 Mr. McCallum talked to Mr. Jarrett. It's about two
18 or three levels of hearsay and it's unclear how that
19 could have any relevance to the processing of this
20 FOIA request, much less any relevance as to
21 Mr. McCallum's voracity.
22        Ms. Weismann didn't say one thing about

5 (Pages 14 to 17)

Page 18

1  how this relates to FOIA processing and she keeps
2  bringing up the timing, but it's unclear how the
3  timing has anything to do with whether there were
4  bad faith delays in the FOIA processing.
5      JUDGE KAY: I think the point being made by
6  Ms. Weismann was that they were exploring a series
7  of events that would question as far as the
8  plaintiff's lawyers are concerned questioned
9  Mr. McCallum's voracity and his voracity was at
10 issue in terms of his other testimony with respect
11 to his processing.
12     MS. OLSON: But I think it would behoove them
13 if they asked Mr. Brody if he had any knowledge
14 whatsoever of Mr. McCallum's involvement in the FOIA
15 processing, if he had any contacts from
16 Mr. McCallum. They have to establish some
17 foundation that Mr. McCallum is lying by -- if
18 that's what their contention is by asking Mr. Brody
19 if in fact he has any knowledge of what Mr. McCallum
20 did with respect to the FOIA processing and we're
21 just so far afield here from the proper scope of
22 this deposition.

Page 19

1      JUDGE KAY: In terms of the actual scope of
2  what's at issue before Judge Sullivan I don't
3  disagree with you. I think, however, that on the
4  issue of the deponent's voracity that may have some
5  bearing on how Judge Sullivan assesses the
6  information or the testimony of any of the witnesses
7  who have been deposed. I think under the
8  circumstances, and I don't know how Judge Sullivan's
9  going on rule, and while I think it doesn't bear
10 directly on the processing, I think if there is a
11 basis for the plaintiff's to argue that Mr. McCallum
12 may have been economical with the truth that they
13 would have a right to argue that whether it had
14 carried any weight with the fact finder Judge
15 Sullivan, I don't know.
16     What I'm going to do is this, I'm going to
17 permit some limited inquiry and I want it made
18 clear, Ms. Weismann, the inquiry is to confirm or
19 verify whether or not Mr. Brody, while knew -- had
20 personal knowledge, for instance, just by way of
21 example, as to whether or not there was some direct
22 communication between Mr. McCallum and Mr. Jarrett

Page 20

1  as opposed to whether he heard it through the
2  grapevine which obviously doesn't help Judge
3  Sullivan one iota as whether or not a third or
4  fourth party told him something, whether or not
5  Mr. Brody had personal knowledge of some of these
6  things, to that extent I will permit you to inquire
7  of Mr. Brody with respect to some of the matters
8  that are contained in this particular e-mail, but I
9  want it clearly understood, again, that any
10 responses by Mr. Brody are not to be disseminated
11 until Judge Sullivan has had a determination to rule
12 on the Government's request, one, as to whether or
13 not it's appropriate and, two, as to whether or not
14 it should be sealed.
15     So I'm going to give you that opportunity
16 to put it on the record. It may well be that
17 subsequently Judge Sullivan would direct that it be
18 redacted but at least it will be there in case he
19 rules in the plaintiff's favor that you did indeed
20 have a right to explore that. I want it limited to
21 his knowledge and I don't want you to go into the
22 substantive events as to the investigation itself.

Page 21

1  I just don't think that is relevant and should be
2  inquired.
3      MS. WEISMANN: We agree. We have no
4  intention --
5      JUDGE KAY: So you've got a fine mine field to
6  tread.
7      MS. WEISMANN: But, Your Honor, I need to bring
8  up one more issue because, as I said, we also wanted
9  to use the USA Today editorials because we believe
10 that Mr. Brody also has personal knowledge that,
11 again, would be --
12     JUDGE KAY: The USA article obviously is not
13 privileged I don't think. But with the same
14 constraints you may inquire of Mr. Brody if he has
15 any reason to -- well, whatever information that may
16 challenge if, as you see it, the voracity of
17 Mr. McCallum.
18     MS. WEISMANN: Okay. That's helpful. Thank
19 you, Your Honor.
20     JUDGE KAY: Thank you. Have a good day.
21     MS. OLSON: Your Honor, does that mean that
22 this -- so these -- but the order with respect to

6 (Pages 18 to 21)

Capital Reporting Company

Page 22

1 these documents yesterday --
2    JUDGE KAY: No, no, I've got one document
3 before me, Ms. Olson.
4    MS. OLSON: So this is still the status quo
5 remains of yesterday that this is not to be publicly
6 disseminated.
7    JUDGE KAY: That is correct, until Judge
8 Sullivan who may open the whole thing up and give
9 plaintiff's lawyers whatever they're asking for. On
10 the other hand, he may agree with you, but I want
11 both sides to have the opportunity to present it to
12 Judge Sullivan and he is the trial court in this
13 matter for him to make a decision. If it was my
14 case I would make the decision but I'm hesitant,
15 something as significant as this which goes beyond
16 the discovery, the monitoring of the deposition,
17 this is post-monitoring as to what is done with the
18 information that is elicited at the deposition and
19 that's for the trial court. He did not refer that
20 to me.
21    MS. WEISMANN: Your Honor, I realize this may
22 be outside the scope of what you have authority but

Page 23

1 raised the issue of briefing before Judge Sullivan.
2 We have a serious concern that the Government will
3 file late as they've done in the past or file very
4 close in time to the hearing and we want to make
5 sure we have an adequate time to respond and I'm
6 assuming that maybe -- I would -- maybe I'm wrong
7 that you don't have the authority to set up a
8 briefing schedule.
9    JUDGE KAY: I tell you what I'm going to do,
10 Counsel, and I think in fairness to both of you, I'm
11 going to get you a briefing schedule and with the
12 response times and I hope neither of you have sort
13 of serious plans about doing other things over the
14 weekend but, anyway, let me speak to Judge Sullivan.
15 Let me get back to you as soon as I can, obviously,
16 problem since his morning is difficult I will call
17 his chambers and ask him for some deadlines on
18 whatever written material you're going to receive
19 and you'll certainly have that by early afternoon.
20    MS. OLSON: Thank you.
21    MS. WEISMANN: Thank you.
22    JUDGE KAY: Thank you.

