# EXHIBIT 2

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLUMBIA

 3
    ------------------------------:
 4  CITIZENS FOR RESPONSIBILITY    :
    AND ETHICS IN WASHINGTON,      :
 5                                 :
         Plaintiff,                :
 6                                 :
            v.                     :  Case No.:
 7                                 :  05-2078(EGS)
    UNITED STATES                  :
 8  DEPARTMENT OF JUSTICE          :
                                   :
 9       Defendant.                :
                                   :
10  ------------------------------:

11                        Washington, D.C.
                          July 18th, 2006
12

13  Videotaped Deposition of:

14            ROBERT D. MCCALLUM, JR.,

15        Called for oral examination by counsel for

16  Plaintiff, pursuant to notice, at the District of

17  Columbia District Court, 333 Constitution Avenue,

18  N.W., Washington, D.C., beginning at 10:40 a.m,

19  before Teague Gibson of Capital Reporting, a Notary

20  Public.

21

22            *    *    *    *    *
```

Capital Reporting Company

Page 2

1          A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF:
3          ANNE L. WEISMANN, ESQ.
           MELANIE SLOAN, ESQ.
4          Citizens for Responsibility
           and Ethics in Washington
5          1400 Eye Street, N.W., Suite 450
           Washington, D.C. 20005
6          (202) 408-5565
7  ON BEHALF OF THE DEFENDANT:
8          LISA A. OLSON, ESQ.
           ELIZABETH J. SHAPIRO, ESQ.
9          U.S. Department of Justice Civil Divisoin
           20 Massachusetts Aveneu, N.W.
10         Washington, D.C. 20530
           (202) 514-5633
11
12
    ALSO PRESENT:  Harold Bayuk, Video Technician
13
14
15
16
17
18
19
20
21
22

Page 3

1          C O N T E N T S
2  EXAMINATION BY:                    PAGE
3  MS. WEISMANN                         5
4  MCCALLUM DEPOSITION EXHIBITS:      PAGE:
5  1      Written Responses          14
6  2      E-mails                    71
7  3      Document                   84
8
9
10
11
12
13
14      (Exhibits retained by court reporter)
15
16
17
18
19
20
21
22

Page 4

1          VIDEO TECHNICIAN:  This is the video deposition
2  Robert McCallum.  Today is July 18th, 2006, the time
3  is approximately 10:35 a.m.  The deposition is being
4  made in accordance with civil procedure.  My name is
5  Harold Bayuk, videographer, and will the parties
6  introduce themselves and will the court reporter
7  please swear the witness?
8          MS. WEISMANN:  Anne Weismann, counsel for
9  Plaintiff CREW.
10         MS. OLSON:  Lisa Olson, counsel for the
11  Department of Justice.
12         MS. SHAPIRO:  Elizabeth Shapiro, Department of
13  Justice.
14         MR. ROTH:  Dan Roth, CREW.
15         MS. SLOAN:  Melanie Sloan, CREW.
16
17         P R O C E E D I N G S
18  WHEREUPON:
19
20         ROBERT D. MCCALLUM, JR.,
21  called for examination, having been duly sworn to
22  tell the truth, the whole truth and nothing but the

Page 5

1          truth, testified as follows:
2
3          EXAMINATION BY COUNSEL FOR PLAINTIFF
4
5  BY MS. WEISMANN:
6      Q    Please state your name for the record?
7      A    Robert D. McCallum, Jr.
8      Q    And what is your current position,
9  Mr. McCallum?
10     A    I'm the Associate Attorney General of the
11  United States Department of Justice.
12     Q    And how long have you been in that
13  position?
14     A    Since July 2003 I think.  I don't have a
15  recollection of the specific date but that's the
16  approximate timeframe.
17     Q    Was there some period of time in which
18  were Acting Associate Attorney General?
19     A    There was.
20     Q    And prior to being Associate Attorney
21  General, what was your position at the Justice
22  Department?

Capital Reporting Company

Page 6

1    A    My position was Assistant Attorney General
2  for the Civil Division.
3    Q    What were the dates that you held that
4  position?
5    A    I began on September 17, 2001 and
6  continued in that position until I became the
7  Associate Attorney General sometime around July
8  2003, if I remember correctly.
9    Q    There was some period of time that you
10  were both Acting Associate Attorney General and
11  Assistant Attorney General?
12    A    I believe that that is correct.  I had
13  not -- technically I had not resigned as the
14  Assistant Attorney General of the Civil Division,
15  even though I believe I was the Acting Associate
16  Attorney General.  I may be wrong in that in that
17  Peter Keisler might have been the Acting.
18    Q    Okay.
19    A    Associate Attorney General until I was
20  sworn in, so.
21    Q    That's for our purposes, that's
22  sufficient?

Page 7

1    A    I just don't remember specifically on
2  that, but it's probably Peter now that I'm thinking
3  about it who was Acting Associate Attorney General.
4  He became --
5    Q    Well, sir, I don't need to know his bio.
6  We're going to focus on you, thank you.
7    A    Okay.
8    Q    And in both capacities your
9  responsibilities included supervision of what we in
10  this litigation have called the tobacco litigation,
11  the Government's case against the tobacco companies;
12  is that correct?
13    A    That's correct.
14    Q    And for purposes of this deposition I'm
15  going to refer to it as the tobacco litigation, is
16  that a sufficiently clear description for you?
17    A    It is.
18    Q    Now, let's talk about your role in the
19  tobacco litigation?
20    MS. OLSON:  Objection, relevance.
21    Q    How closely did you supervise the team?
22    MS. OLSON:  Objection, relevance.  You can

Page 8

1  answer.
2    A    Okay.  As Assistant Attorney General for
3  the Civil Division I was involved in supervising the
4  tobacco litigation trial team whenever someone on
5  the trial team raised an issue for my consideration
6  or thought that it was an issue in which I would be
7  interested and any time that I felt through whatever
8  source of information that my involvement would be
9  helpful to the tobacco litigation trial team but it
10  was sporadic and intermittent depending on when and
11  if people brought issues to my attention from the
12  tobacco litigation trial team.
13    Q    And did you review pleadings that were
14  filed in the case?
15    MS. OLSON:  Objection, relevance.  I'm not
16  going to object to every question, but just to be
17  clear for the record, this line of questioning
18  regarding the tobacco litigation is, in our view,
19  irrelevant and we -- I'm making a general objection
20  so that I don't waive any specific objection.
21    Q    My question was if during that period you
22  also reviewed pleadings that were filed in the case?

Page 9

1    A    I don't remember reviewing any particular
2  pleading during that period of time, although I may
3  have.  But if I did it would be on an extremely rare
4  occasion and generally if I received a pleading I
5  wouldn't necessarily go through it and review it if
6  someone sent me from to the tobacco litigation trial
7  team, unless there was some specific reason for it.
8    Q    Did your role change when you became the
9  Associate Attorney General, and by that I mean did
10  your role in terms of your level of supervision with
11  the tobacco litigation team change?
12    A    It did.
13    Q    And how did that change?  What was that
14  change?
15    A    Well, as Associate Attorney General I had
16  much broader responsibilities and a much larger
17  portfolio so my supervision of the tobacco
18  litigation trial team became even more rare and
19  infrequent.  The responsibility for supervision of
20  the tobacco litigation trial team remained, if you
21  will, with the Assistant Attorney General for the
22  Civil Division who at that time was Peter Keisler.

3 (Pages 6 to 9)

Capital Reporting Company

Page 10

1    Q    And did there come a time in the,
2  focussing specifically, late winter and early spring
3  of 2005 when your supervisory role changed again in
4  any way?
5    A    I wouldn't say my supervisory role changed
6  in terms of responsibilities.
7    Q    Let me -- my question was not clear
8  enough.  What I mean by that is did there come a
9  time when you actually had more contact than you
10  have just described with the tobacco litigation team
11  or at least senior members of that team?
12    A    Intermittently there were times at which I
13  would have greater contact with senior members of
14  the tobacco litigation trial team and it varied.  I
15  can't specifically point to the timeframe that
16  you're talking about and say yes, then, but no,
17  sometime later, but there were certainly periods of
18  time when my contact was more frequent than it had
19  been previously.
20    Q    And did that include evening meetings
21  weekend meetings perhaps even over holiday weekends
22  such as Memorial Day weekend?

Page 11

1    A    Memorial day of 2005?
2    Q    And five?
3    A    Yes, and in that timeframe certainly.  If
4  2005, yes, I'm trying to make sure that it wasn't
5  2006.
6    Q    The period of time I'm talking about is
7  2005?
8    A    Certainly 2005.
9    Q    And when you would meet with the members
10  of the tobacco team however many you met with did
11  you take notes?
12    A    I did take notes, yes.
13    Q    And --
14    A    From time to time, not necessarily every
15  time but generally I would take notes of our
16  meeting.
17    Q    And what would you do with those notes?
18    A    I would put those notes in a Manila
19  redwell like the one you have on your desk.
20    Q    And did you keep them in a filing system
21  relating to the tobacco litigation?
22    A    Filing system gives it a dignity that it

Page 12

1  does not deserve in that -- but I did keep them in a
2  Manila redwell and maintained it but I don't -- when
3  you talk about a filing system, I have this concept
4  of a numbered file that's identified somewhere
5  within a formalistic system and I'm sure that lots
6  of people on the tobacco litigation trial team and
7  in my office and in the Civil Division have such
8  filing systems, but with respect to the Associate's
9  Office I didn't have a formal number that was
10  related to some sort of file system.
11    Q    And do you still have those notes today?
12    A    I do.
13    Q    And at any time did you identify those
14  notes as responsive to a request from the Office of
15  Professional Responsibility when it conducted its
16  investigation?
17    A    I am sure that those notes were provided
18  to them, although I did not myself pick up the
19  folder and take it to the individuals that were
20  involved with the tobacco litigation and the Office
21  of Professional Responsibility.
22    Q    Now, is it not true that you actually

Page 13

1  attended the opening arguments in the tobacco
2  litigation when the Government presented its opening
3  argument?
4    A    I did attend the opening arguments.  I'm
5  trying to remember whether I attended each and every
6  portion of the opening arguments or whether I was
7  absent at any point.  I think I attended the
8  entirety of it but I'm not sure of that.  I might
9  have been absent at some point but.
10    Q    How many days -- do you recall how many
11  days that consumed?
12    A    Gosh.
13    Q    But it was multiple days?
14    A    I don't have that recollection.
15    Q    In fact?
16    MS. OLSON:  Can he finish answering?
17    A    I just don't recall whether it was more
18  than one day.  I don't think it was more than one
19  day but it might have been.
20    Q    And in fact you gave a press conference
21  afterward at the courthouse, did you not?
22    A    I don't know that it was afterwards.  I do

4 (Pages 10 to 13)

Capital Reporting Company

Page 14

1  remember giving a press conference and it might have
2  been in the middle of it.
3      Q    In its proximity of time?
4      MS. OLSON:  I'm sorry, would you mind just not
5  interrupting, if he could just finish his answer we
6  appreciate it.
7      A    I don't know whether it was at the
8  conclusion of the opening statement or whether it
9  was in the middle of it at noontime or thereafter or
10 I don't recall.
11     Q    Okay.
12     A    Now that I'm thinking about it I think
13 that I did miss some of the opening statement
14 because it's my recollection that I was not around
15 at some point that someone else from the Department
16 of Justice gave a -- made some press comments but
17 that might have been at the conclusion of the
18 defendant's opening statement.
19     Q    Can we have this marked as I guess CREW
20 Exhibit 1.
21         (McCallum Exhibit No. 1 was marked)
22     Q    Sir, what I have just handed you is the

Page 15

1  written responses that you gave to the Senate
2  Foreign Relations Committee on June 19th, 2006
3  pursuant to your nomination to be Embassador to
4  Australia?
5      A    Uh-huh.
6      Q    Do you recognize this document?
7      A    I do recognize the first page.  It
8  contains more than the question of Senator Luger.
9      Q    Right.  It also contains responses to
10 questions from Senator Biden as well.  I'd like to
11 focus your attention?
12     A    Just a second, if I can just look at it?
13     Q    I'd like to direct your attention on your
14 response to question number 4 from Senator Biden,
15 it's about halfway through the package, and I'm not
16 going to ask you now to read all of it but there
17 was -- let me ask you this question first.  Did you
18 write these responses?
19     A    I did.
20     Q    In part of your response you talked about
21 an order that Judge Kessler issued on February 28th
22 that was Order Number 886 and you referred to the

Page 16

1  language that she used in that order where she
2  referred to the body blow that the Government's case
3  had been dealt by the D.C. Circuit; isn't that
4  correct?
5      A    That is correct.  She did so refer.
6      Q    Were you aware of that opinion when it
7  came out?
8      A    I was.
9      Q    And --
10     A    And let me make sure that you are
11 understanding what I say.  I was aware of the
12 Circuit Court opinion, then I was aware afterwards
13 that Judge Kessler had entered some order and I
14 don't know specifically that it was 886 or recall
15 that I knew that.  I don't specifically recall
16 reading the order but I may have, but I was aware
17 that she was critical, if you will, of the arguments
18 that the Department of Justice lawyers had made in
19 response to some inquiry that she made about
20 Judge Sentelle's opinion.  I believe that -- that's
21 sort of a general recollection I had.
22     Q    As a result of being generally aware that

Page 17

1  she had been critical, did that cause you to get
2  more involved in what the Government filed?
3      A    Not to the extent of reviewing any
4  pleadings but I -- and I don't remember anything
5  specifically, but I do a have a general recollection
6  that I met with various members of the tobacco
7  litigation trial team about Judge Sentelle's opinion
8  and Judge Kessler's positions or reaction to it and
9  these discussions, gosh, occurred over -- it's not
10 on one occasion but on.
11     Q    Multiple occasions?
12     A    Multiple occasions that there were
13 discussions about the opinion, the position of the
14 trial judge and the consequences to the case and the
15 arguments that had been presented by or the -- not
16 the arguments but the positions that had been
17 articulated by Judge Sentelle and his opinion.
18     Q    Now, you have publicly identified yourself
19 as the individual who made the ultimate decision at
20 the Department of Justice about what the
21 Government's proposed remedy should be; isn't that
22 true?

5 (Pages 14 to 17)

Capital Reporting Company

Page 18

1    A    That is true.
2    Q    And at what point in time did you become
3  actively involved to the point that you felt you
4  were capable of making that decision?
5    A    Well, the question is my capacity to make
6  that decision.  I'll take that as a question
7  regarding the legal capacity to make that decision
8  rather than the intellectual talent.
9    Q    No, I'm not in any way impeding your
10  intellectual talent?
11    A    To be able to do that or the legal
12  expertise or acumen to be able to determine what the
13  right decision was.  I'm confident that there will
14  be different people that will have different
15  opinions as to my expertise and intellectual
16  capacity.  However, when I became Associate Attorney
17  General it was clear that my legal capacity was to
18  resolve issues in which there might be differences
19  of opinion or different views expressed within
20  inside the Department of Justice.  As those views
21  and opinions percolated up what I will call the
22  chain of command so that in your days when you were

Page 19

1  with the Civil Division in federal programs if the
2  branch director disagreed with a decision that you
3  made or had a different opinion with what you were
4  recommending then it would go to the Assistant
5  Attorney General in the Civil Division.
6         If you were still dissatisfied and thought
7  that it really deserves some greater consideration
8  it would go to the Associate Attorney General and
9  then to the Deputy and then to the Attorney General
10  and ultimately if it was important enough to the
11  President of the United States.
12    Q    Let me be a little clearer in my question.
13  I don't want to get bogged down in the decision
14  making processes of the department.  What you have
15  described so far is a fairly sporadic involvement
16  with the day-to-day details of the tobacco
17  litigation; isn't that correct?
18    A    That's correct.
19    Q    And you also described a process where you
20  did not routinely read filings that the Government
21  made and even if you did you didn't have very
22  specific memories necessarily what any individual

Page 20

1  filing or even any individual ruling of the court
2  said; isn't that correct?
3    MS. OLSON:  Object to your characterization of
4  what he just said, the record speaks for itself.
5    Q    I don't want to mischaracterize.  What I'm
6  trying to understand is in order to make this final
7  decision on behalf Of the Department, did there come
8  a time that you emersed yourself more intensely of
9  the case, what was going on in the case, the
10  opinions of the court, et cetera?
11    A    That depends on how one would define
12  immersing one's self more intently.
13    Q    Well, more intently than what I have just
14  described that had been your practice up until this
15  point?
16    MS. OLSON:  Well, I object to your
17  mischaracterization of what he just testified about.
18  Ask him a question and he'll answer it but don't
19  characterize --
20    Q    I've asked the question.
21    MS. OLSON:  I object to the form of that
22  question it's vague, it's misleading, you've

Page 21

1  mischaracterized his testimony and I'll ask you to
2  rephrase the question so he can answer it properly.
