**EXHIBIT A**



U.S. Department of Justice

Office of Information and Privacy

Telephone: (202) 514-3642

_Washington, D.C. 20530_

ADVANCE COPY BY FAX

JAN 2 3 2006

Anne L. Weismann, Esq.
Citizens for Responsibility
   and Ethics in Washington
Second Floor
11 Dupont Circle, NW.
Washington, DC  20036

Re:   Appeal No. 05-2367
       Request No. 0145-FOIA-8394
       MAP:JGM

Dear Ms. Weismann:

     You appealed on behalf of Citizens for Responsibility and Ethics in Washington (CREW) from the fee waiver determination made by the Civil Division with regard to your organization's request for access to records concerning the government's proposed penalty in United States v. Philip Morris USA, et al., No. 99-2496 (D.D.C.), "of any kind and from any source, regardless of format," and including records related "in any way to any offer of settlement" from thirteen enumerated companies and institutions.  (CREW request dated June 28, 2005, ¶ 2 at 1.)

     As you know, the statutory standard for evaluating fee waiver requests provides that fees shall be waived or reduced "if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii) (2000).  In determining whether you have satisfied this statutory standard, we considered the six factors set out in the Department of Justice regulation that puts this statutory standard into effect.  See 28 C.F.R. § 16.11(k) (2005).

     In support of your appeal you state that there has been wide public attention to the government's proposed penalty and seemingly question whether the penalty was a result of improper political influence.  You also state that your request concerns the operations of the federal government and that "disclosure will likely contribute significantly to a better understanding of the individuals and organizations that influenced, or attempted to influence, the litigating position of the United States."  (CREW appeal dated July 11, 2005, ¶ 3 at 1.)  You further state that CREW is a nonprofit corporation organized under section 501(c)(3) of the Internal Revenue Code and that CREW is committed to "protection of citizen rights to be aware of the activities of government officials," to "ensuring the integrity of those officials," and to "empowering citizens to have an influential voice in government decisions."  (CREW appeal dated July 11, 2005, ¶ 3 at 2.)  Your letter of appeal also describes the methods by which CREW advances its mission and advises that this request is not in its financial interest.  And your letter asserts that CREW will analyze the information that it receives and will share that analysis with the public.

JGM

-2-

With regard to the Civil Division's response to CREW of July 7, 2005, advising you of its fee waiver determination, you appear to have misconstrued that response inasmuch as you concluded that the Civil Division had "speculative[ly] claim[ed]" that all records responsive to CREW's request were exempt from disclosure (with the exception of those already in the public domain), thus resulting in a "premature and faulty" fee waiver determination. (CREW appeal dated July 11, 2005, ¶¶ 1-2, at 2.) This Office regards that letter as a partial fee waiver determination limited to the records found as a result of the Civil Division's preliminary search (of approximately three hours). (See Civil Division response dated June 7, 2005, ¶ 1 at 2.)

Your conclusion that the Civil Division's fee waiver determination encompasses all responsive records is at odds with the Civil Division's explanation to you that "if, as we proceed with the processing we determine that records can be released" it would evaluate those records for fee waiver purposes. (Id. ¶ 2 at 2.) Likewise, your reading of the Civil Division's letter gives no effect to Civil Division's statement that it "reviewed a portion of the documents responsive to your request." (Id. ¶ 1 at 2.) While the Civil Division's letter ultimately finds that a "waiver of fees is therefore not appropriate," a reading of that sentence, in conjunction with the entire paragraph in which it is located, makes it clear that all references to "these records" in that paragraph are made with regard to only a portion of the records responsive to your request. It is "these records," therefore, that are the subject of this response.

While I understand that there is some likelihood that records similar to those already located will be found among the records that have yet to be reviewed, until that review is completed, and a fee waiver determination is made by the Civil Division for that portion of records, this Office cannot (nor can the Civil Division) predict what that result might be.

It also appears that you have misconstrued the meaning of at least a portion the statutory fee waiver standard. The language of the fee waiver standard speaks to whether "disclosure" of the requested information would likely contribute to the public's understanding of government operations. If the Civil Division were to simply award a fee waiver to CREW based upon the existence of responsive records, without taking into account which of those records would likely be "disclosed," its action would not comport with the directive of the fee waiver provision that the public interest requirement be met through "disclosure of the information." 5 U.S.C. § 552(a)(4)(A)(iii); see also, e.g., Van Fripp v. Parks, No. 97-0159, slip op. at 10 (D.D.C. Mar. 16, 2000) (stating that "reviewing agencies and court should consider . . . whether the disclosable portions of requested information are meaningfully informative in relation to the subject matter requested" (citing agency's fee waiver regulation)).

You seemingly would have had the Civil Division, and now this Office, find (or, to use your own words, "speculatively claim") that all of the records responsive to your request "satisf[y] fully the criteria for a fee waiver" as you have stated in your appeal. Such a position not only is inconsistent with the wording of the statute as explained above, as it would have been made without an assessment of the nature of the information likely to be disclosed, but it also would place the agency in the untenable position of potentially being unable to recoup fees to

-3-

which it might otherwise be entitled.[1]  The majority of courts that have addressed this issue have concluded that until a fee waiver determination has been made and (if a full fee waiver is not granted) the requester has agreed to pay all the assessable fees, the request is not yet ripe for processing because that has been no compliance with the fee requirements of the FOIA.

With regard to those records that already have been located and reviewed, this Office has concluded that the fee waiver determination made by the Civil Division was correct.  In reaching this decision on your appeal, the six factors referenced above were analyzed as they apply to CREW's request.  It is apparent that many of these records concern the operations or activities of the federal government (fee waiver factor one) and that CREW's interest in the records do not appear to be primarily commercial (fee waiver factors five and six).  Further, you have provided some support for CREW's intention to analyze the records that it receives and that that analysis will be shared with the public through various methods (factor three).  Your request, however, fails to satisfy the remaining factors.  As you are aware, the requester bears the initial burden of demonstrating that it is entitled to a fee waiver.

The releasable records that have been identified thus far consist of records that are part of the public court record in the tobacco litigation.  A fee waiver is not appropriate for such records as the public understanding will not be significantly enhanced by release of information that is already available to the public (fee waiver factors two and four).  See, e.g., Judicial Watch, Inc. v. Dep't of Justice, No. 03-5093, 2004 WL 980826, at *18 (D.C. Cir. May 7, 2004) (finding "no basis to conclude that [plaintiff] is entitled to a blanket fee waiver" where plaintiff did not take issue with the reasonableness of the district court's finding of the public availability of the documents already released; upholding the government's refusal to process additional documents without payment of fees); Carney v. United States Dep't of Justice, 19 F.3d 807, 815 (2d Cir. 1994) (noting that "where records are readily from other sources . . . further disclosure by the agency will not significantly contribute to public understanding"); McClellan Ecological Seepage Situation v. Carlucci, 835 F.2d 1282, 1286 (9th Cir. 1987) (recognizing that new information has more potential to contribute to public understanding).

---

[1] If fee waivers were granted simply on the basis of the face of the request without an assessment of the records likely to be disclosed, and thereafter during the actual processing of the records it were determined that the requested records are properly exempt from disclosure, the agency (having already granted a fee waiver) would be without recourse to demand payment. This is further so because Department of Justice regulations require -- in accordance with the fee guidelines issued by the Office of Management and Budget -- that when assessable fees exceed $25.00, the requester must commit to pay them in writing before the agency is obligated to process that request; in other words -- no commitment, no obligation to process.  While this procedure was created in part to give the requester some protection against fees without first receiving notification from the agency and then agreeing to them, it could have an extraordinary impact on an agency's ability to collect fees if fee waivers, as you appear to suggest, were determined merely on the basis of the nature of the request alone.

-4-

You emphasize in both your initial request and appeal, presumably to enhance CREW's claim that it is entitled to a fee waiver, that CREW is a nonprofit corporation organized under section 501(c)(3) of the Internal Revenue Service Code. While this statement is not disputed, it is irrelevant with regard to CREW's entitlement to a fee waiver. It is well settled that there is no automatic waiver of fees for nonprofit institutions. Further, you describe CREW's commitment to the "protection of the citizen rights to be aware of the activities of government officials and to ensuring the integrity of those officials," and that "CREW is dedicated to empowering citizens." (CREW request dated June 28, 2005, ¶ 3 at 3.) Again, such characterizations address CREW's mission statement and not its qualifications under the statutory standard, and so they are not helpful to this Office in its evaluation of CREW's entitlement to a fee waiver. Accordingly, with regard to the records thus far located and reviewed by the Civil Division, your appeal is denied.

While you have been provided with your full measure of statutory entitlement with regard to search time, your entitlement to one hundred pages of releasable records without cost has not yet been exhausted. Given the wording of your request, however, it would appear that CREW is not interested in receiving the publicly available information that has been located to date. If this is incorrect please inform the Civil Division directly. You should understand, however, that because you have not been granted a fee waiver at this time and because you have not indicated an amount that CREW is willing to pay in the absence of a fee waiver, no further action is required by the Civil Division beyond your statutory entitlements. See 5 U.S.C. § 552(a)(3); see also, e.g., Vennes v. IRS, No. 89-5136, slip op. at 2-3 (8th Cir. Oct. 13, 1989) (explaining that agency is under no obligation to produce material until either requester agrees to pay fee or fee waiver is approved); Casad v. HHS, No. 01-1911, 2003 U.S. Dist. LEXIS 13007, at *18 (D.D.C. June 20, 2003) (recognizing that where fee waiver is denied, no action by agency is required until requester agrees to pay fee associated with request); Daniel v. United States Dep't of Justice, No. 99-2423, slip op. at 2 (D.D.C. Mar. 30, 2001) (dismissing complaint for production of records where plaintiff had failed to pay fee after fee waiver was denied), summary affirmance granted, No. 01-5119, 2001 WL 1029156, at *1 (D.C. Cir. Aug. 28, 2001). The Civil Division previously had asked that you specify an amount of fees that you are willing to expend for this request. To date you have not done so. Please be advised that should you do so and if upon further processing by the Civil Division records are identified that are releasable and qualify for a fee waiver, any money owed by CREW would be reduced commensurate with the amount of the fee waiver granted.

With reference to the breadth of your request, I note that your request, as originally submitted, sought records related to any penalty with regard to the tobacco litigation, as well as records related to any offer of settlement over a multi-year period. There was an enormous volume of potentially responsive records responsive to that request. I now have been informed that as a result of recent discussions between the parties, the volume of records to be reviewed has been substantially reduced.

While I would still suggest that you give consideration to agreeing to pay a particular amount of fees and informing the Civil Division's FOIA Office of that amount in a letter, you might also consider contacting that office, assuming such communications are viable, and asking that it provide you with an estimate of the fees needed to process your request as now modified.

-5-

If you choose the former, it would allow the Civil Division to move forward with your request upon receipt of your commitment letter. By choosing the latter and after receiving the fee estimate, you may then give consideration to agreeing to pay the full amount estimated or a portion of it. As previously mentioned, upon further processing of your request, if it is determined that records reviewed do qualify for a fee waiver, any money owed by CREW would be reduced commensurate with the amount of the fee waiver granted.

Even though this Office is aware that you already have proceeded to litigation, agency regulations require that you be informed of your right to judicial review of this action in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Daniel J. Metcalfe
Director

**EXHIBIT B**

**U.S. Department of Justice**

_____

Office of Information and Privacy

_____

*Telephone: (202) 514-3642*                              *Washington, D.C. 20530*

Ms. Anne Weismann                                        JAN 19 2006
Citizens for Responsibility and Ethics
   in Washington
11 Dupont Circle, N.W.                     Re:   AG/05-R0788
2nd Floor                                        DAG/05-R0789
Washington, DC  20036                            ASG/05-R0790
                                                 MAP:VRB

Dear Ms. Weismann:

     This is in response to your Freedom of Information Act (FOIA) request dated June 28, 2005, and received in this Office on July 1, 2005, in which you requested certain records concerning the government's litigation of <u>United States v. Philip Morris, Inc.</u> This response is made on behalf of the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General.

