# EXHIBIT 3

Page 1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

          ------------------------------:
4   CITIZENS FOR RESPONSIBILITY         :
    AND ETHICS IN WASHINGTON,           :
5                                        :
         Plaintiff,                      :
6                                        :
         v.                              :    Case No.:
7                                        :    05-2078(EGS)
    UNITED STATES                        :
8   DEPARTMENT OF JUSTICE                :
                                         :
9        Defendant.                      :
                                         :
10  ------------------------------:

11                                  Washington, D.C.
                                    July 18th, 2006
12

13  Videotaped Deposition of:

14            ROBERT D. MCCALLUM, JR.,

15         Called for oral examination by counsel for

16  Plaintiff, pursuant to notice, at the District of

17  Columbia District Court, 333 Constitution Avenue,

18  N.W., Washington, D.C., beginning at 10:40 a.m,

19  before Teague Gibson of Capital Reporting, a Notary

20  Public.

21

22                  *    *    *    *    *

1                    A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF:

3            ANNE L. WEISMANN, ESQ.
             MELANIE SLOAN, ESQ.
4            Citizens for Responsibility
             and Ethics in Washington
5            1400 Eye Street, N.W., Suite 450
             Washington, D.C. 20005
6            (202) 408-5565

7    ON BEHALF OF THE DEFENDANT:

8            LISA A. OLSON, ESQ.
             ELIZABETH J. SHAPIRO, ESQ.
9            U.S. Department of Justice Civil Divisoin
             20 Massachusetts Aveneu, N.W.
10           Washington, D.C. 20530
             (202) 514-5633

11

12
     ALSO PRESENT:  Harold Bayuk, Video Technician
13

14

15

16

17

18

19

20

21

22

Page 3

1                    C O N T E N T S

2    EXAMINATION BY:                          PAGE

3    MS. WEISMANN                              5

4    MCCALLUM DEPOSITION EXHIBITS:           PAGE:

5    1          Written Responses             14

6    2          E-mails                       71

7    3          Document                      84

8

9

10

11

12

13

14         (Exhibits retained by court reporter)

15

16

17

18

19

20

21

22

Capital Reporting Company

Page 4

1          VIDEO TECHNICIAN:  This is the video deposition

2    Robert McCallum.  Today is July 18th, 2006, the time

3    is approximately 10:35 a.m.  The deposition is being

4    made in accordance with civil procedure.  My name is

5    Harold Bayuk, videographer, and will the parties

6    introduce themselves and will the court reporter

7    please swear the witness?

8         MS. WEISMANN:  Anne Weismann, counsel for

9    Plaintiff CREW.

10         MS. OLSON:  Lisa Olson, counsel for the

11   Department of Justice.

12         MS. SHAPIRO:  Elizabeth Shapiro, Department of

13   Justice.

14         MR. ROTH:  Dan Roth, CREW.

15         MS. SLOAN:  Melanie Sloan, CREW.

16

17              P R O C E E D I N G S

18   WHEREUPON:

19

20          ROBERT D. MCCALLUM, JR.,

21    called for examination, having been duly sworn to

22    tell the truth, the whole truth and nothing but the

Capital Reporting Company

Page 5

1           truth, testified as follows:

2

3        EXAMINATION BY COUNSEL FOR PLAINTIFF

4

5   BY MS. WEISMANN:

6        Q     Please state your name for the record?

7        A     Robert D. McCallum, Jr.

8        Q     And what is your current position,

9   Mr. McCallum?

10       A     I'm the Associate Attorney General of the

11  United States Department of Justice.

12       Q     And how long have you been in that

13  position?

14       A     Since July 2003 I think.  I don't have a

15  recollection of the specific date but that's the

16  approximate timeframe.

17       Q     Was there some period of time in which

18  were Acting Associate Attorney General?

19       A     There was.

20       Q     And prior to being Associate Attorney

21  General, what was your position at the Justice

22  Department?

Capital Reporting Company

Page 6

1      A    My position was Assistant Attorney General

2    for the Civil Division.

3      Q    What were the dates that you held that

4    position?

5      A    I began on September 17, 2001 and

6    continued in that position until I became the

7    Associate Attorney General sometime around July

8    2003, if I remember correctly.

