# EXHIBIT 1

Capital Reporting Company

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF COLUMBIA
 3
        ------------------------------:
 4   CITIZENS FOR RESPONSIBILITY       :
     AND ETHICS IN WASHINGTON,         :
 5                                     :
            Plaintiff,                 :
 6                                     :
            v.                         : Case No.:
 7                                     : 05-2078(EGS)
     UNITED STATES                     :
 8   DEPARTMENT OF JUSTICE             :
                                       :
 9          Defendant.                 :
                                       :
10   ------------------------------:
11                                      Washington, D.C.
                                        July 18th, 2006
12
13   Videotaped Deposition of:
14            ROBERT D. MCCALLUM, JR.,
15        Called for oral examination by counsel for
16   Plaintiff, pursuant to notice, at the District of
17   Columbia District Court, 333 Constitution Avenue,
18   N.W., Washington, D.C., beginning at 10:40 a.m,
19   before Teague Gibson of Capital Reporting, a Notary
20   Public.
21
22                      *   *   *   *   *
```

Page 14

1  remember giving a press conference and it might have
2  been in the middle of it.
3      Q   In its proximity of time?
4      MS. OLSON: I'm sorry, would you mind just not
5  interrupting, if he could just finish his answer we
6  appreciate it.
7      A   I don't know whether it was at the
8  conclusion of the opening statement or whether it
9  was in the middle of it at noontime or thereafter or
10 I don't recall.
11     Q   Okay.
12     A   Now that I'm thinking about it I think
13 that I did miss some of the opening statement
14 because it's my recollection that I was not around
15 at some point that someone else from the Department
16 of Justice gave a -- made some press comments but
17 that might have been at the conclusion of the
18 defendant's opening statement.
19     Q   Can we have this marked as I guess CREW
20 Exhibit 1.
21     (McCallum Exhibit No. 1 was marked)
22     Q   Sir, what I have just handed you is the

Page 15

1  written responses that you gave to the Senate
2  Foreign Relations Committee on June 19th, 2006
3  pursuant to your nomination to be Embassador to
4  Australia?
5      A   Uh-huh.
6      Q   Do you recognize this document?
7      A   I do recognize the first page. It
8  contains more than the question of Senator Luger.
9      Q   Right. It also contains responses to
10 questions from Senator Biden as well. I'd like to
11 focus your attention?
12     A   Just a second, if I can just look at it?
13     Q   I'd like to direct your attention on your
14 response to question number 4 from Senator Biden,
15 it's about halfway through the package, and I'm not
16 going to ask you now to read all of it but there
17 was -- let me ask you this question first. Did you
18 write these responses?
19     A   I did.
20     Q   In part of your response you talked about
21 an order that Judge Kessler issued on February 28th
22 that was Order Number 886 and you referred to the

Page 16

1  language that she used in that order where she
2  referred to the body blow that the Government's case
3  had been dealt by the D.C. Circuit; isn't that
4  correct?
5      A   That is correct. She did so refer.
6      Q   Were you aware of that opinion when it
7  came out?
8      A   I was.
9      Q   And --
10     A   And let me make sure that you are
11 understanding what I say. I was aware of the
12 Circuit Court opinion, then I was aware afterwards
13 that Judge Kessler had entered some order and I
14 don't know specifically that it was 886 or recall
15 that I knew that. I don't specifically recall
16 reading the order but I may have, but I was aware
17 that she was critical, if you will, of the arguments
18 that the Department of Justice lawyers had made in
19 response to some inquiry that she had made about
20 Judge Sentelle's opinion. I believe that -- that's
21 sort of a general recollection I had.
22     Q   As a result of being generally aware that

Page 17

1  she had been critical, did that cause you to get
2  more involved in what the Government filed?
3      A   Not to the extent of reviewing any
4  pleadings but I -- and I don't remember anything
5  specifically, but I do a have a general recollection
6  that I met with various members of the tobacco
7  litigation trial team about Judge Sentelle's opinion
8  and Judge Kessler's positions or reaction to it and
9  these discussions, gosh, occurred over -- it's not
10 on one occasion but on.