Page 24

1    (Off the record)
2        STEPHEN BRODY,
3  Called for examination, having been duly sworn to
4 tell the truth, the whole truth and nothing but the
5     truth, testified as follows:
6
7 BY MS. WEISMANN:
8    Q   Good morning, Mr. Brody. My name is Anne
9 Weismann. I'm with CREW and I'm the plaintiff and I
10 see you're here with your counsel as well?
11    A   Yes.
12    Q   Your name again is Steve Brody?
13    A   Yes, Stephen Brody.
14    Q   Which do you prefer to be addressed?
15    A   Usually Steve.
16    Q   What is your current position?
17    A   Acting Director of the tobacco litigation
18 team in the Civil Division of the Department of
19 Justice.
20    Q   We have been using the tobacco litigation
21 as the word to describe the Government's lawsuit
22 against Phillip Morris and the other tobacco

Page 25

1 companies, it sounds like you do as well?
2    A   Yes.
3    Q   So if we use that during this deposition I
4 want to make sure we're both talking about the same
5 thing?
6    A   Okay.
7    Q   How long have you been acting Director?
8    A   Since December 1st, 2005.
9    Q   What was your position before that?
10    A   Deputy Director.
11    Q   And how long were you Deputy Director?
12    A   Since September or October of 2001.
13    Q   And were you at the Department of Justice
14 before that?
15    A   Yes.
16    Q   In what capacity?
17    A   Trial attorney on the tobacco litigation
18 team.
19    Q   And for how long were you a trial
20 attorney?
21    A   Starting on December 31st, 2000.
22    Q   So the period of time of May or June of

7 (Pages 22 to 25)

Capital Reporting Company

Page 26

1  last year until December you were the Deputy
2  Director, am I correct?
3     A   Yes.
4     Q   And very briefly just describe what your
5  overall responsibilities were, please?
6     A   My overall responsibilities with the
7  team's Director, Sharon Eubanks, we oversaw the
8  prosecution of the United States' claims and served
9  as trial counsel for the United States in the
10  nine-month racketeering trial against cigarette
11  manufacturers.
12     Q   And how large was your team?
13     A   At its high point I believe we had 38
14  lawyers.
15     Q   And you had an opportunity to work closely
16  with Sharon Eubanks?
17     A   Yes.
18     Q   I'm going to turn your attention now to
19  two FOIA requests.  Do you have knowledge that CREW
20  filed two FOIA requests with the Department of
21  Justice seeking documents relating to the change in
22  remedy in the tobacco litigation?

Page 27

1     A   Yes.
2     Q   And when did you first become aware that
3  CREW had filed those requests?
4     A   First time I was really aware of it was
5  probably October or November of 2005.
6     Q   And so at that time were you aware that
7  the Department was also in litigation with CREW
8  concerning the FOIA requests?
9     A   Yes.
10     Q   Prior to that period of time were you ever
11  asked by anyone to review documents to see whether
12  they would be responsive to CREW's FOIA request?
13     A   No.
14     Q   So I don't want to misstate your
15  testimony, I want to make sure I'm clear though, is
16  it your best recollection that you didn't have any
17  knowledge of the FOIA requests until CREW was
18  already in litigation with the Department?
19     A   Correct.  To be completely accurate, it's
20  possible that I may have seen the FOIA request when
21  it came in but there were a lot of FOIA requests at
22  that time and if I saw it it would have just been

Page 28

1  that they were distributed to members of the team.
2     Q   Along with your deposition notice you were
3  sent a document request, were you not?
4     A   Correct.
5     MS. OLSON:  I have those here.
6     Q   Now I see from your document response that
7  putting aside whatever objections you have to the
8  response you have no documents beyond those that
9  were included in the complaint?
10     A   Correct.
11     Q   And does that mean then that you would
12  have no e-mails, for example, that would discuss any
13  aspect of the processing of CREW's FOIA request?
14     A   That's correct.  I don't have any e-mails
15  relating to the processing of the FOIA request.
16     Q   In responding to the document request can
17  you just describe what you searched?
18     A   Well, in terms of what I have for
19  documents I have documents in my office, I have a
20  stack of what's basically just a couple of the
21  pleadings in the CREW litigation and I have
22  attachments to the complaint that was filed.  And

Page 29

1  then I looked back through e-mail and of course I
2  knew from my memory that I didn't have any e-mail
3  relating to the process of the FOIA request but I
4  did glance through and just do a quick search to see
5  whether I might have been mistaken.
6     Q   Is it your practice to print out e-mail or
7  do you retain it in electronic form.
8     A   Well, both.
9     Q   Quite apart from the issue of what
10  documents you have, do you recall ever receiving any
11  directions from anyone within the Department about
12  how to process CREW's FOIA request?
13     A   No.
14     Q   And you don't recall receiving any oral
15  instructions -- do you recall having any discussions
16  with Jim Kovakas about how to process CREW's FOIA
17  requests?
18     A   No.
19     Q   Do you recall ever being in a meeting with
20  Mr. McCallum where either the fact -- where CREW's
21  FOIA requests were mentioned or discussed?
22     A   No.

8 (Pages 26 to 29)

Page 30

1    Q    Is it your testimony that you have had no
2    role within the Department in processing CREW's FOIA
3    request?
4    A    That's correct.
5    Q    Have you had a role in the litigation and
6    the Department's defense of the litigation?
7    A    Yes.
8    Q    And please describe for me what that role
9    was?
10    A    Without describing the substance of
11    anything, my role has merely been answering
12    questions that Lisa Olson has had along the way to
13    assist her with the defense of the lawsuit.
14    Q    Were you ever tasked with putting together
15    documents, a representative sampling of documents,
16    from the body of documents that were potentially
17    responsive to CREW's FOIA request?
18    A    At one point in time --
19    MR. WEINBERG:  Why don't you answer this
20    question in terms of what you did without getting
21    into any conversations that you had.
22    A    Sure.  See if I can answer it this way.

Page 31

1    Q    I may still ask about those conversations,
2    but we can start with this.
3    A    I put together a sampling of documents for
4    Lisa Olson.
5    Q    And what was your understanding of what
6    that sampling was to consist of?
7    MS. OLSON:  Well, objection.
8    MS. WEISMANN:  I'm only asking for his
9    understanding.
10    MS. OLSON:  It's still attorney/client
11    communication.
12    MR. WEINBERG:  You asked what it consists of,
13    if you ask him what his understanding of what he was
14    doing what he was putting together.
15    MS. WEISMANN:  What's your understanding --
16    MS. OLSON:  It's one thing to ask him if he did
17    this.  It's another thing to ask him if he did it at
18    my direction or what his understanding of my
19    instructions were and that would be attorney/client
20    communications.  So now we've already established
21    that he did it at my instruction, so what he did is
22    off limits.