3    Q    Do you understand the question?
4    A    Read it back to me now, I have forgot the
5  question.
6    Q    The last question?
7    A    So I'll then be able to tell you whether I
8  understand it or not.
9         (Record was read)
10    A    I don't understand the question because it
11  was the preceding questions or series of questions.
12    Q    That's fine.  Let's go at it a different
13  way because it is not my intent to mischaracterize
14  your testimony.  Let me be very clear about that?
15    A    All right.
16    Q    Let's talk about what you did do in order
17  to be able to reach that decision.  Now you have
18  publicly referred to the fact that you got advice
19  from the criminal division or the Office of
20  Organized Crime -- the RICO -- the component of
21  criminal that dealt with RICO; is that not correct?
22    A    I did receive input from the Organized

6 (Pages 18 to 21)

Page 22

1  Crime and Racketeering Section, one member of which
2  was, or one of the members of the Organized Crime
3  and Racketeering Section was a member of the tobacco
4  litigation trial team.
5      Q    And that would be Frank Marine, correct?
6      A    That was Frank Marine.
7      Q    When did you receive his recommendation?
8      A    I certainly don't remember all the dates,
9  but over a series of months there were issues
10  regarding and discussions regarding appropriate
11  remedies under the Sentelle Circuit Court opinion.
12      Q    So it's your testimony Mr. Marine raised
13  issues about the remedy over a period of months
14  starting -- can you at least pin it down as to what
15  month these may have started?
16      A    Over remedies.
17      Q    Yes, that's what we're talking about --
18      A    Talking about remedies.
19      Q    Yes.
20      A    That the Government might be speaking. I
21  don't specifically remember a date that one would
22  say October the 1st, 1999 is when it began, but I

Page 23

1  can tell you that it was a number of issues in the
2  months preceding the closing arguments, that is my
3  general recollection.
4      Q    And when you said in response to Judge
5  Biden's question going back to Exhibit 1 that career
6  attorneys in the organized crime and racketeering
7  section of the Criminal Division including the
8  senior litigation counsel who was a member of the
9  trial team gave a portion?
10      A    I'm sorry, where are you reading?
11      Q    Recommended, I'll tell you in a minute,
12  recommended revising the non-disgorgement remedies
13  to connect them to future violations of RICO.
14  Unfortunately this doesn't have page numbers. It
15  is.
16      A    I'll find it. I got it.
17  MS. OLSON:  What question is it?
18      A    It's question number 4.
19      Q    It's all question number 4.
20      A    There are a number of questions.
21  MS. OLSON:  I see.
22      Q    When you were talking in this response

Page 24

1  when you referred to input that you got
2  recommendations revising the non-disgorgement
3  remedies, were those recommendations again that they
4  came over a period of months?
5      A    If one defines non-disgorgement remedies
6  as all of the other remedies that were in the case,
7  yes, it was over a period of months and that's the
8  way I intended it, i.e. there was a disgorgement
9  remedy and that was very specifically ruled upon by
10  Judge Kessler taken up on appeal and reversed by
11  Judge Sentelle's opinion. So that was one
12  particular type of remedy and there were a number of
13  other remedies that were mentioned in the opening
14  statement and I was referring to all those as
15  non-disgorgement remedies.
16      Q    Now you also have referred publicly to the
17  fact that you spoke with members of the trial team
18  and got their recommendations as to remedies; is
19  that correct?
20      A    Yes. Mr. Marine was a member of the trial
21  team and there were certainly others as well.
22      Q    Did you talk with the senior counsel in

Page 25

1  the Civil Division that was involved with the trial
2  team about the proposed --
3      A    Can you give me a name?
4      Q    Sharon Eubanks and Steve Brody?
5      A    Sharon is the -- the way I identify her is
6  the Director of the tobacco litigation trial team
7  and Steve Brody is the Deputy Director and that's
8  why I didn't understand when you were talking about
9  senior counsel. There were lots of different
10  members of the tobacco litigation trial team.
11  Certainly received input from both your -- now your
12  colleague, as I understand it, Ms. Eubanks at CREW,
13  and from Mr. Brody as well.
14      Q    And in fact did you not receive a memo
15  from them that was dated May 30th, 2005 and that was
16  referenced in the New York Times article with their
17  views on the proposed -- your proposed settlement?
18      A    I don't remember the date of the memo that
19  was referenced in the New York Times article but I
20  certainly received a memo from them and other
21  communications, oral and I believe e-mail.
22      Q    And did you retain copies of their e-mail

Page 26

1  communications?
2      A    Absolutely.
3      Q    And are they in your files however you
4  have described them today?
5      A    They are not paper copies in the redwell
6  that I maintained on the tobacco litigation.  Those
7  e-mails are in the e-mail system of the Department
8  of Justice and I, not being a computer knowledgeable
9  individual, I can't tell you where or how but I
10  understand from the people who are computer
11  knowledgeable that they are there.
12      Q    And so was it not your practice then to
13  print out a copy of an e-mail?
14      A    Lord, no.  I would have four rooms full of
15  paper if I did that on the various litigating
16  divisions, the programmatic components, if I printed
17  every e-mail out so I don't print hardly any e-mails
18  out.
19      Q    Were you aware that Judge Kessler issued a
20  preservation order in the tobacco litigation?
21      A    I don't recall any order but I certainly
22  preserved everything that I had regarding it.

Page 27

1      Q    But you have no specific recollection that
2  she issued a specific preservation order?
3      A    As we sit here today I do not recall a
4  specific preservation order, although it was my --
5  always my understanding that I was to preserve
6  basically everything and that's why I had a redwell
7  for those things that I did either print out or
8  think were significant or that I made any notes on I
9  preserved those things.
10      Q    Now, going back to the timeframe and what
11  events happened when.  At sometime on or before May
12  9th did you not direct or have one of your staff
13  direct the trial team to ask Mr. Meyers to change
14  his testimony or scale back the testimony that he
15  was going to make in this case?
16      A    I believe that that totally
17  mischaracterizes what was -- what my understanding
18  of my direction was.
19      Q    And what is your understanding of your
20  direction?
21      A    My understanding of Mr. Meyers' testimony
22  was that Mr. Meyers was a fact witness who was going

Page 28

1  to give opinion testimony about remedies, some of
2  which the organized crime and racketeering section
3  believed to be unconstitutional.  So there were two
4  issues with respect to the Mr. Meyers' testimony.
5  Number one, the admissibility of those portions of
6  his testimony that related to opinions on remedies
7  since he was not listed as an expert witness.  And
8  then number two there were issues concerning the
9  constitutionality of some of the remedies or
10  suggestions that he was to make.  As you well know
11  from dealing with an expert witness, an expert
12  witness is not your client, nothing that you say to
13  an expert witness is attorney/client privileged
14  and --
15      MS. OLSON:  Can --
16      Q    I don't mean to cut you off.
17      A    You asked me about what direction I was
18  giving and in order to explain that to you I need
19  to --
20      MS. OLSON:  Please let him.
21      A    -- explain the background of the matter.
22  So the issue was my direction and vision someone

Page 29

1  going to Mr. Meyers and saying here is an issue as
2  to whether or not this is Constitutional.  If this
3  is indeed your opinion, would you also be willing to
4  give testimony that says, Mr. Meyers, in the event
5  that Judge Kessler determined that the remedy that
6  you suggest here is unconstitutional, would you have
7  any alternative remedy that you would think,
8  although not as good as the remedy you suggest,
9  would be a beneficial remedy for the court to
10  consider and then to see if he would be willing to
11  give testimony as to a particular remedy that would
12  be clearly Constitutional.
13          It would also my understanding at time
14  that whoever approached Mr. Meyers would in effect
15  say would you object if I didn't ask you a question
16  that provoked your opinion that unconstitutional
17  remedies or potentially unconstitutional remedies
18  should be imposed and if the witness objected and
19  said no, that's my opinion, then I'm going to, if
20  asked, I'm going to and I want you to ask me that,
21  I'm going to give it, then you ask as a trial
22  lawyer, you well know, that you -- that you allow

8 (Pages 26 to 29)

Page 30

1  the expert witness to give whatever testimony that
2  they are honestly going to give as their opinion,
3  but you run the risk if you have Mr. Meyers up there
4  and he is asserting that you ought to take all the
5  tobacco industry executives out and shoot them, that
6  opinion might lose him credibility with the court.
7  And, similarly, if he is suggesting unconstitutional
8  remedies with regard to his testimony you run the
9  risk of his losing credibility with the court, even
10  if they're First Amendment claims.
11       And therefore, it is wise trial strategy
12  from time to time to try to form your questions in a
13  way that avoids expert witness testimony that will
14  injury their credibility with the court. And that
15  was the first issue.
16       The second issue had to do with whether he
17  was giving opinion testimony or not when he had not
18  been listed as an expert witness. He was merely a
19  fact witness. And concern was expressed the way his
20  testimony was going to be presented would result in
21  it being struck in its entirety and that is in fact
22  what happened.

Page 31

1       Now, I do not know who approached
2  Mr. Meyers. I do not know what they said to
3  Mr. Meyers. But I know what my thoughts and my
4  directions to people were and, therefore, I don't
5  agree that in any way one as a trial lawyer would
6  try to have an expert witness, quote, cut back on
7  their testimony and give testimony that they didn't
8  believe. You would have to allow an expert witness
9  to give the testimony that they honestly believed
10  even if it was perhaps not the testimony that you
11  would like for them to have given.
12       Q    And what's your recollection of the
13  timeframe in which -- was it within a day or so of
14  when his testimony was scheduled to be presented to
15  the court?
16       A    I don't know what you mean by testimony
17  presented to the court because there were different
18  sets of circumstances, they were, one, put I
19  believe --
20       Q    It was -- my understanding is his
21  testimony was due with the court on May 9th?
22       A    I have no idea.

Page 32

1       Q    His written testimony?
2       A    No idea, nor do I relate that to any time
3  of these issues coming up. But the way I understood
4  the presentation of "testimony" as you've used that
5  term was that something in writing would be
6  submitted to the court and then at some point later
7  the witness would appear in court and be subject to
8  cross-examination and then redirect to rehabilitate
9  the witness and so I don't know what those time
10  frames were.
11       Q    What I'm focussing on was the time period
12  when his written testimony had to be submitted to
13  court?
14       A    I have no idea when that was.
15       Q    Accept my premise that if it was on May
16  9th which is my understanding then your direction
17  would have been given before that, would it not?
18       A    I have -- I presume, but I don't recall
19  the date or whether it was given before because one
20  I presume could modify or amend one's testimony or a
21  witness's testimony but I have a general
22  recollection that it was before Dr. Meyers, it is

Page 33

1  Dr. Meyers, right?
2       Q    Yes, I believe.
3       A    Doctor, I think it's Dr. Meyers. It is
4  before he testified according to a general
5  recollection that I have, but when you're getting
6  down to May 9th and what occurred this day and what
7  occurred that day I'm a little bit worried that I
8  may mislead you.
9       Q    I'm just trying to give you dates to
10  determine if it was before or after.
11       A    It's my recollection that it would have
12  been before and I would be surprised if it was
13  after. I would think that I would have remembered
14  that but at my age you can't ever be sure of that.
15       Q    And then three days later the Government
16  filed a pleading that was also the subject on May
17  12th and it was your response again to a question of
18  Senator Biden that you were unaware of that filing?
19       MS. OLSON: I'm going to renew my objection.
20  The purpose of this deposition as ordered by the
21  court.
22       MS. WEISMANN: If we're going to have a

Page 34

1  speaking objection we're going to have to go off the
2  record.
3      MS. OLSON:  No, I want it to be on the record.
4      MS. WEISMANN:  I'm not going to use up our
5  time, then we're not going to count it towards the
6  witness' time.
7      MS. OLSON:  Well, I want it on the record.  You
8  have not asked a single question about the
9  processing of this FOIA request.  The purpose of
10 this deposition as ordered by the court was to
11 inquire into whether the Government engaged in bad
12 faith in the processing of the FOIA request.  There
13 has not been a single question on that subject so
14 far.  And I think we have patiently waited for it to
15 become clear how what you are asking is at all
16 relevant to the purpose of this deposition.  So at
17 this time I'd ask you for a proffer as to how this
18 questioning relates to the processing of the FOIA
19 request that is the subject of this litigation and
20 I'm going to ask the Magistrate to become involved
21 if that isn't clear because we are so far afield.
22     MS. WEISMANN:  Well, we will continue with our

Page 35

1  questioning unless you're directing him not to
2  answer.
3      MS. OLSON:  Well, I would like to object and
4  have the Magistrate --
5      MS. WEISMANN:  Are you directing -- the
6  Magistrate was clear that the proceeding was that
7  you need to either make clear that you're directing
8  him to answer or not.  Are you directing him?
9      MS. OLSON:  Yes, at this time, yes, I would
10 like some --
11     MS. SLOAN:  Call the Magistrate?
12     MS. WEISMANN:  Yeah, let's go off the record.
13     VIDEO TECHNICIAN:  The time is 11:12 a.m. we're
14 going off the record.
15     (Off the record)
16     JUDGE KAY:  I understand there's a problem.
17     MS. OLSON:  Yes, Your Honor, it's a problem
18 that I anticipated and we talked about in chambers
19 before.  The court's order says the purpose of these
20 depositions is to explore "the reasons behind the
21 delays in processing CREW's FOIA requests.  There
22 has not been a single question yet this morning on

Page 36

1  that subject and I'm invoking Rule 30(d) which says
2  that any objection during a deposition, while a
3  person may instruct the deponent not to answer to
4  enforce a limitation directed by the court and at
5  any time during a deposition on motion of a party or
6  of the deponent and upon a showing of the
7  examination's being conducted in bad faith the court
8  may cease the -- or bring an end to the deposition.
9      JUDGE KAY:  Okay.
10     MS. OLSON:  I'm questioning what the purpose of
11 this deposition is, it is certainly not to find out
12 about why or if there were any delays in the
13 processing of the FOIA requests.  The questions this
14 morning have pertained solely to Mr. McCallum's
15 involvement in the tobacco litigation, to his
16 involvement in the OPR investigation, to what kind
17 of files he keeps on the tobacco litigation.
18        Now we're getting into areas that are
19 skirting the deliberative process privilege and his
20 thought processes about what the witnesses should
21 testify about, we're just now starting to get into
22 that.  And so we object to the extent they're

Page 37

1  intending to get into the deliberative process, but
2  we are certainly off point here and how many more
3  hours of this are we going to do.
4      I asked Ms. Weismann to make a proffer.
5  She refused.  She said she had no obligation to do
6  so.  But I'm asking the court for there to be some
7  explanation of a link between the questions that
8  have been -- we've been asked for almost an hour now
9  and the purpose of this deposition, thank you.
10     JUDGE KAY:  Ms. Weismann.
11     MS. WEISMANN:  Your Honor, this is the first
12 time hearing that they're doing this under Rule 30.
13 I want to be clear that I refused because the only
14 objection raised was a relevance one and I did not
15 understand that we had an obligation to discuss the
16 relevance.  You had made it clear that that was not
17 a basis on which to direct a witness not to answer.
18 But I think we are certainly entitled to establish
19 some background by way and by that the questions
20 have been intended to get at the level of
21 Mr. McCallum's involvement with the underlying
22 tobacco litigation.

Page 38

1    JUDGE KAY:  Why is that, Ms. Weismann?
2        MS. WEISMANN:  Because I think it goes to
3    motive, I think we're entitled to probe the
4    existence of documents, I think we're entitled to
5    probe how adequate the Government's response to date
6    has been.
7        JUDGE KAY:  What do you mean by motive, I'm not
8    sure I understand, motive in terms of why he would
9    have delayed.
10       MS. WEISMANN:  Yes, exactly.
11       JUDGE KAY:  The production of documents because
12   the Government is motivated against what, the
13   tobacco people who are bringing --
14       MS. WEISMANN:  May I make a request, Your
15   Honor, that the witness not be present for this.
16       JUDGE KAY:  All right.  Mr. McCallum, under the
17   circumstances if you would stay outside for a
18   moment.
19       MS. WEISMANN:  Your Honor, we know why we're
20   here, but it is a fact that this litigation relates
21   to two FOIA requests that sought documents about a
22   highly controversial issue and that surrounding that

Page 39

1    in the public domain there were a great many
2    questions raised about whether Mr. McCallum was
3    influenced by political considerations, there were
4    allegations made that he --
5        JUDGE KAY:  Political considerations in terms
6    of the Government's decision to change.
7        MS. WEISMANN:  His decision to change the --
8        JUDGE KAY:  To change the addendum request.
9        MS. WEISMANN:  And it was a significant change.
10       JUDGE KAY:  Is that an issue before Judge
11   Sullivan?
12       MS. WEISMANN:  I'm trying to link, you've asked
13   me to Judge Sullivan allowed this discovery because
14   he was very troubled by the very significant delays
15   in the processing of our requests especially for the
16   records of the Associate Attorney General.  And we
17   think we're entitled to explore whether that was
18   purposeful on their part because we believe that
19   there are documents that they do not want to bring
20   to light.