     By letter dated July 11, 2005, we acknowledged receipt of your request and, in an effort to speed up our searches for responsive records, suggested that you narrow the scope of your request. However, because we did not receive any response or indication from you that you were willing to narrow the scope of your request, we initiated records searches based on the phrasing of your initial letter to this Office, which sought records "discussing or mentioning in any way any penalty that the U.S. Department of Justice . . . can, may, should or will propose" in the litigation of <u>United States v. Philip Morris, Inc.</u> since January 2001, as well as records of a number of contacts "concerning in any way the tobacco lawsuit." Subsequently, on January 9, 2006, after the commencement of litigation in this case, you agreed to narrow the scope of your request to "documents dealing with the identification and selection of remedies sought by the Department and any changes to particular remedies sought by the Department from January 2005 onward, including records discussing, mentioning or referring in any way to the government's decision to reduce the penalties it is seeking against the tobacco industry from $130 billion to $10 billion or the government's decision to offer testimony from any witness during the remedies phase of trial in <u>United States v. Philip Morris.</u>" On other occasions, you also advised that you are not interested in receiving Court filings or correspondence. Accordingly, we were able to significantly narrow the scope of our records searches based on this new formulation of your request.

     You have requested a "public interest" fee waiver for this request. A fee waiver is appropriate only when "disclosure of the [requested] information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); <u>see also</u> 28 C.F.R. § 16.11(k) (2005) (six fee waiver factors to be considered). While the records you seek do concern the operations or activities of the Department of Justice and you do not appear to have an overriding commercial interest in the

-2-

records, other relevant factors have not been met. Your blanket assertion that "these records are likely to contribute to the public's understanding of the individuals and organizations that influence or attempt to influence the litigating position of the United States of America in a lawsuit of major and far-reaching consequences" is not a sufficient basis for me to grant a fee waiver. First, you provide no evidence that, in fact, any individual or organization attempted to influence or did influence the government's litigating position. Moreover your statement is too ephemeral a basis on which to grant a fee waiver. See American Fed'n of Gov't Employees v. United States Dep't of Commerce, 632 F. Supp. 1272, 1278 (D.D.C. 1986) (finding allegations of malfeasance too ephemeral to warrant waiver of search fees without further evidence that informative material will be found), aff'd on other grounds, 907 F.2d 203 (D.C. Cir. 1990); Fazzini v. United States Dep't of Justice, No. 90 C 3303, slip op. at 11 (N.D. Ill. May 2, 1991) (holding that allegations of government coverup, unsupported by objective evidence, do not create legitimate public interest for purposes of fee waiver); Conklin v. United States, 654 F. Supp. 1104, 1105 (D. Colo. 1987) (finding mere allegations of wrongdoing do not justify fee waiver).

Further, a fee waiver is granted when it is determined that the substantive content of the disclosable portions of the records requested is likely to contribute significantly to public understanding of government operations or activities. See 28 C.F.R. § 16.11(k)(2)(ii). Based upon our review of the documents we have located, our knowledge of the subject matter, and our general familiarity with the records that are responsive to this request, I have determined that a fee waiver is not appropriate. The records you seek are virtually inherently protected by the attorney work-product, attorney-client, and deliberative process privileges. To warrant a waiver or reduction of fees, the public's understanding of the subject matter in question, as compared to the level of public understanding existing prior to the disclosure, must be likely to be enhanced by the disclosure to a significant extent. For the records that are being withheld, there can be no increase in public understanding of the government's operations, and so a fee waiver is not warranted. See Van Fripp v. Parks, No. 97-0159, slip op. at 10 (D.D.C. Mar. 16, 2000) (stating that "reviewing agencies and courts should consider . . . whether the disclosable portions of requested information are meaningfully informative in relation to the subject matter requested" (citing agency's fee waiver regulation)). Thus, we have denied your request for a fee waiver at this time. If in the course of processing your request further we determine that a fee waiver is appropriate for a particular document, we will provide it without cost.

We have determined that you are a non-media, non-commercial requester pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(III). Therefore, you are entitled to two free hours of search time and 100 pages of records per component without incurring search or duplication charges. See 28 C.F.R. § 16.11(d). Beyond the two hours of free search time per component to which you are entitled, you will be required to pay for additional search time incurred at the cost of $28.00 for each hour spent by professional personnel in obtaining these records. See 28 C.F.R. § 16.11(c)(1)(ii). Duplication fees beyond one hundred pages will be assessed at ten cents per page. See 28 C.F.R. § 16.11(c)(2). Because you have not been granted a fee waiver and have not indicated an amount that you are willing to pay, by this letter we are providing you with the results of the two free hours of search time per component that we have provided you.

-3-

We conducted records searches in the Departmental Executive Secretariat, which is the official records repository for the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General, and in the Offices of the Attorney General and Deputy Attorney General. We also initiated a records search in the Office of the Associate Attorney General; however, we were unable to complete our search in that Office within your two hours of free search time. At this time, five documents, totaling twenty pages, responsive to your request have been located. One document, totaling one page, is being withheld in full pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5), which pertains to certain inter- and intra-agency communications protected by the attorney-client, attorney work-product, and deliberative process privileges. This document is not appropriate for discretionary disclosure.

We have referred two documents, totaling thirteen pages, to the Civil Division, and two documents, totaling six pages, to the Criminal Division.

As mentioned above, we have not yet completed our records search in the Office of the Associate Attorney General. We estimate that it will take an additional twelve hours to complete our search in that Office. If you wish for us to continue searching for responsive documents in the Office of the Associate Attorney General, you must pay for the additional search time at a rate of $28.00 per hour, for a total of $336.00. Because this estimate exceeds $250.00, we require an advance payment of $250.00. See 28 C.F.R. § 16.11(i)(2). You may also choose to specify a particular amount you are willing to pay and forward a check for that amount.

Please forward your check or money order, made payable to the United States Treasury, to the Office of Information and Privacy, Flag Building, Suite 570, Washington, D.C. 20530-0001. Both your check or money order and the envelope should be marked with the reference numbers AG/05-R0788; DAG/05-R0789; ASG/05-R0790. If we do not receive your payment within thirty calendar days from the date of this letter, we will assume that you are not interested in any further records search and we will consider your request closed in this Office.

Although I am aware that your request is the subject of ongoing litigation and that appeals are not ordinarily acted on in such situations, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

Melanie Ann Pustay

Melanie Ann Pustay
Deputy Director

**<u>EXHIBIT C</u>**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| THE WASHINGTON POST | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 06-1737 (RMU) |
| | : | | |
| v. | : | Document No.: | 3 |
| | : | | |
| DEPARTMENT OF HOMELAND, | : | | |
| SECURITY | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING THE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## I.   INTRODUCTION

The plaintiff, The Washington Post (the "Post"), seeks records concerning individuals who visited Vice President Richard Cheney and his senior staff at both the White House Complex and the Vice President's residence from the United States Secret Service ("Secret Service"), a division of the United States Department of Homeland Security ("DHS"). The plaintiff claims that it is entitled to this information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et. seq.*, and that under FOIA, the Secret Service must process and fulfill the plaintiff's record request on an expedited schedule. This case is before the court on the plaintiff's motion for a preliminary injunction. Specifically, the Post asks the court to order the Secret Service to immediately process the Post's request and produce all responsive records which are not exempt from disclosure within 10 days of the court's order. Because the records sought are agency records, because the plaintiff will be irreparably harmed without expedited processing of its FOIA request, and because it is in the public, the court grants the plaintiff's motion for a preliminary injunction.

## II.    BACKGROUND

On June 12, 2006, Post staff writer Jo Becker, by letter, requested certain records under FOIA from the Secret Service.  Pl.'s Mot. for a Prelim. Inj. ("Pl.'s Mot."), Ex. 1.  Specifically, the journalist sought records from October 2004 to the present regarding visitor logs of physical access to the White House Complex ("WHC") and the Vice President's residence ("VPR"), "reflecting or concerning the entries and/or exits of any persons who sought or were scheduled to visit the following people in the Office of the Vice President: Vice President Cheney; David Addington, I. Lewis 'Scooter' Libby, C. Dean McGrath, Steven Schmidt, John Hannah, Eric Edelman, Ron Christie, Victoria Nuland, Aaron Friedberg, Stephen Yates, Samantha Ravich, and David Wurmser."  *Id.*

With regard to the WHC, the plaintiff's request sought records maintained on two access monitoring systems – the Worker and Visitor Entrance System ("WAVES") and the Access Control Records System ("ACR").[1]  *Id.*  WAVES consists of records generated when "information is submitted by an authorized White House pass holder to the Secret Service about workers and visitors who need access to the White House" for various purposes.  Def.'s Opp'n, Ex. B ("Morrisey Decl.") ¶7.  ACR contains "records generated when a pass holder, worker, or visitor, swipes his or her pass over one of the electronic pass readers located at entrances to and exists from the White House Complex."  *Id.* ¶ 6.

---

[1]    Regarding solely the WAVES system, Becker sought the portions of any records which "list[] the name of the person who is visiting, where the person went and the name of the person who arranged the visit with the Secret Service."  Pl.'s Mot. at 2-3 & Ex. 1.

With regard to the VPR, Becker sought records "reflecting or concerning the entries and/or exits of any persons, other than the members of the Cheney family, visiting the vice-president's residence." Pl.'s Mot., Ex.1. This request is similarly limited to records from October 2004 to the present. *Id.*

Becker requested that the Secret Service expedite its processing of the plaintiff's FOIA request pursuant to a provision of that statute requiring expedited processing in instances presenting a "compelling need" for the information. *Id.* (relying on the language from 5 U.S.C. § 552 (a)(6)(E)(II). That statutory provision mandates expedited processing if, as relevant here, the request is made "by a person primarily engaged in disseminating information," and has an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). Becker asserted that his request satisfied the statutory requirement for mandatory expedited processing for four reasons: (1) "as a journalist, I am primarily engaged in disseminating information to the public;" (2) "the subject matter of the request concerns actual operations of the federal government, namely [] meetings of the Vice President and his senior aides on official business;" (3) "there is an urgency to inform the public about these governmental activities" because the information will assist the public in "the degree to which lobbyists and special interest representatives may have influenced policy decisions of the Bush administration" and the ongoing CIA-leak case investigation; and (4) "[w]ith the midterm elections looming, any delay in processing this request would deprive the public of its ability to make its views known in a timely fashion[.]" Pl.'s Mot., Ex.1.

On June 16, 2006, the Secret Service denied Becker's request for expedited processing, stating that Becker had not demonstrated a "particular urgency to inform the public about an

actual or alleged federal government activity." Pl.'s Mot., Ex. 2. After the Post appealed this

decision, *id.*, Ex. 3, the Deputy Director of the Secret Service, on August 31, 2006, found that

"expedited treatment is appropriate in this matter," and reversed the Secret Service's prior

decision, *id.*, Ex. 4. After the Deputy Director's decision, however, on September 20, 2006, the

Freedom of Information and Privacy Acts Officer for the Department of Homeland Security

notified Becker that the records sought are not agency records under FOIA and are governed by

the Presidential Records Act, 44 U.S.C. § 2201, *et seq. Id.*, Ex. 6. This official explained that

because the records "remain under the exclusive legal custody and control of the White House

and the Office of the Vice President . . . the [Secret Service] lacks the authority" to provide the

requested records.

The plaintiff subsequently commenced this action on October 10, 2006, seeking

injunctive relief. *See generally*, Pl.'s Mot. Because the plaintiff alleges a violation of a statutory

right to expedited processing of a FOIA request, the court ordered expedited briefing. Minute

Order (Oct. 12, 2005). Now fully briefed, the court turns to the pending motion.

## III.   ANALYSIS

### A.   The Preliminary Injunction Standard is Appropriate In This Case

Before assessing the plaintiff's claims, the court must address the defendant's argument

that expedited judicial review of the plaintiff's claims is inappropriate because the plaintiff seeks

all of the relief it would be entitled to if it prevailed on the merits.[2] Def.'s Opp'n at 8. To the

---

[2]        The court is unclear as to how this argument benefits the defendant because the legal
burden placed on the plaintiff is greater at the preliminary injunction stage.

defendant, the plaintiff seeks "immediate disclosure of non-exempt documents." *Id.*

For two reasons, the defendant's claims are unwarranted. First, the plaintiff does not now seek court ordered disclosure, but rather, it seeks court ordered expedited processing of its FOIA request. Pl.'s Reply at 2-3.