9      Q    There was some period of time that you

10    were both Acting Associate Attorney General and

11    Assistant Attorney General?

12      A    I believe that that is correct.  I had

13    not -- technically I had not resigned as the

14    Assistant Attorney General of the Civil Division,

15    even though I believe I was the Acting Associate

16    Attorney General.  I may be wrong in that in that

17    Peter Keisler might have been the Acting.

18      Q    Okay.

19      A    Associate Attorney General until I was

20    sworn in, so.

21      Q    That's for our purposes, that's

22    sufficient?

Capital Reporting Company

Page 7

1     A     I just don't remember specifically on

2  that, but it's probably Peter now that I'm thinking

3  about it who was Acting Associate Attorney General.

4  He became --

5     Q     Well, sir, I don't need to know his bio.

6  We're going to focus on you, thank you.

7     A     Okay.

8     Q     And in both capacities your

9  responsibilities included supervision of what we in

10  this litigation have called the tobacco litigation,

11  the Government's case against the tobacco companies;

12  is that correct?

13     A     That's correct.

14     Q     And for purposes of this deposition I'm

15  going to refer to it as the tobacco litigation, is

16  that a sufficiently clear description for you?

17     A     It is.

18     Q     Now, let's talk about your role in the

19  tobacco litigation?

20     MS. OLSON:  Objection, relevance.

21     Q     How closely did you supervise the team?

22     MS. OLSON:  Objection, relevance.  You can

Page 8

1    answer.

2        A    Okay.  As Assistant Attorney General for

3    the Civil Division I was involved in supervising the

4    tobacco litigation trial team whenever someone on

5    the trial team raised an issue for my consideration

6    or thought that it was an issue in which I would be

7    interested and any time that I felt through whatever

8    source of information that my involvement would be

9    helpful to the tobacco litigation trial team but it

10    was sporadic and intermittent depending on when and

11    if people brought issues to my attention from the

12    tobacco litigation trial team.

13        Q    And did you review pleadings that were

14    filed in the case?

15        MS. OLSON:  Objection, relevance.  I'm not

16    going to object to every question, but just to be

17    clear for the record, this line of questioning

18    regarding the tobacco litigation is, in our view,

19    irrelevant and we -- I'm making a general objection

20    so that I don't waive any specific objection.

21        Q    My question was if during that period you

22    also reviewed pleadings that were filed in the case?

Capital Reporting Company

Page 9

1    A    I don't remember reviewing any particular

2    pleading during that period of time, although I may

3    have.  But if I did it would be on an extremely rare

4    occasion and generally if I received a pleading I

5    wouldn't necessarily go through it and review it if

6    someone sent me from to the tobacco litigation trial

7    team, unless there was some specific reason for it.

8    Q    Did your role change when you became the

9    Associate Attorney General, and by that I mean did

10    your role in terms of your level of supervision with

11    the tobacco litigation team change?

12    A    It did.

13    Q    And how did that change?  What was that

14    change?

15    A    Well, as Associate Attorney General I had

16    much broader responsibilities and a much larger

17    portfolio so my supervision of the tobacco

18    litigation trial team became even more rare and

19    infrequent.  The responsibility for supervision of

20    the tobacco litigation trial team remained, if you

21    will, with the Assistant Attorney General for the

22    Civil Division who at that time was Peter Keisler.

Page 10

1      Q    And did there come a time in the,

2   focussing specifically, late winter and early spring

3   of 2005 when your supervisory role changed again in

4   any way?

5      A    I wouldn't say my supervisory role changed

6   in terms of responsibilities.

7      Q    Let me -- my question was not clear

8   enough.  What I mean by that is did there come a

9   time when you actually had more contact than you

10  have just described with the tobacco litigation team

11  or at least senior members of that team?

12     A    Intermittently there were times at which I

13  would have greater contact with senior members of

14  the tobacco litigation trial team and it varied.  I

15  can't specifically point to the timeframe that

16  you're talking about and say yes, then, but no,

17  sometime later, but there were certainly periods of

18  time when my contact was more frequent than it had

19  been previously.

20     Q    And did that include evening meetings

21  weekend meetings perhaps even over holiday weekends

22  such as Memorial Day weekend?

Capital Reporting Company

1      A      Memorial day of 2005?

2      Q      And five?

3      A      Yes, and in that timeframe certainly.  If

4   2005, yes, I'm trying to make sure that it wasn't

5   2006.

6      Q      The period of time I'm talking about is

7   2005?