11     Q   Multiple occasions?
12     A   Multiple occasions that there were
13 discussions about the opinion, the position of the
14 trial judge and the consequences to the case and the
15 arguments that had been presented by or the -- not
16 the arguments but the positions that had been
17 articulated by Judge Sentelle and his opinion.
18     Q   Now, you have publicly identified yourself
19 as the individual who made the ultimate decision at
20 the Department of Justice about what the
21 Government's proposed remedy should be; isn't that
22 true?

Page 18

1   A   That is true.
2   Q   And at what point in time did you become
3   actively involved to the point that you felt you
4   were capable of making that decision?
5   A   Well, the question is my capacity to make
6   that decision. I'll take that as a question
7   regarding the legal capacity to make that decision
8   rather than the intellectual talent.
9   Q   No, I'm not in any way impeding your
10  intellectual talent?
11  A   To be able to do that or the legal
12  expertise or acumen to be able to determine what the
13  right decision was. I'm confident that there will
14  be different people that will have different
15  opinions as to my expertise and intellectual
16  capacity. However, when I became Associate Attorney
17  General it was clear that my legal capacity was to
18  resolve issues in which there might be differences
19  of opinion or different views expressed within
20  inside the Department of Justice. As those views
21  and opinions percolated up what I will call the
22  chain of command so that in your days when you were

Page 19

1   with the Civil Division in federal programs if the
2   branch director disagreed with a decision that you
3   made or had a different opinion with what you were
4   recommending then it would go to the Assistant
5   Attorney General in the Civil Division.
6       If you were still dissatisfied and thought
7   that it really deserves some greater consideration
8   it would go to the Associate Attorney General and
9   then to the Deputy and then to the Attorney General
10  and ultimately if it was important enough to the
11  President of the United States.
12  Q   Let me be a little clearer in my question.
13  I don't want to get bogged down in the decision
14  making processes of the department. What you have
15  described so far is a fairly sporadic involvement
16  with the day-to-day details of the tobacco
17  litigation; isn't that correct?
18  A   That's correct.
19  Q   And you also described a process where you
20  did not routinely read filings that the Government
21  made and even if you did you didn't have very
22  specific memories necessarily what any individual

Page 20

1   filing or even any individual ruling of the court
2   said; isn't that correct?
3       MS. OLSON: Object to your characterization of
4   what he just said, the record speaks for itself.
5   Q   I don't want to mischaracterize. What I'm
6   trying to understand is in order to make this final
7   decision on behalf Of the Department, did there come
8   a time that you emersed yourself more intensely of
9   the case, what was going on in the case, the
10  opinions of the court, et cetera?
11  A   That depends on how one would define
12  immersing one's self more intently.
13  Q   Well, more intently than what I have just
14  described that had been your practice up until this
15  point?
16      MS. OLSON: Well, I object to your
17  mischaracterization of what he just testified about.
18  Ask him a question and he'll answer it but don't
19  characterize --
20  Q   I've asked the question.
21      MS. OLSON: I object to the form of that
22  question it's vague, it's misleading, you've

Page 21

1   mischaracterized his testimony and I'll ask you to
2   rephrase the question so he can answer it properly.
3   Q   Do you understand the question?
4   A   Read it back to me now, I have forgot the
5   question.
6   Q   The last question?
7   A   So I'll then be able to tell you whether I
8   understand it or not.
9       (Record was read)
10  A   I don't understand the question because it
11  was the preceding questions or series of questions.
12  Q   That's fine. Let's go at it a different
13  way because it is not my intent to mischaracterize
14  your testimony. Let me be very clear about that?
15  A   All right.
16  Q   Let's talk about what you did do in order
17  to be able to reach that decision. Now you have
18  publicly referred to the fact that you got advice
19  from the criminal division or the Office of
20  Organized Crime -- the RICO -- the component of
21  criminal that dealt with RICO; is that not correct?
22  A   I did receive input from the Organized