Page 32

1    Q    What was your understanding of what you
2    were doing?  What were the parameters that you were
3    working with?
4    MS. OLSON:  Objection, it's attorney/client
5    privilege.
6    MS. WEISMANN:  Are you directing him not to
7    answer?
8    MS. OLSON:  Yeah.
9    MS. WEISMANN:  Okay.  We'll go to the judge on
10    this because this is clearly -- let's go off the
11    record.
12    (Off the record)
13    MR. WEINBERG:  If you would ask Mr. Brody what
14    he did in terms of preparing the documents and not
15    preparing the documents he'll answer that question.
16    BY MS. WEISMANN:
17    Q    Mr. Brody, what did you do in preparing
18    documentation for the litigation?
19    A    I put together the documents that I had
20    dealing with the internal discussions within the
21    Department of Justice concerning the remedies
22    presentation that we made at closing argument and

Page 33

1    post-trial briefing.
2    Q    And when you say the documents that you
3    had, what is the universe of documents?
4    A    The universe of documents --
5    MR. WEINBERG:  You mean how many pages?
6    Q    Approximately -- you said my documents.  I
7    don't know what you mean by that, but, so let me see
8    if you can estimate its size in some fashion?
9    A    Size, I would say about -- I'd say it was
10    probably about four inches.
11    Q    And so when you said my documents you're
12    talking about the documents that you had in your
13    office?
14    A    Correct.
15    Q    And so you were not talking about the
16    documents of the tobacco litigation team as a whole?
17    A    Correct.
18    Q    So you put together -- and the group that
19    you culled, how many pages was it?
20    A    How many pages, I really couldn't
21    estimate.  Four inches probably.
22    Q    But you said you started with a stack of

9 (Pages 30 to 33)

Capital Reporting Company

Page 34

1   four inches?
2      A   I provided a stack, I collected, I
3   gathered a stack of four inches.
4      Q   And what I'm trying to find out is from
5   what did you gather -- what was the universe of
6   documents you were looking at to gather those four
7   inches of documents?
8      MS. OLSON:  If you can answer the question.
9      Q   I'm not asking you to identify what the
10  documents are.  I'm asking you in some way describe
11  them and -- what was the volume?
12     MR. WEINBERG:  You want us to talk about this
13  problem?
14     MS. WEISMANN:  Can we go off the record?
15           (Off the record)
16     MR. WEINBERG:  If you can just again ask what
17  did the -- without getting into the substance of the
18  documents, what was the nature of the documents he
19  put together in terms of the kinds.
20     MS. WEISMANN:  I think you're misunderstanding
21  my question.  I'm not focussed on the documents he
22  put together.  I'm trying to figure out what he

Page 35

1   culled them from.
2      MR. WEINBERG:  He didn't cull them.  If you
3   just ask him, get into it any way you want.  He'll
4   tell you basically what he provided.
5      Q   What did you provide?
6      A   Every document that I had dealing with the
7   change to -- well, dealing with the development of
8   the presentation on remedies and closing and the
9   request for remedies and post-trial briefing.
10     Q   And when you say every document you had,
11  are you looking at documents that are available to
12  the entire tobacco litigation team or just documents
13  that you consider to be in your office?
14     A   Some of the documents were available to
15  the entire tobacco litigation team.  However, many
16  of the documents were only available to me and to
17  Sharon Eubanks among the members of the team.
18     Q   We had a hearing before Judge Sullivan in
19  this matter on February 9th, 2006.  Have you read
20  the transcript of that hearing?
21     A   I have read -- I have seen portions of the
22  transcript of that hearing that were appended to

Page 36

1   CREW's motion for discovery.
2      Q   I'm looking at page 40 of that transcript.
3   Ms. Olson said to the court I asked the head of the
4   tobacco litigation team to give us a representative
5   sample of the documents that he felt would be of the
6   greatest interest to the plaintiff; is that
7   accurate?
8      MS. OLSON:  Well, you can answer that if you
9   can -- if you understand the question.
10     A   I believe -- see if I can answer it this
11  way.
12     MR. WEINBERG:  Just answer whether it's
13  accurate or not.
14     A   I think it's accurate, yes.
15     Q   And she used the term "representative
16  sample" is that also what she asked you to do?
17     MR. WEINBERG:  And is that accurate?
18     A   That is --
19     MS. WEISMANN:  She's now made a statement in
20  open court about what she asked, I think it's a
21  little late for them to be claiming privilege.
22     MS. OLSON:  Well, is your question did I use

Page 37

1   those exact words or?
2      MS. WEISMANN:  Can we read back the question?
3           (Record was read)
4      A   Yes.
5      Q   And she also said I asked him to provide
6   documents that he thought were most responsive; is
7   that also accurate?
8      A   Yes.
9      Q   And in determining what documents would be
10  most responsive what criteria did you use?
11     MS. OLSON:  Well --
12     MR. WEINBERG:  He testified he gave you
13  everything there was that was related to the issue.
14     MS. WEISMANN:  He's described what he gave us.
15  I just want to make sure though because I don't know
16  what else he has.
17     MR. WEINBERG:  His description that he gave was
18  that he gave everything that was related to the
19  issue of --
20     MS. WEISMANN:  The court did not deem that
21  sufficient to answer the court's concerns because
22  that was what Ms. Olson told the court.  I think

10 (Pages 34 to 37)

Page 38

1  we're entitled to probe here.
2       MR. WEINBERG:  I don't think that is what
3  Mr. Olson told the court, but he's given the answer.
4       MS. WEISMANN:  I have the transcript.
5       MR. WEINBERG:  Did Ms. Olson say he gave every
6  document?
7       MS. WEISMANN:  No.
8       MR. WEINBERG:  That's what he's testified
9  already.  He didn't use any criteria, he gave every
10  document.
11       MS. WEISMANN:  Let me explain.  You said he
12  gave every document he had that he thought related
13  to our FOIA, there still is a judgment call.
14       MR. WEINBERG:  No, he didn't say that related
15  to FOIA.  He said he gave every document -- his
16  testimony --
17    Q    Your testimony is that the four inches of
18  documents you provided is the entirety of the
19  documents you have relating in any way to the remedy
20  in this case?
21    A    No, I believe what I testified was
22  relating to the internal discussions within the

Page 39

1  Department of Justice as to what would be presented
2  as the remedy request by the United States.
3    Q    So that was your understanding of what
4  CREW was seeking?
5    A    No.
6    Q    This is where we're having a disconnect
7  and we're entitled to probe.  So you were asked to
8  give a representative sampling of what?  What was
9  your understanding of what you were to give a
10  representative sampling of?
11       MS. OLSON:  Why don't you ask him what he
12  thought?
13       MS. WEISMANN:  I'm asking the questions.
14       MS. OLSON:  You're asking for attorney/client
15  communications.
16       MS. WEISMANN:  You waived attorney/client
17  communication when you reported to the court in open
18  court that you had asked him to give a
19  representative sample.
20       MS. SLOAN:  Basically seems like you all are
21  not being cooperative and not answering the
22  questions.  If we have to go back to the Judge we

Page 40

1  will.
2       MR. WEINBERG:  He's already -- I'll tell you,
3  just taking his testimony today he's already
4  answered that the question you asked as to whether
5  what Ms. Olson said on the transcript was or was not
6  accurate and he's told you and he's willing to tell
7  you again.  What he -- but the point is she might
8  have used the words "representative sample," he has
9  not told you that he provided a representative
10  sample.  He told you that he provided something more
11  than a representative sample.
12       MS. WEISMANN:  I'd like to be -- with all due
13  respect, Mr. Weinberg, I'd like to be able to ask
14  the witness and not get his testimony through you.
15       MR. WEINBERG:  He's testified to that.  The
16  record will show that.
17       MS. WEISMANN:  That's not how I understand his
18  testimony because every time I've attempted to ask a
19  question you've asked me to restate it in a way that
20  you think he can answer and I'm entitled to probe,
21  sir, and if you're telling me that I can't go beyond
22  this, we will take it to the Judge.