21           Now we are not going to get into the
22   underlying rationale for his decision.  We

Page 40

1    absolutely agree that that is not at issue, but I
2    think I'm entitled to explore and establish what his
3    role was vis-a-vis the tobacco litigation and that's
4    all I've been trying to do.
5            Now I would point out that I have
6    attempted on a number of occasions in my questions
7    to steer Mr. McCallum because I think he has gotten
8    somewhat far afield in his responses and has been
9    somewhat long-winded and I have attempted to steer
10   him more directly and every time I have tried to do
11   that counsel has objected and insisted that he has
12   the right to finish his answer.  So I do feel that
13   in part that has kept us much longer than I
14   certainly intended on what I consider to be
15   background questions.
16       JUDGE KAY:  Give me an example of the type of
17   background questions that you are inquiring of
18   Mr. McCallum.
19       MS. WEISMANN:  I have been inquiring about what
20   his specific role was vis-a-vis the tobacco
21   litigation team and I have also been asking and
22   attempting to ascertain what kinds of records he

Page 41

1    created.  So, for example, I have asked him if he
2    took notes of meetings that he had on the remedy
3    with various people and I think that certainly fair
4    game for us to ascertain what potentially responsive
5    documents there are so we can match that up with
6    what the department in fact has said it has.
7        JUDGE KAY:  The underlying case was what here,
8    you're not talking about the case that was here?
9        MS. WEISMANN:  Yes, I am.
10       JUDGE KAY:  The one with Judge Kessler?
11       MS. WEISMANN:  That's correct.
12       JUDGE KAY:  Which has yet to be resolved?
13       MS. WEISMANN:  Which has yet to be resolved.
14       JUDGE KAY:  Your client was the plaintiff in
15   that case?
16       MS. WEISMANN:  No, we are a public interest
17   watchdog group.
18       JUDGE KAY:  You had no involvement?
19       MS. WEISMANN:  No, were not a party -- we filed
20   two FOIA requests and that's what this lawsuit's all
21   about because we believed it was important to be in
22   the public domain exactly what the department did

Page 42

1  and why and what we were able to demonstrate to
2  Judge Sullivan is that the way our request was
3  handled was significantly, significantly, different
4  than the median processing time for the way the
5  records from the Associate Attorney Generals --
6      JUDGE KAY: I think pursuant to that request
7  Judge Sullivan decided that you were entitled to
8  determine whether there was good faith or bad faith.
9      MS. WEISMANN: Correct.
10     JUDGE KAY: On the part of the Government in
11  terms of processing the request for documents.
12     MS. WEISMANN: Right, but, Your Honor, good
13  faith encompasses, it seems to me, issues of motive.
14  If there were bad faith I think it's fair to explore
15  why and we believe there could have been a real
16  incentive.
17     JUDGE KAY: Bad faith in terms of processing?
18     MS. WEISMANN: Yes. The problem here, Your
19  Honor, is that they did nothing. The problem here
20  is that they said they were expediting our request
21  and it took them seven months to get back to us. So
22  when we talk about processing what we're talking

Page 43

1  about and what Judge Sullivan was concerned about
2  was the very significant delay in how they handled
3  our request and our point is simply this, we believe
4  there is a very good chance that that delay was
5  motivated by a desire to ensure that these documents
6  never see the light of day and I think that is a
7  fair avenue of inquiry here.
8      JUDGE KAY: Are you suggesting for a moment
9  that they were destroyed.
10     MS. WEISMANN: No, we have no evidence that
11  they were destroyed.
12     JUDGE KAY: Just a delay in producing them.
13     MS. WEISMANN: The delay in even acknowledging
14  what they have. They haven't yet even told us what
15  they have, much less claimed any exemptions so we
16  can get to the point. They've done virtually
17  nothing. They've given us no information whatsoever
18  about the substance of what they have and we find
19  that troubling.
20     JUDGE KAY: Let's assume, Ms. Weismann, you
21  resume the line of questioning with Mr. McCallum and
22  ascertain that he indeed was prejudiced and was not

Page 44

1  supportive of your request for the production of
2  documents, then what, that in and of itself showed
3  bad faith, maybe, but that's something that
4  ultimately Judge Sullivan will have to come to grips
5  with.
6      MS. WEISMANN: He's also not our only deponent
7  and I think it will -- there are certainly issues of
8  his credibility then if we are able to show direct
9  conflicts between what he's claiming and what is in
10  fact the case. I think given the subject matter of
11  bad faith we are entitled some latitude here and I
12  don't think we've strayed over it.
13         As I said, to the extent that the
14  testimony has gone on as long as it has on these
15  issues I think is more attributable to the fact that
16  Mr. McCallum in the interest of absolute
17  completeness of accuracy has wanted to go and as I
18  said I'm happy to try to redirect him back to very
19  specific and narrow questions, but counsel has not
20  allowed that to happen.
21     JUDGE KAY: Narrow questions with respect to
22  what, his decision making process or what he did

Page 45

1  with respect to, if anything, with respect to the
2  FOIA request.
3      MS. WEISMANN: Well, at this point I haven't
4  been able to get through our background questions
5  because.
6      JUDGE KAY: I understand. Let me hear from
7  Ms. Olson.
8      MS. OLSON: Your Honor, the plaintiff's putting
9  the cart before the horse. They're trying to
10  inquire in a motive when they haven't asked a single
11  question to establish whether Mr. McCallum was even
12  involved in the processing of their FOIA request or
13  if he was involved he was -- there was any delay and
14  if he was responsible for that delay. They haven't
15  asked any questions to establish foundation for
16  inquiring into motive and I also just want to point
17  out as an aside that I made a blanket objection that
18  this is outside the scope of this deposition at the
19  outset. I have not objected to every question and I
20  have asked --
21     JUDGE KAY: It's being taped, is it not, that's
22  something that can be reviewed.

Page 46

1  MS. OLSON: Right. And I have also asked that
2  he be allowed to respond fully to the question. And
3  I also want to point out that Mr. McCallum was
4  completely cleared of any wrong doing by OPR and she
5  has already -- she says she hasn't asked questions
6  about the rationale for his decision in the tobacco
7  litigation but that's all she's asked about. She's
8  asked about his treatment of expert witnesses, about
9  his Congressional testimony, about advice he got
10 from the RICO team and the issue we're supposed to
11 be focussing on here whether Mr. McCallum I think we
12 should start out by finding out whether he was
13 involved in this FOIA processing because I can tell
14 you he'll say he was not.
15 MS. WEISMANN: Your Honor, may I respond,
16 that's not a fair characterization. All I've been
17 trying to do is establish a time line and I've used
18 these external events as ways to try to jog his
19 memory about the time line. To suggest that we have
20 been delving into the deliberative processes is
21 absolutely false and I would note that there has not
22 been a single objection on the privileged grounds so

Page 47

1  far.
2  JUDGE KAY: This is all on tape, so we can see
3  this. Ms. Weismann, I'm going to direct you at this
4  time without prejudice to revisit perhaps some
5  limited -- I'm not ruling on this at all -- some
6  limited inquiry beyond that, this area. But I'm
7  going to limit you to inquire of Mr. McCallum as to
8  his role, if any, in terms of processing the FOIA
9  request. Now, when you've completed your inquiry on
10 that area, then I will hear you based upon what he
11 said as to whether or not you can go beyond that
12 area. Fortunately I think Judge Sullivan will be
13 here the rest of the day but if you disagree with my
14 determination ultimately on that you can go up and
15 speak to Judge Sullivan but my understanding and
16 I've spoken to Judge Sullivan he discussed this
17 matter with me before he referred it to me that the
18 purpose of this inquiry was to ascertain what role
19 the witnesses that you presented to him was
20 potentially deponents are played in the FOIA request
21 and whether or not the Department of Justice acted
22 in bad faith in the seven or eight month delay in

Page 48

1  deciding what, if any, documents should be produced.
2  So I'm going limit you at this time, you may go
3  forward if you so wish and ask Mr. McCallum at the
4  end of the inquiry, I would be happy to hear you as
5  to why you believe that it should go beyond that in
6  terms of the background, and see what you can do.
7  All right. If that's not satisfactory, you can
8  appeal what I've just said up to Judge Sullivan. At
9  this time I don't know whether he'll hear you right
10 now but. Good. Go ahead, see what you can do.
11 MS. OLSON: Thank you.
12 (Off the record)
13 VIDEO TECHNICIAN: The time is 11:39 the
14 deposition of Robert McCallum. We're back on the
15 record.
16 BY MS. WEISMANN:
17 Q    Mr. McCallum, did there come a time when
18 you became aware that CREW had filed a Freedom of
19 Information Act request for documents related to
20 your decision in the tobacco litigation?
21 A    I'm sure they must have. I don't remember
22 specifically being told about it or anything of that

Page 49

1  nature but I do have a general recollection that at
2  some point I became aware of there being litigation
3  filed relating to the FOIA request by CREW.
4  Q    And prior to the litigation being filed
5  were you aware -- do you have any recollection that
6  CREW had first filed administratively with the
7  Department of Justice Freedom of Information Act
8  request?
9  A    I don't have any specific recollection of
10 that, although I'm sure that I was aware of it, but
11 in my recollection the filing the FOIA request and
12 the litigation are merged into one so I don't have
13 any recollection of a distinction between the two.
14 So at some point I was certainly aware that there
15 had been a FOIA request filed and CREW was involved
16 in litigation relating to it in some way.
17 Q    What was your understanding about what
18 CREW was seeking in its FOIA request?
19 A    I don't recall. I'm sure it was tobacco
20 litigation documents but such as the questions
21 you've been asking me previously about the tobacco
22 litigation case, so that's generally what I

13 (Pages 46 to 49)

Page 50

1  understood it's about the tobacco litigation.
2      Q    And did you understand that documents that
3  you might have could be responsive to this request?
4      A    I did not -- better way to say it is I
5  don't have any recollection of a specific request
6  and therefore knowing that my documents would have
7  been involved in it but it was my general
8  understanding certainly that my, you know, documents
9  would be involved in such a FOIA request.
10     Q    And did anyone within the Department of
11 Justice ask you to identify documents in your
12 possession that might be potentially responsive to
13 this request?
14     A    I don't recall anyone specifically asking
15 me to do that.  But I'm sure that occurred.
16     Q    And would that request come to you
17 directly?
18     A    I don't know or through somebody on my
19 staff at the Department of Justice.  I have no
20 recollection one way or the other.
21     Q    And do you have any recollection of making
22 any of your documents available for someone within

Page 51

1  the Department to review for purposes of responding
2  to CREW's FOIA request?
3      A    I have no specific recollection.  I have a
4  general recollection that I delegated the
5  responsibility to respond to whatever requests there
6  were, either OPR requests or FOIA requests to
7  members of my staff.
8      Q    Is it your testimony then if I hear you
9  correctly that you treated the response to your FOIA
10 request in this same way that you treated your
11 response to the OPR request?
12     A    No, that's a mischaracterization.  I
13 certainly treated the OPR request for documents.  I
14 do specifically remember receiving a letter from
15 Marshal Jarrett asking me for documents and I do
16 specifically remember allowing and or rather
17 delegating two particular people on my staff the
18 responsibility for responding to that.  I have no
19 recollection of specifically the FOIA request or
20 what it entailed or who it was directed to or where
21 it came from.  I'm embarrassed to say that I didn't
22 know who CREW was and that was not something that I

Page 52

1  was, you know, conscious of who was requesting it
2  and for what purposes that I can remember.  So the
3  OPR request was certainly one that was something I
4  have a specific recollection about.  The FOIA
5  request that CREW filed I don't.
6      Q    Who did you delegate to write --
7      A    It's my recollection certainly on OPR it
8  was Jeff Senger is the attorney's name in my office
9  and Louis Reyes, R-E-Y-E-S, were the two that I
10 tasked with providing to OPR everything that they
11 could possibly find that related to the tobacco
12 litigation.
13     Q    And are those the same people you would
14 have tasked with responding to any FOIA request?
15     A    I believe that is the case, but since I
16 have no specific recollection of doing that it's
17 sort of my general recollection that Jeff and Lou
18 were responsible for interfacing with the Office of
19 Information and Privacy to respond in whatever way
20 was appropriate, but I don't have the timeframe so
21 I'm not sure whether Lou Reyes was still in the
22 office at the time there was that interface going on

Page 53

1  so.
2      Q    Do you recall when he left your office?
3      A    I want to say months ago, six months is an
4  absolute guess, might have been more than that,
5  might have been less, I just don't recall.
6      Q    For purposes of responding to information
7  requests did you make all of your documents fully
8  accessible to Mr. Senger and Mr. Reyes?
9      A    Yes, absolutely.
10     Q    Did that include any handwritten notes you
11 had taken?
12     A    Absolutely, absolutely.  It included
13 everything that was in my redwell and complete
14 access to my computer system.
15     Q    And I know you've given us some limited
16 description of that redwell, can you just describe
17 by category the kinds of documents you had in it?
18     A    Judicial opinions like Judge Sentelle's
19 opinion.  I'm sure there were some print off e-mails
20 but I don't recall that.  I'm just sure that there
21 must have been, memos to me that may have come from
22 the tobacco litigation trial team or from the Civil

14 (Pages 50 to 53)

Page 54

1  Division would be the types of things that I would
2  have kept in there. But I don't have a -- I didn't
3  have a particular category dividing what things were
4  going to be in there and what things not. It was
5  whatever I thought was significant and that I
6  received and that I thought I would want to print
7  out and keep.
8     Q   And if you had had discussions with people
9  outside the Department of Justice relating to the
10  tobacco litigation would notes from any of those
11  conversations have gone into this redwell?
12     A   Yes.
13     Q   And would that have included any
14  discussions you might have had with the White House?
15     A   Yes.
16     Q   And would that have included any
17  discussions you might have had with representatives
18  of the tobacco industry either their lawyers or
19  tobacco representatives?
20     A   If I had a discussion and made a note then
21  it would go into the redwell.
22     Q   And all of those notes as well would have

Page 55

1  been readily accessible to Mr. Senger and Mr. Reyes?
2     A   Yes. Certainly I had conversations with
3  people that I didn't make notes about, but anything
4  that occurred to me to be significant I would make a
5  note on it and retain it.
6     Q   Sir, I recall when you were the Assistant
7  Attorney for the Civil Division my observation was
8  that in virtually every meeting I was in with you
9  you took very copious notes?
10     A   Uh-huh.
11     Q   Was that a practice that you continued
12  when you were Associate Attorney General?
13     A   It is. It was, yeah. I generally take
14  notes in meetings that I had and then utilize them
15  for the formulation of my -- you know, to-do list
16  and make sure that I have done what I need to get
17  accomplished.
18     Q   And is it your same general practice to
19  take those kinds of notes and telephone
20  conversations as well?
21     A   No, but that does occur if I think it's a
22  significant telephone conversation from time to

Page 56

1  time. That's not a prohibition or something that I
2  never do, but if I'm involved in a telephone
3  conversation I may make a note about it,
4  particularly if I feel that there is something that
5  I need to do so I will make a note, it really serves
6  as a to-do list.
7     Q   Now, do you know whether anyone at OIP,
8  Office of Information and Privacy, ever sought
9  access to the documents that you have relating to
10  the tobacco litigation?
11     A   I have no idea in that as I indicated to
12  you previously I removed myself from that process
13  and delegated that responsibility. So I don't know
14  what OIP did. I don't know what Jeff Senger did or
15  Lou Reyes did or anybody else that was involved in
16  it.
17     Q   Do you know what -- is Stephen Brody
18  currently the Director of the tobacco litigation?
19     A   I think he's the acting Director.
20     Q   Acting Director?
21     A   Of the tobacco litigation trial team.
22     Q   Do you know whether he has ever been

Page 57

1  afforded access to your files on the tobacco
2  litigation?
3     A   I don't know whether you mean afforded
4  access, did I ever produce them to Steve Brody
5  pursuant to a document request?
6     Q   No, allowed him to review what you had?
7     A   He's never requested to review anything I
8  had and I have never reviewed his files and I never
9  reviewed your files when you were a Government
10  lawyer. If he requested it, you know, that would be
11  unusual. You never requested to see my files, did
12  you?
13     Q   Not that I recall. Now on June 1st, 2006
14  Judge Sullivan issued an order in this litigation
15  that we're here on today in which he authorized us
16  to take some discovery including your deposition.
17  Were you made aware of that decision when it came
18  out?
19     A   I was.
20     Q   Prior to that decision were you aware of
21  the fact that CREW was seek discovery?
22     A   I do not recall specifically that -- what

Page 58

1    sort of discovery but I do recall that CREW was
2    seeking discovery and that I believe I was aware
3    that I might be required to give a deposition.
4        Q    And have you actually read his opinion?
5        A    I have.
6        Q    And did that based on the concerns he
7    raised and the issues that he flagged, did that
8    cause you to undertake or have anyone else undertake
9    an assessment of how the Department had processed
10   our requests?