Second, in numerous cases in this federal district, courts have considered motions for preliminary injunctions in FOIA cases on an expedited bases. *Long v. Dep't of Homeland Sec.*, 436 F. Supp. 2d 38 (D.D.C. 2006) (denying injunctive relief after considering a FOIA request under the preliminary injunction four-prong test); *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30 (D.D.C. 2006) (granting a preliminary injunction and ordering expedited processing and disclosure of documents concerning the Bush Administration's policy of conducting surveillance of domestic communications); *Al-Fayed v. CIA*, 2000 WL 34342564, at *6 (D.D.C. Sept. 20, 2000) (denying a FOIA request after considering the plaintiff's claims under the preliminary injunction's four-pronged test), *aff'd* 254 F.3d 300 (D.C. Cir. 2001); *Aguilera v. FBI*, 941 F. Supp. 144, 152-53 (D.D.C. 1996) (granting a preliminary injunction and mandating expedited release of documents). In each of these cases, the plaintiffs sought expedited review of their FOIA request pursuant to 5 U.S.C. § 552 (a)(6)(E). And in each case, the district court rendered its decision prior to the incident upon which the plaintiffs' assertions of expedited need were based.

The court agrees with these decisions. In each case, and true here, the plaintiff asserts statutory entitlement to expedited review of the FOIA request, based on the statutory predicate that the plaintiff has a "compelling need" for the information. 5 U.S.C. § 552 (a)(6)(E). To afford the plaintiff less than expedited judicial review would all but guarantee that the plaintiff

would not receive expedited agency review of its FOIA request. *See Elec. Privacy Info. Ctr.*, 416 F. Supp. 2d at 35.

The court recognizes the urgency presented by the current case. With regard to typical, non-"compelling need" FOIA requests, "unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent [these] abuses." *Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1998). This statement resounds with greater force in this case because the plaintiff claims statutory entitlement to expedited treatment. And it seems the exceptional case where a plaintiff can litigate his case via an ordinary time-table for federal litigation and, if victorious, still attain "expedited review" of his FOIA request.[3]

Indeed, the statutory provision which grants the district court jurisdiction over FOIA cases provides that they "take precedence on the docket over all other causes and shall be assigned for hearing and trial at the earliest practicable date and expedited in every way." 5 U.S.C. § 552 (a)(3); *Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 13 (1974) (recognizing that Section 552 "provides that the FOIA suit generally is to take precedence on the court's docket and is to be expedited on the calendar").

Here, the plaintiff claims statutory entitlement to expedited agency review of its FOIA request. Pl.'s Mot. at 2; 5 U.S.C. § 552 (a)(6)(E)(v) (mandating expedited processing when there

---

[3]    In *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005), the court considered a FOIA request for documents (and expedited processing under 5 U.S.C. § 552) via a motion for summary judgment. Though the court in that case did not consider whether injunctive was appropriate, the timing in that case allowed the district court to rule on a motion for summary judgment prior to the expiration of special provisions of the Voting Rights Act in 2007 -- the root of the plaintiff's claim of urgency. *Id.* at 260.

exists an "urgency to inform the public").  The court considers expedited review of the plaintiff's

claims patently appropriate in providing the plaintiff meaningful judicial review of its claims.

The judicial review provision under FOIA states that "[o]n complaint, the district court . .

. has jurisdiction to enjoin the agency . . . In such a case the court shall determine the matter *de*

*novo*."  5 U.S.C. § 552(a)(4)(B).  The court will consider the matter *de novo*, and will assess the

arguments raised by the parties in support of their respective positions.

**B.    The Court Grants the Plaintiff's Motion for a Preliminary Injunction**

**1.    Legal Standard for a Preliminary Injunction**

This court may issue interim injunctive relief only when the movant demonstrates:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer
> irreparable injury if the injunction is not granted, (3) that an injunction would not
> substantially injure other interested parties, and (4) that the public interest would be
> furthered by the injunction.

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin.*

*Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *see also World Duty*

*Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 64 (D.D.C. 2000).  It is particularly

important for the movant to demonstrate a substantial likelihood of success on the merits.  *Cf.*

*Benten v. Kessler*, 505 U.S. 1084, 1085 (1992) (per curiam).  Indeed, absent a "substantial

indication" of likely success on the merits, "there would be no justification for the court's

intrusion into the ordinary processes of administration and judicial review."  *Am. Bankers Ass'n*

*v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (internal quotation

omitted).

The four factors should be balanced on a sliding scale, and a party can compensate for a

lesser showing on one factor by making a very strong showing on another factor. *CSX Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005) (citing *CityFed Fin. Corp.*, 58 F.3d at 747). "An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747.

Moreover, the other salient factor in the injunctive relief analysis is irreparable injury. A movant must "demonstrate at least 'some injury'" to warrant the granting of an injunction. *CityFed Fin. Corp.*, 58 F.3d at 747 (quotation omitted). Indeed, if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors. *Id.*

Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). As the Supreme Court has said, "[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Id.* (citation omitted). Therefore, although the trial court has the discretion to issue or deny a preliminary injunction, it is not a form of relief granted lightly. In addition, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown. *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990) (citation omitted).

2.    **The Plaintiff Demonstrates a Substantial Likelihood of Success on the Merits**

Success on the merits of the plaintiff's request does not necessarily mean that it will

receive any documents. Rather, the plaintiff seeks merely that the defendant "immediately

process plaintiff's [FOIA] request and disclose the requested records within 10 days of the

court's order." Pl.'s Mot. at 1. As the plaintiff correctly notes, if the court orders the Secret

Service to process the request, "the propriety of any exemption claims will remain to be

litigated." Pl.'s Reply at 2. The only issue for the court, therefore, is whether the plaintiff is

entitled to full FOIA processing of its records request.[4] According to the defendant, the plaintiff

is not entitled to FOIA processing because it believes that the records sought are, categorically,

not agency records subject to FOIA. Def.'s Opp'n at 15.

### A.    WAVES and ACR Records Are Agency Records

The plaintiff seeks processing of its request for WAVES records, Pl.'s Mot. at 2, based on

its belief that these records are agency records under FOIA, *id.*, at 10. "The burden is on the

agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency

---

[4]    According to the defendant, the Secret Service previously determined that the plaintiff's
request was entitled to expedited processing. Def.'s Opp'n at 12. On August 31, 2006,
the Deputy Director sent a letter to the plaintiff explaining that "it is the determination of
the Secret Service that . . . expedited treatment is appropriate in this matter." Pl.'s Mot.
Ex. 4. Within 20 days of its determination to expedite the plaintiff's request, the
defendant had completed its review, and issued a letter to the plaintiff indicating its
conclusion that the records sought "are not agency records subject to the FOIA." Def.'s
Opp'n, Ex. C ("Lyles Aff.") ¶ 5. Thus, although the defendant has afforded the
plaintiff's FOIA request some expedited review, the defendant's interstitial
determination that the records sought were not agency records halted that process before
its completion. *See* Pl.'s Mot., Ex. 6.

records.'" *DOJ v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). Although FOIA does not itself

define "agency records," the Supreme Court has indicated that "agency records" are (1) either

created or obtained by an agency, and (2) under agency control. *Id.*, 492 U.S. at 144-145.

### i.    The Records Are "Created or Obtained by the Agency"

The defendant argues that the WAVES records – those concerning visitor entrances to the

WHC – are not created or obtained by the Secret Service. Def.'s Opp'n at 16 n.6. The defendant

argues that the Office of the Vice President "spurs the generation of the WAVES records by

requesting that the proposed visitor be admitted to the [White House Compex], and it provides

the information that serves as the core of these records," including "the visitor's name, date of

birth, and Social Security number; the time and location of the planned visit; the name of the pass

holder submitting the request; and, the date of the request." *Id.* (citing the Morrissey Decl. at ¶

7). In other words, the WAVES records are generated through actions taken by the Office of the

Vice President.

The court is unconvinced by the defendant's argument. Taking the defendant's assertions

on this point to be true, the records, at a minimum, are "obtained" by the Secret Service in the

performance of official duties. In noting that "[t]he legislative history of the FOIA abounds with

references to records acquired by an agency, the Supreme Court instructed that records obtained

by an agency for FOIA purposes include "studies, trade journal reports, and other materials

produced outside the agencies both by private and governmental organizations." *Tax Analysts*,

492 U.S. at 144.

The defendant's word choices encourages a potential ambiguity as to the actual creator of the records. Here, the defendant's statement, that the Office of the Vice President "spurs the generation of the WAVES record," conceals the record's creator. The WAVES records are "generated when information is submitted . . . to the Secret Service." Morrissey Decl. ¶ 7. Moreover, the Secret Service's typical practice is to "transfer newly-generated WAVES records . . . to the White House Office of Records Management." *Id.* ¶ 8.

Likely, the "newly-generated" records were, in fact, created by the Secret Service. At a bare minimum, they were "obtained by the agency" shortly after their creation by a third entity unidentified by the defendant. And probably, the defendant's argument rests on the defendant's confusion between the agency that created a record with the source of the information contained in that record; here the Office of the Vice President provides the information. Def.'s Opp'n at 16 n. 6.

Because the defendant bears the burden of demonstrating that the records are not "agency records" *Tax Analysts*, 492 U.S. at 142 n.3, however, the court resolves the ambiguity created by the defendant's language in the plaintiff's favor, *Fed. Labor Relations Auth. v. Dep't of Veterans Affairs*, 958 F.2d 503, 508 (2d Cir. 1992) (ruling that fidelity to "FOIA's broad disclosure plan . . . focused on openness, not secrecy" requires that "doubts [be] resolved in favor of disclosure"). Thus, the defendant has not met its burden on demonstrating that the WAVES records are not "agency records." *Tax Analysts*, 492 U.S. at 142 n.3.

11

## ii.   The WAVES Records Are "Under Agency Control"[5]

Having concluded that the defendant created or obtained the records, the first prong in

*Tax Analyst*, the court must next consider the defendant's arguments that the records are not

"under agency control." *Id.*, 492 U.S. at 144-145.

The defendant argues (1) that the information sought is under the "legal control" of the

Office of the Vice President and (2) that the Office of the Vice President is not an agency subject

to FOIA. Def.'s Mot. at 14. Because the Office of the Vice President is not an "agency" under

FOIA, *Schwartz v. Dep't of Treasury*, 131 F. Supp. 2d 12, 147 (D.D.C. 2001), aff'd 2001 WL

674636 (D.C. Cir. May 10, 2001), and because the defendant concedes that the Secret Service is

an "agency" under FOIA, Def.'s Mot. at 15, the court must determine which executive branch

agency, the Secret Service or the Office of the Vice President, controls the records sought. In

other words, the records sought are "agency records" subject to disclosure under FOIA only if the

Secret Service "exercises sufficient control" over the documents. *United We Stand Am. v. IRS*,

359 F.3d 595, 599 (D.C. Cir. 2004).

---

[5]     The defendant seeks to avoid disclosure of the ACR records by arguing that they are not relevant to the plaintiff's request. Def.'s Opp'n at 17. The defendant arrives at this conclusion after noting that "ACR records do not reveal who was visited, and the identity of the visitee is the focal point of plaintiff's request." *Id.*, Ex. B ("Morrissey Decl.") ¶6. The defendant's argument is unconvincing, as it assumes that the only way to determine who was being visited is by the ACR record itself. But as the defendant has described the ACR system, records are generated when visitors swipe their pass over an electronic pass reader. Morrissey Decl. ¶ 6. The court presumes at this stage in the litigation that to obtain a visitor pass in the first place, an individual would have to identify the purpose of their visit, including those with whom they will be visiting. At a minimum, however, the defendant's conclusory argument as to why the ACR records are not responsive are insufficient in carrying its burden of exempting these records from its search. *Fed. Labor Relations Auth. v. Dep't of Veterans Affairs*, 958 F.2d 503, 508 (2d Cir. 1992).

12

The defendant argues that the WAVES records are not under the Secret Service's control. Def.'s Opp'n at 17. Specifically, the defendant claims that the WAVES records "are created subject to an understanding that they are under the OVP's control." *Id.* at 17.