8      A      Certainly 2005.

9      Q      And when you would meet with the members

10  of the tobacco team however many you met with did

11  you take notes?

12     A      I did take notes, yes.

13     Q      And --

14     A      From time to time, not necessarily every

15  time but generally I would take notes of our

16  meeting.

17     Q      And what would you do with those notes?

18     A      I would put those notes in a Manila

19  redwell like the one you have on your desk.

20     Q      And did you keep them in a filing system

21  relating to the tobacco litigation?

22     A      Filing system gives it a dignity that it

Page 12

1    does not deserve in that -- but I did keep them in a

2    Manila redwell and maintained it but I don't -- when

3    you talk about a filing system, I have this concept

4    of a numbered file that's identified somewhere

5    within a formalistic system and I'm sure that lots

6    of people on the tobacco litigation trial team and

7    in my office and in the Civil Division have such

8    filing systems, but with respect to the Associate's

9    Office I didn't have a formal number that was

10    related to some sort of file system.

11        Q    And do you still have those notes today?

12        A    I do.

13        Q    And at any time did you identify those

14    notes as responsive to a request from the Office of

15    Professional Responsibility when it conducted its

16    investigation?

17        A    I am sure that those notes were provided

18    to them, although I did not myself pick up the

19    folder and take it to the individuals that were

20    involved with the tobacco litigation and the Office

21    of Professional Responsibility.

22        Q    Now, is it not true that you actually

Capital Reporting Company

Page 13

1    attended the opening arguments in the tobacco

2    litigation when the Government presented its opening

3    argument?

4         A    I did attend the opening arguments.  I'm

5    trying to remember whether I attended each and every

6    portion of the opening arguments or whether I was

7    absent at any point.  I think I attended the

8    entirety of it but I'm not sure of that.  I might

9    have been absent at some point but.

10        Q    How many days -- do you recall how many

11   days that consumed?

12        A    Gosh.

13        Q    But it was multiple days?

14        A    I don't have that recollection.

15        Q    In fact?

16   MS. OLSON:  Can he finish answering?

17        A    I just don't recall whether it was more

18   than one day.  I don't think it was more than one

19   day but it might have been.

20        Q    And in fact you gave a press conference

21   afterward at the courthouse, did you not?

22        A    I don't know that it was afterwards.  I do

Page 14

1    remember giving a press conference and it might have

2    been in the middle of it.

3        Q    In its proximity of time?

4        MS. OLSON:  I'm sorry, would you mind just not

5    interrupting, if he could just finish his answer we

6    appreciate it.

7        A    I don't know whether it was at the

8    conclusion of the opening statement or whether it

9    was in the middle of it at noontime or thereafter or

10   I don't recall.

11       Q    Okay.

12       A    Now that I'm thinking about it I think

13   that I did miss some of the opening statement

14   because it's my recollection that I was not around

15   at some point that someone else from the Department

16   of Justice gave a -- made some press comments but

17   that might have been at the conclusion of the

18   defendant's opening statement.

19       Q    Can we have this marked as I guess CREW

20   Exhibit 1.

21           (McCallum Exhibit No. 1 was marked)

22       Q    Sir, what I have just handed you is the

Capital Reporting Company

Page 15

1    written responses that you gave to the Senate

2    Foreign Relations Committee on June 19th, 2006

3    pursuant to your nomination to be Embassador to

4    Australia?

5         A    Uh-huh.

6         Q    Do you recognize this document?

7         A    I do recognize the first page.  It

8    contains more than the question of Senator Luger.

9         Q    Right.  It also contains responses to

10   questions from Senator Biden as well.  I'd like to

11   focus your attention?

12        A    Just a second, if I can just look at it?

13        Q    I'd like to direct your attention on your

14   response to question number 4 from Senator Biden,

15   it's about halfway through the package, and I'm not

16   going to ask you now to read all of it but there

17   was -- let me ask you this question first.  Did you

18   write these responses?

19        A    I did.

20        Q    In part of your response you talked about

21   an order that Judge Kessler issued on February 28th

22   that was Order Number 886 and you referred to the

Capital Reporting Company

Page 16

1    language that she used in that order where she

2    referred to the body blow that the Government's case

3    had been dealt by the D.C. Circuit; isn't that

4    correct?

5        A    That is correct.  She did so refer.

6        Q    Were you aware of that opinion when it

7    came out?