Page 41

1       MR. WEINBERG:  I'm telling you what you're
2  doing is you are not listening to the answers he's
3  giving you.
4       MS. SLOAN:  You're testifying for the witness.
5       MR. WEINBERG:  If you want to ask him whether
6  he provided a representative sample or did he
7  provide a comprehensive set of documents, ask him
8  that.  You're asking him as if he was culling
9  documents which he wasn't doing.
10       MS. OLSON:  For the record, I would like to say
11  that I didn't waive any attorney/client privilege.
12  I was responding to a question by the Judge and I
13  didn't reveal any --
14       MS. WEISMANN:  You can raise that with Judge
15  Sullivan as well.
16    Q    Mr. Brody, let me explain by way of
17  background.  There was certain representations made
18  in court and the court itself, Judge Sullivan, did
19  not have a clear understanding of what had
20  transpired within the Civil Division.  However clear
21  you think you're being, I feel an obligation to
22  address Judge Sullivan's questions and concerns.

Page 42

1    MS. OLSON: I have another objection on
2 relevance grounds.
3    MS. WEISMANN: Excuse me.
4    MS. OLSON: Can I just --
5    MS. WEISMANN: This is not relevant.
6    MS. OLSON: No, of course it's not.
7    MS. SLOAN: Let's just call Judge Kay now,
8 let's go.
9    MS. WEISMANN: Let's go off the record. This
10 has been the --
11    MR. WEINBERG: This is so easy.
12    MS. SLOAN: If you're going to say it's not
13 relevant for us to ask about exactly this point we
14 would much rather get a ruling from the Judge on
15 this.
16    MR. WEINBERG: Calm down. He's answering the
17 questions.
18    MS. SLOAN: You're speaking for him. He's not
19 answering any questions. He's barely spoken.
20    MR. WEINBERG: The record will show that he
21 already -- anything I've said has been only after he
22 answered the question, but all I'm asking to you --

Page 43

1    MS. WEISMANN: We're not trying to be
2 difficult.
3    MR. WEINBERG: All I'm saying is we're making a
4 very simple point that shouldn't at all cause you
5 any problem and that is you identified the
6 instructions that were given to him "representative
7 sample." If you would listen to his answers you
8 would have heard that he didn't provide a
9 representative sample, he provided something more
10 than representative sample.
11    MS. WEISMANN: I also heard he didn't provide
12 everything that we want.
13    MR. WEINBERG: I understand. You can't be
14 asking him what the criteria were for his providing
15 a representative sample, that's all I'm saying.
16    MS. WEISMANN: I can ask --
17    MR. WEINBERG: You can ask him, I don't care --
18    MS. SLOAN: Call the Judge. If they're going
19 to argue it's not relevant, it would be good to get
20 it from the Judge.
21    MR. WEINBERG: He's answering the question.
22    MS. OLSON: I didn't tell him not to answer,

Page 44

1 but I do want it to be on the record this has
2 nothing to do with FOIA processing. This has to do
3 with my conduct as the attorney defending the
4 Department of Justice of this litigation. Doesn't
5 have anything to do with delays in the FOIA
6 processing. Mr. Brody's already testified that he
7 didn't have anything to do with the processing of
8 the FOIA request. So I just want that relevance
9 objection to be on the record. I'm not instructing
10 him not to answer if we can get a question that's
11 not attorney/client privilege.
12    Q    I'm going to ask the question again. I
13 know you're going to say I've asked it. I don't
14 think it was answered. I want to get an assertion
15 privilege on the record. Were you asked to give
16 Ms. Olson a representative sampling or words to that
17 affect?
18    A    Yes.
19    Q    And is it your testimony that you gave her
20 something other than a representative sampling?
21    A    Let me see if I can explain. CREW's FOIA
22 request as it was served and as I saw the wording of

Page 45

1 it as an exhibit to the complaint asked for all
2 documents dealing with remedies in the case from
3 2001 onward. What I gave, what I collected, was all
4 of the documents that I had relating to the internal
5 deliberations within the Department of Justice as to
6 what would be presented as a remedies request at
7 closing argument and in post-trial briefing.
8    Q    Thank you for that explanation. And was
9 it your understanding that all of the documents
10 presented to Ms. Olson were privileged?
11    A    I never made that type of assessment. I
12 haven't analyzed it that way.
13    Q    And have you had any occasion since then
14 to analyze it that way?
15    A    No.
16    Q    Has anyone discussed the privilege nature
17 of these documents with you as it relates to CREW's
18 FOIA request?
19    MR. WEINBERG: You mean other than with his
20 counsel?
21    Q    That's not my question.
22    MR. WEINBERG: You said anyone. Why don't you

Page 46

1  limit your question.
2      MS. WEISMANN: I get to ask the questions.
3      MS. OLSON: Object on attorney/client
4  privilege. To the extent you are asking for
5  communications between him and me or any other
6  attorney on this case, we object.
7      Q  When you assembled these documents you had
8  no understanding whatsoever about whether or not
9  they were privileged?
10     A  When I assembled the documents I did not
11 make an assessment about whether the set of
12 documents which constituted the internal
13 deliberations of the Department of Justice has to
14 what the remedies request would be were privileged.
15 I did not go through document by document and make
16 an assessment.
17     Q  And when you presented them, did you
18 present them as internal deliberations, did you use
19 that description or words to that affect?
20     A  I don't recall using words to that affect.
21     Q  Did you make any characterization
22 generally of the kinds of documents they were,

Page 47

1  beyond that they were memos?
2      MR. WEINBERG: He hasn't said that they were
3  memos. Object to the form of the question.
4      A  Without revealing the substance of any
5  communications that I had with Ms. Olson, counsel
6  for United States in this action, yes, I discussed
7  with her the nature of the documents.
8      Q  Now was that your only involvement with
9  respect to documents responsive to CREW's FOIA
10 request?
11     A  Yes.
12     Q  And were you at any point --
13     MS. OLSON: Before you ask that, can I confer
14 with him for a couple seconds, just right here.
15     MS. WEISMANN: Off the record.
16     (Off the record)
17 BY MS. WEISMANN:
18     Q  Let's go back to the documents. What did
19 you go through to cull those documents or pull those
20 documents?
21     A  E-mail, memos, drafts of testimony, drafts
22 of trial presentations.