11       A    No, it did not.  The assertions that were
12   implicit in my giving a deposition was that somehow
13   I had interfered with the processing in OIP and
14   therefore it was my view that it was inappropriate
15   for me to be involved in trying to figure that out,
16   that I thought that that would be something that
17   would be more appropriately handle by others since
18   by virtue of your requesting my deposition I
19   presumed that the thrust of it is that I did
20   something inappropriate there.
21       Q    One of the things I'm not focussing now on
22   what our allegations are or anything you've sort of

Page 59

1    inferred about what our allegations may be, but I'm
2    focussing on some of the factual evidence that we've
3    put in the record, for example, Judge Sullivan cited
4    to the statistics that we have put in the record
5    that showed that the median time for processing
6    requests here far exceeded the median time of your
7    office for the years 2000 to 2004?
8        A    Of my office?
9        Q    Well, the Office of the Associate Attorney
10   General?
11       A    I thought -- I read the order to mean
12   generally the processing by OIP of particular types
13   of requests, so I did not look at it in terms of
14   statistics that related solely to the Office of the
15   Associate Attorney General.
16       Q    Well, it was the senior leadership
17   offices.  And what I'm looking at is the opinion
18   which you appear to have a copy of?
19       A    Yeah, I do have a copy of it.
20       Q    Starting on page 12 where it's the
21   subtitle DOJ's FOIA annual reports and that's the
22   statistical evidence that I'm talking about?

Page 60

1        A    That's footnote 8?
2        Q    It's not just the footnote but, yes, those
3    are some of the actual statistics and then there's a
4    discussion in here that Judge Sullivan had about his
5    concerns of what these statistics meant as applied
6    to how the Department had processed CREW's request?
7        A    Okay.
8        Q    So I gather that you had not focussed on
9    this before, would that be fair to say?
10       A    I think it would be fair to say that I
11   didn't interpret it the way you're interpreting it,
12   yes.  And it would be fair to say that I did not
13   focus on it and I did not make any inquiries.
14       Q    Do you know whether anyone else at the
15   Justice Department since this opinion has been
16   issued has attempted to review or has reviewed at
17   all the way CREW's request was processed?
18       A    I would certainly hope that my lawyers
19   have done that.  If they haven't I'm going to want
20   to know why because they're the ones that are
21   responsible for responding to your inquiries in this
22   matter and if the facts that you are asserting are

Page 61

1    not correct I presume that they will look into it
2    and determine what the incorrectness of them may be,
3    just like you would make inquiries if you wanted to
4    dispute facts that they would present.
5        Q    But outside of the context of defending
6    the Department in this litigation, you're not aware
7    of anyone who has attempted on a programmatic basis
8    to review how CREW's request was handled?
9        MS. OLSON:  I object to the form of this --
10       MS. WEISMANN:  Any concerns with it --
11       MS. OLSON:  -- question because you haven't
12   established whether he knows what these statistics
13   are, has any responsibility for the promulgation or
14   production and is in any way connected to these,
15   much less that what the judge -- what the opinion
16   says here is in fact accurate.  You can answer her
17   question if you able.
18       A    I didn't understand the statistics in the
19   manner that you assert they -- as to what you assert
20   that they mean, number one.  Number two, because I
21   didn't understand them in the way that you
22   understand them I never even considered going

16 (Pages 58 to 61)

Page 62

1  forward with any sort of assessment. Number three,
2  I had removed myself from the processing of the FOIA
3  request and therefore it would have been
4  inappropriate for me as the putative deponent to get
5  in and start trying to determine what was done.
6      Now, if someone else in the Deputy's
7  Offices did that or someone in the Office of
8  Information and Privacy or someone else someplace in
9  the Department of Justice has done that I do not
10  know, could be, might be, but I don't know about it.
11    Q   It is my understanding that in the spring
12  of this year the Department proposed and perhaps has
13  now instituted a reorganization of how OIP
14  functions; is that correct?
15    A   I would describe it as there has been a
16  creation of the Office of Privacy and Civil
17  Liberties that deals with some of the issues that
18  have previously been dealt with by the Office of
19  Information and Privacy and that has been stood up,
20  if you will, with inside the Office of the Deputy
21  Attorney General. So the operations of OIP have
22  certainly been impacted by that new office that was

Page 63

1  required to be established in the Deputy's Office.
2    Q   And didn't the reorganization also propose
3  to transfer some of the functions of OIP to the
4  Civil Division?
5    A   There is -- there have always been
6  functions in the Civil Division that relate to FOIA
7  that concern litigation and uniformity of the FOIA
8  policy across the United States and in litigation
9  matters and, yes, a portion of this new office in
10  the Deputy's Office there have been -- there is
11  rather going to be increased function in the Civil
12  Division.
13    Q   And isn't the necessary impact on the OIP
14  is that it has a smaller area of responsibility or
15  it will have a smaller area of responsibility under
16  this reorganization?
17    A   In my view it has a broader responsibility
18  in that it has now got the obligation to coordinate
19  with the main officer in the Deputy's Office that is
20  in charge of Office of Privacy and Civil Liberties.
21  It must also now coordinate with the Civil Division
22  and it must still provide all of the sorts of

Page 64

1  administrative processing services and teaching that
2  it previously did.
3      If the question is whether or not there
4  are going to be fewer lawyers that are specifically
5  assigned to OIP, I do believe that there will be
6  fewer lawyers. If the question is has the
7  responsibilities of OIP for privacy been assumed to
8  a degree, to a significant degree, by the new
9  officer who's in charge of privacies and civil
10  liberties the answer to that is yes, but because
11  there are such an overlap between privacy and FOIA I
12  see it as no diminution in the significance of the
13  Office of Information and Privacy. I see it as an
14  opportunity for that office to have a greater
15  broader influence because it will be located in the
16  Deputy's Office not in the Associate's Office.
17    Q   To the extent --
18    A   That is the privacy officer and civil
19  liberties officer and that's who they're coordinated
20  with, so there's a direct line in the Deputy's
21  Office rather than an indirect line in there through
22  the Associate's Office.

Page 65

1    Q   Is it still proposal at this point or has
2  it been implemented?
3    A   I think that the -- it's my understanding
4  that the Deputy Attorney General has issued his memo
5  and there is a office now of privacy and civil
6  liberties in the Deputy's Office headed by a
7  particular individual with whom OIP must coordinate.
8    Q   And under this memo isn't it also the case
9  then that the final responsibility for FOIA legal
10  guidance rests now with the Civil Division?
11    A   That is my understanding that in terms of
12  the ultimate decision as to FOIA policy the
13  litigators will make that. That does not obviously
14  preclude anyone in either the Civil Division or in
15  the Office of Information and Privacy from raising
16  any differences of opinion to the Associate's
17  Office, getting a decision from the Associate's
18  Office and then raising it in the Deputy's Office
19  through the officer in charge of privacy and civil
20  liberties.
21    Q   And isn't it true that at least one
22  motivation or one reason for this change was some

17 (Pages 62 to 65)

Page 66

1  serious dissatisfaction in your office with some of
2  the decisions at OIP and its directors had made?
3      A   I don't know that I am allowed to get into
4  issues that might relate to --
5      MS. OLSON:  Well, yeah, object.
6      A   -- questions concerning personnel matters.
7      MS. OLSON:  Objection on deliberative process
8  grounds, it's privileged.
9      Q   I'm not asking for the substance of any
10  discussions. I'm simply asking whether part of the
11  motivation, if you will, for this change was
12  dissatisfaction with how OIP was performing its
13  assigned functions?
14      MS. OLSON:  Objection, that still is
15  deliberative because it relates to his thought
16  processes in so far as he was involved as to why
17  this change should take place. So I'm going to
18  instruct him not to answer.
19      A   The decisions were made by the Deputy
20  Attorney General. The Deputy Attorney General
21  issued his memo and if you want to the reasons for
22  the Deputy Attorney General's decision then you

Page 67

1  would have to ask him as to why he made the decision
2  and what the motivation for that was.
3      Q   But OIP reports to you, do they not?
4      A   They do report to me.
5      Q   And so did you have input into this
6  decision?
7      A   Certainly I had input. Absolutely.
8      Q   And did your input without telling me
9  exactly what it was, I'm not asking what your
10  specific input was, but did your input include
11  observations or comments how OIP had performed its
12  functions in the past?
13      A   Again, I think that any deliberation
14  relating to a stand up of a new office which will
15  assume some functions like privacy functions that
16  were previously handled by another component within
17  the Department of Justice would require an
18  assessment of what the role of that other Department
19  was and how best to organize it and one would not be
20  doing a proper assessment if one did not consider
21  both the strengths and the weaknesses of the prior
22  organizational structure.

Page 68

1      So certainly there are advantages to each
2  organizational structure, there are disadvantages to
3  each organizational structure. The critical point
4  here is that the stand up of the Office of Privacy
5  and Civil Liberties was mandated, it was not a, gee,
6  let's go out and figure out some new office to
7  create. It was obligatory upon the Department is my
8  understanding. So if it was an obligation that the
9  Department had to meet the question is how does one
10  best organize it and the Deputy made the decision on
11  how to go forward with it. Wouldn't surprise me
12  that a new office stands up and all of a sudden you
13  discover problems that -- or issues that you hadn't
14  previously considered and therefore you try to
15  adjust further on down the road, who knows what's
16  going to happen.
17      Q   But given that you had direct supervisory
18  or direct responsibility for OIP and reported
19  directly to you and maybe it still does, does it
20  still?
21      A   Uh-huh.
22      Q   I assume you had significant input in the

Page 69

1  Deputy Attorney General's decision?
2      MS. OLSON:  Objection. If you're trying to
3  extract from him some kind of implicit admission
4  that he approved or disapproved then the question
5  asks for privileged information.
6      MS. WEISMANN:  That's not what I'm asking.
7      MS. OLSON:  I think you've asked it two or
8  three different ways. You can answer but be careful
9  not to divulge privileged information.
10      A   I certainly will try not to do so. I
11  certainly had input as people did on my staff
12  including the Office of Information and Privacy.
13  Now, you asked me a question that suggests that I
14  ought to evaluate what significance my input was to
15  the Deputy Attorney General. I hope that my input
16  whenever I give it to the Deputy Attorney General is
17  one that he values and considers seriously. Now
18  whether he did so in this instance I cannot tell
19  you.
20      Q   I want to go back just a minute to the
21  redwell and sort of defining the --
22      A   Okay.

18 (Pages 66 to 69)

Capital Reporting Company

Page 70

1    Q    -- universe of what you have as
2  potentially responsive to our FOIA request?
3    A    Uh-huh.
4    Q    Would you have included in that the
5  editorial that you wrote for USA today?
6    A    I don't know.
7    Q    Do you have a separate file relating to
8  that editorial?
9    A    No.  If it's in there, I mean, it would be
10  in there.  I presume that whatever was in my redwell
11  was produced to OIP -- I mean, I used the wrong
12  acronym, to OPR, to the Office of Profession
13  Responsibility.  Now whether that editorial is in
14  there or not I don't know.  I don't keep copies of
15  stuff that's in the newspaper generally.
16    Q    But that was an editorial that you
17  yourself wrote, was it not?
18    A    It was.
19    Q    And were you in fact the author of that?
20    A    Yes, it went out under my signature.  Now
21  you asked was I the author, I certainly had the
22  final say on what it was going to say, what the

Page 71

1  final words were going to be.  Now did I come up
2  with every word and all of that, no, you run that
3  around and get input from other people just like you
4  do on a brief.  So certainly other people had input
5  on it.  But I would claim it as me being the author
6  of it because I had the final say as to whether or
7  not I would sign it.  And I signed it.
8    Q    And the input that other -- you got
9  included input from the White House, did it not?
10    A    I don't remember specifically any
11  particular input but I am sure that there were
12  opportunities for people at Public Affairs or others
13  at the White House, I don't know who, but can I tell
14  you that the White House said X or Y, I can't really
15  tell you that, but it would be something that I
16  certainly would have sought input from various
17  quarters.
18       (McCallum Exhibit No. 2 was marked)
19    Q    Can we have this marked as McCallum
20  Exhibit 2.
21    MS. OLSON:  I object to the introduction of
22  this.  This is a Government -- these are Government

Page 72

1  documents.  Unless the Government has produced them
2  publicly to you they've apparently been purloined
3  from the Government, so I object.
4    MS. WEISMANN:  These are not stolen documents
5  and your objection's noted for the record.
6    MS. OLSON:  These are Government e-mails, are
7  they not?  So we need to know where these came from.
8  I just -- these are not legally in your possession
9  as far as I can tell.
10    MS. WEISMANN:  Well, you can make your
11  objection.
12    MS. OLSON:  Well, I object.
13    Q    Mr. McCallum, I'd like you to focus on
14  Exhibit 2 which is a series of e-mails sent on June
15  8th, 2005 and you are the recipient, I believe, on
16  each of these e-mails?
17    MS. OLSON:  I object.  We're not going to
18  answer questions about these until we know whether
19  the Government has in fact disclosed these and
20  provided them to you.  Now I know Ms. Eubanks has
21  recently become employed with you, whether she took
22  them when she left the Government or you got them

Page 73

1  through legal channels I don't know, but until we
2  know that we're not going to answer questions about
3  them.  These are not legally in your possession.
4    Q    Well, we disagree with that.
5    MS. OLSON:  Well, I object and I'm going to
6  instruct him not to answer until we get an answer
7  from you.
8    Q    Okay.  So I'm going to ask you a question
9  which is if you read through these e-mails what you
10  will see is they are commenting on input that the
11  White House has with respect to your editorial which
12  was published the following day in USA Today; isn't
13  that correct?
14    MS. OLSON:  I object.
15    A    I'm not going to answer the question on
16  advice of counsel.
17    MS. OLSON:  I'm going to instruct him not to
18  answer your questions.
19    Q    So earlier when you stated to me that you
20  had received input on your editorial from a number
21  of people that would have included input from the
22  White House, would it not?

Page 74

1    MS. OLSON: Asked and answered. Objection.
2    A    I don't recall the answer.
3    Q    You can answer it again.
4    MS. OLSON: I think he said he sought input
5  from many quarters.
6    Q    I'm focussing specifically on the White
7  House that did include input from the White House,
8  did it not?
9    MS. OLSON: We can read back that answer. I
10  think he -- could you please re-read the question?
11  He already answered that question.
12        (Record was read)
13    MS. WEISMANN: There's no privilege pending,
14  privilege objection pending.
15    MS. OLSON: It's been asked and answered. If
16  he wants to answer it again he can do so.
17    A    Ask me the question again. Did I have
18  input among numerous others on this editorial
19  from --
20    Q    Did that include the White House?
21    A    From the White House, I believe that it
22  did.

Page 75

1    Q    And just so I want to make sure I place
2  this in time, this is before the Department had
3  publicly announced, is it not, what its decision
4  was?
5    A    No. It is my understanding, it's my
6  recollection, that there had been an announcement
7  and a decision made, and who knows whether I'm right
8  on this, but certainly by this time the decision had
9  been made. I had made my decision. I had announced
10  it to Sharon Eubanks. I had announced it to Stephen
11  Brody. I had announced it to Frank Marine. There
12  was no question of what my decision was. It is my
13  recollection that Stephen Brody mentioned it in
14  closing argument and that then having the decision
15  made I issued an editorial or op ed letter or
16  however you want to describe it a letter to the
17  editor. So I don't know the specific timeframe.
18  You can go back and see what date the closing
19  argument was made by me and circulated among the members of
20  been made by me and circulated among the members of
21  the tobacco litigation trial team.
22    Q    My question went to what had been known

Page 76

1  publicly?
2    MS. OLSON: Well, I object to this line of
3  questioning. We're supposed to be inquiring into
4  the role, if any, that he had in processing the FOIA
5  request and you're to ascertain what -- whether
6  there was any bad faith in this alleged delay.
7  We're getting far afield. It's not clear how this
8  connects. If you're going to proceed along these
9  lines again we're going to end up in the same place
10  we did before. So we'll be patient for a little
11  while longer but if we continue to ask questions
12  about editorials in USA Today then we'll have to get
13  the Magistrate back in, so.
14    Q    What I'm trying to place in time if you
15  can is my understanding that the Government made
16  its closing argument on June 8th of 2005 which would
17  have been the very same day that these e-mails are
18  dated. When did you actually circulate your
19  editorial for purposes of this seeking comment?
20    MS. OLSON: Objection, this has no connection
21  to the processing of the FOIA request and it's
22  outside the scope of the Judge's order and the

Page 77

1  Magistrate's order and I'm going to instruct him not
2  to answer.
3    Q    So I just have one more question on this,
4  Mr. McCallum. I had handed you previously
5  Plaintiff's Exhibit 1?
6    A    Yes, ma'am.
7    Q    Which was your Senate testimony?
8    A    Uh-huh. And it's not my Senate testimony.
9    Q    I'm sorry, it's your written responses to
10  questions from Senator Biden is what I'm focussing
11  on specifically and I think it's three pages from
12  the back. I apologize that there are not page
13  numbers to this. The question was asked of you
14  whether you had discussed any aspect of this case
15  including any public statements with any person
16  working for the White House?