To determine whether the documents sought are under agency control, the court must balance four factors under a totality of the circumstances test: (1) "the intent of the document's creator to retain or relinquish control over the records," (2) "the ability of the agency to use and dispose of the record as it sees fit," (3) "the extent to which agency personnel have read or relied upon the document," and (4) "the degree to which the document was integrated into the agency's record system or files." *United We Stand Am.*, 359 F.3d at 599; *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006) (noting that the court's totality of the circumstances test seeks to vindicate Congress' purpose "to open agency action to the light of public scrutiny") (internal quotations omitted)).

As to the first factor, Paul Morrissey, the Deputy Director of the Secret Service, asserts that after the completion of a visitor's visit, "the Secret Service has no continuing interest sufficient to justify preservation or retention of WAVES records." Morrissey Decl. ¶ 10. Therefore, through its established practice, the Secret Service has a clear intent to relinquish control of the records is understood.

With regard to factor two, "the ability of the agency to use and dispose of the record as it sees fit," Morrissey indicates that information in the WAVES records are submitted to the Secret Service for two limited purposes: (1) "to allow the Secret Service to perform background

13

checks," and (2) "to allow the Secret Service to verify the visitor's admissibility at the time of the visit." Morrissey Decl. ¶ 9. Butressing this assertion, affiant Claire O'Donnell, the Assistant to the Vice President and his Deputy Chief of Staff, indicates that the Secret Service transfers WAVES records to the White House Office of Records Management every 30 to 60 days. *Id.*, Ex. A, ("O'Donnell Decl.") ¶ 12. From these assertions, the court is confident that "the ability of the agency to use and dispose of the record as it sees fit" is quite limited. *United We Stand Am.*, 359 F.3d at 599

Concerning the third factor, "the extent to which agency personnel have read or relied upon the document," the defendant stresses the Secret Service's limited use of the information. Def.'s Opp'n at 18. As to this factor, the Secret Service's argument fails. While the defendant is correct that the Secret Service's use of the WAVES records is limited, the defendant fails to recognize that the very purpose of the WAVES records is limited. Morrissey Decl. ¶ 9. Indeed, the inquiry as to the agency's use of a document is tethered to the purpose behind the records' creation in the first instance. *Bureau of Nat'l Affairs*, 742 F.2d 1484, 1490 (D.C. Cir. 1984) (recognizing that the critical factor in determining the extent of reliance upon the document turns on "the purpose for which the document was created, the actual use of the document, and the extent to which the creator of the document and other employees acting within the scope of their employment relied upon the document to carry out the business of the agency").

Here, the WAVES records are generated solely for their use by the Secret Service in protecting the WHC. Morrissey Decl. ¶¶ 5, 7. And the Secret Service utilizes the WAVES

14

records in security related to visitor access to the WHC. *Id.*, ¶¶ 9, 10. As such, the Secret

Service's use of the WAVES records encompasses the entire scope of their purpose. *Bureau of

Nat'l Affairs*, 742 F.2d at 1490 (relying upon a "nexus between the agency's work and the

records" in determining that the agency relied on the document). The third factor, therefore,

favors a determination that the records sought are under agency control.

Finally, the court considers "the degree to which the document was integrated into the

agency's record system or files." *United We Stand Am.*, 359 F.3d at 599. The defendant argues

that because the WAVES records are transferred to the OVP for archival preservation shortly

after the visitor's visit concludes, the records are not integrated into the agency's record system.

O'Donnell Decl. ¶ 12. O'Donnell's assertions convince the court that the WAVES records are

not integrated into the Secret Service's record system or files.

In balancing these factors, the court turns to the D.C. Circuit's analysis in *Bureau of

National Affairs*. In that case, the plaintiff sought daily agendas and desk appointment calendars.

*Bureau of Nat. Affairs*, 742 F.2d 1484. The Circuit noted that both the daily agendas and desk

appointment calendars "were created by agency employees," were "located within (and in that

sense, were within the possession of) the Justice Department," and were not "placed into agency

files." *Consumer Fed'n of Am.*, 455 F.3d at 288. Moreover, "the Department required neither

their creation nor their retention." *Id.*

Despite these similarities in characteristics between the daily agendas and the desk

appointment calendars, the court concluded that only the daily agendas were agency records. *Id.*

15

Accordingly, the court's decision turned on how the documents were "used within the agency."

*Bureau of Nat. Affairs*, 742 F.2d at 1495. In 2006, the D.C. Circuit summarized this holding in

the following fashion:

> What ultimately distinguished the two types of documents was how they were 'used
> within the agency. The purpose of the agendas was to . . . facilit[e] the day-to-day
> operations of the Antitrust Division. Consonant with that function, the agendas were
> 'distributed to top staff within the Antitrust Division[.]' This . . . rendered the daily
> agendas 'agency records.'
>
> In contrast to the agendas, the desk calendars 'were retained solely for the
> convenience of the individual official[ ]' in organizing his 'personal and business
> appointments.' Accordingly, although [] top assistants 'occasionally had access to
> the calendars,' they 'were not distributed to other employees.' This . . . rendered the
> desk calendars personal rather than 'agency records.'

*Consumer Fed. of Am.*, 455 F.3d at 288.

Comparing the records sought here with those sought in *Bureau of National Affairs*, the

court concludes the WAVES records are more akin to the daily agendas than the desk calendars.

Like the documents sought in that case, the WAVES records were created by agency officials,

were in the physical custody of Secret Service personnel during their use, and were not merged

with agency files. *Bureau of Nat. Affairs*, 742 F.2d 1484. And like the daily agendas, the

agency's use of the WAVES records serves an official function. Morrissey Decl. ¶ 9.

To summarize, the court must weighs the four factors so as to comport with the Supreme

Court's definition of "agency control" identified in *Tax Analysts*: "[b]y control we mean that the

material have come into the agency's possession in the legitimate conduct of its official duties."

*Tax Analysts*, 492 U.S. at 145. In so doing, and like the daily agendas in *Bureau of National*

16

*Affairs*, the court concludes that the records sought are agency records. Accordingly, the

WAVES records are subject to FOIA processing.

### B.    Visitor Logs of the Vice President's Residence are Agency Records

The plaintiff also seeks visitor logs to the Vice President's residence. Pl.'s Mot. at 2.

The defendant argues that the records sought are not agency records. Def.'s Opp'n at 19-22. The

defendant vehemently opposes the disclosure of any records pertaining to the VPR, claiming that

such disclosure would compromise the Vice President's ability to discharge his official functions.

*Id.* at 22. For this reason, the defendant urges the court to infuse considerations of constitutional

avoidance into its analysis as to whether the records sought are agency records. *Id.* Accordingly,

before directly confronting the defendant's argument that visitor records to the VPR are not

agency records, the court must first consider the threshold argument that constitutional avoidance

is appropriate in this instance.

### i.    Constitutional Avoidance is Improper

The defendant asks the court to construe the FOIA statute in a manner which avoids

serious constitutional problems. Def.'s Opp'n at 22. In support of this position, the defendant

cites *Immigration and Naturalization Service v. Saint Cyr*, a case in which the Supreme Court

indicated that "if an otherwise acceptable construction of a statute raises serious constitutional

problems, and [] an alternative interpretation of the statute is fairly possible, [courts] are

obligated to construe the statute to avoid such problems." *Id.* (quoting *INS v. St. Cyr*, 533 U.S.

289, 299-300 (2001)). Presumably, the defendant is arguing that if the court were to interpret

17

FOIA to apply to records regarding the VPR, the Vice President's "freedom 'to seek confidential information from many sources, both inside the government and outside' will have been compromised." *Id.* (quoting *In Re Cheney*, 406 F.3d 723, 727 (D.C. Cir. 2005)).

Perhaps the defendant's concerns are valid. But even assuming they are, these concerns do not serve as a license for the court to transmute the meaning of an unambiguous statute. Indeed, the Supreme Court's charge in *St. Cyr* applies to instances in which a statutory provision is capable of alternative interpretations. 533 U.S. at 299. But here, the defendant has identified no ambiguity in the FOIA statute. Rather, in deference to the defendant's concerns, the court must strictly apply the FOIA statute. *In Re Cheney*, 406 F.3d at 728 (recognizing that "[i]n light of the severe separation-of-powers problems [in applying provisions of the Federal Advisory Committee Act, the court] must construe the statute strictly").

In FOIA cases particularly, "Congress understood that government could not function effectively if public access were granted indiscriminately." *Schell v. Dep't of Health & Human Servs.*, 843 F.2d 922, 937 (D.C. Cir. 1988). But rather than grant the court the authority to strike what it perceives as an appropriate balance between transparency and government's ability to function, "Congress sought a workable balance . . . by providing nine statutory exemptions from disclosure." *Id.* The defendant's concerns regarding the potential damage that disclosure would have on the Vice President's ability to discharge his official functions are appropriately addressed by this court if, and when, the defendant invokes a specific FOIA exception. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (recognizing that "Congress had the Government's

18

executive privilege specifically in mind in adopting Exemption 5," which protects from

document "disclosure [] which 'would be injurious to the consultative functions of

government'") (internal quotations omitted).

At this juncture, however, the plaintiff is not asking the court to mandate disclosure of the

records. Instead, it seeks only that the court direct the agency to fully process its FOIA request

and to do so in an expedited fashion. The defendant has neither demonstrated nor argued that

simply processing the plaintiff's FOIA request will do injury to the Vice President's abilities to

discharge the duties of his office. Accordingly, the court will proceed with a determination as to

whether the records in question are agency records, and it will analyze the defendant's arguments

concerning harm to the Vice President's function to a time after the agency conducts its review,

identifies responsive documents, asserts specific exemptions, and otherwise follows the ordinary

course in FOIA cases.

### ii.   Records of Visits to the VPR Are Agency Records

Without rehashing the law discussed in the court's analysis of WAVES records, the court

notes the similarities shared between the visitor records at the VPR and the WAVES and ACR

records. According to the defendant, "the Secret Service monitors and controls access to the

[VPR] though use of [] two lists: a daily roster for individuals with appointments or work orders,

and a permanent access list for those individuals who regularly come to the residence such as

OVP staff members, contractors, military personnel, and the Vice President's family members."

Def.'s Opp'n at 19 (citing Morrissey Decl. ¶ 11). Like the WAVES records, the Secret Service

maintains physical control over the lists for a short period of time, turning them over to the Vice

President's staff at the end of each month. Morrissey Decl. ¶ 12; O'Donnell Decl. ¶ 14. Also

similar to the WAVES records, it is the understanding of the Vice President's Office that these

lists are under the exclusive legal custody of the Office of the Vice President. O'Donnell Decl.

¶¶ 12, 13 (noting that the understanding and practice for WAVES records "is similar with respect

to entry records for the Vice President's Residence").

The only difference the court can find in the defendant's explanation of the lists generated

for entry to the VPR and the WAVES and ACR records, is that the visitor lists to the VPR are

"handwritten on an entry log by the officer working at the gate where the individual arrives."

Def.'s Opp'n at 19. The defendant provides no legal justification for treating the handwritten

records differently than typed or computer generated, and the court can fathom none.

The logs in question are created by the Secret Service and created solely and exclusively

for a particular purpose, albeit limited – to "provide[] protective services for and control[] access

to . . . the Vice President's Residence." O'Donnell Decl. ¶ 9. These records have "come into the

agency's possession in the legitimate conduct of its official duties." *Tax Analysts*, 492 U.S. at

145. Therefore, and for the reasons given regarding the WAVES records, the logs created by the

Secret Service pertaining to visitors of the VPR are created or controlled by the Secret Service

and are under the control of the Secret Service. *Tax Analysts*, 492 U.S. at 144-145. Accordingly,

they constitute agency records under FOIA.[6] *Id.*

---

[6]      The defendant also argues that the court should rule that the logs pertaining to the VRP
are not agency records because they "capture details of the workings of the OVP and the

### 3.    The Plaintiff Demonstrates a Potential for Irreparable Injury

Turning to the irreparable injury component of the preliminary injunction analysis, the plaintiff argues that the "very nature of the right that plaintiff seeks to vindicate in this action – expedited processing – depends on timeliness." Pl.'s Mot. at 15. The court agrees.