8        A    I was.

9        Q    And --

10       A    And let me make sure that you are

11   understanding what I say.  I was aware of the

12   Circuit Court opinion, then I was aware afterwards

13   that Judge Kessler had entered some order and I

14   don't know specifically that it was 886 or recall

15   that I knew that.  I don't specifically recall

16   reading the order but I may have, but I was aware

17   that she was critical, if you will, of the arguments

18   that the Department of Justice lawyers had made in

19   response to some inquiry that she had made about

20   Judge Sentelle's opinion.  I believe that -- that's

21   sort of a general recollection I had.

22       Q    As a result of being generally aware that

Capital Reporting Company

Page 17

1  she had been critical, did that cause you to get

2  more involved in what the Government filed?

3      A    Not to the extent of reviewing any

4  pleadings but I -- and I don't remember anything

5  specifically, but I do a have a general recollection

6  that I met with various members of the tobacco

7  litigation trial team about Judge Sentelle's opinion

8  and Judge Kessler's positions or reaction to it and

9  these discussions, gosh, occurred over -- it's not

10  on one occasion but on.

11      Q    Multiple occasions?

12      A    Multiple occasions that there were

13  discussions about the opinion, the position of the

14  trial judge and the consequences to the case and the

15  arguments that had been presented by or the -- not

16  the arguments but the positions that had been

17  articulated by Judge Sentelle and his opinion.

18      Q    Now, you have publicly identified yourself

19  as the individual who made the ultimate decision at

20  the Department of Justice about what the

21  Government's proposed remedy should be; isn't that

22  true?

Page 18

1      A      That is true.

2      Q      And at what point in time did you become

3   actively involved to the point that you felt you

4   were capable of making that decision?

5      A      Well, the question is my capacity to make

6   that decision.  I'll take that as a question

7   regarding the legal capacity to make that decision

8   rather than the intellectual talent.

9      Q      No, I'm not in any way impeding your

10   intellectual talent?

11      A      To be able to do that or the legal

12   expertise or acumen to be able to determine what the

13   right decision was.  I'm confident that there will

14   be different people that will have different

15   opinions as to my expertise and intellectual

16   capacity.  However, when I became Associate Attorney

17   General it was clear that my legal capacity was to

18   resolve issues in which there might be differences

19   of opinion or different views expressed within

20   inside the Department of Justice.  As those views

21   and opinions percolated up what I will call the

22   chain of command so that in your days when you were

Page 19

1   with the Civil Division in federal programs if the

2   branch director disagreed with a decision that you

3   made or had a different opinion with what you were

4   recommending then it would go to the Assistant

5   Attorney General in the Civil Division.

6           If you were still dissatisfied and thought

7   that it really deserves some greater consideration

8   it would go to the Associate Attorney General and

9   then to the Deputy and then to the Attorney General

10  and ultimately if it was important enough to the

11  President of the United States.

12      Q    Let me be a little clearer in my question.

13  I don't want to get bogged down in the decision

14  making processes of the department.  What you have

15  described so far is a fairly sporadic involvement

16  with the day-to-day details of the tobacco

17  litigation; isn't that correct?

18      A    That's correct.

19      Q    And you also described a process where you

20  did not routinely read filings that the Government

21  made and even if you did you didn't have very

22  specific memories necessarily what any individual

Page 20

1    filing or even any individual ruling of the court

2    said; isn't that correct?

3        MS. OLSON:  Object to your characterization of

4    what he just said, the record speaks for itself.

5        Q    I don't want to mischaracterize.  What I'm

6    trying to understand is in order to make this final

7    decision on behalf Of the Department, did there come

8    a time that you emersed yourself more intensely of

9    the case, what was going on in the case, the

10   opinions of the court, et cetera?

11       A    That depends on how one would define

12   immersing one's self more intently.

13       Q    Well, more intently than what I have just

14   described that had been your practice up until this

15   point?

16       MS. OLSON:  Well, I object to your

17   mischaracterization of what he just testified about.

18   Ask him a question and he'll answer it but don't

19   characterize --

20       Q    I've asked the question.

21       MS. OLSON:  I object to the form of that

22   question it's vague, it's misleading, you've

Page 21

1    mischaracterized his testimony and I'll ask you to

2    rephrase the question so he can answer it properly.

3        Q    Do you understand the question?

4        A    Read it back to me now, I have forgot the

5    question.

6        Q    The last question?

7        A    So I'll then be able to tell you whether I

8    understand it or not.