Page 48

1      Q  Did you go through the entire tobacco
2  litigation files?
3      A  No.
4      Q  What types of documents, give me the
5  categories of documents that you provided Ms. Olson?
6      A  There was primarily e-mail, some drafts of
7  witness testimony. There were memos, internal
8  memos. There was probably one publicly filed
9  meeting.
10     MR. WEINBERG: Hang on one second.
11     (Off the record)
12 BY MS. WEISMANN:
13     Q  Did any of the documents include your
14 personal notes that you took of conversations?
15     A  No.
16     Q  Did any of the documents include e-mail
17 between you and the tobacco representatives?
18     A  No.
19     MS. OLSON: Objection. If you're suggesting
20 that such documents exist that he has any -- you
21 haven't established that he would have had any notes
22 or had any such communications. So just objection

Page 49

1  to the form of the question to the extent that's
2  what you're insinuating.
3      MS. WEISMANN: I think you have to make
4  clear -- let's not have speaking objections.
5      MS. OLSON: I object to the form of the
6  question. I just want it understood that he is not
7  by his answer admitting that he had any such
8  documents or that any such documents exist; is that
9  correct?
10     MS. WEISMANN: No, you can't ask him questions.
11     MS. OLSON: I can ask him a question. I just
12 want it understood that he is not -- that is not
13 what he is answering.
14     Q  At any time have you discussed with anyone
15 in the Office of Information and Privacy any aspect
16 of the CREW's FOIA request?
17     A  No.
18     Q  At any point have you received any
19 communication from either orally, writing, including
20 e-mail, anyone, when I say "them" I mean any
21 personnel in the Office of Information and Privacy
22 concerning CREW's FOIA request?

13 (Pages 46 to 49)

Capital Reporting Company

Page 50

1    A    No.
2    Q    I know I may have asked this, but just to
3  make sure, at any time have you received any
4  communication either orally or in writing from Jim
5  Kovakas or anyone else who handles FOIA requests on
6  behalf of the Civil Division?
7    A    Concerning CREW's FOIA request?
8    Q    Concerning CREW's FOIA request?
9    A    No.
10    Q    Have you had at any time since CREW's
11  litigation was filed provided any access to anyone
12  related to this litigation to other documents beyond
13  what you provided to counsel?
14    MR. WEINBERG: Object to the form of the
15  question.
16    A    Can you explain what you mean by "provided
17  access"?
18    Q    Were you either directly provided or made
19  available?
20    A    I haven't taken affirmative steps to do
21  that. The reason that I'm struggling with your
22  question is that I don't know that I would have to

Page 51

1  take affirmative steps for that to happen. That's
2  why I'm struggling with your question.
3    Q    To your knowledge has counsel for the
4  Government reviewed any other documents that you
5  have in your possession beyond the documents you've
6  described you've provided her?
7    MS. OLSON: Objection, that would be
8  attorney/client. I'm instructing him not to answer.
9    Q    Have you at any point since CREW's
10  document request was filed reviewed any documents in
11  the Associate Attorney General's Office?
12    A    No.
13    Q    Have you been asked to provided any input
14  on any documents within the Associate Attorney
15  General's Office with respect to a FOIA request?
16    A    No.
17    Q    Have you had an opportunity in any other
18  capacity to review Mr. McCallum's documents as they
19  relate to the tobacco FOIA litigation?
20    A    No.
21    Q    Let's marked this as Brody.
22    (Brody Exhibit No. 1 was marked)

Page 52

1    Q    Before we get to that. Going back to
2  Mr. McCallum's documents and the documents within
3  the Associate Attorney General's Office. Have you
4  ever been advised that those documents were made off
5  limits to anyone but a limited number of people,
6  when I say advised, it doesn't necessarily have to
7  be in those precise words or words to that affect?
8    MR. WEINBERG: Object to the form of the
9  question. Are you saying in connection to the FOIA
10  request?
11    Q    We can limit it in connection with the
12  FOIA request, yes.
13    A    Can I confirm with counsel for a second,
14  there's a potential privilege issue?
15    MS. WEISMANN: Okay.
16    (Off the record)
17  BY MS. WEISMANN:
18    Q    Do you know what the last question was?
19    A    Yes. Other than attorney/client
20  communications relating to this litigation I've had
21  no conversations with anyone on that subject.
22    Q    Did you have an understanding that

Page 53

1  Mr. McCallum -- that documents in Mr. McCallum's
2  office that was responsive to CREW's FOIA requests
3  that access was limited to documents in
4  Mr. McCallum's office that was responsive to CREW's
5  FOIA request?
6    MR. WEINBERG: Object to the form.
7    MS. OLSON: I think that's the same question.
8    MR. WEINBERG: Object to the form of the
9  question. He just told you he had no communications
10  other than --
11    MS. WEISMANN: I know he told me -- I think
12  your speaking objections are really a form of
13  coaching.
14    MS. OLSON: Object to the form of the question,
15  you just asked that.
16    Q    You may answer.
17    A    The answer is the same.
18    MS. WEISMANN: Read back his answer.
19    (Record was read)
20    Q    My question goes to whether or not you had
21  an understanding that Mr. McCallum's documents were
22  of limited accessibility?

14 (Pages 50 to 53)

Page 54

1    MR. WEINBERG:  Well, are you asking whether he
2  had an understanding based on anything other than
3  his conversations with counsel which would be
4  privileged?
5    MS. WEISMANN:  I'm happy to ask it that way as
6  a start, but it's my deposition.
7    Q    Do you have an understanding based on
8  anything other than attorney/client communications
9  that access to documents in Mr. McCallum's -- that
10  access to Mr. McCallum's documents was limited?
11    A    No.
12    Q    And I take it then for you to affirm or
13  deny whether or not access was limited, your
14  understanding could require to you reveal -- would
15  require you to reveal attorney/client privilege
16  information?
17    A    That's correct.  I cannot answer that
18  question without revealing attorney/client
19  communications.
20    Q    Let's turn now to Brody Exhibit 1.  Have
21  you had an opportunity to review this document?
22    A    Give me a minute.