17    A    Uh-huh.
18    Q    You did say "I cannot recall ever
19  discussing any public statements or articles about
20  the case with anyone at the White House"? Given
21  what you have testified here today, do you feel that
22  you need to correct that statement?

Page 78

1     MS. OLSON: I object. It's -- this is, again,
2  not related to the reason we're here today. If you
3  want to answer it you can go ahead and answer.
4     A  I'll be happy to answer that question. I
5  interpreted the question about "did you discuss any
6  aspect of this case" and then when it said "public
7  statements or articles thereon," I interpreted that
8  to mean articles and statements by others
9  criticizing my decision and vilifying me in the
10  press and I don't remember doing either. The staff
11  of the Senate Foreign Relations Committee then when
12  I explained to them my interpretation of what that
13  meant they said no, no, we also mean any public
14  statements that you made to the media or any
15  articles or anything like that. And I sent back to
16  them a clarification, not a correction, but a
17  clarification based upon my understanding of what
18  they had meant, what Senator Biden had meant, about
19  public statements and articles to inform them that,
20  yes, indeed, once I had made the decision and I knew
21  that there was going to be a firestorm of criticism
22  and that I was going to be making public statements

Page 79

1  about it, I wanted to alert anyone that would have
2  to deal with that political issue and that certainly
3  included the White House.
4     Q  Now on the preceding page you answered a
5  question as follows: I did not discuss my decision
6  on the cessation remedy with anyone at the White
7  House prior to making it or prior to its
8  presentation in closing argument. After the
9  decision was made and presented in court, I did
10  inform the White House Counsel's Office on the
11  status of the case, the closing argument and my
12  decision.
13     Did you provide any subsequent
14  clarification to the Senate Foreign Relations
15  Committee on that answer?
16     MS. OLSON: I object, again, this is outside
17  the scope of this deposition and the court's orders.
18  I mean, he can answer, you can answer it if you want
19  it's --
20     A  I think it's correct. And it's based upon
21  my recollection that closing argument in the tobacco
22  litigation occurred over a series of days. It was

Page 80

1  not a one day closing, if I'm remembering correctly,
2  and that Mr. Brody made a closing argument and then
3  there was defendants that made a closing argument.
4  And then day after that Ms. Eubanks made a closing
5  argument. I don't know when this occurred as to
6  whether Mr. Brody was on the 8th or not. I don't
7  think that he was. My recollection is that all of
8  this occurred after Mr. Brody had announced my
9  decision in open court in his closing argument and
10  so that's the basis for my answer to the question in
11  which I say I did not discuss the decision prior to
12  making it or prior to its presentation in closing
13  arguments.
14     I didn't mean that closing arguments were
15  fully completed, but I meant that prior to its being
16  presented to the court. And that's still my
17  recollection and time if I'm wrong I'm wrong. I
18  think I would be very easy to go back and find out
19  from the transcript which day Steve Brody made his
20  closing argument on, so I recommend you do that.
21     Q  Maybe this will help your recollection.
22  Do you recall discussions about whether or not your

Page 81

1  editorial should or could come out prior to the
2  Government making its announcement in court?
3     MS. OLSON: Objection, you can answer the
4  question.
5     A  No, no recollection of that.
6     Q  So you can't say that they didn't happen?
7     MS. OLSON: Objection, you may answer.
8     A  I have no recollection one way or another.
9     Q  Now you have described the document
10  production process that you used in your office with
11  respect to OPR and you've suggested that it's
12  comparable to what you would have used in responding
13  to a FOIA request. I know that you --
14     A  No, I disagree with that characterization.
15     Q  I don't want to misstate. What is
16  inaccurate about what I have just said?
17     A  Well, the -- I don't know what was in the
18  FOIA request that you submitted, number one. Number
19  two, I do know what was in the OPR request and --
20  but the only similarity is that I was not involved
21  in either one. Now, so I don't know -- I do know
22  and believe that everything was made available to

21 (Pages 78 to 81)

Capital Reporting Company

Page 82

1  OPR. I don't know anything about what was
2  available, what was asked for, what was reviewed,
3  that has to do with your FOIA request so they're
4  completely different.
5      Q   Do you remember having any discussion with
6  Sharon Eubanks and Steve Brody about CREW's FOIA
7  request?
8      A   I do not. It's possible that I did
9  depending on whether Sharon was still with the
10  Department of Justice at the time, but I don't
11  recall any.
12     Q   Do you recall having any discussions about
13  the FOIA request with Mr. Metcalfe or Mr. Huff, the
14  Directors of OIP?
15     A   I do not recall having any such
16  discussions but it is possible in passing either Dan
17  or Dick or somebody could have said we received a
18  FOIA request and we're processing it, but I don't
19  recall that happening.
20     Q   If I understand your testimony, and please
21  correct me to the extent I'm mischaracterizing
22  because that is not my intent here, you have no

Page 83

1  knowledge of what -- specifically of what the
2  Department did with respect to your documents in
3  responding to CREW's FOIA request.
4      A   That is correct. My documents were made
5  available to my staff and they could do with them
6  what was appropriate for the OPR investigation and
7  for any FOIA request whether from CREW or anybody
8  else, but the only one I'm aware of is the CREW
9  request.
10     Q   And with respect to OPR did you understand
11  yourself to be a target of that investigation?
12     A   Absolutely.
13     Q   But nevertheless you had no concern about
14  letting -- delegating every aspect of the document
15  production to satisfy OPR to your staff?
16     A   Absolutely, because the one thing that I
17  did not want to do was the very implication that
18  you're making here in that I somehow influenced what
19  was going to be available or somehow withheld
20  something or somehow did something untoward with
21  respect to it, so better to have people who no
22  exposure and encourage them to provide whatever is

Page 84

1  appropriate in the OPR investigation which would be
2  everything and I don't know what happened with the
3  FOIA request.
4      Q   And for those same reasons did you keep
5  yourself independent from the OPR investigation?
6      A   Oh, absolutely.
7      Q   And, again, turning to McCallum Exhibit 1
8  of this deposition, your Senate testimony, you did
9  also in response to a question from Senator Biden
10  you said and I don't know if you found it, it's the
11  second?
12     A   I have got it.
13     Q   I have no contact with Marshal Jarrett
14  regarding the OPR investigation; is that correct?
15     A   That's absolutely correct. I saw Marshal
16  from time to time. He never mentioned it to me and
17  I never mentioned it to him, maybe saw it two or
18  three times.
19     Q   Can I ask that this be marked as McCallum
20  Exhibit 3, please.
21     (McCallum Exhibit No. 3 was marked).
22     MS. SHAPIRO:  I need to interject something, I

Page 85

1  apologize.
2      MS. WEISMANN:  You're not handling the
3  deposition.
4      MS. SHAPIRO:  You're not going to permit me to
5  speak?
6      MS. OLSON:  I'm permitting her to speak on my
7  behalf.
8      MS. WEISMANN:  We object. I think the rule is
9  one lawyer handles it.
10     MS. SHAPIRO:  Are you going to object to my --
11  I can write it out for Ms. Olson but it would be
12  faster if I just articulate it myself.
13     MS. WEISMANN:  I object.
14     MS. SHAPIRO:  Okay. Well, I will then.
15     MS. WEISMANN:  In the meantime would you have
16  this marked?
17     MS. SHAPIRO:  I will say it anyway, your
18  objection's noted. But I am going to ask for
19  McCallum Exhibit 2 to be stricken from the record
20  and returned to the Government as well as all copies
21  because it's not clear that the existence of these
22  e-mails was an authorized disclosure from the

22 (Pages 82 to 85)

Page 86

1  Government, if it was an authorized disclosure and
2  you can tell me that then I will withdraw my
3  objection. But in the event that it's an
4  unauthorized disclosure we want to prevent an
5  argument that there's been a waiver from the
6  Government from this unauthorized disclosure and
7  therefore we have an obligation to take steps to
8  recover the information. So I'd ask that the
9  information be returned to the Government now,
10  stricken from the transcript and removed as an
11  exhibit and if you object to that, again, if you can
12  tell me where they came from then that's not a
13  problem.
14      MS. WEISMANN: We object and I think you need
15  to direct that to Judge Kay.
16      MS. SHAPIRO: Then what I'd like to do is make
17  a motion under the rules to stop the deposition,
18  make a motion under the rules and sequester these
19  copies until we can get a rule from the Magistrate.
20      MS. SLOAN: You can't sequester the copies.
21  They're our copies. We're not handing them over to
22  you.

Page 87

1      MS. SHAPIRO: That's fine. Why don't we get
2  the Magistrate's rule on it and I'll make a motion
3  for their return right now. It won't count against
4  your time.
5      MS. WEISMANN: Let's proceed.
6      MS. SHAPIRO: We're not willing to proceed
7  until we have this settled.
8      MS. WEISMANN: I think if you're going to raise
9  this issue I'd like to get another exhibit into the
10  record and then.
11      MS. SHAPIRO: I only interjected it now so that
12  you wouldn't mess up all the numbering because 2
13  should be removed and therefore your next exhibit
14  should be 2.
15      MS. WEISMANN: I don't think, no, I don't think
16  that's relevant.
17          (Off the record)
18      MS. WEISMANN: We'll take a break.
19      VIDEO TECHNICIAN: The time is 12:29, we're off
20  the video record.
21          (Off the record)
22      VIDEO TECHNICIAN: Okay. Time is 12:37 and

Page 88

1  we're back on the record with the deposition of
2  Bobby McCallum.
3  BY MS. WEISMANN:
4      Q   Mr. McCallum, do you recall having any
5  conversations just with Steve Brody about CREW's
6  FOIA request?
7      A   I do not. It's possible I had some but I
8  don't recall any.
9      Q   And you don't recall any, I believe you
10  said, any discussions that you had with Sharon
11  Eubanks about CREW's FOIA; is that correct?
12      A   That's also correct. I don't know if the
13  FOIA request came in when she was still with the
14  Department, but if it did it's possible that I was
15  alerted to it and had some conversation about it.
16      Q   And other than Mr. Metcalfe, do you recall
17  having any other discussions with anyone else at OIP
18  about CREW's FOIA request?
19      A   I don't recall having any conversations
20  with Mr. Metcalfe. I said it's certainly possible
21  that he might have mentioned it in passing but I
22  have no recollection of any conversations with

Page 89

1  Mr. Metcalfe.
2      Q   Do you have a recollection of any
3  conversations with Melanie Pustay about this matter?
4      A   I do not.
5          (Off the record)
6  BY MS. WEISMANN:
7      Q   Mr. McCallum, who have you spoken to about
8  CREW's lawsuit since it was filed?
9      A   Other than counsel?
10      Q   Yes.
11      A   I'll recall recently having talked with
12  Jeff Senger about it that I was giving a deposition
13  and there was a notice to take deposition and
14  document request. Stuart Schiffer has mentioned it
15  to me that I was being required to give a deposition
16  in the matter. Those are the ones that I remember,
17  but there are probably others who had mentioned it
18  because it's got a little play in the press as far
19  as being required to give a deposition so it's
20  certainly possible that others have mentioned it to
21  me.
22      Q   Have you spoken to Dan Marine about the

23 (Pages 86 to 89)

Capital Reporting Company

Page 90

1 litigation, CREW's litigation?
2    A   I do not recall having spoken to Dan
3 Marine about it, again, it is possible, but I do not
4 recall any discussion with Dan about this FOIA
5 request or my having to give a deposition and those
6 are all sort of recent memories since Judge
7 Sullivan's order.  Prior to that I don't have any
8 specific recollection of talking with anybody about
9 the FOIA litigation but as I mentioned previously
10 it's certainly possible that I did.
11    Q    Have you spoken to Mr. Keisler about your
12 deposition?
13    A   I anticipate, or a better way to say it is
14 I expect that he has said something to me about it
15 but I have no specific recollection of that.
16    Q    What documents have you reviewed prior to
17 coming hear?
18    A    Two documents, the Notice of Deposition
19 and document request and the Judge's order, those
20 are the two documents that I reviewed.
21    Q    And you haven't reviewed anything else
22 other than these documents?

Page 91

1    A   I'm not aware of any documents that I have
2 that are other than that and I have not reviewed any
3 other documents.
4    Q    Have you had any discussions with anyone
5 at the White House about your upcoming deposition?
6    A   I don't think so but, again, that is
7 possible since it was in the media that I called
8 them and said there's been this order entered that
9 you may have seen in the media but I don't remember
10 that.
11    Q    If you had discussions with the White
12 House who do you think you would have spoken to?
13    MS. OLSON:  Objection, that's just so
14 hypothetical, if you can speculate as to that you
15 can answer.
16    Q    Who are you likely people within the White
17 House?
18    A    The likely candidates would be in the
19 White House Counsel's Office probably Bill Kelly but
20 I don't remember doing that.
21    MS. WEISMANN:  I think we should take a break
22 and you're relatively close by, as I understand it.

Page 92

1 Are you in main justice?
2    A   I am, have just gotten back I guess last
3 week into main justice so.
4    MS. OLSON:  You want to go off the record?
5    Q    No.  Mr. McCallum, when are you leaving
6 the Department of Justice?
7    A   I'm to be sworn in as the United States
8 Embassador to Australia this Friday on the 21st of
9 July.
10    Q    And when are you actually leaving the
11 country to Australia?
12    A   I would actually be leaving the country
13 around August the 13th.
14    Q    But the period between this Friday and
15 August 13th you will no longer be at the Justice
16 Department?
17    A    Do you mean will I physically be present
18 at the Department of Justice?
19    Q    You won't have an official capacity at the
20 Justice Department?
21    A   I will not then be Associate Attorney
22 General.  I have submitted a letter of resignation

Page 93

1 that will be effective immediately upon my being
2 sworn in as Embassador to Australia.
3    Q    But between now and August 13th will you
4 be in the Washington, D.C. area?
5    A   I will be a -- technically I believe I
6 will be an employee of the Department of State and I
7 will be involved in preparation for my departure
8 with activities at the Department of State and will
9 have facilities made available to me at the State
10 Department.
11    Q    And as Judge Kay mentioned when we
12 discussed the issue of document production, if the
13 Justice Department finds that it has responsive
14 documents and they are produced to us or if we are
15 permitted to go beyond the guidelines that Judge Kay
16 spelled out this morning the parameters for this
17 deposition, after this Friday will you be willing to
18 submit yourself to a further deposition if the court
19 authorizes it and it takes place before you leave
20 for Australia?
21    MS. OLSON:  I object.  I can respond to that.
22 He will comply with any court order and do what he's

24 (Pages 90 to 93)

Page 94

1 legally required to do, so that's a hypothetical
2 question. I don't even know what scenario you're
3 thinking of, so that's your answer.
4    Q    And I take it, Mr. McCallum, you don't
5 dispute your counsel's --
6    A    I do not dispute that I will comply with
7 the court order.
8    MS. WEISMANN: I think we should take a break.
9 If you want to go back to your office and we can --
10 if we're going to resume we can -- it's up to you,
11 but it seems like we're not going to get into the
12 judge probably for another 45 minutes or so.
13    MS. OLSON: Why don't we have lunch.
14    MS. WEISMANN: Right, I'm suggesting for
15 Mr. McCallum there's no reason for him to stay at
16 the court if he's so inclined.
17    MS. OLSON: Let us know when you want us back.
18    MS. SLOAN: Whenever the Judge's back, we're
19 happy to be back. We're not going to go anywhere.
20    MS. WEISMANN: I would say 1:30.
21    A    And for planning purposes, how much longer
22 do you think that we may go today?

Page 95

1    Q    Well, there's some variables. We may not
2 go much further at all, or we may. There's some
3 legal issues or some issues --
4    VIDEO TECHNICIAN: The time is 12:47, the
5 videographer is off the record.
6          (Off the record)
7    MS. SHAPIRO: First, I wanted to seek Your
8 Honor's indulgence to allow me to speak. I'm not
9 the primary attorney handling the deposition, CREW
10 objected to it so I just wanted to make it clear.
11    JUDGE KAY: Okay. I'll let you talk. Go
12 ahead.
13    MS. SHAPIRO: The reason I stopped the
14 deposition and that I needed to present this issue
15 to Your Honor is I have broader responsibilities
16 outside this case to protect privileges in the
17 Department and we were presented during the
18 deposition with two exhibits, first McCallum Exhibit
19 2 and 3, and if I can approach I'll present these to
20 Your Honor.
21    JUDGE KAY: Yeah.
22    MS. SHAPIRO: Those documents appear to us to

Page 96

1 be internal Department of Justice correspondence,
2 e-mail correspondence. We hadn't seen it before.