FOIA was created to foster public awareness, and failure to process FOIA requests in a timely fashion is "tantamount to denial." H.R. Rep. No. 93-876, at 6 (1974); *Payne Enters.*, 837 F.2d at 494 (recognizing the diminutive value of untimely disclosure, stating that "stale information is of little value"). Here, the plaintiff seeks expedited processing under 5 U.S.C. § 552(a)(6)(E)(v)(II), which provides for expedited processing in instances in which there exists an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). And the defendant here has acknowledged that the plaintiff's request meets the statutory requirement for expedited treatment. Pl.'s Mot. Ex. 4.

But beyond this concession, when expedited treatment is statutorily proscribed, the specter of information becoming stale and of little value, increases. *Elec. Privacy Info. Ctr.*, 416

_____

details of the Vice President's private life; they do not illuminate the functioning of the Secret Service." Def.'s Opp'n at 21. The defendant continues that the plaintiff's request threatens "the Vice President's (and his family's) right to personal privacy." *Id.* at 22. The defendant's argument is unclear in that it fails to identify whether the defendant decries disclosure, or FOIA processing, as infringing on the Vice President's right to personal privacy. In either event, the defendant's argument is unconvincing. At this juncture, the plaintiff is not asking the court to order disclosure, but simply to direct the Secret Service to process the plaintiff's FOIA request. Pl.'s Reply at 2. FOIA takes personal privacy into account in exempting materials that contain "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). After processing the plaintiff's FOIA request, if the defendant believes the statutory and decisional law regarding Exemption 6 applies, it may, at that time, raise such a claim.

F. Supp. 2d at 41. The reason the plaintiff gives for expedited processing in this matter is that the

information is of vital public interest for an upcoming congressional election. Pl.'s Mot. at 3.

The plaintiff reasons that delay in the agency's processing of its FOIA request would "deprive

the public of its ability to make its views known in a timely fashion either at the polls, by

lobbyists or through other contacts with public officials." *Id.* at 3-4. Because the urgency with

which the plaintiff makes its FOIA request is predicated on a matter of current national debate,

due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA

request does not receive expedited treatment. *Elec. Privacy Info. Ctr.*, 416 F. Supp. 2d at 41

(ruling that the plaintiff had demonstrated a risk of irreparable injury in a case seeking expedited

processing during a national debate about the government's wireless surveillance program);

*Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005)

(recognizing the urgency of the plaintiff's request given "the upcoming expiration of the special

provisions of the Voting Rights Act of 2007"). Without a preliminary injunction directing the

Secret Service to process the plaintiff's FOIA request in an expedited fashion, the plaintiff would

lose out on its statutory right to expedited processing and on the time-sensitive public interests

which underlay the request.

### 4.    A Preliminary Injunction Does Not Burden Other Parties

The defendant argues that granting the defendant's preliminary injunction would

"substantially injure another interested party, the Vice President, by infringing on his ability to perform his official functions, including his executive functions."[7]  Def.'s Opp'n at 29.  The defendant's concerns are born from its misunderstanding of the relief sought by the plaintiff.  The plaintiff does not seek an order directing the Secret Service to disclose a single document, but asks solely that the court order the defendant to process the plaintiff's FOIA request.  Pl.'s Mot. at 2.  Perhaps the defendant can argue at a later stage in this litigation the harms that would befall the Vice President if the court were to order disclosure.[8]  For the limited relief sought here, however, those arguments are premature.

### 5.    The Public Interest Favors Expedited Processing

---

[7]    The Secret Service also argues that the public's interest is harmed for the same reasons. Def.'s Opp'n at 29.  For the reasons stated in the text accompanying this footnote, the defendant's argument in this regard may have validity, but it is premature.

[8]    The court anticipates that the defendant will claim FOIA exemptions.  In this regard, the court reminds the defendant that FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b).

If the defendant is unable to segregate the information, but still claims an exemption based on the Vice President's privacy, the parties must brief the court on any issues regarding waiver of the exemption in light of the Secret Service's failure to maintain separate visitor logs for official business visits and personal visits.  As the court presently understands this issue, the Vice President conducts official business in a residence owned by the public, and occupied by Richard Cheney, the person currently occupying the position of Vice President.  In this instance, the defendant implies that the public's interest in open government yields to Richard Cheney's privacy interests.  In any subsequent briefing as to the applicability of FOIA exemptions, the court directs the parties to include discussion of this argument, as well as consideration that the inverse may be true.  *Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487 (1994) (noting that in considering FOIA Exemption 6, "a court must balance the public interest in disclosure against the interest Congress intended the exemption to protect") (internal quotations omitted).

23

The Secret Service contends that the public would be harmed by expedited processing because a preliminary injunction would place this plaintiff's FOIA request ahead of the requests of others. *Id.* This argument is unconvincing. The government concedes that the plaintiff here has a statutory right to expedited processing. Pl.'s Mot., Ex. 4. If anything, the public's interest in this case is best assessed through the statutory provisions passed by the public's elected representatives. In that vein, pursuant to the statutory provision mandating expedited treatment, the public's interest in expedited processing of the plaintiff's request outweighs any general interest that it has in first-in-first-out processing of FOIA requests. *Jacksonville Port Auth. v. Adams.*, 556 F.2d 52, 59 (D.C. Cir. 1977) (recognizing "an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate").

## IV.    CONCLUSION

For the foregoing reasons, the court grants the plaintiff's motion for a preliminary injunction. The court orders the defendant to complete the processing of the plaintiff's June 12, 2006 FOIA requests and produce or identify all responsive records within 10 days of the date of this opinion. The court further orders the defendant to provide to provide the plaintiff with a declaration and document index, as required by *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), indicating the defendant's justification for withholding any documents or portions thereof responsive to the plaintiff's FOIA request within 10 days of this opinion. This memorandum opinion is issued this 19th day of October, 2006. An order consistent with this Memorandum

24

Opinion was previously issued on October 18, 2006.


RICARDO M. URBINA
United States District Judge

**EXHIBIT D**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:05-cv-02078 |
| U.S. DEPARTMENT OF JUSTICE, | ) ) | Judge: Emmet G. Sullivan |
| Defendant. | ) ) ) | |

## DECLARATION OF MELANIE ANN PUSTAY

I, Melanie Ann Pustay, declare the following to be true and correct:

1) I am the Deputy Director of the Office of Information and Privacy (OIP), United States Department of Justice. In this capacity, I am the final decision-making authority for the Initial Request (IR) Staff. The IR Staff is responsible for searching for and reviewing records within OIP and the senior leadership offices of the Department of Justice in response to requests made under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (2000 & Supp. II 2002). The IR Staff determines whether records responsive to access requests exist and, if so, whether they can be released in accordance with the FOIA. In processing such requests, the IR Staff consults with personnel in the senior leadership offices and, when appropriate, with other components within the Department of Justice as well as with other Executive Branch agencies.

2) I make the statements herein on the basis of personal knowledge, as well as on information acquired by me in the course of performing my official duties.

<u>Initial Processing of Plaintiff's Request</u>

3)  By letter dated June 28, 2005, Anne L. Weismann, on behalf of plaintiff Citizens for

Responsibility and Ethics in Washington (CREW), submitted a FOIA request to OIP for records

from the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney

General "discussing or mentioning in any way any penalty that the U.S. Department of Justice . . .

can, may, should or will propose" in the litigation of <u>United States v. Philip Morris, Inc.</u> since

January 1, 2001.  The request also sought records of any contacts "between any and all individuals

in the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney and the

White House . . . . [and] between Associate Attorney General Robert D. McCallum and the law firm

Alston & Bird concerning in any way the tobacco lawsuit."  OIP received the request on July 1,

2005.  (A copy of plaintiff's initial request letter is attached hereto as Exhibit A.)

4)  In its initial FOIA request letter, plaintiff requested a fee waiver pursuant to 5 U.S.C.

§ 552(a)(4)(A)(iii), which provides that a fee waiver is appropriate when disclosure of requested

information is in the public interest because it is likely to contribute significantly to public

understanding of the operations or activities of the government, and is not primarily in the

commercial interest of the requester.  Plaintiff based its fee waiver request on the assertion that the

records sought "are likely to contribute to the public's understanding of the individuals and

organizations that influence or attempt to influence the litigating position of the United States of

America in a lawsuit of major and far-reaching consequences."

5)  In its initial FOIA request letter to OIP, plaintiff also requested expedited processing

based on assertions that it is a "non-profit corporation engaged primarily in disseminating

information," and that "[t]here is a particular urgency in informing the public about the

circumstances surrounding the Department of Justice's proposed penalties in the tobacco lawsuit."

The Department of Justice permits expedition of FOIA requests pursuant to four different standards.

See 28 C.F.R. § 16.5(d)(1)(i)-(iv) (2005). Because plaintiff did not specify a particular standard

under which expedition was sought, we applied the standard that comported most closely with the

phrasing of its request. Accordingly, we interpreted the request as seeking expedited processing

pursuant to the Department's second standard permitting expedition for requests involving "[a]n

urgency to inform the public about an actual or alleged federal government activity, if made by a

person primarily engaged in disseminating information." 28 C.F.R. § 16.5(d)(1)(ii).

6)  By letter dated July 11, 2005, OIP acknowledged receipt of plaintiff's FOIA request and

denied plaintiff's request for expedited processing pursuant to 28 C.F.R. § 16.5(d)(1)(ii), because

we could not identify a particular urgency to inform the public about an actual or alleged federal

government activity beyond the public's right to know about government activities in general, and

because plaintiff's primary activity did not appear to be information dissemination. OIP's letter also

advised plaintiff that we would be unable to respond to its FOIA request within the statutory time

limit because the records sought were maintained in other Offices, and suggested that plaintiff

might wish to narrow the scope of its request in order to speed up the search process. Finally, as is

customary, we advised plaintiff that we were deferring a decision on its fee waiver request until we

determined whether any fees would be incurred in the processing of plaintiff's request. This is

OIP's standard practice and is done because non-commercial requesters are entitled to two hours of

free search time per component. In the event the searches for plaintiff's request were completed

within that two hour period, there would be no fees charged to plaintiff. In the absence of fees to

charge there would be no need to adjudicate plaintiff's request for a fee waiver. Accordingly, we

deferred our decision on plaintiff's fee waiver request until the time when we determined that our search in the Office of the Associate Attorney General would exceed two hours.  (A copy of OIP's July 11, 2005 letter is attached hereto as Exhibit B.)

7)  By letter dated July 18, 2005, plaintiff submitted a new request for expedited processing to the Director of the Office of Public Affairs (PAO).  This time, plaintiff specifically sought expedition pursuant to the Department's fourth standard permitting such processing for requests involving "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv).  Plaintiff submitted its new expedition request under standard iv directly to the Director of PAO, who makes the decision whether to grant or deny expedited processing under this standard.  Id. § 16.5(d)(2).  (A copy of plaintiff's July 18, 2005 letter to the Director of PAO is attached hereto as Exhibit C.)

8)  On August 5, 2005, OIP was informed by PAO that the Director of PAO had granted plaintiff's request for expedited processing under standard iv.  By letter dated August 9, 2005, OIP then advised plaintiff of the decision by the Director of PAO.  We also advised plaintiff that we had already initiated searches in the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General for records responsive to its request.  Finally, we reiterated that plaintiff could contact the analyst handling its request if there were any questions.  (A copy of OIP's August 9, 2005 letter to plaintiff is attached hereto as Exhibit D.)

Records Searches

9)  In its request letter, plaintiff specifically sought records from the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General.  Therefore, OIP conducted

-4-

searches for records responsive to plaintiff's request in those Offices, as well as in the Departmental

Executive Secretariat, which serves as the official repository for Attorney General, Deputy Attorney

General, and Associate Attorney General records.

10) By memoranda dated July 22, 2005, records searches were initiated in the Offices of the

Attorney General, Deputy Attorney General, and Associate Attorney General. The practice for

these three Offices is to notify each individual staff member in that Office of the receipt of OIP's

memoranda requesting that a search be conducted, and each staff member's files, both paper and

electronic, are then searched as necessary for records responsive to the request. A search of this

nature typically involves hand searches of large paper files, as well as a vast number of electronic

mail (e-mail) files.

11) In July and August, 2005, records searches were commenced in the Offices of the

Attorney General, Deputy Attorney General, and Associate Attorney General.

12) On August 23, 2005, plaintiff's request was reassigned to a new analyst because the

FOIA Specialist originally handling the case departed OIP.