9                (Record was read)

10       A    I don't understand the question because it

11   was the preceding questions or series of questions.

12       Q    That's fine.  Let's go at it a different

13   way because it is not my intent to mischaracterize

14   your testimony.  Let me be very clear about that?

15       A    All right.

16       Q    Let's talk about what you did do in order

17   to be able to reach that decision.  Now you have

18   publicly referred to the fact that you got advice

19   from the criminal division or the Office of

20   Organized Crime -- the RICO -- the component of

21   criminal that dealt with RICO; is that not correct?

22       A    I did receive input from the Organized

Page 22

1    Crime and Racketeering Section, one member of which

2    was, or one of the members of the Organized Crime

3    and Racketeering Section was a member of the tobacco

4    litigation trial team.

5        Q    And that would be Frank Marine, correct?

6        A    That was Frank Marine.

7        Q    When did you receive his recommendation?

8        A    I certainly don't remember all the dates,

9    but over a series of months there were issues

10   regarding and discussions regarding appropriate

11   remedies under the Sentelle Circuit Court opinion.

12       Q    So it's your testimony Mr. Marine raised

13   issues about the remedy over a period of months

14   starting -- can you at least pin it down as to what

15   month these may have started?

16       A    Over remedies.

17       Q    Yes, that's what we're talking about --

18       A    Talking about remedies.

19       Q    Yes.

20       A    That the Government might be speaking.   I

21   don't specifically remember a date that one would

22   say October the 1st, 1999 is when it began, but I

Page 23

```
 1    can tell you that it was a number of issues in the

 2    months preceding the closing arguments, that is my

 3    general recollection.

 4         Q    And when you said in response to Judge

 5    Biden's question going back to Exhibit 1 that career

 6    attorneys in the organized crime and racketeering

 7    section of the Criminal Division including the

 8    senior litigation counsel who was a member of the

 9    trial team gave a portion?

10         A    I'm sorry, where are you reading?

11         Q    Recommended, I'll tell you in a minute,

12    recommended revising the non-disgorgement remedies

13    to connect them to future violations of RICO.

14    Unfortunately this doesn't have page numbers.  It

15    is.

16         A    I'll find it.  I got it.

17         MS. OLSON:  What question is it?

18         A    It's question number 4.

19         Q    It's all question number 4.

20         A    There are a number of questions.

21         MS. OLSON:  I see.

22         Q    When you were talking in this response
```

Page 24

1    when you referred to input that you got

2    recommendations revising the non-disgorgement

3    remedies, were those recommendations again that they

4    came over a period of months?

5        A    If one defines non-disgorgement remedies

6    as all of the other remedies that were in the case,

7    yes, it was over a period of months and that's the

8    way I intended it, i.e. there was a disgorgement

9    remedy and that was very specifically ruled upon by

10   Judge Kessler taken up on appeal and reversed by

11   Judge Sentelle's opinion.  So that was one

12   particular type of remedy and there were a number of

13   other remedies that were mentioned in the opening

14   statement and I was referring to all those as

15   non-disgorgement remedies.

16       Q    Now you also have referred publicly to the

17   fact that you spoke with members of the trial team

18   and got their recommendations as to remedies; is

19   that correct?

20       A    Yes.  Mr. Marine was a member of the trial

21   team and there were certainly others as well.

22       Q    Did you talk with the senior counsel in

Page 25

```
 1    the Civil Division that was involved with the trial

 2    team about the proposed --

 3         A    Can you give me a name?

 4         Q    Sharon Eubanks and Steve Brody?

 5         A    Sharon is the -- the way I identify her is

 6    the Director of the tobacco litigation trial team

 7    and Steve Brody is the Deputy Director and that's

 8    why I didn't understand when you were talking about

 9    senior counsel.  There were lots of different

10    members of the tobacco litigation trial team.

11    Certainly received input from both your -- now your

12    colleague, as I understand it, Ms. Eubanks at CREW,

13    and from Mr. Brody as well.

14         Q    And in fact did you not receive a memo

15    from them that was dated May 30th, 2005 and that was

16    referenced in the New York Times article with their

17    views on the proposed -- your proposed settlement?

18         A    I don't remember the date of the memo that

19    was referenced in the New York Times article but I

20    certainly received a memo from them and other

21    communications, oral and I believe e-mail.

22         Q    And did you retain copies of their e-mail
```