Page 55

1    Q    Do you recognize this document?
2    A    Yes.
3    Q    Is this in fact a portion of an e-mail
4  that you received from Sharon Eubanks?
5    A    Yes.
6    MS. OLSON:  We renew our objections of
7  yesterday as to the improper disclosure of this as
8  Government property and we renew our objection that
9  it is privileged.
10    Q    Do you have any knowledge whether or not
11  Mr. McCallum spoke with Mr. Jarrett on the subject
12  of this e-mail?
13    A    No.
14    Q    And at any time did the process that's
15  described in this e-mail change?  By process I mean
16  the use of Mr. Schiffer with respect to document
17  processing was that responsibility shifted to
18  someone else?
19    MS. OLSON:  Object to the form of the question.
20  You haven't established he knows that to be the
21  process, to the extent you can answer.
22    MS. WEISMANN:  Fine.  We'll be happy to go into

Page 56

1  the contents of the e-mail.  In fact, if that's your
2  objection, we'll establish our foundation that way.
3    MS. OLSON:  No, it may not be possible to ask a
4  question that is within the scope of what the Judge
5  said was appropriate here.
6    MS. WEISMANN:  Well, you raised an objection.
7  You can't have it both ways.  Either we're allowed
8  to lay a foundation or not.
9    MS. OLSON:  I raised an objection.
10    Q    Can you answer the question that was
11  asked?
12    A    I was just going to ask you to rephrase
13  the question because I think you switched gears mid
14  question and asked two separate things, but I may
15  have misheard it.
16    Q    This e-mail, does it not, describe a role
17  for Mr. Schiffer within the OPR document production
18  process?
19    MS. OLSON:  Objection, the Judge said
20  specifically that you can ask him about --
21    MS. WEISMANN:  About his personal knowledge.
22  These are foundational questions and if we can't get

Page 57

1  them in then we can't get to his personal knowledge.
2    MS. OLSON:  Can I finish my sentence?  He said
3  you could not ask him about the substantive events
4  of the investigation and that's outside the scope of
5  this deposition.
6    MS. WEISMANN:  Are you directing him not to
7  answer?
8    MS. OLSON:  Yes, on Rule 30(b) or whatever it
9  is that deals with scope of the order.
10    Q    At any time did the role that Mr. Schiffer
11  played that is discussed in this e-mail change?
12    MS. OLSON:  Objection, same objection because
13  you've asked the same question.  You're asking about
14  the substance of the OPR investigation.
15    MS. WEISMANN:  Are you directing him not to
16  answer?
17    MS. OLSON:  Yes, just had a hearing with the
18  Judge this morning on that.
19    Q    When did you first become aware of CREW's
20  lawsuit?
21    A    I probably became aware of it in November
22  of 2005.

15 (Pages 54 to 57)

Page 58

1    Q    Who within the Department of Justice have
2  you spoken to about this litigation since it was
3  filed?
4    A    Sharon Eubanks, Lisa Olson, Daniel
5  Crane-Hirsch.
6    Q    Who is Daniel Crane-Hirsch?
7    A    He was a trial attorney on the tobacco
8  team.  Carolyn Hahn who is a trial attorney on the
9  tobacco team, Noel Kurtin.
10   Q    Who is Noel?
11   A    Is a trial attorney on the tobacco team.
12  Linda McMahon is a trial attorney on the tobacco
13  team.  Mary Jo Moltzen is a trial attorney on the
14  tobacco team.  Jeffrey Senger.
15   Q    And Mr. Senger is?
16   A    He works at Robert McCallum's office.  I'm
17  not sure of his exact title.  At one point he was
18  Chief of Staff but I don't know if that's his title.
19   Q    How many discussions did you have with
20  Mr. Senger?
21   A    Two.
22   Q    And each of them related to the FOIA

Page 59

1  litigation?
2    A    Yes.
3  MS. OLSON:  Objection.  That's fine.
4    Q    And when did these discussions take place?
5    A    About three weeks ago.
6    Q    And how long was each discussion in
7  length?
8    A    Two, three minutes.
9    Q    And was any of the discussion centered on
10  your deposition or Mr. McCallum's deposition?
11  MS. OLSON:  Objection, that may divulge
12  privileged information so.
13  MS. WEISMANN:  And what is the privilege that
14  you're asserting?
15  MS. OLSON:  It depends on what his answer would
16  be.  Let me talk with him for a second and see if he
17  can answer it.
18  MS. WEISMANN:  It's somewhat improper generally
19  to consult with counsel while a question is pending.
20  I'm willing to allow it for the preservation of
21  privilege but if I feel that it's abuse we will take
22  that issue --

Page 60

1  MS. OLSON:  Our purpose in confirming with him
2  is to find out whether he can answer the question
3  and it's our greatest endeavor to cooperate as fully
4  as possible and answer the questions as fully as
5  possible and to that end I'll confer with him for a
6  moment and see if he can answer it without divulging
7  privileged information.
8        (Off the record)
9  MS. OLSON:  He can answer your question.
10   A    Yes.
11       (Record was read)
12   A    The answer is yes.
13  BY MS. WEISMANN:
14   Q    Who generated the phone call, were these
15  phone calls or in-person meetings?
16   A    Phone calls.
17   Q    And who called who?
18   A    I initiated the discussion.
19   Q    In both instances?  I think you said there
20  were two phone calls?
21   A    There were two.  I initiated the first
22  call, the easiest way to put it.  As to who picked

Page 61

1  up the phone on the second one I'm not sure.
2    Q    Was the second a follow-up to the first?
3    A    Yes.
4    Q    And what was your purpose in making the
5  phone calls?
6    A    To ensure that everyone involved in the
7  FOIA litigation was aware of obligations imposed by
8  the District Court in the tobacco litigation.
9    Q    Have you had any conversations with
10  Mr. McCallum about CREW's FOIA request or the CREW's
11  FOIA litigation?
12   A    No.
13   Q    What documents did you review prior to
14  coming to your deposition today?
15   A    None, although I saw this document
16  outside.
17   Q    Are you talking about today?
18   A    Today.
19   Q    And have there been any other occasion
20  when you were shown that document?  By that document
21  we're talking about Brody Exhibit 1?
22   A    No.

16 (Pages 58 to 61)

Page 62

1    Q    Were you told anything about yesterday's
2  deposition?
3    A    No.
4    Q    You said you did see a copy of the
5  transcript of the February 9th, 2006 hearing?
6    A    Correct, it was appended to CREW's motion.
7    Q    And who provided you with that copy?
8    A    I don't remember if it was forwarded to me
9  by Lisa Olson or if I pulled it off of the Pacer
10  website myself.
11    Q    And what directions have you been given
12  about your deposition?
13    MS. OLSON:  Objection, attorney/client.
14    MS. WEISMANN:  Are you instructing him not to
15  answer?
16    MS. OLSON:  Yes, of course.
17    Q    Have you had any discussions with Peter
18  Keisler about CREW's FOIA request or this
19  litigation?
20    A    No.
21    Q    Have you had any discussions with Dan
22  Marine about CREW's FOIA request or this litigation?