3 We didn't provide it to CREW and we suspect but
4 don't know but suspect that they may be unauthorized
5 disclosures. In other words, that they were
6 provided to CREW by someone who is not authorized to
7 disclosure privileged information. Those are
8 plainly deliberative conversations. There are
9 drafts attached, if you thumb through McCallum
10 Number 2 the thicker document it has an e-mail on
11 has draft language and it's going to various people
12 for approval suggestion, comment, clearly internal
13 privileged deliberative communications.
14    Now it's possible I suppose that the
15 Department officially released these or otherwise
16 they were officially released and if that's the case
17 then I withdraw my objection and I apologize and I
18 ask CREW --
19    JUDGE KAY: Who would know that?
20    MS. SHAPIRO: I asked CREW where the documents
21 came from and they didn't want to tell us. We're
22 not aware that these have been formally disclosed by

Page 97

1 the Government and therefore they have to be --
2    JUDGE KAY: Would who have custody of these, do
3 you know?
4    MS. SHAPIRO: I'm sure they reside in the
5 Department. I don't know where CREW got the
6 document.
7    JUDGE KAY: Short of having Ms. Weismann or
8 colleagues tell you where they came from, you have
9 no way of ascertaining whether or not?
10    MS. SHAPIRO: I could go back to the Department
11 and query people who may be in a position to know
12 whether or not, for example.
13    JUDGE KAY: Did you do that over the lunch
14 break or no?
15    MS. SHAPIRO: No, I couldn't get into the
16 Department, most of it's closed with only a few
17 people there and my car key didn't access it for
18 complicated reasons. But I would have to track down
19 numerous people including, I suppose, it's possible
20 that when people leave the Department they can seek
21 permission to take certain documents with them. I
22 don't know if that was done. Those e-mails bear on

25 (Pages 94 to 97)

Page 98

1  the top left-hand corner the name of Sharon Eubanks
2  indicating in all likelihood those were printed out
3  from her computer. I don't know if Ms. Eubanks
4  provided those to CREW. She now works for CREW. I
5  understand there's a Chinese wall between her and
6  this case but she could have provided them prior.
7  We don't know the circumstances.
8         Nevertheless, in order to protect
9  ourselves from an argument that we're waiving
10 privilege, we ask that they -- we declined to allow
11 the witness to be questioned about them because we
12 don't want him waiving privilege and we ask that
13 they not be included in the transcript.
14     JUDGE KAY: They're now disclosed to CREW's
15 attorneys?
16     MS. SHAPIRO: They have not been disclosed in
17 an authorized way, so we have not waived any
18 privilege and that is why it is incumbent on us to
19 take steps to secure the documents and make sure
20 that we are not in any way formally acknowledging
21 their disclosure. To what extent that those are
22 unauthorized it would trigger some sort of internal

Page 99

1  investigation as to how they were disclosed.
2      JUDGE KAY: That's a separate issue.
3      MS. SHAPIRO: I agree.
4      JUDGE KAY: What I'd like to do is have this
5  deposition go forward and be completed. Seems to me
6  to the extent, well, you also I hypothesize that if
7  they were disclosed then there would be nothing
8  inappropriate, obviously, the documents finding
9  their way into CREW's counsel's hands.
10     MS. SHAPIRO: If they had been authorized.
11     JUDGE KAY: If they had been authorized, but
12 you -- no one knows at this juncture as to whether
13 that's --
14     MS. SHAPIRO: Apart from CREW may know. I
15 agree we wanted to try to go forward with the
16 deposition. CREW advises us that it may not be
17 possible absent the documents to go forward which is
18 why we wanted to wait for Your Honor to resolve the
19 issue.
20     JUDGE KAY: This is what I'm going to suggest.
21 Seems to me that they have been disclosed, the
22 information, without necessarily the Government in

Page 100

1  any way waiving the privilege. I will permit the
2  Government to retain the privilege but under the
3  circumstances to have the deposition go forward, let
4  CREW counsel question Mr. McCallum. If subsequently
5  it turns out that these documents were not
6  authorized to be disclosed, obviously internally the
7  Department of Justice has to do its own
8  investigation, but with respect to use of those
9  documents and any information that is disclosed or
10 any answers to questions by Mr. McCallum it seems to
11 me that Judge Sullivan should not use that and
12 therefore that information can be redacted from the
13 videotaped deposition and would not be made
14 available to Judge Sullivan. That's one way of
15 doing it.
16        Otherwise, I don't know how long it's
17 going to take you to find out that it's going to
18 further postpone the deposition. Ms. Weismann says
19 she can't go forward with the deposition without
20 interrogating Mr. McCallum on this document, of
21 course if they're determined to be not authorized it
22 may well be that that brings a rapid end to the

Page 101

1  deposition.
2      MS. SHAPIRO: There are a couple issues, one is
3  that, first, to allow Mr. McCallum to be questioned
4  on them would disclose further privileged
5  information presumably and that would be a problem
6  because we contend that those are privileged
7  documents and therefore CREW's not entitled to this
8  information. And, second, if we were to go forward
9  at all then we would want the transcript and the
10 videotape to be sealed pending resolution of the
11 privilege issue because any disseminate of the
12 information would disseminate potentially privileged
13 information further into the public domain.
14     JUDGE KAY: I haven't had a chance to look at
15 the long document. Does the information contained
16 in here relate to the production of documents?
17     MS. SHAPIRO: The information in there pertains
18 to matters outside the scope of Your Honor's
19 previous order and that's item number two. They do
20 not pertain to the FOIA processing at all or the
21 FOIA request, it has to do with the underlying
22 tobacco litigation which has been the persistent

26 (Pages 98 to 101)

Capital Reporting Company

Page 102

1  problem we've encountered.
2      JUDGE KAY: Ms. Weismann.
3      MS. WEISMANN: Let me respond to Your Honor's
4  suggestion first is that we think whether or not
5  these documents are privileged and whether or not
6  the Government has waived any privilege is a
7  completely separate issue than what should happen to
8  them in this litigation. The Government of course
9  is free in any deposition to take the position that
10 these are privileged documents, their disclosure was
11 not authorized by the Government and they're not
12 going to answer any questions relating to him, but I
13 don't think that necessarily equates to the having
14 these documents stricken from the record. Those are
15 entirely different issues and what the Government
16 actual a presented us was a demand that we return
17 the documents and all copies of the documents and we
18 think that's not a justified request. They're free
19 to raise the issue of privilege if they have a
20 concern that these documents -- their disclosure was
21 not authorized, they can raise the privilege now and
22 preserve that and the fact that there might be

Page 103

1  dissemination of the information in no way would
2  affect the Government's assertion of privilege. It
3  happens all the time that information finds its way
4  into the public domain and the Government agency
5  that is the possessor of the information will say
6  notwithstanding that we continue to maintain that
7  it's privileged and obviously if it's privileged
8  they can make whatever appropriate arguments they
9  wish to Judge Sullivan about whether or not it
10 should come into play ultimately in his decision on
11 how to proceed on the merits of the issue of whether
12 there's been bad faith here. But I think it is
13 entirely --
14     JUDGE KAY: If he determines they're privileged
15 then what happens to the documents?
16     MS. WEISMANN: I think that's -- it may mean
17 that we can't use them in this litigation, but I
18 think that has to be the end of it. The Government
19 has --
20     JUDGE KAY: That he would preclude you from
21 further use of those documents and require you to
22 return the documents and any copies you've made?

Page 104

1      MS. WEISMANN: I don't know what legal support
2  there would be for that, Your Honor. Short of a
3  finding by him that we somehow stole them and we
4  ourselves took the documents from the Government in
5  some unauthorized fashion, I don't know what
6  possible -- and I think this is -- it comes up all
7  the time, it comes up when members of the media get
8  access or leak documents. In fact in this very case
9  there was an internal memo leaked and the New York
10 Times published it and Department at that time said
11 we're not going to comment on that memo because we
12 continue to take the view that it's privileged but
13 they did not dispute its authenticity.
14     JUDGE KAY: If Mr. McCallum takes a position
15 that the -- you can use these two documents as
16 privileged then as a result he raises the privilege
17 and refuses to answer your questions then it seems
18 to me you're stymied, are you not?
19     MS. WEISMANN: That may be. I guess my point
20 was that the Government has a process to protect its
21 privilege. If it chooses to invoke that process
22 then that's what it should do and obviously then we

Page 105

1  can't ask anymore questions on these documents.
2      JUDGE KAY: Well, I don't disagree with your
3  argument on that and you're suggesting that our
4  precluding use of the documents at this stage is
5  premature.
6      MS. WEISMANN: Exactly. And I do think, yes,
7  exactly. And I also did want -- because the other
8  point that counsel raised was the relevance and we
9  do have a transcript and we can go back but I
10 certainly dispute that. There's no question and
11 they never -- they didn't raise a relevance
12 objection during the questioning and I think that's
13 important too. After Your Honor made your ruling we
14 focussed on the FOIA processing but this was part
15 and parcel of that discussion. We wandered a little
16 bit off it directly but I think even Your Honor
17 recognized in the conference that we had before you
18 on June 14th that there's some latitude in there.
19 They never voiced an objection on relevance grounds.
20 They never said this whole subject matter is off
21 limits and you can't proceed on that basis. The
22 basis of their objection was that the documents in

27 (Pages 102 to 105)

Page 106

1  their view had possibly been stolen or purloined is
2  the word they used and they thought therefore it was
3  appropriate that they demand copies back.
4      JUDGE KAY: I ruled earlier that you were going
5  to be restricted to inquiring of Mr. McCallum as to
6  his role, if any, in the reduction process or the
7  compliance with the FOIA request and then to come up
8  with two documents which, again, I must obviously
9  decline to say I know what's contained in detail,
10  they need to be reviewed, but to have two documents
11  that you now wish to inquire of Mr. McCallum that
12  may well in effect be sort of a back door entree
13  into going into an area that I had earlier told you
14  that I would entertain a request on your part after
15  you had explored what Mr. McCallum's role was so.
16      MS. WEISMANN: Let me explain the context if I
17  may. We have asked a series of questions that
18  relate to the processing and his involvement in the
19  process. As part of that we have also probed him on
20  what documents that he has in his possession that he
21  has in what he's described as a redwell folder that
22  might have been responsive to our FOIA request. And

Page 107

1  I think that is an appropriate extent of this
2  court's order.
3      JUDGE KAY: I think maybe that's right.
4      MS. WEISMANN: And this discussion came up
5  because one of the things that he did and he has
6  acknowledged is he wrote an editorial for the USA
7  Today newspaper about this very tobacco litigation
8  and his decision. The inquiry went to whether or
9  not his redwell contained documents relating to that
10  editorial and these are documents --
11      JUDGE KAY: Was that part of the FOIA request?
12      MS. WEISMANN: Oh, yes, absolutely. We had a
13  request that specifically went to the Associate
14  Attorney General's Office and asked for his
15  documents.
16      JUDGE KAY: What was his answer to that?
17      MS. WEISMANN: He has frankly professed very
18  little recollection of the FOIA request. He's not
19  sure whether he knew about it, he's not sure who he
20  might have talked to about it, if he did if this was
21  processed in his office it was handled by two of his
22  assistants. So there's also what we have also

Page 108

1  attempted to do is prod his memory because he's not
2  been categorical that he had no involvement.
3      JUDGE KAY: What do these documents do by way
4  of prodding his memory?
5      MS. WEISMANN: To go back to the first document
6  which is the package of documents, those all relate
7  to that editorial and those are back and forth
8  discussions between the DOJ and referencing some
9  White House input they got into the editorial
10  itself. We were trying to ascertain whether that
11  was within the universe of documents that
12  Mr. McCallum had that would have been responsive and
13  I think that's highly relevant.
14      JUDGE KAY: So it's your intent if you were
15  permitted to examine Mr. McCallum on this is to show
16  him this document?
17      MS. WEISMANN: Yes.
18      JUDGE KAY: And based upon his having an
19  opportunity to look at this document was he CCed?
20      MS. WEISMANN: Yes.
21      JUDGE KAY: And that based upon his review of
22  this does that refresh his recollection as to what

Page 109

1  documents he was involved with or may have had
2  copies of?
3      MS. WEISMANN: Right, and whether or not as
4  part of the process of writing this editorial it
5  might again refresh him of what documents might
6  exist there.
7      JUDGE KAY: You're not contemplating asking him
8  any questions substantively as to what's contained
9  in these?
10      MS. WEISMANN: No.
11      JUDGE KAY: Merely this is refreshing a
12  recollection.
13      MS. WEISMANN: It's two things. It's
14  refreshing the recollection and our attempt to
15  ascertain what the universe of documents might be in
16  his possession. I don't know how close.
17      JUDGE KAY: Has he seen them?
18      MS. WEISMANN: Yes, he has. He's seen that
19  document. I don't know how close.
20      JUDGE KAY: You're going to inquire as to
21  whether he's seen them, it may have his name on
22  them.

28 (Pages 106 to 109)

Page 110

1    MS. WEISMANN: Even if he has at that point it
2  would be appropriate to use as a refresher of his
3  recollection not so much about the specific content
4  of these e-mails but about the kinds of documents
5  that would have been generated around his drafting
6  of this editorial.
7    JUDGE KAY: You want to go beyond these
8  documents?
9    MS. WEISMANN: In that respect, yes, refresh
10 his memory about the universe.
11   JUDGE KAY: Were there other documents?
12   MS. WEISMANN: Yes, associated with the
13 drafting of the editorial that's referenced in
14 those. The second document we have not even gotten
15 anywhere with him because the Government objected
16 immediately and that is the document that relates to
17 his role in the Office of Professional
18 Responsibility investigation.
19   JUDGE KAY: And you intend to use this for what
20 purpose?
21   MS. WEISMANN: Well, Mr. McCallum has stated
22 publicly and his counsel made a big point this

Page 111

1  morning of noting for the court the fact that the
2  Office of Professional Responsibility has cleared
3  him from any liability or responsibility for any
4  improper acts and Mr. McCallum has stated publicly
5  that he had absolutely no contact whatsoever with
6  Marshal Jarrett the head of OPR and anything
7  relating to this investigation and we think this
8  document shows that.
9    JUDGE KAY: Investigation of?
10   MS. WEISMANN: Of Mr. McCallum, among others.
11 The OPR conducted an investigation based on
12 allegations that were made and complaints.
13   JUDGE KAY: Relating to the FOIA request?
14   MS. WEISMANN: No, relating to the underlying
15 tobacco litigation.
16   JUDGE KAY: What has that got to do with the
17 FOIA request?
18   MS. WEISMANN: Because Mr. McCallum has
19 described dual processes. He has very little
20 recollection, if any, of the FOIA request. He has
21 described a process that he used in his office to
22 respond to an inquiry from the Office of

Page 112

1  Professional Responsibility. He said that he had
2  his aids, they had access to this redwell and
3  certainly I think my recollection of his testimony
4  is that he suggested that would be the same process
5  he would have used, he might have gotten less
6  involved in the FOIA response than the OPR.
7    So, again, I think it's highly relevant to
8  find out what is the universe of documents that were
9  part and parcel potentially of his OPR response and
10 compare that to what the Department has provided or
11 has identified as potentially responsive or is
12 responsive to CREW's FOIA request.
13   JUDGE KAY: So you're going to ask him to look
14 at this, find out what he recalls, ostensibly he was
15 quoting from the statement here he was on the
16 telephone line I assume MCC is McCallum.
17   MS. WEISMANN: Yes, that's my understanding
18 from reading it.
19   JUDGE KAY: And you want to ask him, one,
20 whether he recalls this and are there any other
21 documents extend to that?
22   MS. WEISMANN: Right.

Page 113

1    JUDGE KAY: It seems to me if this is true this
2  document speaks for itself, does it not, to some
3  degree, as to the fact that he was part of an
4  investigation, yes?
5    MS. WEISMANN: Yes.
6    JUDGE KAY: And if you want to use that to
7  refresh his recollection, but to go into the nature
8  of the investigation.
9    MS. WEISMANN: We have no intent at all of
10 inquiring into that, absolutely none.
11   JUDGE KAY: Let me hear from the Government.
12   MS. SHAPIRO: Three quick points. On the
13 refreshing recollection, wonderful rule of evidence.
14 You can use anything to refresh recollection even a
15 ham sandwich we all learned that, but also
16 fundamental is that there has to be a loss of memory
17 to be refreshed and Mr. McCallum had no failure of
18 recollection. He was asked with respect to the USA
19 Today article whether or not it would be in his
20 redwell and he said he didn't know, it might have
21 been, it might not have been. There's no failure to
22 recollect anything. I think that is a ruse sort of

29 (Pages 110 to 113)

Page 114

1 the most classic sort when it comes to using the
2 documents to refresh recollection.
3     JUDGE KAY: I understand that. But
4 Ms. Weismann is saying with respect to the big
5 package, so you hand him the big package and then
6 give him a few moments to go through it, does that
7 change your answer in terms of what you recall you
8 looked at or had access to prior to your writing the
9 editorial or the piece in the newspaper, what would
10 be wrong with that?