13) By memoranda dated August 29, 2005, OIP advised the Offices of the Attorney

General, Deputy Attorney General, and Associate Attorney General that plaintiff's request had been

granted expedited processing under 28 C.F.R. § 16.5 (d)(1)(iv) and that, accordingly, records

searches should be completed as soon as possible.

14) On September 6, 2005, a career attorney in the Office of the Associate Attorney General

contacted me by telephone to discuss plaintiff's request. He advised me that the Office of the

Associate Attorney General had a large volume of records potentially responsive to plaintiff's

request, including electronic records, handwritten notes, and calendar entries.

15) On September 8, 2005, a staff member in Office of the Attorney General contacted me to discuss plaintiff's request. She informed me that the Office of the Attorney General had identified records that were potentially responsive to plaintiff's request.

16) Between September 8, 2005 and September 15, 2005, the analyst handling the case consulted with FOIA personnel in the Civil Division.

17) On September 14, 2005, the FOIA Specialist assigned to plaintiff's request went to the Office of the Attorney General to review the files that had been identified thus far. Those documents that appeared responsive to plaintiff's request were copied for further processing and review by OIP's IR Staff.

18) On September 16, 2005, plaintiff's counsel, Anne Weismann, called and left a message with OIP regarding the status of plaintiff's request. The FOIA Specialist assigned to plaintiff's request returned Ms. Weismann's call and advised her that records searches had been initiated and were still pending in the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General on an expedited basis, and that OIP would provide an interim response to plaintiff's FOIA request when possible.

19) On September 16, 2005, subsequent to the OIP FOIA Specialist's conversation with plaintiff's counsel on that same day, the Office of the Attorney General advised OIP that it had completed its records search and had not located any additional records that appeared responsive to the request beyond those which had already been obtained by OIP.

20) On September 26, 2005, plaintiff's counsel, Anne Weismann, again called the FOIA Specialist assigned to plaintiff's request. The FOIA Specialist informed Ms. Weismann that OIP had completed its records search in the Office of the Attorney General, but that the records located

-6-

Case 1:05-cv-02078-EGS    Document 13-3    Filed 03/10/2006    Page 7 of 49

in that Office required further review, including consultations with other Department components, before an interim response could be provided.  Such consultations are required by Department of Justice regulation 28 C.F.R. § 16.4(c)(1) (2005), and are appropriate in determining whether to disclose records when other components within the Department have an interest in the documents. The consultations envisioned at that time were with FOIA personnel in the Offices of the Inspector General, Solicitor General, Professional Responsibility, and Legislative Affairs, and in the Justice Management, Civil, and Criminal Divisions.  The FOIA Specialist also advised Ms. Weismann that records searches were continuing in the Offices of the Deputy Attorney General and Associate Attorney General.

21) On October 3, 2005, a career attorney in the Office of the Associate Attorney General contacted the Senior Counsel for the IR Staff to discuss plaintiff's request.  He advised OIP that he was conducting a search for records in the Office of the Associate Attorney General.

22) During October, 2005, the FOIA Specialist assigned to plaintiff's request continued to review the documents located in the Office of the Attorney General.

23) On October 14, 2005, the career attorney in the Office of the Associate Attorney General gave me an update on the status of his search.

24) On October 26, 2006, the FOIA Specialist assigned to plaintiff's request contacted the Office of the Deputy Attorney General to check on the status of the search.

25) On November 1, 2005, the career attorney in the Office of the Associate Attorney General called and advised that his search was complete.

26) On November 2, 2005, the FOIA Specialist assigned to plaintiff's request and the IR Staff Senior Counsel retrieved copies of potentially responsive records from the Office of the Associate Attorney General.

-7-

27) On November 4, 2005, the FOIA Specialist assigned to plaintiff's request had additional discussions with the search contact in the Office of the Deputy Attorney General.

28) On November 16, 2005, the FOIA Specialist assigned to plaintiff's request, the IR Staff Senior Counsel and I conferred on the status of the request and made plans for providing plaintiff with an interim response that would have addressed the status of plaintiff's request in the three offices, and made a determination on plaintiff's fee waiver request.

29) One day later, on November 17, 2005, OIP was advised that plaintiff had filed suit. During the next few weeks, discussions ensued with plaintiff's counsel concerning the possible narrowing of her request to reduce the number of responsive documents. The interim response letter was put on hold while the parties discussed a possible narrowing of plaintiff's request.

30) On December 9 and 13, 2005, OIP searched the electronic database of the Departmental Executive Secretariat, which uses a central database to control and track certain incoming and outgoing correspondence for the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General. Those documents that appeared responsive to plaintiff's request were retrieved for further processing and review by OIP's IR Staff.

31) On December 20, 2005, the IR Staff Senior Counsel and I went to the Office of the Associate Attorney General to conduct a more targeted search for responsive records. The FOIA Specialist assigned to plaintiff's request continued her review and processing of the records that had been located thus far.

32) By memorandum dated December 22, 2005, the Office of the Deputy Attorney General advised OIP that it had completed its records search and did not locate any records responsive to plaintiff's request.

## Review of Records Prior to Narrowing of Request

33) As originally worded, plaintiff's request was exceptionally broad, spanning a four-year period and encompassing documents that mentioned in "any way any penalty" that the government "can, may, should or will propose" in the tobacco litigation.  Once OIP completed the records searches in the Offices of the Attorney General and Deputy Attorney General, and expended plaintiff's two free hours of search time in the Office of the Associate Attorney General, over four hundred and fifty documents had been located, and consultation and referral packages were thereafter prepared for no less than seven Department components – with the Offices of the Inspector General, Solicitor General, Professional Responsibility, and Legislative Affairs, and in the Justice Management, Civil, and Criminal Divisions.  Also, the records as yet to be searched in the Office of the Associate Attorney General consisted of an estimated 62,000 e-mail communications, three hundred pages of hand written notes, fifty pages of electronic files, one hundred pages of paper files, and an indeterminate number of calendar entries.

34)  As records were located and compiled throughout the pendency of OIP's records searches, IR Staff conducted a continual analysis and review of the documents located.  This process included the identification and excision of duplicative and non-responsive material, creation of "working" document sets and corresponding document indexes, identification of the various Department components' equities in the records, and the assessment and assembly of necessary consultations and/or referrals with those components maintaining such equity, and the application of any FOIA exemptions to the material.  The possibility of providing an interim response to plaintiff was repeatedly assessed; however, just one day after a decision was made to provide an interim response, plaintiff filed suit and so the interim response was delayed while the parties worked to narrow the scope of the request.

## Narrowing of Plaintiff's Request

35) On January 9, 2006, defendant's principal counsel advised OIP that pursuant to communications with plaintiff's counsel, Anne Wiesmann, plaintiff had agreed to narrow the scope of its request to "documents dealing with the identification and selection of remedies sought by the Department and any changes to particular remedies sought by the Department from January 2005 onward, including records discussing, mentioning or referring in any way to the government's decision to reduce the penalties it is seeking against the tobacco industry from $130 billion to $10 billion or the government's decision to offer testimony from any witness during the remedies phase of trial in United States v. Philip Morris." Additionally, plaintiff agreed to narrow its request to exclude court filings and correspondence.

36) Based on plaintiff's January 9, 2006 reformulation of its request and the narrowing, OIP's IR staff re-reviewed the universe of potentially responsive documents, which had been assembled for processing in preparation for an interim response. Based on the narrowed scope of plaintiff's request, OIP was able to hone in on and more readily process those records – a task that had initially proven difficult given the breadth of the original request. Further, as a result of plaintiff's narrowed request, OIP was able to drastically reduce the amount of responsive material to a total of twenty pages of documents and, consequently, the need for all but one consultation was completely eliminated, as was the need for all but two referrals.

## OIP's Interim Response to Plaintiff

37) By letter dated January 19, 2006, OIP provided an interim response to plaintiff. OIP notified plaintiff that its request for a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) had been denied based upon the applicable statutory standards, Department of Justice regulations, and case law. We also advised plaintiff that we were categorizing it as a "non-media, non-commercial"

requester under 5 U.S.C. § 552(a)(4)(A)(ii)(III), and as such it was entitled to two free hours of search time and 100 free pages of records per component.   Moreover, we informed plaintiff that while our records searches in the Offices of the Attorney General and Deputy Attorney General had been completed, we were unable to complete our records search in the Office of the Associate Attorney General within the two hours of free search time allotted to plaintiff.  We advised plaintiff that we estimated it would take an additional twelve hours to complete our search in the Office of the Associate Attorney General and that the search fees would total $336.00.  Pursuant to Department of Justice regulations, we required an advance payment of that fee.  To date plaintiff has not remitted payment.  (A copy of this letter is attached hereto as Exhibit E.)

38) In OIP's interim response, we also informed plaintiff that pursuant to our records searches, and based upon the narrowed scope of its request, we located five responsive documents, totaling twenty pages.  Of these, one document, totaling one page, was withheld in full pursuant to the attorney-client, attorney work-product, and deliberative process privileges of Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5).  Regarding the remaining responsive documents, we notified plaintiff that we had referred two documents, totaling thirteen pages, to the Civil Division, and two documents, totaling six pages, to the Criminal Division.[1]

39) The broad scope of the initial wording of plaintiff's request made the searches for responsive records daunting and time-consuming.  Moreover, the broad wording initially encompassed hundreds of documents that needed to be referred to other Department of Justice components.  If, at any time plaintiff had narrowed its request, the search for and processing of

---

[1] Upon consultation with the Office of Professional Responsibility, it was subsequently determined that all twenty pages of the documents responsive to plaintiff's request are also protected in their entirety by FOIA Exemption 7(A).

records would have been significantly faster. Ironically, the filing of this lawsuit itself resulted in a delay of preparation of an interim response because attention was focused on preparing the Answer and coordinating with the litigator. Throughout the process, plaintiff's request was being handled in a routine manner, and progress was being made consistently throughout that time.

## Plaintiff's Administrative Appeals

40) By letter dated July 18, 2005, plaintiff administratively appealed OIP's denial of its request for expedited processing to the Co-Director of OIP. (A copy of plaintiff's July 18, 2005 administrative appeal is attached hereto as Exhibit F.)

41) By letter dated August 12, 2005, the Co-Director of OIP advised plaintiff that because the Director of the Office of Public Affairs had afforded its request expedited treatment, its administrative appeal of OIP's denial of expedition was moot. (A copy of OIP's August 12, 2005 response to plaintiff's administrative appeal is attached hereto as Exhibit G.)

42) By letter dated July 11, 2005, plaintiff administratively appealed the Civil Division's denial of its fee waiver request to the Co-Director of OIP. (A copy of plaintiff's July 11, 2005 administrative appeal is attached hereto as Exhibit H.)

43) By letter dated July 28, 2005, OIP acknowledged receipt of plaintiff's July 11, 2005 administrative appeal. (A copy of OIP's July 28, 2005 letter is attached hereto as Exhibit I.)

44) This appeal was assigned to an OIP career senior counsel on August 10, 2005, and the relevant background information was received from the Civil Division on September 20, 2005. Upon review of the background material, and in order to draft a response, the senior counsel assigned to plaintiff's appeal had multiple substantive conversations with personnel in the Civil Division seeking clarification and additional information. The senior counsel assigned to plaintiff's appeal was actively working on drafting a response by mid to late November through

late December, and had a final draft prepared by early January. The response letter was in for review from January 10 to January 23, 2006. OIP's response to plaintiff's administrative appeal was completed and an advance copy faxed to plaintiff on January 23, 2006.

45)  During the time period in which OIP was preparing its response to plaintiff's administrative appeal, the senior counsel assigned to the appeal had many other duties and responsibilities including supervising litigation, reviewing fee waiver appeals of other OIP staff members, working on approximately forty other pending administrative appeals, performing designated FOIA ombudsperson work, drafting letters and appeal recommendations, and instructing in FOIA training programs.

46)  By letter dated January 23, 2006, the Director of OIP advised plaintiff that he was affirming the determination of the Civil Division.[2] (A copy of OIP's January 23, 2006 response to plaintiff's administrative appeal is attached hereto as Exhibit J.)

I declare under penalty of perjury that the foregoing is true and correct.

_Melanie Ann Pustay_

MELANIE ANN PUSTAY

Executed this 10 day of March, 2006.