Page 63

1    A    No.
2    Q    So you have identified the universe of
3  people within the Justice Department you have had
4  discussions about CREW's lawsuit?
5    A    I may have offhand mentioned to one person
6  or another current or former tobacco team members
7  that I was going to be deposed but beyond that no.
8    Q    Are you familiar with the editorial that
9  went into the USA Today under Mr. McCallum's name?
10    A    Yes.
11    Q    And when did you first become aware that
12  Mr. McCallum was intending to write an editorial?
13    A    The day before it appeared in the USA
14  Today, that would have been June 8th I think of
15  2005.
16    Q    Did you have any understanding of when the
17  editorial was actually drafted?
18    A    I had an understanding, yes.
19    Q    What was that understanding?
20    A    That it was drafted that day that I first
21  became aware of it June 8th.
22    Q    Do you recall if there were any

Page 64

1  discussions that you knew about within the
2  Department about the timing of when the editorial
3  should be released?
4    A    Discussions about the timing, no.
5    Q    Were you aware that there was
6  consideration that the -- to release the editorial
7  before closing arguments in the case?
8    A    No.
9    Q    You gave part of the closing argument, did
10  you not?
11    A    Yes.
12    Q    And when did that happen?
13    A    June 7th, 2005.
14    Q    As the Deputy Director of the tobacco
15  litigation team, did you attend meetings with
16  Mr. McCallum?
17    A    Yes.
18    Q    And directing your attention to the period
19  of February through the time that the -- February of
20  2005 through the time that the Department announced
21  what its proposed remedy was going to be, how
22  frequent would you say those meetings were?

Page 65

1    MR. WEINBERG:  I'm going to object to that
2  question.  It's beyond the scope of the inquiry.
3  Mr. Brody has testified at length before the
4  appropriate investigating authorities about the
5  substance of what happened during that period.  Was
6  your FOIA request filed in February of 2005?  Was
7  the processing of your FOIA request occurring?  He's
8  not here to talk about the tobacco litigation, the
9  OPR investigation or anything other than the
10  processing of the FOIA.
11    MS. WEISMANN:  Well, we got a ruling today from
12  the Magistrate Judge that we're entitled to probe on
13  one issue.  I'm not going to get into the substance
14  of either the OPR investigation or the tobacco
15  litigation.  You can certainly make your objection,
16  but unless you are going to direct him not to answer
17  in which case we're happy to go to the Magistrate
18  Judge and make a proffer.
19    MR. WEINBERG:  I'm pretty close to that.  You
20  can't use this litigation to --
21    MS. WEISMANN:  You don't need to lecture me on
22  what we can and can't do.

17 (Pages 62 to 65)

Capital Reporting Company

Page 66

1    MR. WEINBERG:  Let's see where you get, go
2  ahead.
3    MS. WEISMANN:  Are you allowing him to answer
4  the question?
5    MR. WEINBERG:  Yeah.
6    Q    How frequent were those meetings?
7    A    You mean meetings related to anything?
8    Q    No, I'm sorry, meetings related to the
9  tobacco litigation?
10   A    Well, anything in the tobacco litigation?
11   Q    Uh-huh.
12   A    Pretty frequent.
13   Q    Would you define what you mean by pretty
14  frequent?
15   A    It's hard to answer the question because
16  it's not like --
17   Q    I realize it may not be the same from week
18  to week?
19   A    Right.
20   Q    But were there periods of time where they
21  would have been daily?
22   A    I doubt they ever would have been daily.

Page 67

1    Q    Were there periods of time they would have
2  happened more than one a week?
3    A    Yes.
4    Q    And at their most intense, by most intense
5  I mean most frequent, what would you say the amount?
6    A    I imagine there were probably weeks with
7  three or four meetings.
8    Q    And did Mr. McCallum take notes during
9  those meetings?
10   A    Yes.
11   Q    Did Mr. McCallum review filings that were
12  made of the case before they were made?
13   A    Occasionally.
14   Q    Do you know whether or not he reviewed a
15  filing that the Government made on May 12th, 2005
16  which I think revolve around Dr. Fiore's testimony?
17   A    Yes, I do know.
18   Q    And what is the answer?
19   A    No.
20   Q    And you are, I assume, familiar with Judge
21  Kessler's ruling of February 28th, 2005?
22   A    You're referring to Order 886, yes, I'm

Page 68

1  familiar with Order 886.
2    Q    And do you know when Mr. McCallum became
3  aware of that ruling?
4    MS. OLSON:  Anne, object, because you were
5  asking Mr. McCallum about this yesterday and it
6  resulted in the court's voracity.  How does this relate
7  to Mr. McCallum's voracity?  If you can explain
8  that, we'd be willing to answer the question but if
9  it's just going to get into the substance.
10   MS. WEISMANN:  It's not going to get into the
11  substance.
12   MR. WEINBERG:  It is getting --
13   MS. OLSON:  Could you just explain how it's
14  going to get into the voracity?
15   MR. WEINBERG:  You can have the witness out of
16  the room and explain it to us.
17   MS. WEISMANN:  The ruling that we got this
18  morning and I wrote down the language.
19   MS. OLSON:  Information that may challenge the
20  voracity of Mr. McCallum.
21   MS. WEISMANN:  Right.
22   MR. WEINBERG:  He wasn't giving you an

Page 69

1  opened-ended -- you were talking about what is now
2  Brody Exhibit 1 and the Magistrate allowed you
3  specifically to inquire as to whether he had any
4  personal knowledge of any conversations between
5  McCallum and Jarrett.
6    MS. WEISMANN:  With respect to that and it's
7  really --
8    MR. WEINBERG:  You could literally, on your
9  interpretation, you can inquire into every
10  conversation that was ever had with Mr. McCallum to
11  see whether some place or another he said something
12  that wasn't correct and that can't be what the
13  Magistrate was ordering.
14   MS. WEISMANN:  I'm not inquire about any
15  conversations with Mr. McCallum.  All I inquired
16  about was the frequency of those conversations.  I
17  have not touched the subject matter beyond the fact
18  that they related to the tobacco litigation.
19   MR. WEINBERG:  Unless you have a specific --
20  his knowledge of --
21   MS. WEISMANN:  I'm asking about specific
22  documents that -- whether he reviewed them.  Are you

18 (Pages 66 to 69)

Capital Reporting Company

Page 70

1  directing him not to answer or not?
2      MR. WEINBERG: I guess what we're saying is
3  that we would be happy if the witness leave the room
4  and you can explain how this could possibly relate
5  to the FOIA litigation and then we can make a
6  decision as to whether to direct him or not.
7      MS. WEISMANN: Off the record.
8          (Off the record)
9  BY MS. WEISMANN:
10     Q   I'm not going to require to you answer
11  that last question. I want to go back and focus,
12  again, on the documents that you assembled for Ms.
13  Olson. Did you yourself get those documents or did
14  you delegate that to someone else?
15     A   I assembled that set of documents myself.
16     Q   And were these documents that had already
17  been segregated in some way?
18     A   Yes.
19     Q   It would be helpful if you would start by
20  describing where these documents were housed?
21     A   I was able to collect the documents from
22  the files in my office.