11     MS. SHAPIRO: Well, it's not relevant and he
12 didn't have a loss of recollection, but we won't
13 object to that question, Your Honor, if that's the
14 sole question you want to put to Mr. McCallum.
15     JUDGE KAY: That's what I'm hearing. I guess
16 there will be other questions.
17     MS. SHAPIRO: If that's the sole question is
18 does this refresh your memory then we're not going
19 to hold this up on that basis.
20     JUDGE KAY: That's what I'm going to permit and
21 this is at Ms. Weismann's risk if she goes farther
22 afield and similarly I see no harm in showing him

Page 115

1 this, I don't know what beyond this, but clearly
2 while you may categorize it classified or a ruse
3 it's an acceptable ruse, it's like fishing
4 expeditions if you catch fish.
5     MS. SHAPIRO: Let me add just two points. One
6 is that those documents we maintain until we know
7 otherwise are privileged and so therefore we don't
8 want them to be disseminated further even if they
9 were questioned here we would ask that until the
10 question of privilege is resolved that the
11 transcript be sealed. And then, third, I might
12 suggest to help us in that to figure out if in fact
13 these are privileged that if perhaps CREW wants to
14 talk to Your Honor ex parte and tell Your Honor
15 where these documents came from that that might be
16 of assistance and at the same time I have made a
17 phone call over lunchtime to ascertain the same, did
18 not hear back, but I could renew that call and see
19 if I can get through and maybe both of those tracks
20 can settle the question of whether these are
21 privileged documents. Until we know otherwise
22 though we claim privilege and therefore would not

Page 116

1 permit questioning, as to the substance of them we
2 would claim privilege and we would ask that they be
3 sealed until the question is resolved.
4     JUDGE KAY: Well --
5     MS. WEISMANN: May I be heard on the issue --
6     JUDGE KAY: Yes.
7     MS. WEISMANN: I don't think there's any basis
8 whatsoever for that. She doesn't offer any basis.
9 The Government has the right to take what steps it
10 needs to preserve its privilege and that's the
11 extent of the right that the Government has here.
12     JUDGE KAY: That's your right, Ms. Weismann, to
13 challenge any ruling I make to Judge Sullivan.
14     MS. WEISMANN: The other thing, Your Honor
15 mentioned that you saw this as limited to
16 refreshing, but we noted for Your Honor, I noted
17 that there was a second purpose which was to
18 ascertain the universe of responsive documents,
19 which is somewhat different than just merely
20 refreshing.
21     JUDGE KAY: You can ask him that without
22 showing him this group of documents and what other

Page 117

1 documents --
2     MS. WEISMANN: Fair enough.
3     JUDGE KAY: You have documents here, you can
4 show him you're saying does this refresh your
5 recollection, then I see nothing wrong in you asking
6 him if there are any other -- does this array of
7 documents here trigger anything and if he says,
8 well, these documents don't, then you're stuck with
9 that answer. But I want to caution you, I think I
10 know where you're heading and what you would like to
11 have but I don't think based upon my understanding
12 of Judge Sullivan's order I don't think you can go
13 there in terms of pushing the envelope to the extent
14 of, well, I'm entitled to some leeway and I just
15 don't think I have the luxury of defining what a
16 number, if you will, out there that you can go into
17 and tread into something that I see perhaps goes
18 beyond the narrow confines of whether or not there
19 was bad faith. I recognize that motive is an issue
20 but I would also assume that as a member of the
21 Department of Justice most of the people over at
22 Justice in the decision making role would be prefer

30 (Pages 114 to 117)

Capital Reporting Company

Page 118

1  you not to have access to the documents but that's
2  the nature of adversarial litigation.
3       So I'm going to limit you to that.  You
4  may show him your documents, you may request his
5  recollection but I'm going to direct that you not go
6  into the substantive content.  I'm going to permit
7  the Government to preserve its privilege.  I'm not
8  going to seal the documents at this juncture the
9  videotaped deposition.  I've already issued an order
10 to the effect of limiting its usage and that it is
11 so limited until Judge Sullivan rules otherwise and
12 I understand he's left open that issue and I don't
13 know when the videographer will have this tape ready
14 to distribute, but my sense is he probably could
15 have it an hour afterwards the way technology is
16 today.  But if you wish to seek to have the material
17 sealed, then I'm going to have to leave that to the
18 trial court, not being the trial court I'm hesitant
19 to seal it at this time.  If you will adjourn early,
20 I don't know how you're running on time, but if you
21 get to Judge Sullivan before he leaves the
22 courthouse I'm sure he would hear you on an

Page 119

1  emergency basis.  Or my recommendation to Judge
2  Sullivan would be to, in effect, put all of you
3  under a prescription, if you will, not to do
4  anything until you've had an opportunity to appear
5  before him at a convenient time or present some
6  briefing on it and I would hope as a courtesy to one
7  another you would agree to that voluntarily, but I'm
8  not going mandate it at this point, seems to me
9  there's a lot of disagreement here but as
10 professionals you should follow the rules.  And one
11 of the rules is that it be limited to refreshing
12 recollection.  Thank you, Counsel, you may proceed.
13          (Off the record)
14    VIDEO TECHNICIAN:  The time is 2:54 p.m. and we
15 are back on the record with the deposition of Robert
16 McCallum.
17 BY MS. WEISMANN:
18    Q    Mr. McCallum, over the break did you have
19 an opportunity or did you talk to anyone about your
20 deposition here today?
21    A    None other than my counsel and I called my
22 wife to let her know that it was not yet over during

Page 120

1  lunch.
2     Q    And did you have an opportunity or did you
3  over this break look at any documents related --
4  that in any way relate to this litigation?
5     A    Exhibits 1, 2 and 3.
6     Q    And did you in fact take copies of those
7  exhibits with you?
8     A    Did I take them with me?
9     Q    Yes, physically?
10    A    Yeah, I had them with me when I looked at
11 them.
12    Q    And did you show those exhibits to anyone
13 else while you were --
14    A    No.
15    Q    I want to direct you again to McCallum
16 Exhibit 2 which is this one right here?
17    A    Okay.  The one that has Cynthia Magnuson.
18    Q    Correct.  Just to place you back in the
19 context when I introduced this I was asking you
20 about the contents of your redwell and whether the
21 file that you have identified having whatever
22 documents you have that relate to this litigation in

Page 121

1  it and am I correct that it is only one redwell?
2     A    No, there are several.
3     Q    Do you know how many?
4     A    Three, maybe four.
5     Q    If you had to estimate how many pages of
6  documents they include what would your best guess
7  be?
8     A    I would have no idea.  How many pages
9  would you estimate are in this that we have here, a
10 hundred or 20?
11    Q    20 is probably the closer approximation?
12    A    It would be total speculation.
13    Q    How many inches thick is each redwell?
14    A    I'd say each redwell is like that, now is
15 that four inches maybe?
16    Q    Four to six inches perhaps?
17    A    Four inches, so probably have either three
18 or four of those, maybe eight inches of paper if you
19 stacked them up.  Probably be something similar to
20 what you have in your files right there.
21    Q    I just want to be clear, this represents
22 the totality of the files or documents you have in

31 (Pages 118 to 121)

Capital Reporting Company

Page 122

1  your office relating to the tobacco litigation?
2      A   It's the totality of the files that I,
3  Robert McCallum, have on the matter.  Now does Jeff
4  Senger have a file and he is in my office, is that a
5  file in my office?  I don't know whether he's got a
6  file or not, I presume that he does.
7      Q   Do you know whether anyone else in your
8  office was asked to search their files for documents
9  responsive to CREW's request?
10     A   I do not know.
11     Q   Aside from Jeff Senger who else in your
12 office would be likely to have records relating to
13 the tobacco litigation?
14     A   Lou Reyes.
15     Q   And is there anyone else.
16     A   In the old days Matt Zabel, Z-A-B-E-L.
17     Q   And you said the old days, is he no longer
18 or your staff?
19     A   No, he left the Department of Justice.
20     Q   Do you know what happened to his files
21 when he left?
22     A   I don't know.  I don't know that he had

Page 123

1  files.
2      Q   But if he did you don't know whether
3  they're still in your office or somewhere else?
4      A   I do not.
5      Q   When you were Assistant Attorney General
6  and also had supervisory responsibility over tobacco
7  litigation, did you also maintain files as Assistant
8  Attorney General?
9      A   I believe that I did.  It's my
10 recollection that in that circumstance that it was
11 an opened file that was in some sort of --
12     Q   A more formal filing system?
13     A   I more formal filing system.  I could be
14 wrong on that but I think there was a more formal
15 listing in the office of various Civil Division
16 cases and -- but.
17     Q   Aside from what the office may have more
18 formally retained or kept as a matter of business,
19 did you as Assistant Attorney General keep your own
20 more personal files similar to the redwells you've
21 described that you have as Associate Attorney
22 General?

Page 124

1      A   I don't think so.  I think they were
2  within a more formalized file structure but I don't
3  remember.
4      Q   And what would have happened then to any
5  personal notes that you took from meetings or phone
6  conversations or the like when you were Assistant
7  Attorney General relating to the tobacco litigation,
8  where would those things be housed?
9      A   They would be either in the redwells that
10 I maintained and that I may have had a pad of notes
11 or a group of notes that I took with me to the
12 Associate's Office but I don't remember they would
13 be in one of those two places.
14     Q   Am I hearing you --
15     A   I presume.
16     Q   -- correctly that when you were Assistant
17 Attorney General you also did maintain some kind of
18 redwell that was different from the more formal file
19 you've described your office having?
20     A   No, I think it was part of the more formal
21 file but I don't remember that exactly but I believe
22 that Carrie Gunn, my administrative assistant, had a

Page 125

1  more formal filing list, if you will.
2      Q   So, for example, if you had had a meeting,
3  say just hypothetically, with the trial team in
4  which you took notes and you wanted to retain those
5  notes when you came back from the meeting would you
6  have given those to your personal assistant to file?
7      A   I don't think so, I would have just put
8  them in the file myself.
9      Q   But they would have been housed in that
10 one single more formal filing system that you've
11 described?
12     A   I believe that's the case, that would be
13 what I would presume would be my custom but I don't
14 recall specifically exactly how that worked.
15     Q   When you went to become Associate Attorney
16 General, did you bring with you any of the files you
17 had maintained on the tobacco litigation?
18     A   I presume I brought with me notes but I
19 can't be sure of that.  If I did not bring them they
20 remained in the file, but I just haven't gone
21 through the notes to determine what the dates of
22 them were.  If they were June 2003 and I became

32 (Pages 122 to 125)

Page 126

1  Associate Attorney General in July 2003, then I'm
2  likely, this is, again, speculation on my part but
3  I'm likely to have brought those notes with me in
4  the event that there was anything that I needed to
5  do and I just I don't know if there were notes in
6  June 2003 or whether I brought them, but it would be
7  in one of those two files would be my assumption.
8      Q   You're talking a lot about assumptions and
9  you not -- I gather that you're not precisely
10 certain what is in the redwells that you currently
11 have; is that correct?
12     A   I'm not -- I couldn't -- let me -- I am
13 certain that it's all of the documents that I have
14 maintained since I became Associate Attorney
15 General. I'm not sure whether a particular document
16 is in there other than the Circuit Court opinion,
17 I'm sure of that.
18     Q   When you were preparing --
19     A   Maybe some others.
20     Q   When you were preparing for your Senate
21 Confirmation Hearing, did you have occasion to
22 review your redwell or any part of it, when I say

Page 127

1  your redwell, I mean the files you have relating to
2  the tobacco litigation?
3      A   I'm sure that I got out and reviewed Judge
4  Sentelle's opinion of the Porter 886 so I'm certain
5  that I looked at those documents going back through
6  and reviewing portions of the redwell.
7      Q   In your testimony you -- I'm referring now
8  to the written testimony in response to Senator
9  Biden's questions, you also made reference and we
10 touched on this briefly before you made reference to
11 certain other decisions such as the February 28th
12 decision?
13     A   What is the February 28th decision?
14     Q   February 28th of 2005 the decision where
15 Judge Kessler used the language that the Government
16 had suffered a body blow or something to that
17 effect?
18     A   Talking about order 886. I didn't
19 understand what you were referring to.
20     Q   Is that something that you also reviewed
21 as part of your --
22     A   Preparation for that Senate testimony?

Page 128

1      MS. OLSON:  Objection, again, we're getting
2  outside of scope of bad faith delays and FOIA
3  processing.
4      MS. WEISMANN:  We're trying to identify the
5  universe of documents.  He says he doesn't recall
6  and I'm trying to find out if there are any aspects
7  of the file that he has reviewed more recently to
8  probe his memory and I think that is a fair --
9  fairly within what the court has allowed.
10     MS. OLSON:  You can answer.
11     A   The question is order 886 within the
12 redwell?
13     Q   Well, you referred to it in your written
14 testimony?
15     A   It is within the redwell, I'm sure of
16 that.
17     Q   And I guess what I'm trying to find out is
18 in the course of preparing your response to the
19 written questions, did you review that order and, if
20 so, did you review it -- did you take it from your
21 redwell?
22     A   I don't know whether I printed it off or

Page 129

1  whether someone printed it off for me from the
2  website.
3      Q   You don't recall going into your redwell
4  and locating a copy or having someone else do that?
5      A   No, I don't, but I certainly had a copy of
6  886.
7      Q   And in the course of the OPR investigation
8  for which you have said you were a target, at any
9  time I assume also you were interviewed for that
10 process?
11     A   Yes.
12     Q   And in preparation for your interview did
13 you at any time review the contents or any of the
14 contents of your redwell files?
15     A   Yes.
16     Q   And when in time would that have been?
17     A   I was interviewed on January 13, 2006
18 immediately before I had hip replacement surgery and
19 that's why I'm able to remember it, the date
20 specifically, because they were planning on
21 interviewing me at some date that was after the date
22 of my scheduled surgery.  And so I reviewed the

33 (Pages 126 to 129)

Capital Reporting Company

Page 130

1  contents of the redwell, not every page or
2  everything, but leafed through it prior to January
3  13, 2006.
4      Q    And based on that review, and I'm not
5  asking for the contents of any of the documents,
6  what is your recollection about the nature of the
7  documents, the kinds of documents that were in your
8  redwell?
9      A    Well, as I said before, there was those
10 two opinions.
11     Q    By those two you mean the D.C. Circuit
12 opinion and the February 28th opinion?
13     A    The February 28th order 886.  And I had
14 some notes, note pads that I looked at.  I had some
15 e-mails I'm sure.
16     Q    When you say note pads, what were they
17 recordations of?
18     A    Different meetings.
19     Q    Meetings?
20     A    Well, I mean, I don't know that there was
21 no telephone call in there or that there was no --
22     Q    But these were your personal notes?

Page 131

1      A    Yeah, these were notes that I wrote in my
2  own hand, if that's what you mean by personal notes.
3      Q    And do you recall if any of those notes
4  related to conversations you had with tobacco
5  industry representatives?
6      A    I don't know whether I can respond to that
7  question without advice of counsel because there are
8  certain pending orders that prohibit me from
9  discussing certain things.
10     Q    Again, I'm not asking you any of the
11 substance of any of these conversations.  The
12 simply, just to be clear on what the question is,
13 I'm simply asking whether you have any recorded
14 notes of conversations with representatives of the
15 tobacco industry?
16     A    I believe that I am prohibited from
17 answering that question.
18     MS. OLSON:  She's referring to Judge Kessler's
19 order.
20     Q    Which order was that?
21     A    It's an order under seal.
22     MS. OLSON:  It's a very restrictive order.

Page 132

1      MS. WEISMANN:  I think we need to know that.
2      MS. OLSON:  I don't have the order in front of
3  me and if he feels that it's perhaps encompassed by
4  that order then I can either go find out now or.
5      MS. WEISMANN:  After this deposition why don't
6  you go back and review the terms of the order and
7  then let us know what your position is and if it is
8  that it's covered by the order will you at least
9  give us the language of the order that you think
10 covers the question?
11     A    The order is under seal.
12     MS. OLSON:  The order itself is under seal.
13     MS. WEISMANN:  Well, at a minimum then --
14     MS. OLSON:  I'm not even allowed to see it,
15 that's why I don't know the contents of it.
16     MS. WEISMANN:  Let's go off the record for a
17 minute.
18     VIDEO TECHNICIAN:  The time is 3:05 p.m., we're
19 off the record.
20         (Off the record)
21     VIDEO TECHNICIAN:  The time is 3:14 p.m., we're
22 back on the record.

Page 133

1      MS. OLSON:  He cannot respond to the question
2  pursuant to an order issued by Judge Kessler which
3  is under seal, the contents of which he is familiar
4  with having read it and agreed to it and if -- I
5  think your response was that if you did have any
6  such documents or information it would be in your
7  redwell but I don't want to answer that for you.
8      A    Yeah, if I have such documents it would be
9  in my redwell, but I'm not suggesting to you one way
10 or another whether there are such documents.