---

[2] This appeal letter adjudicated plaintiff's administrative appeal based upon information identified as disclosable by the Civil Division. This letter also advised plaintiff that, going forward, it would be well advised to clarify whether publicly available records were intended to be within the scope of its request given that it was unclear.

-13-

**EXHIBIT E**

**Capital Reporting Company**

Page 1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3     ------------------------------:        ◻ **ORIGINAL**

4    CITIZENS FOR RESPONSIBILITY     :
     AND ETHICS IN WASHINGTON,       :

5                                    :

6         Plaintiff,                 :

7              v.                    :    Case No.:
                                     :    05-2078(EGS)

8    UNITED STATES                   :
     DEPARTMENT OF JUSTICE           :
                                     :

9         Defendant.                 :
                                     :

10   ------------------------------:

11                                   Washington, D.C.
                                     July 19th, 2006

12

13   Deposition of:

14              DANIEL METCALFE,

15         Called for oral examination by counsel for

16   Plaintiff, pursuant to notice, at the offices of

17   Citizens for Responsibility and Ethics in

18   Washington, 1400 Eye Street, N.W., Suite 450,

19   Washington, D.C. beginning at 3:30 p.m, before

20   Teague Gibson of Capital Reporting, a Notary Public.

21

22              *    *    *    *    *

**Capital Reporting Company**

Page 2

```
 1   ON BEHALF OF THE PLAINTIFF:

 2              ANNE L. WEISMANN, ESQ.
                MELANIE SLOAN, ESQ.
 3              Citizens for Responsibility
                and Ethics in Washington
 4              1400 Eye Street, N.W., Suite 450
                Washington, D.C. 20005
 5              (202) 408-5565

 6   ON BEHALF OF THE DEFENDANT:

 7              LISA A. OLSON, ESQ.
                ELIZABETH J. SHAPIRO, ESQ.
 8              U.S. Department of Justice Civil Divisoin
                20 Massachusetts Aveneu, N.W.
 9              Washington, D.C. 20530
                (202) 514-5633

10

11

12

13

14

15

16

17

18

19

20

21

22
```

**Capital Reporting Company**

Page 44

1    that means that request is put at the head of the

2    line and handled as soon as practicable.

3        Q    When you say the head of the line because

4    I'm used to seeing that term with respect to

5    document production, so when an agency goes in and

6    files an open America stay and you talk about

7    putting it at the head of the line, are you saying

8    it goes to the head of the line in terms of when

9    your office will get to a fee waiver request?

10       A    I'm not distinguishing between a fee

11   waiver request aspect of the FOIA request and the

12   remainder of the request.

13       Q    So it's fair to say that in your mind your

14   office tries to expedite the handling of all aspects

15   of a request when it's in your office, if it's been

16   granted expedition?

17       A    I think it's fair to say that Government

18   wide all agencies if they grant expedited treatment

19   will put the request at the head of the line and

20   then make sure that that request is not waiting

21   behind other requests ahead of it.  That is the

22   nature of expedition.

**Capital Reporting Company**

Page 49

1   of any of the processes in your office?

2        A    Would cause or has in fact caused?

3        Q    Has in fact caused, that's what I tried to

4   ask the first time?

5        A    I can answer the question this way for

6   complete clarity.  After reading that decision I did

7   go back and examine the administrative appeal

8   adjudication file in this case and looked at it in

9   relation to the opinion.

10       Q    And as a result of that review have you

11  learned anything additional about how OIP did handle

12  the request?

13       A    As a result of going back to the

14  administrative appeal I focussed on the

15  administrative appeal denial and looked at the time

16  interval in relation to the Judge's opinion and I

17  also looked at another aspect of it in relation to,

18  here I might be confusing two things so I'll

19  indicate that in advance, either the opinion or a

20  brief that was filed in this case, and I concluded,

21  again, I'm not certain now today whether this aspect

22  was in the opinion or merely in the brief, that a

**Capital Reporting Company**

1  appeal aspect of the Civil Division FOIA request.

2      Q    Who was that discussion with?

3      A    Janice McCloud.

4      Q    Was she the senior attorney that was

5  assigned to handle the appeal?

6      A    Yes.

7      Q    Were you aware that the requests had been

8  expedited?

9      A    You're asking was I aware.  You said were

10  you aware.

11      Q    Are you aware?

12      A    At what point in time?

13      Q    When did you -- were you aware that they

14  had been expedited?

15      A    Yes, I'm aware of that today, yes.

16      Q    And when did you become aware that the

17  Civil Division request had been expedited?

18      A    Sitting here today I have no recollection

19  of becoming aware of that prior to January of this

20  year when I acted upon or approximately the time I

21  acted upon the appeal from the denial of the fee

22  waiver request made to the Civil Division.

**Capital Reporting Company**

Page 17

1    Associate's Office?

2        MS. OLSON:  We renew our objection, but for

3    purposes of this particular set of questions we'll

4    allow him to answer, although we are not waiving our

5    right to assert the deliberative process privilege

6    with respect to any other areas.

7        A    Jeff Senger, Jeffrey Senger.

8        Q    And what did Melanie tell you his

9    understanding was of how the Civil Division was

10   processing its request?

11       A    Melanie told me when we first talked about

12   this that Jeff Senger had developed an understanding

13   based upon, I suppose conversations with the Civil

14   Division that the Civil Division was taking, what

15   could be called for, I guess the most accurate way

16   of describing it a categorical approach to the

17   request.

18       Q    And what did you understand her to mean by

19   that or what do you mean by that expression in this

20   context?

21       A    I understand Melanie to mean that that was

22   an approach that would involve not necessarily

**Capital Reporting Company**

1   looking for records individually record by record,

2   at least at the outset of this stage of the handling

3   of the request at which they were at that point.

4   And then I told Melanie or I guided Melanie

5   suggesting that she speak to Jeff Senger in very no

6   uncertain terms about what Melanie thought and I

7   thought was the proper handling of the request

8   notwithstanding Jeff Senger's understanding of how

9   it was being handled in the Civil Division and I

10   should probably hasten to add that I've since

11   learned that Jeff's understanding how it was handled

12   in the Civil Division was incorrect, they were not

13   taking a categorical approach.

14        Q     And what was the advice that you and

15   Melanie were agreed on that was I presume from what

16   you said communicated to Mr. Senger?

17        A     I can't speak firsthand to what Melanie

18   said to Mr. Senger.  I can only speak firsthand to

19   what Melanie told me.

20        Q     And what was it that you and Melanie

21   agreed upon as the proper approach?

22        A     You've used the phrase "agreed upon."

## Capital Reporting Company

Page 19

1    Q    I thought you had described it -- well,

2    let's go back to your last answer where I believe --

3    those may not have been your exact words, it was

4    certainly my understanding.

5                    (Record was read)

6    Q    So what was it that Melanie and you both

7    thought was the proper approach?

8    A    Other than an approach that was more

9    routine and other than the categorical approach that

10   Jeff Senger had communicated to Melanie, Melanie

11   told me, that he was inclined to take.

12   Q    And what do you mean when you use the word

13   "more routine"?

14   A    More routine in that it is an exception

15   rather than the rule to take a categorical approach

16   to a request.  The routine handling of a request

17   would be to search for records, find those records

18   individually and consider them individually as

19   opposed to taking a more categorical approach that

20   is not nearly so records specific if records

21   specific at all.

22   Q    When you had this conversation with

Page 22

1    happen?

2        A    My best recollection is that was some

3    number of weeks later.

4        Q    And did you ever get any information from

5    her or any other source that in fact the Associate's

6    Office at some point in time took at what you have

7    called a more routine approach?

8        A    Yes, I believe some number of weeks later

9    in at least one additional conversation Melanie told

10   me that, yes, that matter had been resolved and it

11   was at a point at which Melanie no longer had the

12   concern that she had discussed with me.

13       Q    And in that conversation that you just

14   described, was there anything else you learned about

15   the processing of the FOIA request either in your

16   office or the Associate's Office?

17       A    You added my office as well as the

18   Associate's Office.

19       Q    Just in those discussions with Melanie?

20       A    Up until now we've been discussing the

21   Associate's Office.  Why don't I answer that

22   question first.  The answer to that question is no.

**Capital Reporting Company**

Page 50

1    matter of an inconsistency was not at all accurate

2    on the part of the party or parties who said there

3    was an inconsistency or claimed there was such.  I

4    can't sitting here today recall whether that found

5    its way into the Judge's opinion, it might have.

6         MS. WEISMANN:  Let's take a five minute break.

7              (Off the record)

8    BY MS. WEISMANN:

9         Q    Since Judge Sullivan's opinion came out on

10   June 1st of this year has OIP changed in any respect

11   to how it continues to handle CREW's request?

12        A    You're asking me now about CREW's request

13   vis-a-vis the Associate's Office with the leadership

14   offices?

15        Q    Yes.  I understood you didn't have a role

16   other than the fee appeal in Civil's request?

17        A    That's correct.  And I don't have a role

18   with respect to what you're speaking about now.

19   That's being handled by the initial request staff

20   under the direction of OIP Deputy Director Melanie

21   Pustay.

22        Q    Do you have any knowledge?

## Capital Reporting Company

Page 51

1      A      Not only do I not have any knowledge, I

2  would not in the ordinary scheme of things have any

3  such knowledge.

4      Q      It's not every day that you get a judge

5  being this critical as he has been of the Deputy's

6  handling, so I'm trying to see if that has caused

7  anyone at OIP to re-evaluate how they are handling

8  CREW's FOIA request?

9      A      If it aids you in your understanding I can

10  tell you that given that initial requests are

11  handled by the initial request staff under Melanie's

12  direction and given that now as of today as of last

13  month, two months, several months, I have been

14  acting on administrative appeals I would have no

15  involvement, no knowledge, of what is happening at

16  the initial request level.  In other words, to be

17  specific, the same wall that existed between

18  Melanie's staff and Dick prior to his retirement in

19  October now exists and has existed for several

20  months vis-a-vis me.

21      Q      Do you know if there was any document

22  review conducted in the Associate Attorney General's

**EXHIBIT F**

Page 1

1          UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLUMBIA

3    ------------------------------:
                                   :    ORIGINAL
4    CITIZENS FOR RESPONSIBILITY    :
     AND ETHICS IN WASHINGTON,      :
5                                   :
          Plaintiff,               :
6                                   :
          v.                       :    Case No.:
7                                   :    05-2078(EGS)
     UNITED STATES                  :
8    DEPARTMENT OF JUSTICE          :
                                    :
9         Defendant.               :
                                    :
10   ------------------------------:

11                              Washington, D.C.
                                 July 18th, 2006
12

13   Videotaped Deposition of:

14             ROBERT D. MCCALLUM, JR.,

15          Called for oral examination by counsel for

16   Plaintiff, pursuant to notice, at the District of

17   Columbia District Court, 333 Constitution Avenue,

18   N.W., Washington, D.C., beginning at 10:40 a.m,

19   before Teague Gibson of Capital Reporting, a Notary

20   Public.

21

22                  *    *    *    *    *

## Capital Reporting Company

Page 2

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFF:

 3              ANNE L. WEISMANN, ESQ.
                MELANIE SLOAN, ESQ.
 4              Citizens for Responsibility
                and Ethics in Washington
 5              1400 Eye Street, N.W., Suite 450
                Washington, D.C. 20005
 6              (202) 408-5565

 7   ON BEHALF OF THE DEFENDANT:

 8              LISA A. OLSON, ESQ.
                ELIZABETH J. SHAPIRO, ESQ.
 9              U.S. Department of Justice Civil Divisoin
                20 Massachusetts Aveneu, N.W.
10              Washington, D.C. 20530
                (202) 514-5633
11