Page 71

1      Q   And how many filing cabinets do you have
2  in your office?
3      A   Filing cabinets that are assigned
4  personally for my use, probably five.
5      Q   And was it within those five filing
6  cabinets that these documents resided?
7      A   I think they were actually in a bookcase.
8      Q   And so these are documents that had
9  already been assembled by you before the request
10  came from counsel?
11     A   Yes.
12     Q   And what was your purpose initially in
13  assembling these documents?
14     MS. OLSON: Objection, that would violate --
15  that's privileged under law enforcement
16  investigatory privilege.
17     Q   Is that an ongoing investigation?
18     MS. OLSON: I'm going to -- my understanding is
19  that his response to that would divulge privileged
20  information or could divulge it, so I'm going to ask
21  him not to answer.
22     MS. WEISMANN: But are you talking about an

Page 72

1  ongoing law enforcement investigation, because OPR
2  has provided publicly two letters that state its
3  conclusions.
4      MR. WEINBERG: Mr. Brody has his own
5  obligations with respect to whatever may have
6  occurred here and he can't be in a position of
7  divulging information that he's not permitted to
8  divulge. So it's not necessary to -- anything to do
9  with the FOIA request. He's told you what the
10  documents consisted of. He's told you where they
11  were located in his office and he's told you they
12  were segregated for another purpose. It's of no
13  moment to you what the purpose was.
14     MS. WEISMANN: It is -- I'm entitled to know
15  whether the parameters he used in these other are
16  consistent with the parameters of our request.
17     MR. WEINBERG: He's already told you the
18  parameters that he used for these documents and
19  he'll tell you again. You don't need to know what
20  the other purpose was.
21     Q   I'm not trying to breach any privilege.
22  Let's go back to these documents. You already had a

Page 73

1  segregated group of documents in your office?
2      A   That's correct.
3      Q   And so when the request from counsel came
4  in this case that is what you provided counsel?
5      A   That's correct.
6      Q   As part of satisfying counsel's request
7  did you review any larger volume of documents or did
8  you rely on the documents you had already assembled?
9      A   I relied on the documents I already
10  assembled.
11     Q   And at any point since that request has
12  come in have you gone back to a larger body of
13  documents for purposes of this litigation?
14     A   No.
15     Q   And at any point did you direct anyone
16  else to assemble documents for purposes of this
17  litigation?
18     A   No.
19     Q   Did you direct anyone else to assemble
20  documents for purposes of responding to our FOIA
21  requests?
22     A   No.

Page 74
1    Q    And have you seen an actual copy of CREW's
2  FOIA requests to the Civil Division?
3    A    I believe so, yes.
4    Q    And do you know when you saw it?
5    A    As I said, I probably saw it at -- I
6  probably saw it about the time that it came in,
7  although I can't tell you specifically that that's
8  when I saw it.  It would have just been something
9  that was distributed to the entire team as
10  correspondence related to the case and I can't tell
11  you for certain if I actually saw it at about the
12  time it came in.
13    Q    I thought your testimony initially was you
14  were not aware of the FOIA request until the
15  litigation was filed?
16    A    Right, but what I'm saying is I could have
17  seen a copy of the request.  There were a lot of
18  FOIA requests coming in to the Department of Justice
19  following closing arguments at trial, a number of
20  those, and I don't know if CREW's was included
21  amongst these were circulated to everyone on the
22  tobacco team as was most general correspondence

Page 75
1  dealing with the case.
2    MR. WEINBERG:  So the record is clear, he has
3  given that same answer earlier in this deposition.
4    Q    The record is what it is.  It's not your
5  testimony that at that time you took any actions to
6  identify documents that might be responsive to our
7  FOIA request?
8    A    Correct.
9    Q    Are you aware whether anyone else on the
10  tobacco team or within the Civil Division was asked
11  to assemble documents that were responsive to CREW's
12  FOIA request?
13    A    At what point in time?
14    Q    At any time since the request was filed?
15    A    I am aware that.  I think Jim Kovakas was
16  doing something.
17    Q    But no one else on the tobacco litigation
18  team that you're aware of?
19    A    Correct.
20    Q    Would this include the period of time that
21  Sharon Eubanks was there?
22    A    Correct.

Page 76
1    Q    And do you know when Mr. Kovakas was
2  assembling documents?
3    A    No.
4    Q    Do you know whether it happened after the
5  litigation was filed?
6    A    Well, I don't know whether or what he
7  actually did, it's just my understanding he had some
8  involvement in it.
9    Q    You just have a general understanding that
10  he had some involvement in CREW's FOIA request?
11    A    Correct.
12    Q    You worked pretty closely with Ms. Eubanks
13  over a period of years, did you not?
14    A    Yes.
15    Q    And based on that do you feel that she is
16  an honest person?
17    MS. OLSON:  Objection, just completely outside
18  the scope of this deposition.  I'm going to instruct
19  him not answer.  It has nothing to do with the
20  voracity of Mr. McCallum.  It has nothing to do with
21  what the court said yesterday, the processing of
22  this FOIA request, and so under Rule 30 I'm going to

Page 77
1  instruct him not to answer.
2    MS. WEISMANN:  I, for the record, would note
3  that you have made the most outrageous of
4  accusations about her conduct and I think it is
5  relevant, but if you want to continue to direct him
6  not to answer?
7    MS. OLSON:  Well, yes, I am.
8    MS. WEISMANN:  I think we're done.  Thank you
9  so much for your time.
10    (Reading and signing was waived)
11    (12:10 p.m. the deposition was concluded)
12
13
14
15
16
17
18
19
20
21
22

20 (Pages 74 to 77)

Capital Reporting Company

Page 78
```
 1        I, TEAGUE GIBSON, the officer before whom
 2  the foregoing deposition was taken, do hereby
 3  certify that the witness whose testimony appears in
 4  the foregoing deposition was duly sworn by me; that
 5  the testimony of said witness was taken by me in
 6  stenotypy and thereafter reduced to typewriting
 7  under my direction; that said deposition is a true
 8  record of the testimony given by said witness; that
 9  I am neither counsel for, related to, nor employed
10  by and of the parties to the action in which this
11  deposition was taken; and, further, that I am not a
12  relative or employee of any counsel or attorney
13  employed by the parties hereto, nor financially or
14  otherwise interested in the outcome of this action.
15
16            Teague Gibson
17         Notary Public in and for
18           the District of Columbia
19
20  My commission expires:
21  June 14, 2010
22
```