11     Q    I have a request which is that when you go
12 back to main Justice either you or someone at your
13 direction who has access to this order if you would
14 review it and just verify that in fact given the
15 fact that you have limited recollection of a vast
16 majority of documents to which you've been directed
17 and given the fact we have no independent way to
18 verify this?
19     A    You can go to Judge Kessler, I presume.
20     MS. OLSON:  Maybe the question would be does he
21 recall the order.
22     A    I do recall the order.

34 (Pages 130 to 133)

Page 134

1    MS. WEISMANN: I'm asking the questions.
2    MS. OLSON: You're making a request, you're not
3  asking questions.
4    Q   Let's get at it this way. Hypothetically
5  if you had informal discussions with representatives
6  from the tobacco companies that were not pursuant to
7  any formal settlement process would those kinds of
8  conversations be within the scope of this order?
9    MS. OLSON: I object.
10   A   I can't answer the question.
11   MS. OLSON: You're asking him to speculate.
12   Q   I'm trying to probe what the parameters of
13 that -- you can understand that we are basically
14 shut down by this order which you have?
15   A   As am I.
16   Q   But I have no idea what its parameters
17 are. All I'm trying to do is in a hypothetical
18 fashion find out are there any conversations that
19 you hypothetically had or could have had with
20 tobacco representatives that would not be
21 encompassed by this order?
22   MS. OLSON: Objection, if you can answer that

Page 135

1  question without violating the order you are free to
2  do so.
3    A   I have no idea what the question means
4  hypothetical if there was something, you know, out
5  there, but.
6    Q   I am assuming that the order applies to
7  all the parties in the case and not just to you?
8    A   The order is under seal. I'm not going to
9  respond to the question about an order that's under
10 seal that burdens me with an obligation.
11   Q   I don't understand how this question --
12 let me try to ask it again. Is there any question
13 about any tobacco -- any conversation that you may
14 have had with a tobacco representative without
15 conceding in any way that you had such a
16 conversation that you could identify given the
17 court's order?
18   A   I don't believe that I can answer that
19 question under the court's order.
20   Q   All right. Let's go back then to the
21 notes that you were describing. If you had any
22 conversations with the White House, would they have

Page 136

1  been contained in those note pads that are in your
2  redwells?
3    A   Probably so, but I don't remember any
4  specifically, but I would think so.
5    Q   When you reviewed these redwells for
6  purposes of your interview with OPR, do you recall
7  seeing any notes that were recordings of
8  conversations with White House personnel?
9    A   I don't recall any.
10   Q   What other documents can you identify or
11 do you recall from your review in January of this
12 year are in your redwell?
13   A   Besides e-mails, court opinions, my note
14 pads there may have been other intermediate orders
15 from Judge Kessler or orders from other unrelated --
16 or orders from other cases that were not the tobacco
17 case but cases that were against the tobacco
18 industry. There was some private suits but I'm not
19 sure that I have any of those in there, I just don't
20 remember.
21   Q   And is there any other category of
22 document that you can recall?

Page 137

1    A   Not that I recall right now.
2    Q   Have you had occasion since January of
3  this year to review any of the contents of your
4  files I think you said --
5    A   Sure.
6    Q   -- when you prepared for your Senate
7  Confirmation Hearing?
8    A   I looked at the Circuit Court opinion and
9  Order 886 and some of my notes I'm sure.
10   Q   Do you recall when you placed Order 886 in
11 the redwell?
12   A   No, I don't.
13   Q   Do you recall that you put it in close in
14 time to when the order itself was issued?
15   A   I don't. I don't think that I did but I
16 might have.
17   Q   There's no other -- are there in your
18 redwells, are there any memoranda?
19   A   I'm sure there are memoranda from Steve
20 and from Sharon from the tobacco litigation trial
21 team, from various members, I'm sure there are.
22   Q   You said that there was some e-mail and

35 (Pages 134 to 137)

Capital Reporting Company

Page 138

1  you testified earlier that it was not your general
2  practice to print out e-mail, so how was it that you
3  came to be in possession of these specific e-mail?
4      A   I don't know.  That's sort of something
5  that I don't do but I thought I testified that if
6  the e-mail was significant to me for one reason or
7  another or it was something that I needed to pursue
8  or set up on a to-do list that I might have printed
9  it off.  I think that's what I testified to.
10     Q   Were these all e-mail within the
11  Department of Justice?
12     A   I don't know.  I believe so but do you
13  mean if I got an e-mail from somebody at the Surgeon
14  General's Office or was copied on an e-mail from
15  them, would that be possible?  You know, it may have
16  been possible but I don't think so.  My recollection
17  is that these are all internal DOJ e-mails but I
18  can't be sure of that.
19     Q   Did you ever on any subject have e-mail
20  correspondence with individuals at the White House?
21     A   I don't remember.  I presume that I
22  probably did but I don't remember.

Page 139

1      Q   And so is it possible included in these
2  e-mail are also e-mail with individuals at the White
3  House?
4      A   I don't know.  I don't know.  Certainly
5  possible, but I don't remember any -- I don't have
6  any recollection of a e-mail to the White House but
7  that doesn't mean that there weren't some.
8      Q   And other than the occasions you've
9  described has there been any other occasion since
10  January of this year when you reviewed the contents
11  of your redwells?
12     A   There may have been but I don't remember
13  any.  The only thing that occurs to me is the Senate
14  Confirmation Hearing and that process.
15     Q   In response to Senator Biden's questions
16  did you again review the contents of your e-mails --
17  I'm sorry, of your redwells?
18     A   I'm sure I looked at something in there.
19  I believe I testified that I'm confident that I
20  looked at the Circuit Court opinion and Order 886 as
21  part of that.  I also provided to the Senate staff,
22  now that I think of it, a letter to the editor from

Page 140

1  Frank Marine which he stated that the decision on
2  the cessation remedy was not a politically
3  influenced decision.
4      Q   And that was a document you got from your
5  redwell itself?
6      A   I don't know that I got -- I don't think
7  that I got that from my redwell.  I think that that
8  was gotten from an Internet site in the Washington
9  Post.
10     Q   Do you have -- is there a copy of that
11  editorial in your redwell?
12     A   I don't know.
13     Q   And do you recall at the time that that
14  editorial was generated did you see any earlier
15  drafts of it or other documents surrounding its
16  preparation?
17     A   Oh, sure, yes.
18     Q   And do you know whether or not any of
19  those documents are in your redwell?
20     A   I don't know.
21     Q   Now, describe for me physically where
22  these redwells are housed?

Page 141

1      A   I have a desk with a credenza and it's in
2  one of the drawers of the credenza or the desk.
3      Q   Who has access to those files?
4      A   Anybody that wants to open my drawer.  I
5  don't keep it under lock and key.
6      Q   Under those basis do other people have
7  access to your files?
8      A   I have no idea.  I presume that they
9  don't, but who knows whether the people that come in
10  and do sort of security checks on what documents are
11  on your desk and make sure that you don't have any
12  classified documents laying around.  I would be
13  surprised if anybody went into it without telling me
14  but stranger things have happened, I suppose.
15     Q   And do the lawyers on your staff have
16  occasion to access your personal files?
17     A   It would not surprise me that in
18  responding to the OPR investigation that Jeff Senger
19  or Lou Reyes went in there and I'm sure if they went
20  in there they told me about it and said I've got to
21  go do X or Y and want to look at this or that, but I
22  don't remember that.  I presume that that happened

36 (Pages 138 to 141)

Page 142

1 and I don't know about the FOIA request just because
2 I don't know what transpired there.
3     Q    With respect to OPR did they make a copy
4 of your files?
5     A    I don't know what they did.  I presume
6 they made a copy of my files and provided them to
7 OPR.
8     Q    And have you ever been advised or become
9 aware that a copy of those files was made for
10 purposes of our FOIA request?
11    A    I don't know.  I said before I have no
12 idea what was done in relation to the FOIA request.
13    Q    So as far as you know the Department could
14 have ignored your files all together, you just don't
15 know?
16    A    I'd be very surprised if they did, but I
17 don't know, but there certainly would be people who
18 would know.
19    Q    Let's go back to McCallum Exhibit 2 which
20 is a series of e-mails and have you had an
21 opportunity to review these e-mails?
22    A    Some of it.  I haven't read the entirety

Page 143

1 of it, but.
2     Q    Well, take what time you need?
3     A    Okay.  Well, give me the question and I'll
4 make a determination as to what the detail is that I
5 need to --
6     Q    I want to know if in reading these e-mails
7 it refreshes your memory on something so I think it
8 would be helpful for you to --
9     MS. OLSON:  We don't object to that question
10 but he do renew our objection to the use of this
11 document because it's subject to the deliberative
12 process privilege.  I haven't read it very closely
13 but there might be attorney/client information in
14 here as well.
15    Q    Let me know when you're ready.
16    A    I'm ready.  I'll take a crack at it
17 without reading all of it.
18    Q    My question is seeing this chain of
19 e-mails discussing a draft of your USA Today
20 editorial, does that refresh your recollection about
21 what documents may have been generated around the
22 drafting of that editorial?

Page 144

1     A    No, I presume that these are the documents
2 that would have been generated.
3     Q    And are these the kinds of documents that
4 you would normally have made copies of and remained
5 in your redwell?
6     A    Not necessarily.  I don't know whether
7 these are in my redwell or not.  I doubt it.
8     Q    But you don't know?
9     A    I don't know for certain and I'm not going
10 to sit here and tell you they're not in the redwell
11 because I don't know, but I can tell you that as of
12 a matter of practice I don't think that I would keep
13 in the redwell an e-mail chain that says I'm
14 tweaking this paragraph and I'm changing this
15 paragraph and I'm changing this paragraph and wait a
16 minute, the newspaper's going to cut this paragraph
17 out so we got to make it shorter or they won't print
18 it or, so I would be surprised if this were in there
19 but it might be, I just don't know.
20    Q    If you had received a directive or -- from
21 the White House relating to this topic, is that
22 something that you would have expected to keep?

Page 145

1     A    I don't remember ever receiving any
2 directive from the White House about anything that
3 had to do with the tobacco case including this
4 particular op ed.  As I read this, it shows that the
5 White House had wanted some changes and I'm not
6 exactly sure what those changes were and whether or
7 not they were ones that were accepted by all of the
8 people that were involved in this process of
9 drafting and making comments on a letter to the
10 editor or op ed that I was going to sign and author
11 so I just don't -- I don't recall any such
12 directive.
13    Q    And, again, focussing on this subject
14 matter and trying to recreate if we can what might
15 be in your redwell, what was the period of time that
16 this editing process consumed?
17    A    I have no idea, but I would presume that
18 it would be 24, 48 hours beginning on the 8th at
19 3:55 p.m. or something like that.
20    Q    Do you recall when you first drafted the
21 editorial?
22    A    No.

37 (Pages 142 to 145)

Capital Reporting Company

Page 146

1    Q    How many days it was before it was
2  actually published?
3    A    No, I don't, but I have a general
4  recollection that it was not days before, that it
5  was immediately before.
6    MS. WEISMANN:  I need about a three minute
7  break.
8    VIDEO TECHNICIAN:  The time is 3:33 and we'll
9  be off the record.
10   (Off the record)
11   VIDEO TECHNICIAN:  Time 3:35 and we are back on
12  the record.
13  BY MS. WEISMANN:
14   Q    Again, focussing on the kinds of documents
15  that you might have put into your redwells, your
16  personal files on the tobacco litigation, would you
17  have put any notes that you took relating to the OPR
18  investigation?
19   MS. OLSON:  I object to this line of
20  questioning.  I mean, we're trying to be
21  accommodating and allow you some latitude but there
22  is no clear link between his redwell and any alleged

Page 147

1  bad faith delay in the processing of the FOIA
2  litigation.  He said he has delegated those
3  responsibilities, he had no connection or knowledge
4  of what happened, no connection with or knowledge of
5  what happened and what is in his file is irrelevant
6  so.
7    MS. WEISMANN:  As I told --
8    MS. OLSON:  Not to mention outside the scope of
9  both orders.
10   MS. WEISMANN:  As I told Judge Kay we were
11  going to inquire into the universe of responsive
12  documents.  The Department has formally identified
13  the universe of responsive documents.  Given the
14  delay I think we're entitled to probe whether -- the
15  accuracy of that identification.  So I have a
16  question and to get back to your redwell to try to,
17  again, it's to ascertain the potential universe of
18  documents that might be in it, not the specific
19  documents, not the substance of those documents but
20  the nature of the documents.  Would you have put in
21  that redwell any documents relating to the OPR
22  investigation?

Page 148

1    MS. OLSON:  I still object to the question
2  because it's unclear to me how the contents of his
3  redwell have any connection to delay in FOIA
4  processing and --
5    MS. WEISMANN:  Are you directing him not to
6  answer?
7    MS. OLSON:  No, I'm not.
8    Q    Okay.  Then you may answer the question.
9    A    Would you read me back the question?
10   (Record was read)
11   A    That I took related to the OPR
12  investigation, I don't know what you mean by that.
13   Q    Personal notes that you might have taken
14  with respect to any conversations?
15   A    Any conversations in the interview that
16  the OPR people had with me?
17   Q    In any context of the OPR, either the
18  interview or conversations you might have had with
19  OPR about the investigation?
20   A    I had, best I can recall, I didn't have
21  any conversations with anybody at OPR about the
22  investigation other than during the course of the

Page 149

1  interviews and I didn't take notes that I remember
2  during the interviews.  It might have been possible
3  that I wrote down when they asked me a question a
4  point that I wanted to make or something that I
5  thought was responsive but I don't remember that.
6    Q    I'm going to show you what's been marked
7  as McCallum Exhibit 3 and ask you to read it?
8    A    I've read it.
9    Q    Does this refresh your recollection as to
10  whether or not you had any conversations with anyone
11  from OPR?
12   A    I don't think I ever had a conversation
13  and I stand by that.  I might be wrong but I don't
14  think I ever had a conversation with Marshal
15  Jarrett.  It's interesting to me that this indicates
16  that I was going to call Jarrett or check with
17  Jarrett and I don't remember ever having done that.
18  It may be that I checked with Schiffer regarding
19  Sharon Eubanks' view that Schiffer was prejudiced
20  against her and asked Schiffer to determine whether
21  he was the right person to do that but I don't have
22  a recollection of that.  But I don't think I ever

38 (Pages 146 to 149)

Capital Reporting Company

Page 150

1  contacted Marshal Jarrett and I don't think that I
2  ever told Sharon Eubanks that I would contact
3  Marshal Jarrett. She may have heard me say that and
4  understood it that way, but it may be one of those,
5  you know, there's a judge in Atlanta that I used to
6  try a bunch of cases in front of, Richard Freeman,
7  and he had on his desk a little thing that said I
8  know that you think you understood what I just said,
9  but what you've got to realize is what you heard is
10  not what I meant and there are --
11      Q    You've answered my question, thank you.
12      A    I think I'm entitled to go ahead and
13  answer it fully and completely and so I do not think
14  that I said that, although she may have understood
15  it that way, so.
16      Q    Okay.
17      A    But, you know, you can check with Marshal
18  Jarrett and if he says that I contacted him then his
19  recollection is better than mine.
20      Q    Just focussing in on Mr. Metcalfe. Do you
21  know whether or not you have any documents relating
22  to e-mails between you and Mr. Metcalfe?

Page 151

1      A    There are in my -- not in my redwell but
2  there are many e-mails between Mr. Metcalfe and me
3  over the years.
4      Q    I'm sorry, I'm talking about relating it
5  to the tobacco litigation or through the FOIA
6  request?
7      A    Without someone searching my e-mails I
8  can't be sure of that. I can tell you that I do not
9  think there are any but who knows if I got one from
10  Dan, I just don't know.
11      Q    And do you recall any e-mails between you
12  and Mr. Brody regarding CREW's FOIA request?
13      A    I don't. I don't. But there may have
14  been some similarly we could certainly search my
15  e-mails and certainly search Steve's e-mails and if
16  there are any there I presume that he maintained his
17  just as I have archived and maintained mine.
18      MS. WEISMANN:  This concludes the deposition,
19  we're finished.
20      MS. SHAPIRO:  Thank you for your time.
21      MS. OLSON:  Thank you very much.
22          (Reading and signing was waived)

Page 152

1      (3:35 p.m. the deposition was concluded)

Page 153

2      I, TEAGUE GIBSON, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing deposition was duly sworn by me; that
6  the testimony of said witness was taken by me in
7  stenotypy and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness; that
10  I am neither counsel for, related to, nor employed
11  by and of the parties to the action in which this
12  deposition was taken; and, further, that I am not a
13  relative or employee of any counsel or attorney
14  employed by the parties hereto, nor financially or
15  otherwise interested in the outcome of this action.
16
17          Teague Gibson
            Notary Public in and for
18          the District of Columbia
19
20
21
            My commission expires:
22  June 14, 2010