12
     ALSO PRESENT:  Harold Bayuk, Video Technician
13

14

15

16

17

18

19

20

21

22
```

**Capital Reporting Company**

Page 121

1    it and am I correct that it is only one redwell?

2         A    No, there are several.

3         Q    Do you know how many?

4         A    Three, maybe four.

5         Q    If you had to estimate how many pages of

6    documents they include what would your best guess

7    be?

8         A    I would have no idea.  How many pages

9    would you estimate are in this that we have here, a

10   hundred or 20?

11        Q    20 is probably the closer approximation?

12        A    It would be total speculation.

13        Q    How many inches thick is each redwell?

14        A    I'd say each redwell is like that, now is

15   that four inches maybe?

16        Q    Four to six inches perhaps?

17        A    Four inches, so probably have either three

18   or four of those, maybe eight inches of paper if you

19   stacked them up.  Probably be something similar to

20   what you have in your files right there.

21        Q    I just want to be clear, this represents

22   the totality of the files or documents you have in

**Capital Reporting Company**

Page 141

1     A    I have a desk with a credenza and it's in

2  one of the drawers of the credenza or the desk.

3     Q    Who has access to those files?

4     A    Anybody that wants to open my drawer.  I

5  don't keep it under lock and key.

6     Q    Under those basis do other people have

7  access to your files?

8     A    I have no idea.  I presume that they

9  don't, but who knows whether the people that come in

10  and do sort of security checks on what documents are

11  on your desk and make sure that you don't have any

12  classified documents laying around.  I would be

13  surprised if anybody went into it without telling me

14  but stranger things have happened, I suppose.

15     Q    And do the lawyers on your staff have

16  occasion to access your personal files?

17     A    It would not surprise me that in

18  responding to the OPR investigation that Jeff Senger

19  or Lou Reyes went in there and I'm sure if they went

20  in there they told me about it and said I've got to

21  go do X or Y and want to look at this or that, but I

22  don't remember that.  I presume that that happened

1    nature but I do have a general recollection that at

2    some point I became aware of there being litigation

3    filed relating to the FOIA request by CREW.

4         Q    And prior to the litigation being filed

5    were you aware -- do you have any recollection that

6    CREW had first filed administratively with the

7    Department of Justice Freedom of Information Act

8    request?

9         A    I don't have any specific recollection of

10   that, although I'm sure that I was aware of it, but

11   in my recollection the filing the FOIA request and

12   the litigation are merged into one so I don't have

13   any recollection of a distinction between the two.

14   So at some point I was certainly aware that there

15   had been a FOIA request filed and CREW was involved

16   in litigation relating to it in some way.

17        Q    What was your understanding about what

18   CREW was seeking in its FOIA request?

19        A    I don't recall.  I'm sure it was tobacco

20   litigation documents but such as the questions

21   you've been asking me previously about the tobacco

22   litigation case, so that's generally what I

**Capital Reporting Company**

Page 51

1   the Department to review for purposes of responding

2   to CREW's FOIA request?

3       A    I have no specific recollection.  I have a

4   general recollection that I delegated the

5   responsibility to respond to whatever requests there

6   were, either OPR requests or FOIA requests to

7   members of my staff.

8       Q    Is it your testimony then if I hear you

9   correctly that you treated the response to your FOIA

10  request in this same way that you treated your

11  response to the OPR request?

12      A    No, that's a mischaracterization.  I

13  certainly treated the OPR request for documents.  I

14  do specifically remember receiving a letter from

15  Marshal Jarrett asking me for documents and I do

16  specifically remember allowing and or rather

17  delegating two particular people on my staff the

18  responsibility for responding to that.  I have no

19  recollection of specifically the FOIA request or

20  what it entailed or who it was directed to or where

21  it came from.  I'm embarrassed to say that I didn't

22  know who CREW was and that was not something that I

**Capital Reporting Company**

Page 61

1    not correct I presume that they will look into it

2    and determine what the incorrectness of them may be,

3    just like you would make inquiries if you wanted to

4    dispute facts that they would present.

5         Q    But outside of the context of defending

6    the Department in this litigation, you're not aware

7    of anyone who has attempted on a programmatic basis

8    to review how CREW's request was handled?

9         MS. OLSON:  I object to the form of this --

10        MS. WEISMANN:  Any concerns with it --

11        MS. OLSON:  -- question because you haven't

12   established whether he knows what these statistics

13   are, has any responsibility for the promulgation or

14   production and is in any way connected to these,

15   much less that what the judge -- what the opinion

16   says here is in fact accurate.  You can answer her

17   question if you able.

18        A    I didn't understand the statistics in the

19   manner that you assert they -- as to what you assert

20   that they mean, number one.  Number two, because I

21   didn't understand them in the way that you

22   understand them I never even considered going

**Capital Reporting Company**

Page 62

1    forward with any sort of assessment.  Number three,

2    I had removed myself from the processing of the FOIA

3    request and therefore it would have been

4    inappropriate for me as the putative deponent to get

5    in and start trying to determine what was done.

6           Now, if someone else in the Deputy's

7    Offices did that or someone in the Office of

8    Information and Privacy or someone else someplace in

9    the Department of Justice has done that I do not

10   know, could be, might be, but I don't know about it.

11       Q    It is my understanding that in the spring

12   of this year the Department proposed and perhaps has

13   now instituted a reorganization of how OIP

14   functions; is that correct?

15       A    I would describe it as there has been a

16   creation of the Office of Privacy and Civil

17   Liberties that deals with some of the issues that

18   have previously been dealt with by the Office of

19   Information and Privacy and that has been stood up,

20   if you will, with inside the Office of the Deputy

21   Attorney General.  So the operations of OIP have

22   certainly been impacted by that new office that was

**EXHIBIT G**

**Capital Reporting Company**

Page 1

```
1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

        -------------------------------:
4   CITIZENS FOR RESPONSIBILITY         :        ORIGINAL
    AND ETHICS IN WASHINGTON,           :
5                                       :
        Plaintiff,                      :
6                                       :
            v.                          :   Case No.:
7                                       :   05-2078(EGS)
    UNITED STATES                       :
8   DEPARTMENT OF JUSTICE               :
                                        :
9       Defendant.                      :
                                        :
10  -------------------------------:

11                              Washington, D.C.
                                July 19th, 2006
12

13  Deposition of:

14                  STEPHEN BRODY,

15          Called for oral examination by counsel for

16  Plaintiff, pursuant to notice, at the offices of

17  Citizens for Responsibility and Ethics in

18  Washington, 1400 Eye Street, N.W., Suite 450,

19  Washington, D.C. beginning at 10:45 a.m, before

20  Teague Gibson of Capital Reporting, a Notary Public.

21

22              *    *    *    *    *
```

**Capital Reporting Company**

Page 2

```
 1    ON BEHALF OF THE PLAINTIFF:

 2              ANNE L. WEISMANN, ESQ.
               MELANIE SLOAN, ESQ.
 3             Citizens for Responsibility
               and Ethics in Washington
 4             1400 Eye Street, N.W., Suite 450
               Washington, D.C. 20005
 5             (202) 408-5565

 6    ON BEHALF OF THE DEFENDANT:

 7              LISA A. OLSON, ESQ.
               U.S. Department of Justice Civil Divisoin
 8             20 Massachusetts Aveneu, N.W.
               Washington, D.C. 20530
 9             (202) 514-5633

10    ON BEHALF OF THE WITNESS:

11              ROBERT M. WEINBERG, ESQ.
               Bredhoff & Kaiser, PLLC
12             805 Fifteenth Street, N.W.
               Washington, D.C. 20005
13             (202)842-2600

14

15

16

17

18

19

20

21

22
```

**Capital Reporting Company**

1    dealing with the case.

2         MR. WEINBERG:  So the record is clear, he has

3    given that same answer earlier in this deposition.

4         Q    The record is what it is.  It's not your

5    testimony that at that time you took any actions to

6    identify documents that might be responsive to our

7    FOIA request?

8         A    Correct.

9         Q    Are you aware whether anyone else on the

10   tobacco team or within the Civil Division was asked

11   to assemble documents that were responsive to CREW's

12   FOIA request?

13        A    At what point in time?

14        Q    At any time since the request was filed?

15        A    I am aware that.  I think Jim Kovakas was

16   doing something.

17        Q    But no one else on the tobacco litigation

18   team that you're aware of?

19        A    Correct.

20        Q    Would this include the period of time that

21   Sharon Eubanks was there?

22        A    Correct.

**Capital Reporting Company**

Page 27

1      A     Yes.

2      Q     And when did you first become aware that

3   CREW had filed those requests?

4      A     First time I was really aware of it was

5   probably October or November of 2005.

6      Q     And so at that time were you aware that

7   the Department was also in litigation with CREW

8   concerning the FOIA requests?

9      A     Yes.

10     Q     Prior to that period of time were you ever

11  asked by anyone to review documents to see whether

12  they would be responsive to CREW's FOIA request?

13     A     No.

14     Q     So I don't want to misstate your

15  testimony, I want to make sure I'm clear though, is

16  it your best recollection that you didn't have any

17  knowledge of the FOIA requests until CREW was

18  already in litigation with the Department?

19     A     Correct.  To be completely accurate, it's

20  possible that I may have seen the FOIA request when

21  it came in but there were a lot of FOIA requests at

22  that time and if I saw it it would have just been

**Capital Reporting Company**

Page 70

1    directing him not to answer or not?

2        MR. WEINBERG:  I guess what we're saying is

3    that we would be happy if the witness leave the room

4    and you can explain how this could possibly relate

5    to the FOIA litigation and then we can make a

6    decision as to whether to direct him or not.

7        MS. WEISMANN:  Off the record.

8                    (Off the record)

9    BY MS. WEISMANN:

10       Q    I'm not going to require to you answer

11   that last question.  I want to go back and focus,

12   again, on the documents that you assembled for Ms.

13   Olson.  Did you yourself get those documents or did

14   you delegate that to someone else?

15       A    I assembled that set of documents myself.

16       Q    And were these documents that had already

17   been segregated in some way?

18       A    Yes.

19       Q    It would be helpful if you would start by

20   describing where these documents were housed?

21       A    I was able to collect the documents from

22   the files in my office.

**Capital Reporting Company**

Page 71

```
 1      Q    And how many filing cabinets do you have

 2  in your office?

 3      A    Filing cabinets that are assigned

 4  personally for my use, probably five.

 5      Q    And was it within those five filing

 6  cabinets that these documents resided?

 7      A    I think they were actually in a bookcase.

 8      Q    And so these are documents that had

 9  already been assembled by you before the request

10  came from counsel?

11      A    Yes.

12      Q    And what was your purpose initially in

13  assembling these documents?

14      MS. OLSON:  Objection, that would violate --

15  that's privileged under law enforcement

16  investigatory privilege.

17      Q    Is that an ongoing investigation?

18      MS. OLSON:  I'm going to -- my understanding is

19  that his response to that would divulge privileged

20  information or could divulge it, so I'm going to ask

21  him not to answer.

22      MS. WEISMANN:  But are you talking about an
```

**Capital Reporting Company**

Page 38

1    we're entitled to probe here.

2         MR. WEINBERG:  I don't think that is what

3    Mr. Olson told the court, but he's given the answer.

4         MS. WEISMANN:  I have the transcript.

5         MR. WEINBERG:  Did Ms. Olson say he gave every

6    document?

7         MS. WEISMANN:  No.

8         MR. WEINBERG:  That's what he's testified

9    already.  He didn't use any criteria, he gave every

10   document.

11        MS. WEISMANN:  Let me explain.  You said he

12   gave every document he had that he thought related

13   to our FOIA, there still is a judgment call.

14        MR. WEINBERG:  No, he didn't say that related

15   to FOIA.  He said he gave every document -- his

16   testimony --

17        Q    Your testimony is that the four inches of

18   documents you provided is the entirety of the

19   documents you have relating in any way to the remedy

20   in this case?

21        A    No, I believe what I testified was

22   relating to the internal discussions within the

Page 48

1      Q     Did you go through the entire tobacco

2   litigation files?

3      A     No.

4      Q     What types of documents, give me the

5   categories of documents that you provided Ms. Olson?

6      A     There was primarily e-mail, some drafts of

7   witness testimony.  There were memos, internal

8   memos.  There was probably one publicly filed

9   meeting.

10     MR. WEINBERG:  Hang on one second.

11                    (Off the record)

12  BY MS. WEISMANN:

13     Q     Did any of the documents include your

14  personal notes that you took of conversations?

15     A     No.

16     Q     Did any of the documents include e-mail

17  between you and the tobacco representatives?

18     A     No.

19     MS. OLSON:  Objection.  If you're suggesting

20  that such documents exist that he has any -- you

21  haven't established that he would have had any notes

22  or had any such communications.  So just objection